## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM; ELECTRICAL WORKERS PENSION FUND LOCAL 103, I.B.E.W.; and LOCAL 103, I.B.E.W. HEALTH BENEFIT PLAN, Individually and on Behalf of All Others Similarly Situated, | Docket No. |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| BANK OF AMERICA, N.A.; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS SECURITIES CORP.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE AG; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC.; FIRST TENNESSEE BANK, N.A.; FTN FINANCIAL SECURITIES CORP.; GOLDMAN SACHS & CO. LLC; JPMORGAN CHASE BANK, N.A.; J. P. MORGAN SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INC; AND UBS SECURITIES LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

City of Birmingham Retirement and Relief System; Electrical Workers Pension Fund Local 103, I.B.E.W.; and Local 103, I.B.E.W. Health Benefit Plan (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, complain upon knowledge as to their own acts and upon information and belief as to all other matters, against Defendants (defined below) for their violations of law from at least January 1, 2009 through April 27, 2014 (the "Class Period") as follows:

## INTRODUCTION

1.     Defendants are horizontal competitors and the dominant dealers of debt issued by the Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage

Corporation ("Freddie Mac").  These financial instruments are collectively referred to herein as "FFBs," short for Fannie and Freddie bonds.  FFBs refer to unsecured issuances, and do not include the mortgage-backed securities issued by Fannie Mae and Freddie Mac.

2.     During the Class Period (defined above), Defendants were the largest players in the process that Fannie Mae and Freddie Mac use to issue FFBs (the "FFB Issuance Process")[1] which gave Defendants control over FFB supply ultimately available to investors.

3.     The U.S. Department of Justice ("DOJ") Antitrust Division is currently pursuing a criminal investigation into price-fixing in the secondary market for FFBs, where Defendants are the largest dealers in terms of the volume of FFBs they sell to, and buy from, investors.  Multiple sources indicate that the investigation focuses on antitrust and fraud violations in connection with the activities of bank traders in the $550 billion secondary market.

4.     The secondary market for FFBs is a vast "over-the-counter" ("OTC") market.  Unlike stocks, by contrast, FFBs are not traded on a national exchange.  In order to buy or sell FFBs, an investor must typically communicate directly with a salesperson or trader employed by a dealer over computer networks and/or by phone to receive a price quote.  An OTC market is therefore a dark market that enables a few select, knowledgeable, and privileged dealers to collude and harm investors – especially as compared to stock markets with a multitude of banks and investors and other agents able to see public information updated in real-time as they trade.

5.     Consistent with the DOJ Antitrust Division's investigation, empirical, economic price data and other market facts demonstrate that Defendants used their control over FFB supply

---

[1]     Defendants' status as dominant players in the FFB Issuance Process is relevant here because it provided Defendants with a common financial incentive and sufficient control of FFB supply to fix FFB prices paid by investors.  It also provides an opportunity to collude.  However, by this Complaint, Plaintiffs are not advancing claims based on price-fixing in the FFB Issuance Process, which is described in more detail in Part I, below.

to fix the prices of these instruments, causing Plaintiffs and the Class to pay too much (when buying FFBs) and receive too little (when selling FFBs) on their FFB transactions during the Class Period.

6.       Plaintiffs obtained pricing data for over 13,117 unique FFBs and a total of 1.6 million FFB transactions.  The price data and other market data reveal highly anomalous FFB pricing.  The economic facts are consistent with price-fixing of the FFBs which Defendants traded with their customers during the Class Period.

7.       First, the economic facts strongly suggest an agreement by Defendants to charge inflated, supracompetitive prices for *newly issued* FFBs that they sold to investors after acquiring them from Fannie Mae or Freddie Mac.  Inflating prices after FFB issuances was lucrative for Defendants because a large volume of their FFB sales occurred in the week following an FFB issuance.  Consequently, each Defendant had the common motive to inflate the prices of these products by charging agreed-upon, supracompetitive prices to investors after acquiring FFBs from Fannie Mae or Freddie Mac.

8.       Second, the economic facts strongly suggest coordination amongst Defendants to inflate the prices of *older* FFBs in the days prior to each new FFB issuance.  This acted to drive the market price of new FFBs artificially higher by establishing an inflated benchmark for comparison so that Defendants could earn excess, unlawful profits once they had new FFB inventory to sell.

9.       Third, throughout the Class Period, the market and pricing data strongly suggest Defendants, rather than competing with each other for investors' FFB transactions, agreed to inflate the prices at which they sold FFBs to investors (the "ask" price), or deflated the price at which they purchased FFBs from investors (the "bid" price), or both.  Observation of the bid-ask

spreads that Defendants charged during the Class Period in comparison with the bid-ask spreads that Defendants charged after the Class Period shows that, after the Class Period, when Defendants' alleged conspiracy had ceased to operate, bid-ask spreads in the FFB market markedly decreased for no other apparent economic reason, which is consistent with an unlawful conspiracy amongst Defendants to fix bid-ask prices during the Class Period.

10.     Tellingly, the patterns of these three behaviors are observed to statistically diminish after April 2014 following the increase in oversight and scrutiny of banks' fixed income operations in the wake of the LIBOR scandal, when multiple government regulators forced Defendants to institute internal controls to deter a recurrence of widespread anticompetitive conduct in their sales and trading businesses, as well as the publicity surrounding the criminal investigation into banks' manipulation of the foreign exchange ("FX") market.

11.     Defendants thus colluded to manipulate prices in the secondary market to extract supra-competitive profits for themselves at the expense of Plaintiffs and Class members. Defendants' conspiracy systematically raised their profits earned from dealing FFBs at the expense of their customers – investors who traded FFBs with Defendants and who were repeatedly overcharged and underpaid due to Defendants' anticompetitive conduct.

12.     Investors typically were drawn to FFBs for their safety and liquidity.  FFBs are not perceived to be risky investments, and their returns to investors reflect this fact.  Investors did not bargain for the overcharges and underpayments that the Defendant banks caused.

13.     Defendants' alleged agreement to restrain trade in the FFB market is another instance of collusion and price-fixing in financial markets by these same Defendants during the same period of time.  Given the persistent, pervasive, and secret nature of Defendants' conspiracy, as well as the existence of ongoing governmental investigations into the misconduct alleged herein,

Plaintiffs believe that further evidentiary support for their claims will be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, respectively, and pursuant to 28 U.S.C. §1331.

15.     Venue is proper in this District, pursuant to, among other statutes, Sections 4, 12, and 16 of the Clayton Act; 15 U.S.C. §§15, 22, and 26; and 28 U.S.C. §1391(b), (c) and (d).  During the Class Period, each Defendant resided, transacted business, was found, or had agents in the District; a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District, as more particularly alleged in Part II, below.  For example, Defendants Barclays Capital Inc., Merrill Lynch Pierce Fenner & Smith, Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Goldman Sachs & Co. LLC, JPMorgan Chase Bank, N.A., J. P. Morgan Securities LLC, BNP Paribas Securities Corp., and UBS Securities LLC are headquartered in this District. Defendants Barclays Bank PLC, First Tennessee Bank, National Association, FTN Financial Securities Corp, and Credit Suisse AG conduct business in this District through their subsidiaries as agents and through branch offices located in this District, as more particularly alleged below.

16.     This Court has personal jurisdiction over each Defendant. As alleged below, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and the United States.  Defendants conspired to fix the prices of FFBs that Defendants traded in this District and with customers located in the United States.  Defendants' price-fixing conspiracy harmed investors

in this District and throughout the United States by causing them to pay more for their FFB purchases and receive less on their FFB sales than they would have in a competitive market.

17.     Defendants, either themselves or through their subsidiaries as agents, purposefully availed themselves of doing FFB business in the United States and in this District by, *inter alia*: (a) enacting their conspiracy here by charging artificial, agreed-upon prices in FFB transactions with investors in this District and throughout the United States; and (b) collecting unlawful overcharges from investors in this District and throughout the United States.

## PARTIES

18.     Plaintiff City of Birmingham Retirement and Relief System ("Birmingham") is a public pension fund created by statute that provides retirement, disability, and survivor benefits to eligible civil service employees, elected officials, and appointed employees of the City of Birmingham, Alabama.   Throughout the Class Period, Birmingham participated in FFB transactions directly with Defendants Citigroup Global Markets Inc.; Deutsche Bank AG; First Tennessee Bank, N.A.; First Tennessee Securities, Inc.; and Merrill Lynch, Pierce, Fenner & Smith Inc.   Birmingham suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix the prices of FFBs.

19.     Plaintiff Electrical Workers Pension Fund Local 103, I.B.E.W. ("IBEW 103 Pension Plan") is a defined benefit retirement plan that currently provides benefits to over 2,500 retired participants.  IBEW 103 Pension Plan manages more than $1 billion in assets.

20.     Plaintiff Local 103, I.B.E.W. Health Benefit Plan ("IBEW 103 Health Plan") is a health plan that currently provides benefits to over 16,500 lives including participants and their families.  Participants are covered by a comprehensive benefits program designed to protect and

provide for each Participant and their family through a broad range of unexpected events and extraordinary expenses.

21.     IBEW 103 Pension Plan and IBEW 103 Health Plan are designed to provide financial stability and benefit security for all Local 103 members.  IBEW Pension Plan and IBEW Health Plan are referred to collectively as "IBEW 103."

22.     Throughout the Class Period, IBEW 103 participated in FFB transactions directly with Defendants Bank of America, N.A., Barclays Capital, Inc.; BNP Paribas Securities Corp.; Citigroup Global Markets Inc.; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; Goldman Sachs & Co. LLC; J. P. Morgan Securities LLC; and UBS Securities LLC. IBEW 103 suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix the prices of FFBs.

23.     **Barclays**: Defendant Barclays Bank PLC, operating under the trade name "Barclays Investment Bank," is headquartered in London, England and provides investment banking advisory services, foreign exchange securities lending, and loan syndication services through at least three offices in the United States, including its New York Branch located in this District.  Barclays Bank PLC's macro market line of business is supported by trading desks that specialize in dealing FFBs. Barclays Bank PLC is a direct, wholly owned subsidiary of Barclays PLC, a multinational financial services corporation.

24.     During the Class Period, Plaintiffs purchased and/or sold FFBs from Barclays Bank PLC and Barclays Capital, Inc.

25.     Defendant Barclays Capital Inc. ("BCI") is a wholly owned subsidiary of Barclays Bank PLC, incorporated in the state of Connecticut, with its headquarters in New York, New York and domestic branch offices in at least 15 other U.S. cities.  BCI is the main U.S. broker-dealer

entity for the Barclays group of entities and is a U.S. registered securities broker-dealer with the SEC; a futures commission merchant, a commodity pool operator, a commodity trading advisor registered with the Commodity Futures Trading Commission ("CFTC"); and a municipal advisor registered with the SEC.  BCI is registered as a "4(k)(4)(E)" securities subsidiary under the Bank Holding Company Act, which permits it to engage in securities underwriting, dealing, and market-making activities.

26.     BCI's activities include transactions in asset-backed securities, agency mortgage-backed securities, debt securities, other corporate related securities, equities, resale and repurchase agreements, securities lending and borrowing, and clearing derivative products.  It is an approved dealer for both Fannie Mae and Freddie Mac, providing BCI access to FFB supply through the FFB Issuance Process.  As of December 31, 2017, BCI held $8.5 billion in agency securities, a category that includes FFBs.[2]  During the Class Period, BCI employees located in this District priced, marketed, and dealt FFBs to members of the Class.

27.     BCI performed its FFB business in the United States and in this District with the knowledge and consent of, for the benefit of, and under some control by Barclays Bank PLC as alleged below.

28.     BCI conducts FFB-related activities, including FFB dealing with investors, as part of Barclays Bank PLC's "Barclays Investment Bank" division. Barclays Investment Bank (which includes both Barclays Bank PLC and BCI) maintains a website in the United States where it advertises that "We serve our institutional investor clients by helping them to understand

---

[2]     The terms "agency securities" and "agency bonds" are catch-all terms sometimes used to refer to debt instruments issued by agencies of the United States Federal government and entities sponsored by the Federal government, like Fannie Mae and Freddie Mac.  These terms include FFBs.

developments in global markets and offering execution and risk management tools across each major asset class."  One of the ways in which Barclays Bank PLC serves its institutional investor clients is by transacting in FFBs with investors like Plaintiffs through its wholly owned subsidiary and main broker-dealer in the Barclays Investment Bank division, BCI.  For example, Barclays Bank PLC wrote that Barclays Investment Bank "integrates our primary offering capabilities on behalf of issuer clients (*e.g.*, BCI's FFB underwriting activities in the FFB Issuance Process) with **our** secondary trading capabilities on behalf of **our** investor clients (*e.g.*, BCI's FFB transactions with investors including Treasury)" (emphasis added).  These allegations show that BCI transacted in FFBs in the United States with the knowledge and consent of Barclays Bank PLC.

29.     BCI conducted FFB-related activities for the benefit of Barclays Bank PLC, including from its headquarters in this District. Barclays PLC, the ultimate parent of both BCI and Barclays Bank PLC, reports its results on a consolidated basis and describes its operations using the term "Barclays or Group" to refer to "Barclays PLC together with its subsidiaries."  In its financial reports, Barclays PLC consolidates trading revenues generated by BCI and Barclays Bank PLC, including transactions in FFBs, in the entry "net trading income."  Barclays PLC also incentivized BCI employees to perform activities on its behalf, including trading in FFBs with investors, by establishing a share-based compensation plan that rewards BCI employees with shares of Barclays PLC stock based on performance.

30.     Barclays Bank PLC exercises control over BCI. For example, Gerard LaRocca is President of BCI, but is also the New York branch manager of Barclays Bank PLC's New York office.  In mid-March 2012, Barclays Bank PLC reorganized BCI to absorb it into its Barclays Investment Bank division.  Barclays Investment Bank is a division of Barclays Bank PLC that includes BCI's FFB-related activities.   Barclays Investment Bank maintains a New York

headquarters at 745 7th Avenue in New York, NY.  BCI is headquartered at the same location in the same office.  The Global Head of Market Risk, who is responsible for managing risk across all of Barclays Bank PLC's Barclays Investment Bank division, also manages market risk for BCI and is a Board Director of BCI.  Edvard "Ed" Olsen is the Managing Director and Head of Compliance for Barclays Bank PLC's Barclays Investment Bank division, and is also the Chief Compliance Officer for BCI, demonstrating that Barclays Bank PLC exercises control of compliance and oversight functions for BCI.  BCI staff report to senior managers in Barclays Bank PLC's Barclays Investment Bank division, who monitor their performance and make decisions concerning their compensation and advancement.

31.     Barclays Bank PLC also determines and publishes the terms that apply to BCI's FFB transactions with investors in the United States, further demonstrating Barclays Bank PLC's control over BCI's FFB trading and sales activities in this District and the United States.

32.     **Bank of America/Merrill Lynch**: Defendant Bank of America, N.A. ("BANA") is an American global bank and financial services company incorporated in Delaware and headquartered in Charlotte, North Carolina with operations in all 50 states.  Bank of America Corporation, the parent company of BANA, completed its purchase of Defendant Merrill Lynch, Pierce, Fenner, & Smith, Inc. ("Merrill Lynch") on January 1, 2008 and continued operating its debt and equity underwriting sales and trading business after that date by merging Merrill Lynch with Bank of America Corporation's former broker-dealer subsidiary, Banc of America Securities LLC. Bank of America Corporation also assumed all liabilities and obligations of Merrill Lynch on October 1, 2013.

33.     Bank of America Corporation reports its financial position on a consolidated basis, which includes the activities of both BANA and Merrill Lynch.  As of December 31, 2017, Bank

of America Corporation held over $440 billion in debt securities, including FFBs.  During the Class Period, Bank of America Corporation performed investment banking activities, including dealing FFBs to investors, through its wholly owned subsidiary Merrill Lynch.

34.     Defendant Merrill Lynch is a wholly owned indirect subsidiary of Bank of America Corporation and a corporate affiliate of BANA.  Merrill Lynch is incorporated in Delaware, with its principal place of business in New York, New York.  Merrill Lynch acts as a broker and a dealer in the purchase and sale of various financial instruments, including FFBs throughout the United States and in this District.  It provides underwriting services and is registered as a broker-dealer and investment advisor with the SEC.  Merrill Lynch is the primary broker-dealer for the Bank of America Corporation corporate family, including BANA, and prices, markets, and sells FFBs on behalf of BANA.

35.     During the Class Period, Plaintiffs purchased and/or sold FFBs from both BANA and Merrill Lynch.

36.     As of December 31, 2017, Merrill Lynch held over $440 billion in U.S. Treasury and government agency securities, a category that includes FFBs.  Merrill Lynch was an approved dealer for both Fannie Mae and Freddie Mac throughout the Class Period.

37.     Bank of America Corporation is responsible for internal controls, compliance, and oversight for both BANA and Merrill Lynch.  It handles "Fixed Income Compliance," which includes monitoring and detecting unlawful conduct within Merrill Lynch's and BANA's sales and trading businesses, including Merrill Lynch's and BANA's FFB dealing activities.

38.     **Citi**: Citigroup, Inc. is a global banking institution headquartered in New York, New York.  It is the ultimate parent of its wholly owned dealer-subsidiary, Defendant Citigroup Global Markets Inc. ("CGMI").  As of December 31, 2017, Citigroup Inc. reported that "fair value

levels" of all "U.S. Treasury and federal agency securities" held by itself and its subsidiaries (including CGMI) was approximately $21 billion.

39.     CGMI is a New York corporation with its principal place of business in New York, New York.  CGMI has been registered with the SEC since 1960 as both an investment adviser and a broker-dealer.  CGMI currently has approximately 43,000 advisory accounts and $22 billion USD in regulatory assets under management.[3]  During the Class Period, CGMI dealt FFBs to investors, including Plaintiffs, from offices located in this District.

40.     Citigroup Inc. manages internal controls, oversight, and compliance for CGMI.  In this capacity, it is responsible for monitoring CGMI's activities and detecting violations of law, including CGMI's FFB-related activities.

41.     As of June 18, 2018, CGMI reported that it has assets of approximately $17 billion in U.S. Treasury and federal agency securities (a category that includes FFBs), and over $20 billion in liabilities of the same.

42.     During the Class Period, Plaintiffs purchased and/or sold FFBs from CGMI.

43.     **Credit Suisse**: Defendant Credit Suisse AG ("CS AG") is a multinational banking and financial services company which engages in banking, finance, consultancy, and trading activities in the United States and worldwide.  CS AG has a primary U.S. office located in New York, New York referred to as "Credit Suisse AG, New York Branch."  Credit Suisse AG, New York Branch ("CS NY") is a legal and operational extension of CS AG in the United States and is not a separately incorporated entity.  CS NY is a primary dealer in U.S. government securities and trades with the Federal Reserve Bank of New York in this District in agency debt, which includes

---

[3]     The SEC defines regulatory assets under management as "securities portfolios for which you provide continuous and regular supervisory or management services."

FFBs.  Through its New York Branch, CS AG serves as a dealer in U.S. government and agency securities, including FFBs.

44.     CS AG has direct and indirect subsidiaries based in the United States, including Defendant Credit Suisse Securities (USA) LLC. CS AG is registered to do business in New York with the New York State Department of Financial Services.  As of October 2017, CS AG held over $1 billion in FFBs.

45.     Defendant Credit Suisse Securities (USA) LLC ("CS Securities") is a wholly owned subsidiary of Credit Suisse AG, organized under the laws of Delaware with its principal place of business in New York, New York.  CS Securities is a "Material Legal Entity" according to CS AG's latest U.S. Resolution Plan, described as the "U.S. broker dealer" and "main U.S. operating company" of CS AG.  It is a U.S. registered broker-dealer, providing capital raising, market making, advisory, and brokerage services.  It is an underwriter, placement agent, and dealer for money market instruments, mortgage and other asset-backed securities, as well as a range of debt, equity, and other convertible securities of corporations and other issuers.  Until November 2017, CS Securities was a primary dealer in U.S. government securities.  In November 2017, CS Securities transitioned its primary dealer license and a substantial portion of its U.S. Government and Agency Primary Dealership, secondary market trading, and repo market making to Credit Suisse AG, New York Branch.  CS Securities is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB dealing inventory that it used in transactions with investors.

46.     CS AG manages internal controls, oversight, and compliance for CS Securities. In this capacity, it is responsible for monitoring CS Securities' activities and detecting violations of law, including CS Securities' FFB dealing activities.

47.     During the Class Period, Plaintiff IBEW 103 purchased and/or sold FFBs from Credit Suisse Securities (USA) LLC.

48.     **Deutsche Bank**. Deutsche Bank AG ("DB AG") is a multinational bank that provides services in commercial banking, investment banking, and retail banking, as well as wealth and asset management products to corporations, governments, institutional investors, small and medium-sized businesses, and private individuals.  DB AG engages in U.S. banking activities directly through its New York branch, which is based in this District. It also operates in this District through its U.S.-based subsidiaries including Deutsche Bank Securities Inc.  DB AG describes Deutsche Bank Securities Inc. as its "principal U.S. SEC-registered broker-dealer subsidiary."  As of October 2018, DB AG held $361 million in FFBs.

49.     Defendant Deutsche Bank Securities Inc. ("DB Securities"), formerly known as Deutsche Banc Alex. Brown Inc., is a wholly owned subsidiary of Deutsche Bank AG.  It is incorporated in Delaware with its principal place of business in New York, New York.  DB Securities is a registered securities broker-dealer and investment advisor with the SEC, a futures commission merchant with the CFTC, and a member of FINRA.  DB Securities provides capital raising, market making, and brokerage services for its governmental, financial institution, and corporate clients.  As of December 31, 2017, DB Securities held over $2 billion in U.S. Government agency obligations, a category that includes FFBs.  DB Securities is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB inventory to trade with investors.  During the Class Period, DB Securities employed trading and sales staff who priced, marketed, and dealt FFBs to members of the Class, including Plaintiffs, from within this District.

14

50.     DB AG manages internal controls, oversight, and compliance for DB Securities and all other DB AG subsidiaries.  In this capacity, it is responsible for monitoring DB Securities' activities and detecting violations of law, including by DB Securities' FFB dealing businesses.

51.     During the Class Period, Plaintiffs purchased and/or sold FFBs from DB AG and Deutsche Bank Securities, Inc.

52.     **Goldman Sachs**: Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") is a wholly owned subsidiary of Goldman Sachs Group Inc., organized under New York Law with its principal place of business in New York, NY.  Goldman Sachs is a registered broker-dealer with the SEC and trades financial products in all 50 states and the District of Columbia.  It is registered with the CFTC as a futures commission merchant and a swap dealer.  As of December 2016, Goldman Sachs held over $44 billion in U.S. government and federal agency obligations, a category that includes FFBs.  Goldman Sachs is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB inventory.

53.      During the Class Period, Goldman Sachs employed FFB trading and sales staff based in the United States and in this District, who priced, marketed, and dealt FFBs to investors, including Plaintiffs.

54.     Goldman Sachs Execution & Clearing, L.P. was a wholly owned subsidiary of Goldman Sachs Group, Inc. that offered trade execution and clearing services to other subsidiaries within the Goldman Sachs brand.  Goldman Sachs Execution & Clearing, L.P. also executed FFB trades with Plaintiffs and members of the Class at artificial prices during the Class Period, until it was acquired by Goldman Sachs in or around August 2017.

55.     During the Class Period, Plaintiff IBEW 103 purchased and/or sold FFBs from Goldman Sachs & Co.

56.     **JPMorgan**: Defendant JP Morgan Chase Bank, National Association ("JP MNA") is a wholly owned "principal subsidiary" of JPMorgan Chase & Co., headquartered in New York, New York.  It is a national banking association with branches in at least 23 U.S. states.  As of February 2, 2018, JP MNA held over $1.7 billion in U.S. government agency and U.S. government-sponsored agency debt securities, a category that includes FFBs.  During the Class Period, JP MNA traded FFBs with members of the Class from within this District.

57.     Defendant J.P. Morgan Securities LLC ("JPMS"), previously known as J.P. Morgan Securities Inc., is a Delaware limited liability company with its headquarters in New York. It is a wholly owned and "principal" subsidiary of JPMorgan Chase & Co., which is also the parent company of JP MNA.  JPMS is registered with the SEC as a broker-dealer and investment advisor and registered with the CFTC as a futures commission merchant.  JPMS acts as a primary dealer in U.S. government securities, makes markets in FFBs, and clears OTC derivative contracts in connection with its corporate affiliates' market-making and risk management activities.  JPMS is an approved dealer for both Fannie Mae and Freddie Mac, providing access to FFB inventory through the FFB Issuance Process that JPMS and its affiliates, including JP MNA, use when dealing FFBs to investors.  During the Class Period, JPMS dealt FFBs to members of the Class, including Plaintiffs, from offices located in this District.

58.     On October 1, 2016, JPMS acquired J.P. Morgan Clearing Corp., which was known as Bear Stearns Securities Corp. until October 2008. J.P. Morgan Clearing Corp. offered execution and clearing services for corporations affiliated under the "JPMorgan" brand name, and, in that capacity executed FFB for trades members of the Class at artificial prices.

59.     JPMorgan Chase & Co. manages internal controls, oversight, and compliance for its subsidiaries including JP MNA and JPMS.  In this capacity, it is responsible for monitoring

16

JPMorgan Chase & Co.'s Fixed Income business unit, which encompasses JP MNA's and JPMS' FFB-related activities.

60.     During the Class Period, Plaintiffs purchased and/or sold FFBs from JPMS.

61.     **UBS**: UBS AG is a multinational banking and financial services corporation which engages in banking, financial, advisory, and trading service activities worldwide.   It is headquartered in Basel, Switzerland.  UBS AG maintains several branch and representative offices in the U.S. and is registered as a swap dealer with the CFTC.  UBS AG reports that it conducts securities activities in the United States primarily through UBS Securities LLC.  As of October 2018, UBS AG held over $304 million in FFBs.

62.     Defendant UBS Securities LLC ("UBS Securities") is an indirect, wholly owned subsidiary of UBS AG with its principal place of business in New York, New York.  It is a registered broker-dealer under the Securities Exchange Act of 1934 and is a member of the New York Stock Exchange, FINRA, NASDAQ, and other principal exchanges.  UBS Securities provides a full range of investment banking services, including trading and sales and prime brokerage operations.

63.     As of December 31, 2017, UBS Securities held over $5.7 billion in U.S. government and agency obligations, a category that includes FFBs.  UBS Securities is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB inventory through the FFB Issuance Process.  During the Class Period, UBS Securities priced, marketed, and dealt FFBs to investors from offices located in this District.

64.     UBS AG manages internal controls, oversight, and compliance for UBS Securities. In this capacity, it is responsible for monitoring UBS Securities' activities and detecting violations of law, including by UBS Securities' FFB dealing businesses.

65.     During the Class Period, Plaintiff IBEW 103 purchased and/or sold FFBs from UBS Securities LLC and UBS Financial Services Inc.

66.     **First Tennessee**: Defendant First Tennessee Bank, N.A. ("First Tennessee") is a financial services company based in Memphis, Tennessee.  It operates a large debt capital markets division that focuses on public issuers such as Fannie Mae and Freddie Mac and on trading and selling debt instruments to institutional investors such as Plaintiffs and members of the Class.  First Tennessee calls this division "FTN Financial Capital Markets."

67.     First Tennessee is registered with the SEC as a broker-dealer in government securities.  As of December 31, 2012, First Tennessee and its subsidiaries, including FTN Financial Securities Corp., held over $3 million in government agency securities, a category that includes FFBs.  During the Class Period, either independently and/or through FTN Securities Corp., First Tennessee priced, marketed, and dealt FFBs to investors in this District during the Class Period.

68.     Defendant FTN Financial Securities Corp. ("FTN Financial") is a wholly owned subsidiary of First Tennessee and operates as part of First Tennessee's FTN Financial Capital Markets division.  It is one of the largest underwriters of FFBs and dealt FFBs to institutional investors.

69.     FTN Financial performed FFB business in this District with the knowledge and consent of, for the benefit of, and under some control by First Tennessee, as alleged below.

70.     Both First Tennessee and FTN Financial comprise First Tennessee's FTN "Financial Capital Markets division" and as such, conduct mutually beneficial FFB-related activities.  First Tennessee acquires FFBs in the primary market by serving as an underwriter in the FFB Issuance Process.  FTN Financial is described as "our capital markets business" on the Annual Report for First Tennessee and their mutual parent holding company, First Horizon

National Corp. ("First Horizon").  In this capacity, FTN Financial provides FFB dealing services to investors, selling and trading FFBs acquired by First Tennessee.  As described on the Annual Report, "FTN Financial provides a broad spectrum of financial services for the investment and banking communities through the integration of traditional capital market securities activities, loan sales, portfolio advisory services, and derivative sales."

71.     First Tennessee and FTN Financial operate as a single integrated unit, with operations by FTN Financial advertised under the same trade name and on the same website as First Tennessee.  FTN Advisors is the trade name for wealth management products and services provided by First Tennessee and its affiliates.  The FTN Advisors website represents itself as an advisor and seller of agency bonds, a category that includes FFBs.  The FTN Financial website advertises that, "whether it's providing mortgage trading, underwriting agency debt, providing customized portfolio strategies or more, we serve approximately 4,700 institutional customers in more than 50 countries."  The FTN Financial website boasts that "we are backed by $2.9 billion in capital as a division of First Tennessee Bank, N.A., which we don't hesitate to put behind every underwriting in which we participate," indicating that First Tennessee consented to and benefits from FTN Financial's FFB-related business activities.

72.     First Tennessee reports its results on a consolidated basis, under its holding company, First Horizon, which uses the overarching terms "our" and "we" to describe First Tennessee and FTN Financial, with both explicitly listed as comprising "our core business."  In its financial reports, First Horizon consolidates revenues generated by First Tennessee and FTN Financial.

73.     FTN Financial has a significant FFB-related business presence in this District. For example, its Research Division markets FFBs from offices located at FTN Financial's offices at 444 Madison Avenue, 9th Floor, New York, NY 10022.

74.     During the Class Period, Plaintiff Birmingham purchased and/or sold FFBs from First Tennessee Bank, N.A. and First Tennessee Securities, Inc.

75.     **BNP Paribas**: BNP Paribas S.A. ("BNPP SA") is one of the world's largest global banking organizations.  It does business in 75 countries and employs over 180,000 people, including approximately 15,000 in the U.S. As of December 31, 2012, BNPP SA and its subsidiaries held approximately €69 trillion ($90 trillion) government bonds, a category that includes FFBs.  In the year 2012, it sold €93 trillion ($121 trillion) in government bonds, including FFBs.

76.     Defendant BNP Paribas Securities Corp. ("BNP Securities") is an indirect, wholly owned subsidiary of BNPP SA, headquartered in New York, New York.  BNP Securities is a registered broker-dealer with the SEC.  It is BNPP SA's "main broker dealer" in the U.S., and it is its most significant subsidiary in terms of assets, revenue, head count, and capital.

77.     BNP Securities is a primary dealer in U.S. government securities and an approved dealer for both Fannie Mae and Freddie Mac.  BNP Securities traded FFBs with investors in the United States from offices located in this District during the Class Period.  BNP Securities' broker-dealer business is composed overwhelmingly of highly liquid assets, including U.S. Treasury securities and agency debt (a category that includes FFBs).

78.     BNPP SA manages internal controls, oversight, and compliance for BNP Securities.  In this capacity, it is responsible for monitoring BNP Securities' activities and detecting violations of law, including by BNP Securities' FFB dealing business.

79.     During the Class Period, Plaintiff IBEW 103 purchased and/or sold FFBs from BNP Paribas Securities Corp.

80.     Defendants Merrill Lynch, JPMS, FTN Financial, CGMI, CS Securities, BCI, DB Securities, UBS Securities, Goldman Sachs, and BNP Securities are approved dealers for debt securities issued by both Fannie Mae and Freddie Mac.  During the Class Period, these Defendants had access to FFB supply through the FFB Issuance Process that is described in Part I.C, below, which they used to acquire FFB inventory to deal to investors.  These Defendants are collectively referred to as "Approved FFB Dealer Defendants."

**SUBSTANTIVE ALLEGATIONS**

I.      **BACKGROUND**

    A.      **Fannie Mae and Freddie Mac**

81.     Fannie Mae and Freddie Mac are "government-sponsored entities" ("GSEs"). GSEs are privately run enterprises sponsored by the Federal government and established for a public purpose.  Congress created Fannie Mae and Freddie Mac to provide liquidity, stability, and affordability in the national residential mortgage market.  They provide liquidity (ready access to funds on reasonable terms) to banks and mortgage companies that make residential mortgage loans to consumers with the goal of making mortgage loans more affordable for consumers.

82.     Fannie Mae and Freddie Mac finance operations by issuing FFBs.  FFB issuances occur several times a month, typically in a predictable pattern based on a pre-determined calendar. The great majority of newly issued FFBs have similar or identical characteristics as existing FFBs except that they mature on a later date.

83.     Each FFB issue is identified with a unique nine-digit alphanumeric code known as a Committee on Uniform Security Identification Procedures number ("CUSIP number").  The

CUSIP number identifies specific provisions of each bond issue precisely, such as issuer, coupon, issue date, maturity, and call provisions.

      **B.**      **Characteristics of FFBs**

      84.      All FFBs have core similarities that distinguish them as a single class of issuances.

      85.      FFBs are all issued by Fannie Mae and Freddie Mac, and therefore carry substantially similar levels of "credit risk."  Credit risk is the risk that Fannie Mae or Freddie Mac will default on its repayment obligations.  Unlike U.S. Treasury bonds and bonds issued by certain federal agencies, FFBs are not backed by the full faith and credit of the United States government, meaning they are not guaranteed by the federal government.  Credit risk is generally low for FFBs, however, because GSEs benefit from a perceived tie to the federal government as institutions established under federal legislation.  In September 2008, the Federal Housing Finance Agency became the conservator of Fannie Mae and Freddie Mac.  Accordingly, debt issued by GSEs generally have high credit quality.  The senior debt of the GSEs is rated AAA/Aaa, while the subordinated debt of Fannie Mae and Freddie Mac is rated AA-/Aa-.

      86.      FFBs are unregulated, unregistered OTC issuances that are exempt from the registration and disclosure provisions of the federal securities laws.

      87.      All Defendants operate trading desks that specialize in FFB trading and sales. Within each Defendant's sales and trading business, the same team that deals one type of FFB to investors also deals all other kinds of FFBs.  Thus, the same employees within each Defendant's FFB trading and sales business determine prices charged to investors in FFB transactions for all types of FFBs.

      88.      FFBs also have other common features.  These include face value, maturity, and coupon payment, explained below.  Collectively, these characteristics are used to determine an

FFB's "yield to maturity," which is the annual return that the holder of an FFB earns from the instrument.

89. The amount of money that Fannie Mae or Freddie Mac owes to the holder of an FFB upon maturity is known as the "face value," and the length of time between when an FFB is issued and when an FFB matures is known as its "maturity." The most recently issued FFBs are known as "on-the-run" FFBs, while all other, older FFBs with similar characteristics are known as "off-the run" FFBs.

90. Most FFBs pay a fixed rate of interest or fixed coupon rate semi-annually. Some FFBs pay a variable or floating coupon rate that adjusts periodically based on a designated index. Fixed-rate FFBs have fixed interest rates and fixed maturities. If held to maturity, they preserve their principal and offer certainty of cash flow. Prior to maturity, however, the market value of fixed-rate FFBs fluctuates with changing interest rates. In a falling-rate environment, market values will rise, creating the potential for capital gains. In a rising-rate environment, prices will fall, creating the risk of loss when securities are sold prior to maturity.

91. Medium-term FFBs (FFBs with maturities between 2 years and 10 years) and long-term FFBs (FFBs with maturities longer than 10 years) can also offer periodic interest payments known as "coupons." FFB coupon payments occur semi-annually and are calculated by multiplying the interest rate specified for the FFB (*e.g.*, 5%) by the FFB's face value (*e.g.*, $100,000). Thus, a coupon-bearing FFB with a face value of $100,000 and a 5% coupon payment would entitle the holder to two annual interest payments of $2,500, for a total of $5,000 per year, until maturity. At maturity, Fannie Mae or Freddie Mac pays the holder the face value specified in the FFB.

92.     Short-term FFBs do not offer coupon payments.  Instead, short-term FFBs are issued at a discount to face value.  The difference between the price paid and the face value due upon maturity represents the interest that the FFB purchaser earns in exchange for buying the short-term FFB.  For example, assume a purchaser pays $98,382.75 to purchase a short-term FFB with a face value of $100,000 that matures in 120 days.  When the purchaser redeems the FFB at maturity, it receives the full $100,000 face value from Fannie Mae or Freddie Mac, $1,617.25 more than what it paid to purchase that FFB.  The extra $1,617.25 represents the amount of interest that Fannie Mae or Freddie Mac paid to borrow $98,382.75 for 120 days, or approximately 5% annually.

93.     Most FFBs are non-callable or "bullet" bonds, but Fannie Mae and Freddie Mac also issue callable FFBs that can be redeemed by the issuer prior to maturity.

## C.     The FFB Market

94.     Fannie Mae and Freddie Mac issue FFBs by selling them directly to an exclusive, pre-approved group of "Approved FFB Dealers."  Approved FFB Dealers buy FFBs from Fannie Mae and Freddie Mac so that they can profit from trading FFBs with investors, such as Plaintiffs and the Class, in the secondary market.

95.     Thus, the FFB market is structured as a three-tiered pyramid with Fannie Mae and Freddie Mac at the top, Approved FFB Dealers in the middle, and investors like Plaintiffs and the Class at the bottom.  Figure 1, below, illustrates the structure of the FFB market.  The black arrows represent FFB supply.  First, Fannie Mae and Freddie Mac issue FFBs to Approved FFB Dealers.  Next, Approved FFB Dealers trade FFBs with investors like Plaintiffs and the Class.  Approved FFB Dealers also trade FFBs with other dealer banks who in turn trade FFBs with investors like Plaintiffs and the Class.

**FIGURE 1**

**THE STRUCTURE OF THE FFB MARKET**



96.     Fannie Mae and Freddie Mac issue FFBs using two methods. Most medium- and long-term FFBs are issued in what is known as a "syndication."  In a syndication, a subset of Approved FFB Dealers (known as a "syndicate") underwrite the FFB issuance together by agreeing to purchase the newly issued FFBs from Fannie Mae or Freddie Mac.

97.     Fannie Mae and Freddie Mac also issue FFBs through private auctions.  The only dealers who can purchase FFBs in auctions are Approved FFB Dealers.

98.     Collectively, FFB syndications and FFB auctions are referred to herein as the "FFB Issuance Process."

99.     Approved FFB Dealers profit from participating in the FFB Issuance Process by acquiring FFB inventory that they then sell to investors for profit.  The FFB Issuance Process concentrates FFB supply among Defendants as the largest Approved FFB Dealers.

100.    Investors like Plaintiffs do not participate in the FFB Issuance Process, except in rare instances when they participate in auctions.  Instead, they typically transact with Approved FFB Dealers to invest in FFBs.

101.    When underwriters sell new FFBs directly to other dealers (or, sometimes, investors) for the first time on offer day before those FFBs are declared "free to trade," these sales are said to occur in the primary market.  After a syndicate is terminated and the new issue is declared free to trade, secondary market trading has commenced.  The secondary market also includes sales by investors to dealers of older issues that the investor has decided to sell rather than hold until maturity, and purchases by investors from dealers of such older issues.

102.    The DOJ Fraud and Antitrust Divisions have launched an investigation into price-fixing by dealers in the FFB secondary market, as set forth in more detail below.  The investigation concerns collusion among dealers to fix the prices of FFBs that they traded with investors, such as Plaintiffs and the Class, in the secondary market.

**D.      Defendants Controlled FFB Supply**

103.    Defendants controlled a significant portion of FFB supply because they purchased a large proportion of FFBs from Fannie Mae and Freddie Mac.  As explained above, Approved FFB Dealers that participate in an FFB underwriting syndicate secure substantial allocations of FFB supply that they subsequently make available to investors.  Accordingly, an Approved FFB Dealer's share of FFB underwriting correlates with the amount of FFB inventory that the Approved FFB Dealer can use to trade FFBs with investors.

104.    Approved FFB Dealer Defendants have consistently been the 10 largest FFB underwriters in the United States, and each underwrote more than $28 billion in FFBs during the Class Period.  Thus, Defendants as a bloc dominated control of FFB supply and were well-positioned to use that dominant position to fix the prices of FFBs charged to their customers, Plaintiffs and the Class.

## TABLE 1

**Share of FFB Underwriting from March 1, 2010 through April 27, 2014**

| Defendant | FFBs Underwritten |
|---|---|
| BCI | $87 billion |
| UBS Securities | $58 billion |
| JPMS | $57 billion |
| DB Securities | $52 billion |
| CGMI | $51 billion |
| BNP Securities | $45 billion |
| CS Securities | $42 billion |
| First Tennesse National Bank Association | $38 billion |
| Goldman Sachs | $32 billion |
| Merrill Lynch | $28 billion |
| Total Underwritten by Defendants | $486 billion |
| Total Underwritten | $759 billion |
| Defendants' share of FFB Underwriting | 64.1% |

105.    Collectively, Defendants underwrote $486 billion of FFBs during the Class Period, which constituted approximately 64% of the total FFBs underwritten from March 1, 2010 through April 27, 2014.

106.    Data published by the Federal Reserve Bank of New York (the "FRBNY") further demonstrates that the FFB market is highly concentrated among the largest FFB dealers.  The FRBNY recently published a report on transaction volume in the market for "agency debt securities"[4] that breaks down the market share percentage for the top 10 dealers in the agency debt securities market.  This data showed that the top 10 dealers by market share accounted for 98.90% of all reported transactions of non-coupon bearing agency debt securities, a category that includes short-term FFBs.  The data also showed that the top 10 dealers by market share accounted for 81.35% of all reported transactions of agency debt securities that pay coupons, a category that includes medium-term and long-term FFBs.

107.    This high degree of concentration in the primary market gave Defendants substantial control over the FFB supply available to investors in the secondary market.  It also gave Defendants the ability to fix the prices that investors paid for FFBs, and the motive and opportunity to fix FFB prices to generate enormous FFB trading profits.

**E.    FFB Pricing**

108.    The market price of an FFB at any given time is calculated by comparing the yield to maturity offered by the FFB with the yield offered by other, similar debt instruments.  Investors and dealers in the FFB market often use U.S. Treasury securities as a comparison to determine FFB prices because U.S. Treasury securities are widely viewed as the lowest risk, most actively traded debt securities available to investors.

---

[4]    The NYFRB classifies FFBs as agency debt.

109.    Interest rates and bond prices have an inverse relationship.  As interest rates increase, the prices of FFBs decrease to reflect the fact that an investor can earn a greater amount of interest by purchasing a new debt instrument at the higher prevailing interest rate.  Conversely, as interest rates decrease, the prices of existing FFBs increase to reflect the fact that the amount of interest offered by the existing FFB is greater than the amount of interest an investor could earn by purchasing a new debt instrument at the prevailing interest rate.

110.    FFBs are OTC debt.  Generally, employees at a trading desk within the Approved FFB Dealer's FFB business are responsible for determining FFB price quotes offered to investors. The Approved FFB Dealer sends the price quote to the investor without disseminating the price quote to the investing public.  Despite the vast size of the market, trades are typically conducted over the phone or by message, person to person.

111.    This feature of the market makes the FFB market opaque.  Investors do not see FFB price quotes in real-time, and thus cannot evaluate prices quoted by multiple dealers without a substantial delay.

112.    As the largest Approved FFB Dealers, Defendants profit by dealing FFB inventory to customers in the primary and secondary markets.  Approved FFB Dealers profit from trading FFBs with investors by keeping the difference between the price that the Approved FFB Dealer pays to purchase an FFB and the price at which the Approved FFB Dealer sells an FFB to a customer.

113.    Defendants typically quote FFB prices in the form of a "bid-ask spread."  The bid price indicates the price at which the dealer is willing to buy a given FFB from a customer, and the ask price represents the price at which a dealer is willing to sell the same FFB to that customer. By buying at a lower price and selling at a higher price, Defendants profit off of the difference.

The wider the bid-ask spread, the greater the profit for the Defendant in an FFB transaction and the higher the cost for the customer.

114.    For example, a Defendant might quote a bid-ask spread of $99.90/$100.10 for a given FFB.  $99.90 is the bid price, or the price at which the Defendant is willing to purchase the FFB from the customer, and $100.10 is the ask price, or the price that the Defendant is willing to accept for selling the FFB.  The bid-ask spread in this example is $.20, or 20 basis points.[5]

115.    One factor that determines bid-ask spreads is transaction volume, also known as "liquidity."  Bid-ask spreads have an inverse relationship to liquidity in the market.  As liquidity increases, bid-ask spreads become narrower to reflect the lower risk that the dealer will be forced to carry the FFB while searching for a buyer, exposing the dealer to losses arising from changing financial conditions such as a credit downgrade to Fannie Mae or Freddie Mac or a change in prevailing interest rates.  The cost associated with this risk is known as the "liquidity premium."  In competitive OTC bond markets, liquidity is such a strong determinant of the bid-ask spread that it is often used as a "proxy" for bond market liquidity.

116.    In competitive OTC bond markets, dealers compete against each other by offering superior prices to customers in order to secure business.  Competition keeps bid-ask spreads within a relatively narrow range, since any dealer that unilaterally quotes inferior prices to customers will lose business to competitors.

---

[5]     The term "basis point" is used to compare price and yield.  Each percentage point is divided into 100 basis points, or "bp."  A basis point therefore refers to 1/100th of one percent.  As an example, the difference between an interest rate yield of 6% and 6.12% is 12 bp.

## II.    DEFENDANTS CONSPIRED TO FIX FFB PRICES CHARGED TO INVESTORS

### A.    The DOJ Is Conducting a Criminal Price-Fixing Investigation into the FFB Market

117.    On June 1, 2018, *Bloomberg* reported that four confidential sources revealed the DOJ Antitrust Division is conducting a criminal investigation into collusion among dealers to fix FFB prices.

118.    These confidential sources revealed that the investigation concerns the prices that dealers in the FFB market charged to investors, such as Plaintiffs and the Class.  Specifically, the investigation focuses on illegal activities of bank traders suspected of coordinating to benefit the institutions they work for.  Sources said prosecutors from the Justice Department's antitrust division and criminal division are working on the investigation into the dealers' behavior in the secondary market.

### B.    Features of the FFB Market Fostered Collusion Among Defendants

119.    Defendants had the ability to use secretive communications, such as multi-user electronic chat rooms, to maintain their collusive price-fixing scheme and coordinate in real time to share proprietary customer information and align their pricing.  The *Wall Street Journal* has described secretive and instantaneous means such as chat rooms as "integral to the way traders communicate with one another."

120.    Fannie Mae and Freddie Mac monitored Defendants' performance in the secondary market and awarded underwriting privileges based on success in the secondary market.  This connection between the underwriting process and the secondary market gave Defendants a motive to conspire to raise and fix prices in the secondary market.

121.    Furthermore, an OTC market is susceptible to collusion among dealers for several reasons.  Unlike in central exchange-based markets like the stock market, investors like Plaintiffs

31

and the Class lack access to real-time pricing data. This limited Plaintiffs' and the Class's ability to search for superior, non-cartel prices and enhanced the efficacy of Defendants' conspiracy.

122.    Because the FFB market is an opaque OTC market, Defendants were able to charge fixed prices without revealing their conspiracy to their customers.

123.    In an OTC market, customers typically contact only a limited number of dealers before transacting. Furthermore, the time required to navigate the OTC process provides dealers with the opportunity to communicate and collude with one another before an order is executed.

124.    In January 2018, the Treasury Market Practices Group ("TMPG") issued its latest set of recommendations for Best Practices for Treasury, Agency Debt,[6] and Agency Mortgage-Backed Securities Markets. The TMPG is composed of senior business managers and legal and compliance professionals from a variety of institutions, including securities dealers, banks, buy-side firms, market utilities, and others, and is sponsored by the FRBNY. The stated goal of these best practices is to ensure integrity, transparency, efficiency, liquidity, and "vigorous competition" in the Treasury, agency debt, and agency mortgage-backed securities markets. The TMPG has issued best practice recommendations encompassing FFBs roughly on an annual basis since 2010.

125.    The TMPG best practices recommendations are an acknowledgement that the FFB market has opportunities for "illegal activities such as price manipulation," collusion, and anti-competitive conduct. This is evident from the enumerated practices and trading strategies it cautions against, including misuse of confidential information and manipulative practices such as "painting the tape."

126.    For example, a recognized danger in the FFB market is that dealers will mishandle and share confidential information entrusted to them by their counterparties to influence prices to

---

[6]    The TMPG classifies FFBs as agency debt.

the benefit of the dealers and detriment of their customers.  Because investors trade FFBs OTC rather than on an exchange, investors are forced to transact with market-maker dealers and, in the process, reveal their identities and the details of the transactions they seek to conduct.  TMPG specifically warns that the sharing of confidential information among traders working for competing firms may support an inference of an unlawful agreement to unreasonably restrain competition.  Such information exchanges allow Defendants to collusively manage the market for FFBs.  TMPG also states that the misuse of confidential information and inappropriate and illegal communication practices that the FFB market lends itself to have recently manifested themselves in dealers conspiring to manipulate the prices of U.S. dollars and euros in the foreign currency exchange spot market and to manipulate the London Interbank Offered Rate ("LIBOR").

127.    TMPG also recognizes that markets such as the FFB market are susceptible to the manipulative practice known as painting the tape.  Using this technique, dealers buy and sell securities among themselves, building a record on TRACE (a FINRA-created database that reports OTC secondary market transactions) to create the illusion of substantial trading activity at certain prices.

128.    Defendants who engaged in any of these forms of market manipulation would have been able to buy at a lower price or sell at a higher price than they otherwise would have been able to.

129.    Defendants' access to trade data provided Defendants a mechanism to monitor compliance with their price-fixing agreement by checking other cartel members' FFB transactions.

130.    The FFB traders and sales personnel at Defendants' respective offices had well-established relationships, sometimes dating back to prior overlapping employment.  They worked together regularly, over an extended period of time, as a small group of traders and salespeople

operating in the same markets. Defendants' FFB traders and sales personnel were well-acquainted with each other and had pre-existing relationships based on time spent working together within one of the Defendant's FFB business.

131.    For example, in May 2010, DB Securities revamped its U.S. credit and trading sales business, which includes FFB sales and trading, by hiring Jared Dolce from Citigroup Inc.'s bond trading and sales business, Nick Blewitt from co-conspirator UBS Securities, and John Raveche from co-conspirator BCI. Later in the Class Period, Raveche joined co-conspirator UBS, where he served as an Executive Director for bond sales in its UBS Investment Bank division.

132.    Similarly, UBS Securities expanded its OTC bond trading business in 2009 by hiring Anatoly Nakum from Defendant BCI. Nakum previously worked at DB Securities before moving to BCI.

133.    Other aspects of the FFB market also make it highly susceptible to collusion. There is a high level of industry concentration in the FFB market. Defendants are a small number of competitors who controlled the supply of FFBs available to investors through their dominant share in the FFB Issuance Process.

134.    There are high barriers to entry into the FFB market. It is expensive to become an Approved FFB Dealer, and few banks can bear the costs and risks associated with carrying sufficient FFB inventory to serve as a dealer in the FFB market. As explained above in Part I, changes in prevailing interest rates and other factors can affect the value of FFBs held in a dealer's inventory, limiting the ability of smaller players to engage in large FFB trades or hold FFB inventory. The Bank for International Settlements, a policy and research organization owned by 60 of the world's leading central banks, explained that barriers to entry for prospective dealers in OTC markets like the FFB market include: "a sufficiently large client base to get a good view of

the flow of orders; the capacity to take on large principal positions; continuous access to multiple markets, including funding and hedging markets; the ability to manage risk, especially the risk of holding assets in inventory; and market expertise in providing competitive quotes for a range of securities."

135.    These barriers to entry prevented non-cartel members from competing with Defendants' cartel on equal terms and luring customers by offering superior prices.

### C.    Prices and Other Economic Data Confirm the Existence and Impact of Defendants' Conspiracy

136.    Plaintiffs examined FFB prices to identify whether Defendants operated a conspiracy in the FFB market.  The economic facts show prices for FFBs throughout the Class Period strongly suggest a price-fixing conspiracy successfully inflated the prices that investors paid when buying FFBs and deflated the prices investors received when selling FFBs throughout the Class Period.

137.    Consistent with the focus of the DOJ Antitrust Division's investigation, Plaintiffs' analysis uncovered statistically significant economic facts (with a confidence degree of 95%)[7] of anomalies in FFB pricing that are inconsistent with normal, competitive market conditions. Specifically, the economic facts are consistent with Defendants: (1) fixing prices of newly issued FFBs in the week following each FFB issuance artificially higher; (2) fixing prices for on-the-run FFBs artificially higher in the period leading up to a new FFB issuance; and (3) quoting agreed-upon, artificially inflated bid-ask spreads to investors throughout the Class Period on all FFB transactions with investors.

---

[7]      Statistical significance means that the results are at least 95% likely to have been caused by factors other than chance or coincidence.

138.     The FFB prices charged by Defendants were anomalous during the Class Period as compared to the period after April 27, 2014.  On that date, the *Financial Times* and *Reuters* reported that DOJ criminal prosecutors were travelling to London to question FX traders.  This development suddenly brought to a boil the multiple government investigations into collusion and price-fixing by Defendants and their corporate parents in numerous financial markets that had been simmering since 2012, described in Part II.D, below.  These government investigations revealed that Defendants implemented deficient compliance and oversight measures during the Class Period in their respective trading and sales businesses.  After government investigations, fines, and criminal prosecutions forced each Defendant to implement new compliance and oversight measures, and after news broke in April 2014 confirming that criminal prosecutions would not be limited to LIBOR, FFB prices suddenly and dramatically changed.

### 1.      Defendants Fixed the Prices of Newly Issued FFBs

139.     Plaintiffs obtained and examined the prices that Defendants charged investors for newly issued FFBs soon after FFB issuances when Defendants had new FFB inventory to sell. What is observed are anomalous pricing patterns that show inflated prices for newly issued FFBs when Defendants had new FFB inventory to sell to investors.  This caused investors like Plaintiffs and the Class to overpay for FFBs.

140.     First, Plaintiffs examined data to observe the difference between the price that Defendants paid to purchase FFBs from Fannie Mae or Freddie Mac and the price that Defendants then charged to investors for these same FFBs.

141.     In a competitive market, this difference should be especially small for Defendants' sales of newly issued FFBs made on the same day that Fannie Mae or Freddie Mac issued the FFBs ("offer days").  For these sales, only a short amount of time has passed (*i.e.*, less than one day) between the time when the Defendant purchased the FFB from Fannie Mae or Freddie Mac and

the time when it sells the same FFB to an investor. Thus, the impact of new information, such as changes in prevailing interest rates, Fannie Mae's or Freddie Mac's creditworthiness, or liquidity is near zero.[8]

142. Plaintiffs obtained pricing data for Fannie Mae Benchmark Notes and Freddie Mac Reference Notes (collectively, the "Notes"). The Notes represent over $400 billion of total FFB issuance and are among the most traded FFBs, accounting for over 2 million transactions out of 5.9 million total (33.9%) reported FFB transactions from March 1, 2010 through December 31, 2017. Defendants participated in underwriting 85.4% of these instruments from March 1, 2010 through April 27, 2014.

143. Plaintiffs observed the average difference between the price that Approved FFB Dealers paid to Fannie Mae or Freddie Mac for Notes and the price at which Approved FFB Dealers sold these Notes to investors on offer days from April 27, 2014 through December 31, 2017. This difference was very small after the Class Period, averaging 0.4 cents (represented by the blue bar in Figure 2, below).

144. Next, Plaintiffs observed the average difference between the price that Approved FFB Dealers paid to Fannie Mae or Freddie Mac for Notes and the prices at which Approved FFB Dealers sold these newly issued Notes to investors on offer days before April 27, 2014. This difference was 3.2 cents (represented by the red bar in Figure 2, below).

145. Thus, the prices that Defendants charged investors for newly issued Notes on offer days was **eight times higher** before April 27, 2014 than after. These results are anomalous. The substantial decrease in the prices of newly issued Notes after the Class Period would not have been observed in a competitive market.

---

[8]    For an explanation of how such information impacts FFB pricing, see Part I, above.

146.    Figure 2 below illustrates the results of this analysis.  The horizontal line marked "0" is the baseline.  It represents the price that the Approved FFB Dealers paid to purchase Notes from Fannie Mae or Freddie Mac.  The vertical axis is the difference between the price that the Approved FFB Dealer paid Fannie Mae or Freddie Mac for the Notes and the price that the Approved FFB Dealer charged to investors for these same Notes on offer days.  As Figure 2 illustrates, this difference was much higher during the Class Period, indicating that Defendants colluded to charge higher prices to investors for newly issued FFBs during the Class Period.



147.    Plaintiffs' analysis also demonstrates that the price inflation for newly issued FFBs persisted for a minimum of one week after offer days.

148.    With regard to all FFBs issued after March 1, 2010, a significant difference is observed between the price that each Approved FFB Dealer Defendant paid Fannie Mae or Freddie Mac for FFBs and the price at which the same Approved FFB Dealer Defendant sold these FFBs

to investors both before and after April 27, 2014.  This analysis showed that each Defendant charged significantly higher prices for newly issued FFBs it sold to investors during the Class Period compared to after April 27, 2014.

149.    This observation is summarized in Figure 3, below.  The horizontal line marked "0" is the baseline.  It represents the prices that Defendants paid to Fannie Mae or Freddie Mac to purchase the newly issued FFBs that they underwrote.  The horizontal axis represents the increase in price above the baseline that the Defendants charged to investors for the same newly issued FFBs on offer days.  The red bar represents this increase from March 1, 2010 through April 26, 2014, and the blue bar represents this increase from April 27, 2014 through December 31, 2017.



150.    The data displayed in Figure 3 is not reflective of a competitive market and instead demonstrates that the prices of newly issued FFBs that Defendants underwrote were artificially inflated from at least March 1, 2010 through April 26, 2014, which is represented by the red bar on the left.  The blue bar shows that this increase in price was only .73 basis points from April 27,

2014 through December 31, 2017.  However, the red bar shows that this increase was on average

3.01 basis points from March 1, 2010 through April 26, 2014, ***more than four times higher than***

***the blue bar***.

151.    Next, a significant difference is observed between the prices that non-Defendant

Approved FFB Dealers charged for newly issued FFBs that they underwrote prior to April 27,

2014 as compared to the prices that they charged after April 27, 2014.

152.    Non-Defendant Approved FFB Dealers are other dealers in the FFB market that

also underwrote FFBs from March 1, 2010 through April 26, 2014 and sold these products to

investors.  Plaintiffs compared the results of this analysis with the results shown in Figure 3, above,

to identify differences between the prices charged by Defendants and the prices charged by non-

Defendant Approved FFB Dealers.

153.    This analysis showed that the change in prices that Defendants charged for newly

issued FFBs that they underwrote after April 27, 2014 was much lower than the change in prices

that non-Defendants charged for newly issued FFBs that they underwrote after April 27, 2014.

Figure 4, below, depicts the results of this analysis.



154.    The prices that Defendants charged for newly issued FFBs above the baseline were 4 times higher during the Class Period as compared to after the Class Period, which is depicted by the red bar.  In contrast, the change in prices that non-Defendant Approved FFB Dealers charged for newly issued FFBs was only 2.8 times higher during the Class Period compared to after the Class Period (represented by the blue bar).  Accordingly, Figure 4 indicates that Defendants drove up the price for newly issued FFBs during the Class Period because Defendants' change in pricing after the Class Period was much more significant than the change in pricing by non-Defendant Approved FFB Dealers.

155.    In addition, an increase is observed in prices that Defendants charged for newly issued FFBs relative to the yields offered by U.S. Treasury securities with comparable maturities. U.S. Treasury securities carry a similar amount of credit risk as FFBs.

156.    Prices of U.S. Treasury securities are affected by the same macroeconomic factors and market conditions as FFBs.  For example, changes in the credit condition of the U.S. federal government and prevailing interest affect FFBs and U.S. Treasury securities similarly.

157.    For each FFB issuance, Plaintiffs compared the difference between the price that each Approved FFB Dealer charged to investors for newly issued FFBs and the price that the same Approved FFB Dealer charged to investors for newly issued U.S. Treasury securities of a comparable maturity.  For example, Plaintiffs compared the price that Defendants charged investors for newly issued FFBs with five-year maturities to the yields offered by comparable five-year U.S. Treasury Notes, and compared the prices that Defendants charged investors for newly issued FFBs with 10-year maturities to the comparable newly issued 10-year U.S. Treasury Notes, etc.  Plaintiffs repeated this process for FFBs and U.S. Treasury securities with maturities from one year through 10 years.

158.    Plaintiffs' analysis shows that the inflated prices that Defendants charged for newly issued FFBs on offer days was highly abnormal as compared to the yields offered by U.S. Treasury securities of comparable maturities.



159.    In Figure 5, the horizontal axis represents the difference between: (1) the increase in price that an Approved FFB Dealer charged to investors for newly issued FFBs over the price that the Approved FFB Dealer paid to purchase the FFBs from Fannie Mae or Freddie Mac, and (2) the yield offered by U.S. Treasury securities with a comparable maturity.  The baseline, marked "0," indicates the point where this difference is zero (*i.e.*, where the increase in price that an Approved FFB Dealer charged to investors for newly issued FFBs is equal to the yield offered by U.S. Treasury securities of a comparable maturity).  The red bars represent this difference for Defendants, and the blue bars represent this difference for non-Defendant Approved FFB Dealers. The column on the left shows the difference prior to April 27, 2014, and the column on the right shows the difference after April 27, 2014.

160.    As Figure 5 shows, the Defendants charged much higher prices for newly issued FFBs relative to yields offered by comparable U.S. Treasury securities (the red bar on the left)

than non-Defendants (the blue bar on the left) prior to April 27, 2014. This difference practically disappeared after April 27, 2014.

161.    This analysis shows that the prices that Defendants charged for newly issued FFBs that they underwrote prior to April 27, 2014 were not explained by macroeconomic factors or conditions in bond markets generally.

> **2.    Defendants Fixed the Prices of the Previously Issued FFBs Just Before They Went "Off-the-Run" to Create an Artificial Benchmark**

162.    As explained in Part I, above, Fannie Mae and Freddie Mac typically issue FFBs using a predictable, regular schedule. Newly issued FFBs of a given type generally have similar features to existing FFBs except that they mature at a later date. Thus, the prices of newly issued FFBs are closely correlated with the prices of FFBs with similar characteristics that have been previously issued.

163.    This correlation between the prices of previously issued FFBs and newly issued FFBs with comparable features created an opportunity for Defendants' conspiracy to increase the market value of new FFB supply by inflating the market price of FFBs with similar features that were about to go "off-the-run."

164.    After April 27, 2014, the prices of FFBs that were about to go "off-the-run" (*e.g.*, Benchmark Notes in the week before a new issue of Benchmark Notes) traded at lower prices than newly issued FFBs. This price difference occurs because the market for on-the-run FFBs is generally more liquid (*i.e.*, larger transaction volume) than the market for off-the-run FFBs. Investors prefer to invest in more liquid FFBs because an investor has a higher likelihood of finding a buyer for these instruments at the market price should the investor decide to sell. Because demand is higher for on-the-run FFBs than for off-the-run FFBs, prices of on-the-run FFBs are also generally higher.

165. Thus, in a competitive market, demand (and therefore price) of FFBs that are about to go off-the-run should be relatively low in the days leading up to a new issuance of FFBs with similar features because investors would prefer to purchase FFBs from the new issuance.

166. However, this is not what occurred on and before April 27, 2014. Notes that were about to go off-the-run exhibited an anomalous increase in price in the days leading up to a new issuance of Notes. Specifically, Notes about to go off-the-run consistently experienced a statistically significant price increase in the two days immediately leading up to a new issuance.

167. A way to isolate Defendants' price inflation of Notes about to go off-the-run and account for any other potential macroeconomic factors is to compare the prices Defendants charged to their customers for these FFBs and the prices that Defendants charged to each other for the same Notes. This comparison shows that the price inflation for Notes about to go off-the-run only occurred in transactions involving *customers*. In otherwise identical transactions between Defendants, no price inflation occurred.

168. As with prices for newly issued Notes, price inflation for Notes that were about to go off-the-run dissipated beginning after April 27, 2014.

169. Defendants' practice of charging inflated prices to their customers for FFBs that were about to go off-the-run while charging lower prices to their horizontal competitors provides further evidence of anticompetitive conduct.

### 3. Defendants Fixed Bid-Ask Spreads for FFBs Artificially Wider

170. Defendants also agreed to charge inflated bid-ask spreads for FFBs that they traded with investors. This enabled Defendants to earn artificially inflated profits on all FFB transactions that they entered with Plaintiffs and the Class throughout the Class Period, causing Defendants' customers to overpay or not receive enough on every FFB transaction.

171.    In a competitive market, dealers compete by offering narrower bid-ask spreads to customers.  If a dealer charges wider bid-ask spreads – by either lowering the bid price and/or raising the ask price – it should lose customers to rivals offering tighter spreads.

172.    For example, in a competitive market, an FFB dealer ("Dealer A") might present a customer with a quote of 99.95/100.05 for a given FFB.  In this example, Dealer A has offered to buy the FFB for $99.95 and has offered to sell the same FFB for $100.05.  The bid-ask spread in this example is 10 basis points.

173.    A competing dealer ("Dealer B") looking to increase market share might react by offering the customer a quote of 99.96/100.04 for the same FFB.  In this example, the bid-ask spread quoted by Dealer B is 8 basis points, which is two basis points narrower than the bid-ask spread quoted by Dealer A.  The price at which Dealer A offers to buy the FFB is higher, and the price at which Dealer A offers to sell the FFB is lower, resulting in a better price for the customer. Even though the quote offered by Dealer B is less profitable for Dealer B because it has a narrower bid-ask spread (and thus a smaller profit), it makes economic sense for Dealer B to offer this quote because it gives Dealer B a better chance to earn the customer's business.

174.    When dealers agree to fix bid-ask prices, they conspire to artificially raise the bid when a customer sought a bid, or lower the ask when a customer sought an ask, or both.  Another method is to agree to offer a particular bid-ask quote (*e.g.*, 99.93/100.07 for FFBs) or agree to charge a minimum bid-ask spread (*e.g.*, 14 basis points).  In all cases, the dealers are better off because they can guarantee a consistent profit margin on each transaction and avoid losing customers to competition from rivals who are willing to offer superior prices and narrower bid-ask spreads.

175. Plaintiffs analyzed the bid-ask spreads quoted by dealers in the FFB market both before and after April 27, 2014. This analysis yielded statistically significant results showing that bid-ask spreads were more than 1.85 basis points wider during the Class Period as compared to the post-Class Period.

176. These results were highly anomalous, and they are even more significant and unusual after analyzing the relationship between bid-ask spreads in the FFB market to changes in liquidity (*i.e.*, FFB transaction volume).

177. As explained in Part I, above, bid-ask spreads normally decrease as liquidity increases to reflect a lower liquidity premium. However, just the opposite occurred in the FFB market prior to April 27, 2014. As liquidity increased, bid-ask spreads became ***wider***. This is exactly the reverse of what occurs in competitive financial markets but makes sense in the context of Defendants' agreement to quote inflated bid-ask spreads. As liquidity increased, Defendants' ability (by providing more opportunities to quote fixed prices) and motive to profit (through greater transaction volume) from inflating bid-ask spreads also increased. Plaintiffs' analysis shows that Defendants responded to greater liquidity by agreeing to maintain wider bid-ask spreads, thereby earning additional profits on each FFB transaction with customers as liquidity increased.

178. The effect of Defendants' conduct on bid-ask spreads can be observed in the bid-ask spreads that Defendants quoted in "riskless principal" transactions. A riskless principal transaction is a trade where a dealer purchases an FFB after it has already agreed to sell the FFB to a customer or vice-versa, and therefore never bears any liquidity risk associated with carrying that FFB. Analyzing riskless principal transactions is useful for measuring the impact of Defendants' conspiracy on bid-ask quotes because these transactions are not impacted by liquidity premiums or changes in market conditions.

179.    This analysis yields statistically significant results further confirming that Defendants quoted artificially wide bid-ask spreads for FFBs to customers.  Prior to April 27, 2014, the average bid-ask spread for riskless principal FFB transactions was 13.4 basis points.  In the post-Class Period, bid-ask spreads in riskless principal FFB transactions suddenly and dramatically decreased to an average of 11.9 basis points, as shown in Figure 6 below.  This represents an additional 12.6% in profits per transaction for Defendants prior to April 27, 2014, and corresponding overcharges paid by investors.



180.    Plaintiffs also analyzed all available FFB quotes for which it was possible to identify the dealer who supplied the quote.[9]  This dataset included more than 17 million FFB quotes from January 1, 2009 through April 27, 2014, including quotes from six Defendants.[10]

---

[9]     Generally, the identity of the dealer supplying an FFB quote is usually removed from the data. For this analysis, Plaintiffs used all quotes that identified the dealer supplying the quote.

[10]    Quotes could be attributed to the following six Defendants: BCI, BNP Securities, DB Securities, Goldman Sachs, JPMS, and CS Securities.

181.    Plaintiffs removed the highest 5% of quotes and the lowest 5% of quotes from the sample. This process ensures that the results of the analysis are not skewed by outliers.

182.    Plaintiffs adjusted the spreads in the bid-ask quotes in the sample to account for differences in the prices of the FFBs.  This step ensures that differences in the notional value of the quoted FFBs do not affect the analysis.  The result is the "average relative bid-ask spread."

183.    Last, Plaintiffs compared the average relative bid-ask spreads in the quotes attributable to the enumerated Defendants against the average relative bid-ask spreads in the quotes attributable to non-Defendant Approved FFB Dealers.

184.    The results of this analysis are shown in Figure 7, below.  The average relative bid-ask spread in Defendants' quotes (represented by the red bar) was 62.8 basis points.  During the same time period, the average relative bid-ask spread in the non-Defendant Approved FFB Dealers' quotes (represented by the blue bar) was only 43.9 basis points.  Thus, the average relative bid-ask spread in Defendants' FFB quotes, represented by the red bar, was *43% wider* than the average relative bid-ask spread in non-Defendant Approved FFB Dealers' FFB quotes, represented by the blue bar.



**Figure 7**
Average Relative Bid-Ask Spreads in Quotes from January 1, 2009 through April 27, 2014.

185.    The results described above indicate that Defendants were responsible for the artificially wide bid-ask spreads quoted to investors, including Plaintiffs, during the Class Period.

**D.    Defendants Failed to Adequately Supervise Their Trading and Sales Business During the Class Period**

186.    Defendants engaged in multiple, similar price-fixing conspiracies in various financial markets during the Class Period that led government investigators to find parallel deficiencies in oversight and control at Defendants' trading and sales businesses.  These ongoing investigations have resulted in criminal trials and convictions, billions of dollars in fines, and successful litigation by injured investors.

187.    These findings further support the conspiracy alleged in this Complaint because they demonstrate that each Defendant used deficient compliance and oversight systems in their sales and trading businesses during the Class Period.

188.    **FX:**  Multiple Defendants here failed to control or detect rampant misconduct amongst their trading staff in the foreign exchange market.  These failures allowed traders to fix

bid-ask spreads, coordinate trading strategies with competitors to manipulate benchmark prices, and share confidential customer order information and proprietary information on trading positions with competitors in group chat rooms with names like "The Cartel."  Defendants' deficient oversight and controls allowed this anticompetitive conduct to persist undetected for years during the Class Period.  The DOJ's Antitrust Division, the same regulatory office presently investigating Defendants' collusive conduct in the FFB market, has obtained guilty pleas against the following corporate parents of Defendants in this case for failing to adequately monitor anticompetitive conduct in their subsidiaries' trading businesses: Citicorp. (a wholly owned, direct subsidiary of Citigroup Inc., the parent company of Defendant CGMI), Barclays PLC (the corporate parent of Defendants Barclays Bank PLC and BCI), and JPMorgan Chase & Co. (the corporate parent of JP MNA and JPMS), for operating inadequate oversight measures that allowed trading and sales staff to engage in a years' long conspiracy to fix FX prices during the Class Period.  Defendant CS AG has also been charged with engaging in "anti-competitive practices" by the European Commission.  CS AG, DB AG, and Goldman Sachs Group, Inc., the parent company of Goldman Sachs, have also entered into Consent Orders with the New York State Department of Financial Services regarding their FX trading.

189.   LIBOR/Euribor/Yen LIBOR/Swiss franc LIBOR: Government investigations and civil lawsuits have revealed widespread collusion among banks to manipulate benchmark interest rates for multiple currencies (U.S. Dollar LIBOR, Euribor, Yen LIBOR, Swiss franc LIBOR) during the Class Period.  These investigations have led to dozens of fines and settlements for price fixing by the following corporate parents of Defendants here who failed to detect and prevent anticompetitive conduct by trading and sales staff within their subsidiaries:  Barclays PLC, Bank of America Corporation (the parent of Defendants BANA and Merrill Lynch), Deutsche Bank AG

(the corporate parent of Defendant DB Securities), UBS AG, JPMorgan Chase & Co., and Citigroup Inc. Regulators found that trading staff within these banks engaged in widespread misconduct during the Class Period, including coordinating false submissions by panelists to the benchmark-setting panel, sharing customer and order information, and manipulating market prices by submitting false orders (*i.e.*, "spoofing").

190.    ISDAfix:  DB Securities, JP MNA, BNP Securities, BANA, Citibank, N.A. (a wholly owned subsidiary of Defendant Citigroup Inc.), Goldman Sachs, Barclays Bank PLC, and BCI for operating deficient compliance and oversight functions that allowed traders to systematically manipulate the U.S. dollar ISDAfix benchmark during the Class Period to boost trading profits.

191.    SSA Bonds:  A DOJ investigation into price-fixing in the sub-sovereign and supranational agency ("SSA") bond market became public in December of 2015.  It quickly prompted simultaneous cartel investigations by the UK Financial Conduct Authority, the European Commission, and the filing of private lawsuits.  The private civil action, originally filed in May 2016, was amended in April 2017 to include 10 banks (originally filed against five) and hundreds of redacted chats and transcripts that demonstrated that these banks failed to oversee collusive communications by trading and sales staffs in their bond businesses.  In August 2017, Deutsche Bank AG and Bank of America Corp. agreed to settle for a total of $65.5 million.

192.    Mexican Government Bonds:  The Mexican antitrust regulator, the Comisión Federal de Competencia Económica ("COFECE"), announced in April 2017 that it uncovered evidence of anticompetitive conduct among dealers in the Mexican Government Bond ("MGB") market, including subsidiaries of Defendants Barclays Bank PLC, Citigroup Inc., JPMorgan Chase

& Co., and Bank of America Corp. At least one bank was accepted into its cartel leniency program after admitting to participation in a conspiracy to fix Mexican Government Bond prices.

193.     <u>Swiss Franc Interest Rate Derivatives</u>: The European Commission fined UBS AG, JPMorgan Chase & Co., and CS AG a total of €32.3 million euros for conspiring to fix bid-ask spreads in the market for interest rate derivatives denominated in Swiss francs.  The Swiss franc interest rate derivatives conspiracy operated similarly to the conspiracy alleged in this Complaint and involved an agreement among horizontal competitors in the OTC market for derivatives to charge inflated bid-ask spreads to customers.  These Defendants failed to detect and deter collusive communications among traders at these banks.

## III.     **ANTITRUST INJURY**

194.     Plaintiffs are domestic consumers of FFBs.  They purchased and sold hundreds of millions of dollars' worth of FFBs in the United States during the Class Period, doing so directly with each Defendant.

195.     As described above, Defendants fixed the prices of FFBs during the Class Period for their own profit.

196.     As a direct result of Defendants' misconduct, Plaintiffs were overcharged each time they purchased FFBs from Defendants and underpaid each time they sold FFBs to Defendants.  Thus, as set forth in more detail below, Plaintiffs were injured and suffered harm in each FFB transaction conducted during the Class Period.

197.     **IBEW 103**: "IBEW 103" is a domestic consumer of Fannie Mae and Freddie Mac FFBs.  During the Class Period, it purchased and sold millions of dollars of FFBs in the United States, including directly with Defendants BCI, JPMS, UBS Securities, DB Securities, CGMI, Goldman Sachs, BNP Securities, CS Securities, and BANA at artificial prices due to Defendants' conspiracy.

198.    IBEW 103's FFB transactions include FFB purchases of on-the-run FFBs in the week prior to new FFB issuances, FFB purchases of newly issued FFBs in the week following FFB issuances, and purchases and sales with Defendants at artificial bid and ask prices that Defendants agreed to charge customers during the Class Period.  Accordingly, IBEW 103 was injured when it paid more in FFB purchases and received less in FFB sales with Defendants during the Class Period as a direct result of Defendants' conspiracy.

199.    For example, IBEW 103 Pension Plan purchased FFBs from Defendant BNP Securities on or around February 8, 2012.  Fannie Mae issued these FFBs on or around February 6, 2012.  During the Class Period, BNP Securities participated in a conspiracy to fix prices in the FFB market, which included charging artificially inflated prices for newly issued FFBs. Accordingly, IBEW 103 Pension Plan was injured when it paid more than it should have for FFBs it bought from BNP Securities on or around February 8, 2012.

200.    Likewise, IBEW 103 Health Plan purchased FFBs from Defendant J.P. Morgan Securities, LLC on or around August 18, 2011.  Fannie Mae issued these FFBs on or around August 17, 2011.  During the Class Period, J.P. Morgan Securities, LLC participated in a conspiracy to fix prices in the FFB market, which included charging artificially inflated prices for newly issued FFBs.  Accordingly, IBEW 103 Health Plan was injured when it paid more than it should have for FFBs it bought from J.P. Morgan Securities, LLC on or around August 18, 2011.

201.    IBEW 103 cumulatively made dozens more FFB purchases from Defendants on offer days or in the week after FFB issuances throughout the Class Period.

202.    IBEW 103 also suffered injury by paying artificially higher prices when buying on-the-run FFBs in the week prior to new issuances.  Specifically, IBEW 103 Pension Plan purchased on-the-run FFBs from Defendant Barclays Capital Inc. on or around October 29, 2010, which

FFBs went off-the-run on or around November 4, 2010.  During the Class Period, Barclays Capital Inc. participated in a conspiracy to fix prices in the FFB market, which included charging artificially inflated prices for on-the-run FFBs in the period leading up to a new FFB issuance. Accordingly, IBEW 103 Pension Plan was injured when it paid more than it should have for FFBs it bought from Barclays Capital Inc. on or around October 29, 2010.

203.    IBEW 103 also suffered injury by paying artificially higher prices when buying FFBs, and receiving artificially lower prices when selling FFBs, as a result of Defendants' agreement to maintain artificially wide bid-ask spreads.

204.    For example, IBEW 103 Pension Plan sold FFBs to Credit Suisse on or around March 16, 2011.  Freddie Mac issued these FFBs on or around May 21, 2009, and they matured on or around June 15, 2012.  During the Class Period, Credit Suisse participated in a conspiracy to fix prices charged to investors in the FFB market, including by agreeing to maintain artificially wide bid-ask spreads.  Accordingly, IBEW 103 Pension Plan was injured when it received less than it should have for FFBs it sold to Credit Suisse on or around March 16, 2011.

205.    Likewise, IBEW 103 Health Plan sold FFBs to Barclays Capital on or around June 15, 2012.  Freddie Mac issued these FFBs on or around January 13, 2012, and they will mature on or around January 13, 2022.  During the Class Period, Barclays Capital participated in a conspiracy to fix prices charged to investors in the FFB market, including by agreeing to maintain artificially wide bid-ask spreads.  Accordingly, IBEW 103 Health Plan was injured when it received less than it should have for FFBs it sold to Barclays Capital on or around June 15, 2012.

206.    **Birmingham**: Birmingham is a domestic consumer of FFBs.  It purchased and sold hundreds of millions of dollars' worth of FFBs in the United States during the Class Period, including directly with Defendants First Tennessee Bank, N.A.; First Tennessee Securities Corp.;

Citigroup Global Markets, Inc.; Merrill Lynch; and Deutsche Bank AG at artificial prices due to Defendants' conspiracy.

207.    Birmingham's FFB transactions include FFB purchases of off-the-run FFBs in the week prior to new FFB issuances, FFB purchases of newly issued FFBs in the weeks following FFB issuances, and purchases and sales with Defendants at artificial bid and ask prices that Defendants agreed to charge customers during the Class Period.  Accordingly, Birmingham was injured when it paid more in FFB purchases and received less in FFB sales with Defendants during the Class Period as a direct result of Defendants' conspiracy.  *See* Part II.C.1-3., above.

208.    For example, Birmingham purchased FFBs from Defendant Merrill Lynch on or around October 3, 2012.  Fannie Mae issued these FFBs on or around September 24, 2012.  During the Class Period, Merrill Lynch participated in a conspiracy to fix prices in the FFB market, which included charging artificially inflated prices for newly issued FFBs.  *See* Part II.C.1., above.  Accordingly, Birmingham was injured when it paid more than it should have for FFBs it bought from Merrill Lynch on or around September 24, 2012.

209.    Birmingham made dozens more FFB purchases from Defendants on offer days or in the week after FFB issuances throughout the Class Period.

210.    Birmingham also suffered injury by paying artificially higher prices when purchasing FFBs as a result of Defendants' agreement to the fix the price of soon to be off-the-run FFBs higher in the week leading up to new FFB issuance.

211.    Birmingham also suffered injury by paying artificially higher prices when buying FFBs, and receiving artificially lower prices when selling FFBs, as a result of Defendants' agreement to maintain artificially wide bid-ask spreads.

212.   For example, on or around November 13, 2012, Birmingham sold FFBs to Defendant Citigroup Global Markets, Inc.  Fannie Mae issued these FFBs on or around May 21, 2010, and they matured on or around June 26, 2013.  During the Class Period, Citigroup Global Markets, Inc. participated in a conspiracy to fix FFB prices, including by agreeing to maintain artificially wide bid-ask spreads.  *See* Part II.C.3, above.  Accordingly, Birmingham was injured when it received less than it should have for FFBs it sold to Citigroup Global Markets, Inc. on or around November 13, 2012.

## CLASS ACTION ALLEGATIONS

213.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and as representatives of the following Class:[11]

> All persons or entities who transacted in Fannie Mae or Freddie Mac bonds during the period of at least January 1, 2009 through April 27, 2014 (the "Class Period") with a Defendant, where such persons or entities were domiciled in the United States or its territories.  Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, employee, agent or co-conspirator of any Defendant.[12]

214.   The Class is so numerous that the individual joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least thousands of geographically dispersed Class members transacted in FFBs during the Class Period at artificial prices due to Defendants' conspiracy.

---

[11]   Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, the Class Period.

[12]   The Class definition does not include transactions in which a party purchased an FFB directly from Fannie Mae or Freddie Mac.

215.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

216.     Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs are adequate representatives of the Class and have no interests that are adverse to the interests of absent Class members.  Plaintiffs have retained counsel competent and experienced in class action litigation, including antitrust class action litigation concerning collusion in financial markets.

217.     Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class.  These common questions of law and facts include, without limitation:

(a)     whether Defendants' collusion caused FFB prices to be artificial during the Class Period;

(b)     whether Defendants' unlawful acts violate Section 1 of the Sherman Act;

(c)      whether Defendants' unlawful conduct caused injury to the business or property of Plaintiffs and the Class;

(d)     the operative time period and extent of Defendants' foregoing violations; and

(e)     whether such injury or the fact or extent of artificiality in FFB prices caused by Defendants' conduct may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

218.   A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

219.   Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

220.   The statutes of limitations governing Plaintiffs' claims were tolled under the doctrine of fraudulent concealment until at least June 2018, when it was revealed that the DOJ Antitrust Division was investigating price-fixing in the market for FFBs.  The doctrine applies here because Defendants fraudulently concealed their misconduct through their own affirmative acts, and because Defendants' conduct was inherently self-concealing.

221.   Defendants actively concealed their violations of law from Plaintiffs and the Class by, *inter alia*, (i) relying on non-public forms of communication, such as private electronic messages and telephone calls; (ii) implicitly representing that the FFB pricing quotes Defendants supplied to Plaintiffs and the Class were the product of honest competition and not fixed by a conspiracy; and (iii) affirmatively misrepresenting that they complied with applicable laws and

regulations, including antitrust laws.   Below is a list of non-exhaustive examples of such statements that each Defendant published during the Class Period:

       a.     Barclays PLC, reporting on behalf of Barclays Bank PLC and BCI, reported in its 2010 Annual Report that it "operate[s] a system of internal control which provides reasonable assurance of effective and efficient operations covering all controls, including financial and operational controls and compliance with laws and regulations."  Barclays PLC claimed that it "acknowledges that free and fair competition is good for business and customers and clients, driving innovation and improvements in service provision."

       b.     Bank of America Corporation, reporting on behalf of BANA and Merrill Lynch, wrote in its 2010 Annual Report that it operated a program "consistently applied across the Corporation . . . to manage compliance risk."  It also reported that it maintained an independent "Corporate Audit function" to "provide reasonable assurance" that "employees' actions are in compliance with . . . applicable laws and regulations."  It further claimed that it emphasized a "culture of compliance" across the organization, including at BANA and Merrill Lynch.

       c.     Citigroup Inc. implemented a "Citi Code of Conduct" during and after the Class Period.  The Citi Code of Conduct applied to all entities affiliated with Citigroup Inc., including CGMI, and stated that Citigroup Inc. and its affiliates were "committed to promoting free and competitive markets."  In its 2010 Annual Report, Citigroup Inc. claimed that it "monitor[ed] and control[led]" employee conduct, which included employees of CGMI, through "compliance and legal reporting systems, internal controls, management review processes and other mechanisms."

d.      Credit Suisse Group AG, reporting on behalf of CS AG and CS Securities, boasted that it had developed a "strong compliance culture" during the Class Period.  It wrote in its 2010 Annual Report that it continued to "proactive[ly] develop[] [its] compliance framework [to] position[ it] well to respond to evolving regulation in the markets in which [it] operate[s]."  Credit Suisse Group AG also emphasized that its "compensations practices and plans . . . are consistent with and promote effective risk management practices as well as [its] compliance and control culture."  It published an updated Code of Conduct in 2010 "to place a greater emphasis on the values and professional standards underpinning our control and compliance."

e.      DB AG, which reports on behalf of DB Securities, wrote in its 2010 Annual Report that it maintained a "Regional Management" group responsible for both local and corporate-wide "compliance with regulatory and control requirements."  DB AG also represented that it was "in compliance with the German laws that are applicable to [its] business in all material aspects."  Price-fixing agreements among horizontal competitors are prohibited under German law.

f.      Goldman Sachs Group Inc., which reports on behalf of Goldman Sachs, wrote in its 2010 Annual Report that it "monitor[s] and control[s] [its] risk exposure through a risk and control framework encompassing a variety of separate but complementary financial, credit, operational, compliance and legal reporting systems, internal controls, management review processes and other mechanisms."  Goldman Sachs Group Inc. further claimed that "compliance with the law is the minimum standard to which we hold ourselves."  Goldman Sachs Group Inc. also published a Code of Conduct during the Class Period that purportedly required "fair and ethical competition" by its employees,

including employees of Goldman Sachs, and prohibited "manipulation" and "unfair dealing practice[s]."

g.      JPMorgan Chase & Co. published a "Code of Conduct" during the Class Period that applied to "all its direct and indirect subsidiaries."  In the Code of Conduct, JPMorgan Chase & Co. claimed that it was "committed to complying with the letter and spirit of applicable competition laws wherever we do business."  JPMorgan Chase & Co., which reports on behalf of JPM NA and JPMS, reported in its 2010 Annual Report that its Audit Committee "reviews with management the system of internal controls that is relied upon to provide reasonable assurance of compliance with the Firm's operational risk management processes."  It further assured investors that it "has established policies and procedures, and has in place various oversight functions, intended to promote the Firm's culture of 'doing the right thing.'"

h.      First Tennessee and FTN Financial reported under First Horizon's 2010 Annual Report that First Horizon had "[m]anagement processes, structure, and policies are designed to help ensure compliance with laws and regulations as well as provide organizational clarity for authority, decision-making, and accountability."  First Horizon also reported having a risk management team that "monitor[s] business practices in relation to those [establish[ed] appropriate operating standards."  It also wrote in its Code of Conduct that it prohibited "manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any unfair dealing practice."

i.      BNP Paribas SA, which reports on behalf of subsidiaries including BNP Securities, wrote in its 2010 Annual Report that it had in place a "complex internal control governance structure involving the Board of Directors, through various Committees," to

purportedly ensure an effective internal compliance system. BNP Paribas SA published a 2011 Code of Conduct where it wrote that it prohibited "market manipulation" and required "natural[] compl[iance] with the laws, regulations and professional standards" from its employees, including employees of BNP Securities.

j.      UBS AG, which reports on behalf of UBS Securities, boasted in its 2010 Annual Report that it "pursue[s] the highest levels of compliance through extensive employee training and investment in risk management processes and standards." Additionally, it emphasized that it evaluated its employees "base[d]" in part on "whether they . . . operate with a high level of integrity and in compliance with UBS policies." UBS Securities also claimed in its global Code of Business Conduct and Ethics that it was "committed to . . . complying with relevant laws, rules and regulations, including applicable antitrust and competition laws."

222.    Defendants' conspiracy was inherently self-concealing because it relied on secrecy for its successful operation. Had the public learned that Defendants conspired to fix prices in the FFB market, their conspiracy could not have continued for as long as it did. Accordingly, Plaintiffs could not have learned of Defendants' anticompetitive conduct prior to June 2018, when confidential sources revealed that the DOJ Antitrust Division was investigating dealers for fixing the prices of FFBs purchased and sold by investors.

223.    Because of Defendants' fraudulent concealment, Plaintiffs and the Class were not aware of Defendants' misconduct and could not have discovered it through the exercise of due diligence until June 2018, when the DOJ's price-fixing investigation was revealed publicly for the first time. Accordingly, Plaintiffs assert that the applicable statutes of limitations on Plaintiffs'

claims were tolled. Defendants are also equitably estopped from asserting any statute of limitations defense.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (For Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*)
### (Against All Defendants)

224.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

225.    Defendants and their unnamed co-conspirators engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, *et seq.*

226.    During the Class Period, Defendants controlled the supply of FFBs available to investors and were horizontal competitors in the FFB market.

227.    The combination and conspiracy consisted of a continuing agreement, understanding and concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, and charged artificial prices for FFBs to investors.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

228.    Defendants' conspiracy and resulting impact on FFB prices paid by investors occurred in and affected U.S. interstate commerce.

229.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property.  These injuries included, but were not limited to, paying artificial and non-competitive prices for FFBs as a proximate result of Defendants' anticompetitive conduct.  Plaintiffs and the Class were also deprived of the benefits of free and open competition in the FFB market.

230.   Plaintiffs and members of the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

**SECOND CLAIM FOR RELIEF**
**(Unjust Enrichment in Violation of the Common Law)**
**(Against All Defendants)**

231.   Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

232.   Plaintiffs and Class members transacted in FFBs during the Class Period directly with Defendants Barclays Capital, Inc.; Merrill Lynch, Pierce, Fenner, & Smith, Inc.; BNP Paribas Securities Corp.; Citigroup Global Markets Inc.; Credit Suisse AG; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; First Tennessee Bank, N.A., Goldman Sachs & Co. LLC; JPMorgan Chase Bank, National Association; J. P. Morgan Securities LLC; and UBS Securities LLC. These transactions were supposed to be priced based on competitive market forces and reflect honest competition by the Defendants.

233.   However, as alleged above, rather than competing honestly and aggressively with each other, Defendants colluded to fix the prices charged or remitted to Plaintiffs and the Class in purchases and sales of FFBs.

234.   Defendants' collusion enabled them to collect supra-competitive profits on every transaction of FFBs with Plaintiffs and the Class.  At the same time, it caused Plaintiffs and the Class to pay more (in the case of FFB purchases) and receive less (in the case of FFB sales) on their FFB transactions with Defendants.

235.   It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiffs and the Class, and equity and good conscience require the Defendants to make restitution.

236.     Plaintiffs and the Class therefore seeks restoration of the monies of which they were unfairly and unlawfully deprived as described in this Complaint.

### **PRAYER FOR RELIEF**

Accordingly, Plaintiffs demand relief as follows:

A.      For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, designating Plaintiffs as the Class representatives, and appointing their counsel as Class counsel;

B.      For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

C.      For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

D.      For a judgment awarding Plaintiffs and the Class damages against Defendants for Defendants' violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

E.      For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

**F.**      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury of all issues so triable.

Dated: February 22, 2019

*s/ Christopher M. Burke*
CHRISTOPHER M. BURKE (CB-3648)
600 W. Broadway, Suite 3300
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
San Diego, CA 92101
Tel: (619) 233-4565
Fax: (619) 233-0508
*cburke@scott-scott.com*

DAVID R. SCOTT (DS-8053)
AMANDA F. LAWRENCE (AL-8804)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Tel: (860) 537-5537
Fax: (860) 537-4432
*david.scott@scott-scott.com*
*alawrence@scott-scott.com*

DONALD A. BROGGI (DB-9661)
KRISTEN ANDERSON (KA-1965)
THOMAS BOARDMAN (TB-0530)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

Todd A. Seaver
Carl N. Hammarskjold
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
SF, CA 94104
Tel: (415) 433-3200
Fax: (415) 433-6382
*tseaver@bermantabacco.com*
*chammarskjold@bermantabacco.com*

Leslie R. Stern
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194
*lstern@bermantabacco.com*

*Attorneys for Plaintiffs Electrical Workers Pension Fund Local 103, I.B.E.W., and Local 103, I.B.E.W. Health Benefit Plan*

Vincent Briganti
Christian Levis
Roland R. St. Louis, III
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
*vbriganti@lowey.com*
*clevis@lowey.com*
*rstlouis@lowey.com*

Julia R. McGrath
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, Pennsylvania
Tel: (215) 399-4770
Fax: (610) 862-9777
*jmcgrath@lowey.com*

*Attorneys for Plaintiffs*

George A. Zelcs
Randall P. Ewing, Jr.
Ryan Z. Cortazar
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Tel: (312) 641-9750
Fax: (312) 641-9751
*gzelcs@koreintillery.com*
*rewing@koreintillery.com*
*rcortazar@koreintillery.com*

Stephen M. Tillery
Michael E. Klenov
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Tel: (314) 241-4844
Fax: (314) 241-3525
*stillery@koreintillery.com*
*mklenov@koreintillery.com*

*Attorneys for Plaintiffs*

The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Tel: (212) 223-6444
Fax:  (212) 223-6334
*dbroggi@scott-scott.com*
*kanderson@scott-scott.com*
*tboardman@scott-scott.com*

*Attorneys for Plaintiffs City
of Birmingham Retirement
and Relief System*