**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                     :
                                     :

IN RE GSE BONDS ANTITRUST
LITIGATION
                                     :

                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Civil Case No. 1:19-cv-01704 (JSR)

ORAL ARGUMENT REQUESTED

 

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR JOINT MOTION TO DISMISS THE CONSOLIDATED AMENDED
<u>CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM</u>**

June 13, 2019

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ............................................................................................................3

    A.    GSE Bonds.........................................................................................3

    B.    The *Bloomberg* Article ....................................................................5

    C.    The Original Complaints....................................................................6

    D.    Plaintiffs' Criticisms of Each Other's Statistics ...............................7

    E.    The Consolidated Amended Complaint ............................................8

ARGUMENT ...............................................................................................................12

I.    Plaintiffs Fail to Plead a Plausible Overarching Conspiracy to Fix the
Secondary-Market Price of Every GSE Bond Transaction................................12

    A.    Plaintiffs Fail to Plead "Direct Evidence" of an Overarching Conspiracy...........13

        1.    The Four Chats Reflect Lawful Discussions Among
Co-Underwriters About the Bonds They Underwrote, Not Price
Fixing .........................................................................................13

        2.    The Four Chats Do Not Suggest an Overarching Conspiracy ..................16

        3.    Plaintiffs' Direct Evidence Is Limited to Callable Bonds ........................18

        4.    Plaintiffs Do Not Allege Any Direct Evidence Relating to the Price
of Previously Issued Bonds or to Bid-Ask Spreads ...................................19

    B.    Plaintiffs Fail to Allege Parallel Conduct or "Plus Factors" That Create a
Plausible Inference of an Overarching Conspiracy ................................19

        1.    Plaintiffs Do Not Even Attempt to Plead Parallel Conduct......................19

        2.    Plaintiffs Do Not Plead Viable "Plus Factors" ......................................20

    C.    Plaintiffs' Resort to Group Pleading Underscores the Implausibility of the
Alleged Overarching Conspiracy................................................................23

        1.    Plaintiffs' Group Pleading Is Fatal to Their Claims Against All
Defendants .................................................................................24

        2.    Plaintiffs' Claims Against Some Defendants Are Even More
Deficient for Additional Reasons......................................................25

            a.    For a group of Defendants, Plaintiffs do not allege direct
evidence, statistical evidence, or specific transactions ............. 25

            b.    FTN illustrates the defects in Plaintiffs' group pleading........... 29

    D.    Plaintiffs' Statistics Are Fatally Flawed and Unreliable.......................................29

<table>
<tr><td>1.</td><td>Plaintiffs' Use of Averages Renders Their Analysis Unreliable</td><td>31</td></tr>
</table>

1.      Plaintiffs' Use of Averages Renders Their Analysis Unreliable ...............31

2.      Plaintiffs' Data Fail to Distinguish Among Defendants or Between Defendants and Non-Defendant Dealers ....................................33

3.      Plaintiffs' Underlying Data and Assumptions Are Opaque and Unreliable..........................................................................34

      a.      Plaintiffs do not adequately identify their underlying data........ 35

      b.      Plaintiffs fail to account for underwriter concessions .............. 35

      c.      Plaintiffs' data do not reliably identify customer sales or post-FTT sales by Defendants ......................................... 36

      d.      Plaintiffs' data do not focus on callable GSE bonds ................ 37

4.      Plaintiffs Fail to Control for Various Factors ............................37

5.      Plaintiffs' Individual Charts Suffer from Additional Facial Flaws ..........40

II.      Plaintiffs Fail to State a Rule-of-Reason Claim Based on Alleged Agreements Among Co-Underwriters During the Syndication Phase of Offerings ............................41

    A.      The Rule of Reason Applies to Agreements Among Co-Underwriters Operating as a Syndicate About the Price of the Bonds They Underwrote..........42

    B.      Plaintiffs Do Not Even to Try to Plead a Rule-of-Reason Claim .........................46

III.      Plaintiffs Lack Antitrust Injury Because They Fail to Allege Any Injury-In-Fact............47

    A.      Plaintiffs Do Not Adequately Allege That Defendants Fixed the Price of Bonds They Purchased or Sold ...............................................48

    B.      Plaintiffs' Statistics Are Insufficient to Show That Any Plaintiff Suffered Injury-in-Fact ..........................................................50

IV.      Plaintiffs' Claim Based on Pre-February 22, 2015 Conduct Is Time-Barred...................52

CONCLUSION...............................................................................55

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*7 W. 57th St. Realty Co.* v. *Citigroup, Inc.*,
   2015 WL 1514539, at *12 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 2019 WL
   1914278 (2d Cir. Apr. 30, 2019) ..........................................................................34

*Alaska Elec. Pension Fund* v. *Bank of Am. Corp.*,
   175 F. Supp. 3d 44, 54 (S.D.N.Y. 2016)...............................................................19

*In re Aluminum Warehousing Antitrust Litig.*,
   2014 WL 4277510, at *33 (S.D.N.Y. Aug. 29, 2014), *aff'd*, 833 F.3d 151 (2d
   Cir. 2016) ..............................................................................................................21

*Apex Oil Co.* v. *DiMauro*,
   822 F.2d 246, 253 (2d Cir. 1987).........................................................................13

*Arista Records LLC* v. *Lime Grp. LLC*,
   532 F. Supp. 2d 556, 569 (S.D.N.Y. 2007)...........................................................50

*Bell Atlantic Corp.* v. *Twombly*,
   550 U.S. 544, 553, 557, 566-67 (2007) ......................................................... *passim*

*Bookhouse of Stuyvesant Plaza, Inc.* v. *Amazon.com, Inc.*,
   985 F. Supp. 2d 612, 621 (S.D.N.Y. 2013)...........................................................47

*Broad. Music, Inc.* v. *CBS*,
   441 U.S. 1, 9, 24 (1979)....................................................................................42, 43

*Bruce* v. *Suntech Power Holdings Co. Ltd.*,
   64 F. Supp. 3d 1365, 1369 (N.D. Cal. 2014) .......................................................15

*Burtch* v. *Milberg Factors, Inc.*,
   662 F.3d 212, 225 (3d Cir. 2011).....................................................................12, 17

*Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*,
   996 F.2d 537, 545 (2d Cir. 1993)..........................................................................21

*Chapman* v. *N.Y. State Div. for Youth*,
   546 F.3d 230, 238 (2d Cir. 2008)..........................................................................47

*Chubirko* v. *Better Bus. Bureau of S. Piedmont, Inc.*,
   763 F. Supp. 2d 759, 765 (W.D.N.C. 2011) .........................................................17

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
   213 F. Supp. 3d 631, 648, 661-62, 678 (S.D.N.Y. 2016) ............................. *passim*

## TABLE OF AUTHORITIES
### (continued)

*Page(s)*

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*,
  2013 WL 1100770, at *4-5 (S.D.N.Y. Mar. 18, 2013), *aff'd*, 560 F. App'x 84
  (2d Cir. 2014) ........................................................................................................30, 33, 35

*Concord Assocs., L.P.* v. *Entm't Props. Tr.*,
  817 F.3d 46, 53-55 (2d Cir. 2016) ......................................................................................47

*Continental T.V., Inc.* v. *GTE Sylvania Inc.*,
  433 U.S. 36, 58-59 (1977) .............................................................................................42, 45

*Credit Suisse Secs. (USA) LLC* v. *Billing*,
  551 U.S. 264, 269-70, 276, 279-86 (2007) ...................................................................43, 44

*In re Currency Conversion Fee Antitrust Litig.*,
  773 F. Supp. 2d 351, 367-73 (S.D.N.Y. 2011) ..................................................................19

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677, 695 (2d Cir. 2009) .......................................................................................54

*ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JPMorgan Chase Co.*,
  553 F.3d 187, 206 (2d Cir. 2009) .......................................................................................54

*In re Elevator Antitrust Litig.*,
  502 F.3d 47, 52 (2d Cir. 2007) ...............................................................................18, 23, 24

*In re Elevator Antitrust Litig.*,
  2006 WL 1470994, at *11 (S.D.N.Y. May 30, 2006), *aff'd*, 502 F.3d 47 (2d
  Cir. 2007) ...........................................................................................................................21

*Ganino* v. *Citizens Utils. Co.*,
  228 F.3d 154, 166 (2d Cir. 2000) .......................................................................................15

*Gatt Commc'ns, Inc.* v. *PMC Assocs., LLC*,
  711 F.3d 68, 75 (2d Cir. 2013) ...........................................................................................47

*Harry* v. *Total Gas & Power N. Am., Inc.*,
  889 F.3d 104, 110, 116 (2d Cir. 2018) ....................................................................48, 50, 51

*Hinds Cty.* v. *Wachovia Bank N.A.*,
  620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009) .......................................................................53

*Hinds Cty., Miss.* v. *Wachovia Bank N.A.*,
  708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) .......................................................................24

# TABLE OF AUTHORITIES
## (continued)

*Page(s)*

*In re Initial Pub. Offering Sec. Litig.*,
   383 F. Supp. 2d 566, 585 (S.D.N.Y. 2005)............................................................15

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300, 315-16 (3d Cir. 2010) ...................................................................46

*Integrated Sys. & Power, Inc.* v. *Honeywell Int'l, Inc.*,
   713 F. Supp. 2d 286, 298 (S.D.N.Y. 2010)............................................................46

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
   768 F. Supp. 2d 961, 972 (N.D. Iowa 2011).........................................................18

*In re Interest Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430, 463, 467, 470-71, 478, 483, 489 (S.D.N.Y. 2017) ...................... *passim*

*Johnson* v. *Nyack Hosp.*,
   86 F.3d 8, 11 (2d Cir. 1996).................................................................................52

*LaFlamme* v. *Société  Air France*,
   702 F. Supp. 2d 136, 154 (E.D.N.Y. 2010) .............................................................3

*In re Late Fee & Over-Limit Fee Litig.*,
   528 F. Supp. 2d 953, 964 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir.
   2014) ................................................................................................................20

*Leegin Creative Leather Prod., Inc.* v. *PSKS, Inc.*,
   551 U.S. 877, 886 (2007)......................................................................................42

*LLM Bar Exam, LLC* v. *Barbri, Inc.*,
   271 F. Supp. 3d 547, 578-79 (S.D.N.Y. 2017) ................................................37, 42

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   213 F. Supp. 3d 530, 560 (S.D.N.Y. 2016) ............................................................22

*Love* v. *Johanns*,
   439 F.3d 723, 731 (D.C. Cir. 2006) .......................................................................37

*MacDermid Printing Sols. LLC* v. *Cortron Corp.*,
   833 F.3d 172, 182 (2d Cir. 2016)...........................................................................46

*Madison 92nd St. Assocs., LLC* v. *Courtyard Mgmt. Corp.*,
   624 F. App'x 23, 28 (2d Cir. 2015) .......................................................................53

**TABLE OF AUTHORITIES**
**(continued)**

*Page(s)*

*Mayor & City Council of Balt.* v. *Citigroup, Inc.*,
    709 F.3d 129, 135-38 (2d Cir. 2013) ............................................................ *passim*

*In re Merrill Lynch Ltd. P'ships Litig.*,
    154 F.3d 56, 60 (2d Cir. 1998) .................................................................... 55

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186, 1194 (9th Cir. 2015) ........................................................... 20

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
    2019 WL 1747780, at *5 (N.D. Cal. Mar. 08, 2019) .................................... 42

*NCAA* v. *Bd. of Regents of the Univ. of Okla.*,
    468 U.S. 85, 103-04 (1984) ........................................................................ 43

*In re Nine West Shoes Antitrust Litig.*,
    80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000) .................................................. 52

*Ohio* v. *Am. Express Co.*,
    138 S. Ct. 2274, 2284-87 (2018) ................................................................ 45

*In re Optical Disk Drive Antitrust Litig.*,
    2011 WL 3894376, at *9 (N.D. Cal. 2011) .................................................. 18

*Palm Beach Strategic Income, LP* v. *Salzman*,
    457 F. App'x 40, 42-43 (2d Cir. 2012) ........................................................ 30

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
    541 F. Supp. 2d 487, 491-92 (D. Conn. 2008) ........................................... 23

*In re Platinum & Palladium Antitrust Litig.*,
    2017 WL 1169626, at *51 (S.D.N.Y. Mar. 28, 2017) .................................. 26

*Polk Bros., Inc.* v. *Forest City Enters.*,
    776 F.2d 185, 190 (7th Cir. 1985) .............................................................. 43

*Precision Assocs., Inc.* v. *Panalpina World Transp. (Holding) Ltd.*,
    2011 WL 7053807, at *8-11 (E.D.N.Y. Jan. 4, 2011) .................................. 50

*In re Propranolol Antitrust Litig.*,
    249 F. Supp. 3d 712, 723-24 (S.D.N.Y. 2017) ........................................... 23

*SCFC ILC, Inc.* v. *Visa USA, Inc.*,
    36 F.3d 958, 963 (10th Cir. 1994) .............................................................. 45

## TABLE OF AUTHORITIES
### (continued)

*Page(s)*

*SEC* v. *Jones*,
476 F. Supp. 2d 374, 382 (S.D.N.Y. 2007)............................................................54

*Sejin Precision Indus. Co.* v. *Citibank, N.A.*,
235 F. Supp. 3d 542, 552 (S.D.N.Y. 2016)............................................................53

*Sheet Metal Workers Local 441 Health & Welfare Plan* v. *GlaxoSmithKline, PLC*,
2010 WL 3855552, at *30 (E.D. Pa. Sept. 30, 2010) ............................................52

*Singh* v. *Cigna Corp.*,
918 F.3d 57, 63 (2d Cir. 2019)...............................................................................54

*In re SSA Bonds Antitrust Litig.*,
2018 WL 4118979, at *2, 6-8 (S.D.N.Y. Aug. 24, 2018)....................47, 48, 49, 52

*Starr* v. *Sony BMG Music Entm't*,
592 F.3d 314, 319 (2d Cir. 2010)...........................................................................27

*Texaco* v. *Dagher*,
547 U.S. 1, 8 (2006)................................................................................................43

*Todd* v. *Exxon Corp.*,
275 F.3d 191, 200, 207-08 (2d Cir. 2001) .......................................................46, 47

*In re TVIX Sec. Litig.*,
25 F. Supp. 3d 444, 449 (S.D.N.Y. 2014), *aff'd sub nom. Elite Aviation LLC*
v. *Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014)............................................15

*United States* v. *Morgan*,
118 F. Supp. 621, 687-90 (S.D.N.Y. 1953) ...........................................................43

*In re Vitamin C Antitrust Litig.*,
995 F. Supp. 2d 125, 131 (E.D.N.Y. 2014) ...........................................................53

*Woori Bank* v. *Merrill Lynch*,
923 F. Supp. 2d 491, 497 (S.D.N.Y. 2013).............................................................55

*In re Zinc Antitrust Litig.*,
155 F. Supp. 3d 337, 369-70, 384 (S.D.N.Y. 2016) .........................................18, 24

**TABLE OF AUTHORITIES**
**(continued)**

*Page(s)*

**Statute and Rules**

15 U.S.C. § 15b ..................................................................................................................52

Fed. R. Civ. P. 9(b) .......................................................................................................53, 54

Fed. R. Civ. P. 12(b)(6) .......................................................................................................1

Fed. R. Civ. P. 15 ..............................................................................................................53

**Treatise**

VII PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW (2d ed. 2003) .....................22

Defendants respectfully submit this memorandum of law in support of their joint motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Consolidated Amended Class Action Complaint (ECF No. 171) ("CAC") for failure to state a claim.

## PRELIMINARY STATEMENT

Plaintiffs attempt to plead an impossibly broad conspiracy among 16 different dealers to fix the price of tens of thousands of different bonds issued by four different government-sponsored entities ("GSEs") over a seven-year period.  Although Plaintiffs promise a trove of "smoking gun direct evidence" based on information supplied by a "cooperating" dealer (CAC ¶ 3), the CAC points to only four chats among different combinations of only four Defendants that relate to only four bonds of one particular type over a two-year period.  (*Id.* ¶¶ 147-54.)  All but one of the chats consist of communications among dealers acting as an underwriting syndicate before the bonds were declared "free to trade" ("FTT"), a time when Plaintiffs themselves acknowledge that dealers are free to communicate with each other about prices.  (*Id.* ¶¶ 11, 128, 148-49, 152.)  In the sole post-FTT chat, one dealer expressly states that "if we are free to trade, we cannot talk about prices" (*id*. ¶ 150), thus belying any notion of price-fixing.  Plaintiffs try to buttress their minimal factual allegations with an "analysis" of "GSE Bond prices" that they say is "consistent with a price fixing conspiracy."  (*Id.* ¶¶ 6, 179-221.)  But Plaintiffs' statistics have no discernable connection to their "direct evidence" and are so flawed that another plaintiff in this matter advised the Court that they "reflect a fundamental misunderstanding of how banks are compensated for underwriting GSE bonds."  (ECF No. 101 at 23.)

That the CAC comes up short is not surprising.  Seizing on a June 2018 *Bloomberg* report that the Department of Justice ("DOJ") had opened an inquiry into secondary-market trading of bonds issued by two GSEs, various plaintiffs filed competing complaints containing highly generalized allegations, conflicting class periods, and contradictory statistics.  Notably, the CAC

conflicts with the predecessor complaints filed by the same Plaintiffs, which previously alleged, based on largely the same statistical analysis, that the conspiracy began in 2009 and ended in April 2014.  (ECF No. 1.)  The CAC now asserts that the conspiracy lasted until January 1, 2016 (CAC ¶ 263), contending that the same comparative analysis of prices during and after the alleged conspiracy somehow also supports the newly-expanded conspiracy period.  (*See id.* ¶¶ 189-99, 216-21.)  Such results-driven analysis does not render Plaintiffs' conspiracy allegations plausible.

Even accepting as true its barebones factual allegations, the CAC should be dismissed for failure to state a claim.  *First*, Plaintiffs fail to plead a plausible conspiracy to fix the price of every GSE bond traded in the secondary market between 2009 and 2016.  The CAC offers no details about how such a massive conspiracy even could work, given that small subsets of approximately 65 authorized dealers[1] (most of which are not defendants) acting in separate syndicates underwrote and traded tens of thousands of GSE bonds during that period.  There also is a stark mismatch between the breadth of Plaintiffs' claim and the factual allegations they marshal in support, even with the aid of a "cooperating" dealer.  Plaintiffs' so-called "direct evidence" is limited to four chats among different combinations of five co-underwriters that relate to only four bonds, a miniscule subset of both the total number of GSE bonds traded during the class period and the "13,117 GSE Bonds" Plaintiffs purport to have analyzed.  (*Id.* ¶ 6.)  Plaintiffs also fail to plead any parallel conduct by Defendants or any viable "plus factors," and Plaintiffs' resort to impermissible group pleading underscores the implausibility of their allegations of an overarching conspiracy involving 15 Defendants.  Lastly, Plaintiffs' statistics about GSE bond prices are so fatally flawed and unreliable that they lend no support for Plaintiffs' conspiracy allegations.

---

[1]    *See, e.g.*, Freddie Mac, *Dealer Groups*, http://www.freddiemac.com/debt/products/dealer-groups.html;    FHLBanks,    *Authorized    Dealers*,    http://www.fhlb-of.com/ofweb_userWeb/pageBuilder/authorized-dealers-134.

*Second*, Plaintiffs' allegations challenging discussions among co-underwriters while acting as an underwriting syndicate about the price of the bonds they underwrote are not subject to the *per se* rule, which applies only to practices with manifestly anticompetitive effects that lack any redeeming virtue.  To the extent the Court elects to decide this question now, such communications among co-underwriters should be examined under the rule of reason, and Plaintiffs do not even attempt to plead a rule-of-reason claim.

*Third*, given the CAC's failure to plead a plausible overarching conspiracy, Plaintiffs must plead both a conspiracy and antitrust injury on a bond-by-bond basis.  The CAC does not allege that Defendants unlawfully fixed the price of any bond Plaintiffs purchased.  As a result, Plaintiffs do not allege injury-in-fact sufficient to plead antitrust injury.

*Fourth*, Plaintiffs' antitrust claim based on conduct occurring before February 22, 2015 is barred by the Clayton Act's four-year statute of limitations.  Plaintiffs cannot invoke equitable tolling because the CAC fails to plead fraudulent concealment with the required particularity.  The statute of limitations wipes out most of Plaintiffs' proposed class period, including any claim based on the four chats alleged in the CAC.

## BACKGROUND

### A.    GSE Bonds

GSEs are "privately run enterprises sponsored by the federal government and established for a public purpose."  (*Id*. ¶ 108.)  Plaintiffs predicate their antitrust claim on the sale of unsecured debt of four different GSEs:  Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac"), Federal Home Loan Banks ("FHLB"), and Federal Farm Credit Banks ("FFCB").  (*Id.* ¶¶ 1, 108-10.)

These GSEs issue a wide variety of unsecured bonds in many different forms.  (*Id.* ¶¶ 111, 119-22.)  Of particular relevance to this case, "GSE Bonds can be non-callable, or 'bullet,' bonds

or callable GSE Bonds that can be redeemed by the issuer prior to maturity." (*Id.* ¶ 122.)  Non-callable GSE bonds include "GSE Benchmark and Reference Notes," which "are among the most traded GSE Bonds, accounting for over 2.5 million transactions from March 1, 2010 through December 31, 2017." (*Id.* ¶ 185.)  While benchmark and reference notes have standardized terms and are issued on a fixed, published schedule,[2] callable bonds are issued almost daily, with customized contractual terms that vary considerably across issuances.[3]  Callable bonds often are issued through a "reverse inquiry" process, "where an underwriter requests a particular callable structure."[4]  Unlike benchmarks and notes, callable bonds are issued on more of an *ad hoc*, informal basis.[5]

GSEs issue bonds to a "syndicate" of approved dealers that underwrite the offering by purchasing and reselling the newly-issued bonds.  (CAC ¶¶ 123, 127.)  The underwriting syndicate for any given offering consists of only a very small subset of the broader group of 65 approved dealers, and syndicate members vary from offering to offering.  (*Id.* ¶¶ 127-29.)  The dealers in the underwriting syndicate work together to sell the newly-issued GSE bonds to other dealers, regional banks, and customers.  (*Id.* ¶¶ 128, 160.)  As Plaintiffs acknowledge, "[d]uring the syndication phase, the Approved GSE Bond Dealers are permitted to communicate with each other to effectuate the initial placement in the primary market." (*Id.* ¶ 128; *see also id.* ¶ 160.)  The underwriters attempt to sell the newly issued bonds in the primary market to customers at the

---

[2]  Frank J. Fabozzi and George P. Kegler, FEDERAL AGENCY SECURITIES 245 (2008).

[3]  The Bond Market Ass'n, *An Investor's Guide to GSE Debt Securities*, http://www. freddiemac.com/debt/pdf/guide_gse_debtsecurities.pdf.

[4]  Freddie Mac, *Product Overview:  Callable Debt* (March 2008), http://www.freddiemac. com/debt/pdf/callable-debt_brochure.pdf; *see also* Fabozzi, *supra* note 2 at 246 ("Callable bonds are issued daily, primarily as customized issues from reverse inquiry of institutional investors.").

[5]  *See* Letter from Regional Bond Dealers Ass'n to U.S. Securities & Exchange Comm'n (May 7, 2009), https://www.sec.gov/comments/sr-finra-2009-010/finra2009010-2.pdf.

offering price to which they have agreed with the issuer—this is called the "par" price. Underwriters also may sell the bonds in the primary market to other dealers at a specified dealer concession, essentially a "wholesale" price stated on the face of the term sheet.

According to Plaintiffs, the "syndication phase ends when the Approved GSE Bond Dealers declare the new issuance 'free-to-trade' often abbreviated as 'FTT.'" (*Id.* ¶ 129.) "Once this announcement occurs, secondary market trading begins." (*Id.*) Although non-callable bonds typically go FTT at a pre-set time within minutes of when the offering is priced with the issuer, there is no pre-set time for callable bonds to go FTT. As a result, co-underwriters of callable bonds need to communicate with each other to decide when to declare the bonds FTT.

In the secondary market, GSE bonds are traded "over-the-counter" ("OTC") rather than on an exchange. (*Id.* ¶ 5.) Plaintiffs allege that traders at the approved dealers "are responsible for determining GSE Bond price quotes offered to investors" in the secondary market. (*Id.* ¶ 138.) "The bid price indicates the price at which a dealer is willing to buy a GSE Bond from a customer, and the ask price represents the price at which the dealer is willing to sell the same GSE Bond to that customer." (*Id.* ¶ 140.) "This difference is called the 'bid-ask spread.'" (*Id.* ¶ 139.) In addition to the most recently issued GSE bonds, known as "on-the-run" bonds, the secondary market includes trading of previously issued "off-the-run" GSE bonds. (*Id.* ¶ 118.) GSE bond prices fluctuate over time based on numerous different factors.

### B.    The *Bloomberg* Article

On June 1, 2018, *Bloomberg* reported that the DOJ had opened an investigation into whether unnamed traders at unspecified banks manipulated secondary-market prices of bonds

issued by Fannie Mae and Freddie Mac.  (*Id*. ¶¶ 155-57.)[6]  The article stated that the "inquiry is in

its early stages and focuses on whether traders at banks coordinated with one another" in the

secondary market.  It also reported that "[i]t's unclear whether the investigation will lead to any

prosecutions."  (*Id*.)  No charges have been brought against any trader or bank.

### C.    The Original Complaints

Following the *Bloomberg* article, numerous different complaints were filed in this Court

asserting antitrust claims against different groups of authorized dealers.  Several of Plaintiffs filed

the first complaint on February 22, 2019.  (ECF No. 1 ("Compl.").)  They asserted claims on behalf

of a putative class of investors that traded GSE bonds issued by Fannie Mae and Freddie Mac with

a group of defendants in the secondary market between January 1, 2009 and April 27, 2014.

(Compl. ¶¶ 213, 217, 231-36.)  Relying entirely on so-called economic analysis, Plaintiffs alleged

that "price data and other market data" revealed anomalies when comparing prices before and after

April 2014.  (*Id*. ¶ 6; *see also* ¶ 138.)  Plaintiffs asserted that those anomalies "statistically

diminish[ed] after April 2014 . . . in the wake of the LIBOR scandal."  (*Id*. ¶ 10.)  According to

Plaintiffs, "after news broke in April 2014 confirming that criminal prosecutions would not be

limited to LIBOR, [GSE bond] prices suddenly and dramatically changed."  (*Id*. ¶ 138.)

Shortly after Plaintiffs filed their complaint, a different set of lawyers filed a related

complaint, *Alaska Electrical Pension Fund* v. *Bank of America*, No. 19-cv-01796 (ECF No. 53),

asserting claims against a different group of defendants and based on bonds also issued by FFCB

and FHLB.  (*Alaska* Compl. ¶ 179.)  Whereas Plaintiffs' original complaint claimed that economic

data suggest a conspiracy starting in 2009 and ending in April 2014, the *Alaska* complaint claimed

---

[6] *See* David McLaughlin & Tom Shoenberg, *U.S. Opens Criminal Probe Into Trading in Fannie, Freddie Bonds*, Bloomberg (June 1, 2018), *available at* https://www.bloomberg.com/news/articles/2018-06-01/trading-in-fannie-freddie-bonds-is-said-to-be-probed-by-u-s.

that economic data suggest that the conspiracy did not start until 2012 and that it continued until June 2018.  (*Id.* ¶¶ 90-93.)

>    D.    **Plaintiffs' Criticisms of Each Other's Statistics**

In support of its lead-counsel application, the *Alaska* plaintiff correctly pointed out various deficiencies in Plaintiffs' statistics, including that they fail to distinguish between primary- and secondary-market sales.  (ECF No. 101 at 23.)  The *Alaska* plaintiff explained that Plaintiffs' statistics appear to be a "simple comparison of (a) the price paid by the underwriters to acquire the bonds from the issuer to (b) the price at which the underwriters then sold the newly-issued bonds to investors"—a price comparison that "appears to reflect a fundamental misunderstanding of how banks are compensated for underwriting GSE bonds."  (*Id.*)  As the *Alaska* plaintiff stated, "the difference between what the underwriters pay to the GSEs for newly-issued bonds and what they receive from investors in the public offering is simply a function of the underwriting *fees* set by the issuer," which "are fully disclosed."  (*Id.*)

In defense of their complaint, Plaintiffs stated that their "expert analysis indicat[es] that the impact from Defendants' misconduct in the GSE bond market started to abate after . . . April 2014." (ECF No. 131 at 3.)  They argued that "GSE bond traders were unlikely to continue openly communicating with each other in group chat rooms about fixing prices after [April 2014]."  (*Id.*) As Plaintiffs put it, the *Alaska* plaintiff "ignore[s] these facts," and its proposal to extend the class period past April 2014 "does not accord with . . . reality."  (*Id.* at 4.)  Plaintiffs also took issue with the *Alaska* plaintiff's assertion of claims based on bonds issued by FFCB and FHLB, stating that "FFCB and FHLB bonds traded in higher volumes and with narrower bid-ask spreads, consistent with a normally functioning market."  (*Id.* at 2-3.)

###### E.    The Consolidated Amended Complaint

**The Parties.**  After the Court's lead-counsel appointment (ECF No. 159), Plaintiffs filed the CAC.  Although the CAC includes four named Plaintiffs, only one, the Treasurer of the Commonwealth of Pennsylvania ("Commonwealth Funds"), alleges that its transactions include GSE bonds that the "cooperating" dealer "identified as being impacted by the conspiracy."  (CAC ¶ 21.)  Despite the CAC's allegation that Commonwealth Funds "participated in thousands of GSE Bond transactions" with Defendants during the class period (*id.* ¶ 21), it identifies only six transactions, involving only four callable bonds and two Defendants, that the alleged "cooperating" dealer "identified as among those" affected by the supposed conspiracy (*id.* ¶ 238).[7]

The three other named Plaintiffs are (i) City of Birmingham Retirement and Relief System ("Birmingham"), (ii) Electrical Workers Pension Fund Local 103, I.B.E.W. ("IBEW Pension Plan"), and (iii) Local 103, I.B.E.W. Health Benefit Plan ("IBEW 103").  (*Id.* ¶¶ 22-24.)  These Plaintiffs allege that they traded in an unidentified number of GSE bonds with certain, but not all, Defendants at unidentified times during the class period.  Collectively, they allege only limited facts about seven transactions, none of which was supposedly affected by the conspiracy purportedly described by the alleged "cooperator."  (*Id.* ¶¶ 246-61.)

The CAC names 15 Defendants, out of the 65 approved dealers for GSE bonds.  (*Id.* ¶¶ 27-106.)  Plaintiffs allege that Defendants "were the largest underwriters in the primary market" and "the largest dealers of GSE Bonds to investors in the secondary market."  (*Id.* ¶ 2.)  The CAC concedes, however, that non-defendant dealers underwrote close to 23% of the GSE bond offerings

---

[7]  The CAC alleges limited facts about two of Commonwealth Funds' other transactions, but does not claim that those transactions were affected by the conspiracy described by the alleged "cooperator."  (CAC ¶¶ 242, 245.)

during the class period and that four Defendants have less than 2% "market share."[8]  (*Id.* ¶ 134.)

**Plaintiffs' Claim and Proposed Class.**  The CAC seeks to assert a single antitrust claim on behalf of all investors that transacted with a Defendant in the secondary market between January 1, 2009 and January 1, 2016 in any GSE bond issued by the four GSEs.  (*Id.* ¶ 263.)  The CAC broadly asserts that *all* Defendants conspired to fix the prices of *all* GSE bonds traded in the secondary market during the class period.  (*Id.* ¶ 3.)  The CAC contradicts Plaintiffs' allegation in their original complaint that the prices of GSE bonds "suddenly and dramatically changed" in April 2014.  (Compl. ¶ 138.)  Plaintiffs now contend, without any explanation, that "[t]he economic fingerprints that Defendants' conspiracy left on the GSE Bond market" continued until January 2016, when the "cooperating" dealer—which appears to be Deutsche Bank Securities, Inc. ("DBSI")—"discovered the anticompetitive conduct alleged" in the CAC.  (CAC ¶ 11.)

**Plaintiffs' "Direct Evidence."**  The principal new addition to the CAC is Plaintiffs' so-called "smoking gun direct evidence" provided by their "cooperating" dealer.  (*Id.* ¶ 3.)  According to that "cooperator," Defendants "conspired to fix the price at which GSE Bonds [went] FTT in the secondary market" (*id.* ¶ 145), a far more limited conspiracy than what the CAC alleges.

As its only "direct evidence," the CAC quotes *four* chats involving different combinations of *four* Defendants and DBSI that relate to *four* specific bonds issued by *two* GSEs:  FFCB and FHLB.  (*Id.* ¶¶ 144-54.)[9]  According to the publicly available pricing supplements, all four bonds

---

[8]  According to the CAC, the following Defendants have less than 2% market share:  HSBC (1.82%), TD Securities (USA) LLC ("TD") (1.28%), Cantor Fitzgerald ("Cantor") (0.97%) and SG Americas Securities, LLC ("SG") (0.13%).

[9]  Although Cantor allegedly co-underwrote one of the four bonds, it did not participate in the chat quoted by the CAC.  (*See* CAC ¶ 152.)

were callable bonds, not non-callable benchmarks or notes.[10]   Although the CAC asserts that "[t]his misconduct occurred regularly from at least as early as August 2009 through at least January 2016" (*id.* ¶ 146), the four chats take place on distinct dates, months apart, during the much shorter period of September 2011 through September 2013.   Notwithstanding Plaintiffs' assertion that the four chats are direct evidence that "Defendants conspired to fix the price at which GSE bonds were FTT in the secondary market" (*id.* ¶ 145), the chats do not suggest a price-fixing agreement.   They instead appear to reflect discussions among co-underwriters—in all but one case during the syndication phase—about whether to declare the bonds FTT and to *reduce* the price of the bonds from "par" (*i.e.*, 100) to a discounted initial price (*e.g.*, 99.925 or 99.985).   (*See id*. ¶¶ 148-49, 152.)   Plaintiffs themselves acknowledge that dealers are permitted to communicate with each other during the syndicate phase about the price of the bonds they underwrote.   (*Id.* ¶¶ 11, 128, 160.)   Although one of the four chats allegedly reflects post-FTT communications among syndicate members, it rebuts Plaintiffs' assertion that traders fixed secondary-market prices after bonds went FTT:   in that chat, the Goldman Sachs trader expressly states, "if we are free to trade, we cannot talk about prices," to which the DBSI trader replied, "ok.  Fair enough."  (*Id.* ¶ 150.)

Despite the narrow fact pattern reflected in the chats, the CAC broadly asserts that all Defendants conspired to fix the price of hundreds of thousands of secondary-market transactions in tens of thousands of different GSE bonds, regardless of whether the transactions involved callable bonds and occurred shortly after the bonds were declared FTT.   Plaintiffs do not provide

---

[10]   *See* Ex. 1 (Term Sheet, FFCB (Aug. 31, 2011)); Ex. 2 (Pricing Supp., FHLB (Feb. 13, 2012)); Ex. 3 (Pricing Supp., FHLB (July 16, 2012)); Ex. 4 (Offering Notice, FHLB (Sept. 18, 2013)).  All exhibits referenced herein are exhibits to the Declaration of Richard C. Pepperman II, dated June 13, 2019.  The same is true of the bonds identified at Paragraph 238, which Commonwealth Funds allegedly purchased.  *See* Ex. 2 (Pricing Supp., FHLB (Feb. 13, 2012)); Ex. 5 (Term Sheet, FFCB (August 7, 2012)); Ex. 6 (Pricing Supp., Freddie Mac (Nov. 5, 2013)); Ex. 7 (Pricing Supp., Freddie Mac (May 20, 2015))).

any direct evidence of the all-encompassing conspiracy asserted by the CAC or any explanation of how such a massive conspiracy could be effected and maintained.  None of the four chats suggests market-wide conduct; rather, each is limited to a specific bond and a specific subset of dealers.  Plaintiffs cite no chats or direct evidence of any type pertaining to 11 of the 15 Defendants.

**Plaintiffs' "Plus Factors."**  Although Plaintiffs do not even attempt to allege that Defendants engaged in parallel conduct, they contend that so-called "plus factors" support "an inference of collusion."  (*Id.* ¶ 158.)  Plaintiffs allege an opportunity to conspire "because Defendants could communicate freely with one another during the underwriting and syndication" phases of offerings (*id.* ¶ 162) and because traders sometimes changed jobs (*id.* ¶ 167) and "gathered for social and industry events" (*id.* ¶ 168).  They also allege a motive to conspire because "[t]he GSEs monitored Defendants' performance in the secondary market and awarded underwriting privileges based in part on success in the secondary market."  (*Id.* ¶ 172.)  And Plaintiffs allege that "[t]here is a high level of industry concentration in," and "high barriers to entry into," GSE bond underwriting (*id.* ¶¶ 176-78), notwithstanding that 65 authorized dealers underwrite GSE bonds and the CAC alleges that approximately 77% of GSE underwritings was split among 16 different dealers, including four with less than 2% market share (*id.* ¶ 134).

**Plaintiffs' Purported Statistical Analysis.**  Plaintiffs claim that their statistical "analysis" uncovered "anomalies in GSE Bond pricing that are inconsistent with normal, competitive market conditions."  (*Id.* ¶ 180.)  Without adequately identifying the data underlying their statistics, Plaintiffs purport to analyze (i) the average difference between the prices dealers paid to GSEs for bonds and the prices at which they sold bonds to investors on offer days, (ii) average prices for bonds about to go off-the-run on the days leading up to a new issuance, and (iii) average bid-ask spreads quoted by dealers before and after January 1, 2016.  (*Id.* ¶¶ 179-221.)  Plaintiffs maintain

that this analysis of average prices and bid-ask spreads both during and after the proposed class period is somehow "consistent with a price-fixing conspiracy." (*Id*. ¶ 179.)  None of Plaintiffs' statistical analysis, however, addresses the initial discounted price of callable bonds after they are declared FTT, the subject of Plaintiffs' so-called "direct evidence."

## ARGUMENT

I.   **Plaintiffs Fail to Plead a Plausible Overarching Conspiracy to Fix the Secondary-Market Price of Every GSE Bond Transaction.**

Under *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 553 (2007), the CAC's allegations fall well short of adequately pleading a sprawling conspiracy among 16 dealers to fix the price of every secondary-market transaction in every bond issued by four GSEs over a seven-year period.[11]

"A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed."  *Mayor & City Council of Balt.* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  "[T]here are two ways to do this."  *Id*.  First, a plaintiff may allege "direct evidence" of a conspiracy—*i.e.*, "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *Burtch* v. *Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011).  Second, a plaintiff may allege "circumstantial facts supporting the *inference* that a conspiracy existed."  *Citigroup*, 709 F.3d at 136.  These "circumstantial facts" ordinarily consist of allegations that defendants engaged in parallel conduct, accompanied by so-called "plus factors" raising a plausible inference that the parallel conduct "flowed from a preceding agreement."  *Id*. at 137-38.

Plaintiffs do neither here.  Their "direct evidence" does not suggest a broad conspiracy to fix the prices of secondary-market transactions across GSE bonds over seven years, and the CAC pleads neither parallel conduct nor "plus factors" that support a plausible inference of such a

---

[11]  Unless otherwise indicated, all internal citations, alterations and quotation marks are omitted.

massive conspiracy involving tens of thousands of bonds and hundreds of thousands of trades. Plaintiffs' improper resort to group pleading only reinforces the implausibility of the alleged overarching conspiracy involving 15 different Defendants.  Finally, Plaintiffs' flawed statistical analysis of bond prices and bid-ask spreads does not make their all-encompassing conspiracy any more plausible.

### A.     Plaintiffs Fail to Plead "Direct Evidence" of an Overarching Conspiracy.

Conspiracies "concern[ing] long-term complex relationships among competitors" (as is alleged here) should be "more susceptible of direct proof."  *Apex Oil Co.* v. *DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987).  Despite touting "smoking gun" evidence from a "cooperating" dealer (CAC ¶ 3), the only purported "direct evidence" that Plaintiffs cite are four chats, among different combinations of only four Defendants, concerning a total of four callable bonds (*id.* ¶¶ 147-52). Those communications do not raise a plausible inference of a broad price-fixing conspiracy involving all secondary-market transactions in tens of thousands of bonds over seven years.

### 1.     The Four Chats Reflect Lawful Discussions Among Co-Underwriters About the Bonds They Underwrote, Not Price Fixing.

The four chats cited in the CAC are not direct evidence of illegal price fixing.  All four involved communications among co-underwriters operating as an underwriting syndicate.  (*Id.* ¶¶ 147-52.)  Plaintiffs themselves acknowledge the crucial role syndicates play in bringing GSE bonds to market. (*Id.* ¶ 127.)  As the CAC alleges, dealers in the "syndication" phase work together to place the newly issued bonds in the "primary market," and they "are permitted to communicate with each other to effectuate [that] initial placement." (*Id.* ¶ 128; *see also id.* ¶ 160.)  In performing this function, syndicate members can and need to "discuss pricing."  (*Id.* ¶ 11.)  According to Plaintiffs, "the syndication phase ends" when the co-underwriters "declare the new issuance" FTT, and only then does "secondary market trading begin[]."  (*Id.* ¶ 129.)

Plaintiffs admit that three of the four chats discussed in the CAC reflect communications among co-underwriters, acting as a syndicate, before any secondary-market trading occurred.[12] These three chats each involve a discussion among syndicate members about whether to declare the bonds FTT and offer the bonds at a discounted price below par.  (*Id.* ¶¶ 148-49, 152.)  The CAC fails to explain how or why such a discussion is direct evidence of unlawful price fixing in the secondary market when syndicate members "are permitted to communicate with each other" during the syndication phase and when the discussions do not reflect an anticompetitive agreement related to secondary-market trading.  (*Id.* ¶ 128.)  And while the fourth chat allegedly reflects continuing communications among co-underwriters after the bonds were declared FTT (*id.* ¶ 150), the chat itself makes clear that the dealers did *not* agree on a price.  After a DBSI trader stated, "I know we're FTT, and anyone can hit any bid, but given that it's day #2 w/ these bonds, figure maybe we at least try and stay on the same page," a Goldman Sachs trader responded, "if we are free to trade, we cannot talk about prices."  (*Id.*)  The DBSI trader then replied, "ok.  Fair enough," and the communication ended.  (*Id.*)  Nothing in that chat provides any direct or "smoking gun" evidence of an agreement to fix the price of secondary-market trades.  *Citigroup*, 709 F.3d at 136.

Despite Plaintiffs' possession of "pricing data for over 13,117 GSE Bonds encompassing a total of 1.6 million GSE Bond transactions" (CAC ¶ 6), the CAC says nothing about the actual prices paid for the bonds discussed in the chats after the bonds went FTT.  That omission is particularly glaring because the same TRACE data on which Plaintiffs rely (*id.* ¶¶ 10, 185 & n.6, 207, 212) reveal that the potential prices referenced in the chats generally were *not* the prices at

---

[12]  *See* CAC ¶ 148 (February 2012 chat occurred "[p]rior to selling those bonds in the secondary market); ¶ 149 (September 2013 chat occurred "prior to selling GSE Bonds newly issued by FHLB in the secondary market"); ¶ 152 (discussions among co-underwriters while in syndicate).

which the bonds actually traded in the secondary market.[13]

For example, the CAC alleges that co-underwriters DBSI, Morgan Stanley, and BNPP discussed in February 2012 a callable bond issued by FHLB with the CUSIP identifier 313378BR1.[14] In the quoted chat, the traders discuss going FTT and reference a potential initial discounted price of 99.985. (CAC ¶ 148.) According to TRACE data, after the bond went FTT, the very next sale was at a price of 99.97—*i.e.*, **below** the price discussed in the chat. (*See* Ex. 8 (TRACE data summary for CUSIP 313378BR1).) Indeed, after the date of the quoted chat, a total of 53 sales of this bond occurred, and all but 14 were at a price **below** 99.985. (*Id.*) Accordingly, nothing in the actual trading history of this bond suggests anything resembling an agreement among the co-underwriters to fix secondary-market prices. This is not an isolated example: after going FTT, the bonds discussed in three of the four chats quoted in the CAC repeatedly traded in the secondary market at a price **below** the initial discounted price discussed in the chats.[15]

---

[13] The Court may take judicial notice of pricing data on a motion to dismiss. *See Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) (collecting cases). Indeed, courts have considered trading data, including TRACE data, on motions to dismiss. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 585 (S.D.N.Y. 2005); *Bruce* v. *Suntech Power Holdings Co. Ltd.*, 64 F. Supp. 3d 1365, 1369 n.2 (N.D. Cal. 2014).

[14] Plaintiffs fail to identify the GSE bonds referenced in the chats, despite alleging other details. (CAC ¶¶ 147, 149, 150, 152.) The Court may take judicial notice of offering documents and term sheets tied to each bond. *See, e.g.*, *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 449 (S.D.N.Y. 2014) ("[o]n a motion to dismiss, the court may take judicial notice of offering documents"), *aff'd sub nom. Elite Aviation LLC* v. *Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014). The term sheet for the referenced bond, 313378BR1, shows that it was a callable bond underwritten by DBSI, Morgan Stanley, and BNPP. (*See* Ex. 2.) Although Plaintiffs refer to the quoted communication as a "February 17, 2012" chat (CAC ¶ 148), the chat on its face states that it occurred on February 16, 2012.

[15] The September 1, 2011 chat between DBSI and BNPP (CAC ¶ 152) discusses a callable bond issued by FFCB. (Ex. 1.) Although the chat mentions a potential price of 99.925, the TRACE data show that the bond was sold the very next day at a price of 99.915, which is **below** the price discussed in the chat, and was subsequently repeatedly sold below that price. (Ex. 9 (TRACE data summary for CUSIP 31331KXS4).) Similarly, the July 17, 2012 chat among DBSI, BNPP,

What is more, the initial discounted price of 99.985 referenced in the chat was set forth in the bond's term sheet available to all investors, which provides that the "issue price" for the bond is "100 per cent" and that the co-underwriters may offer the bond to "[o]ther dealers participating in the distribution of the Bonds" at "a selling concession of 0.015 per cent"—*i.e.*, at 99.985 (100 minus 0.015 percent).  (*See* Ex. 2 at 5.)  Accordingly, the price mentioned in the chat (99.985) matched exactly the dealer-concession price in the term sheet.  If the underwriters discussed that price when declaring the bonds FTT, they simply decided to offer the bonds to *all* purchasers, not just other dealers, at the publicly disclosed discounted price (99.985).

In sum, none of these chats is direct evidence of any conspiratorial agreement to fix secondary-market prices.

### 2.    The Four Chats Do Not Suggest an Overarching Conspiracy.

Even if the chats were direct evidence of an agreement related to the price of the four callable bonds they discuss, they manifestly are not "direct evidence" of the sweeping, seven-year conspiracy Plaintiffs purport to allege.  The chats are among only four named Defendants; none of the other 11 Defendants is alleged to have participated in any chat at all.[16]  Moreover, the four callable bonds discussed in the chats account for less than 0.03% of the total offerings of GSE bonds during the class period (CAC ¶ 134, Table 1), and the CAC alleges no facts suggesting that

---

Goldman Sachs, and Merrill Lynch (CAC ¶ 150) discusses a callable bond issued by FFCB.  (Ex. 3.)  Although the chat references a potential price of 99.875, the TRACE data show that, on the very next day, the bond was traded seven times at various prices *below* 99.875.  (Ex. 10 (TRACE data summary for CUSIP 3133EAZF8).)  The TRACE data exhibits remove "cancelled" trades, incorporate reported trade "corrections," and remove duplicate buy-side inter-dealer trades to the extent the sell-side of the inter-dealer trade is already reported.

[16]  While Plaintiffs assert in a single conclusory sentence that their alleged cooperator "directly implicated" each Defendant "in this misconduct" (CAC ¶ 146), the four cited chats involve only four Defendants (*id.* ¶¶ 148-52), and do not show the alleged misconduct.  Plaintiffs' conclusory allegation lumping all 15 Defendants together is impermissible group pleading.  *See infra* Argument I.C.

the four chats are direct evidence of a sweeping, market-wide conspiracy involving all transactions in tens of thousands of GSE bonds over a seven-year period. *See Burtch*, 662 F.3d at 225 ("Direct evidence of a conspiracy is evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.").

Nor could it. Different combinations of the 65 approved dealers that participated in underwriting GSE bonds formed tens of thousands of separate syndicates at different times during the class period. Plaintiffs do not contend that the 50 non-defendant dealers conspired in any way. Given that various combinations of 65 dealers participated in underwriting syndicates—and that many thousands of bonds were issued during the class period (*see* CAC ¶ 6)—Plaintiffs' allegation of a broad, market-wide conspiracy is implausible. Nothing in the chats remotely suggests that any "agreement" extended to other offerings or to other dealers not participating in these chats.

Furthermore, even with the aid of a "cooperator," Plaintiffs never describe how an overarching conspiracy involving 16 different dealers operating in small, time-limited groups in thousands of different syndicates purportedly functioned over a seven-year period. *See Chubirko* v. *Better Bus. Bureau of S. Piedmont, Inc.*, 763 F. Supp. 2d 759, 765 (W.D.N.C. 2011) (dismissing complaint after finding that "the sheer breadth and scope of the conspiracy alleged . . . alone renders Plaintiff[s'] claims facially implausible" because it would require a degree of "organization and cooperation [that is] practically impossible"). Nor do Plaintiffs explain how the wide-ranging conspiracy would consistently turn a profit, when other, non-defendant dealers— which, according to the CAC, underwrote close to 23% of GSE offerings (CAC ¶ 134)—actively traded in the secondary market. Plaintiffs fail to explain why, if Defendants charged inflated prices for the bonds they underwrote, investors would not simply trade with other dealers that offered alternative GSE bonds with similar characteristics at better prices. (*Id*. ¶¶ 111, 127, 154.)

These gaps in the CAC render its allegations of an overarching conspiracy implausible. *See In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 972 (N.D. Iowa 2011) (dismissing claim where plaintiffs failed to allege facts "that could tie together the specific, discrete incidents" to "the overarching all-defendant four-plus-year conspiracy" asserted by plaintiffs); *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9 (N.D. Cal. 2011) (dismissing claim where allegations of sporadic conduct were "a far cry from establishing plausibility for a broad six year continuing agreement among all defendants"); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 369-70 (S.D.N.Y. 2016) (allegations regarding defendants' conduct at "only one point in time" were insufficient to "support the broad scheme alleged").

### 3.   Plaintiffs' Direct Evidence Is Limited to Callable Bonds.

As noted above, all four chats discussed *callable* bonds.[17]   (*See* Exs. 1-4.)  Plaintiffs plead *no* direct evidence relating to non-callable bonds such as benchmarks and reference notes, which account for most of the trading during the class period.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (dismissing claims where "Plaintiffs provide[d] an insufficient factual basis for their assertions of a" conspiracy in one geographic market based on "[a]llegations of anticompetitive wrongdoing" in another geographic market).  Unlike *ad hoc* offerings of callable bonds, offerings of non-callable benchmarks and notes occur on a pre-set schedule established by the issuer and more closely resemble a traditional underwriting:  before the offering, the underwriters build a book of investors to purchase the bonds, and the bonds go FTT almost immediately after they are priced with the issuer.  *See supra* at 3-4.  There is thus no occasion or need for the underwriters of non-callable bonds to discuss when to declare the bonds FTT and at

---

[17]   The same is true of the other four bonds referenced elsewhere in the CAC that supposedly are "among those whose FTT prices Defendants and their co-conspirators agreed to fix during the Class Period."  (CAC ¶ 238; *see also* Exs. 2, 5-7.)

what initial discount to par.

### 4. Plaintiffs Do Not Allege Any Direct Evidence Relating to the Price of Previously Issued Bonds or to Bid-Ask Spreads.

The CAC appears to suggest that Defendants somehow also conspired to (i) inflate secondary-market prices of soon-to-be off-the-run bonds in the days before new issuances (*e.g.*, CAC ¶ 8), and (ii) artificially widen bid-ask spreads (*id.* ¶ 9). Plaintiffs plead no direct evidence that supports these allegations; indeed, the four chats cited in the CAC have absolutely nothing to do with previously-issued GSE bonds that are about to go off-the-run[18] or with bid-ask spreads.

### B. Plaintiffs Fail to Allege Parallel Conduct or "Plus Factors" That Create a Plausible Inference of an Overarching Conspiracy.

### 1. Plaintiffs Do Not Even Attempt to Plead Parallel Conduct.

Plaintiffs make no attempt to plead facts suggesting that Defendants engaged in parallel conduct, let alone parallel conduct suggesting a conspiracy to fix secondary-market prices of *any* GSE bonds. The CAC is devoid of factual allegations about uniform and consistent pricing of GSE bonds by Defendants. *Cf.*, *e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 367-73 (S.D.N.Y. 2011) (alleging multi-year period when each defendant implemented same foreign-currency conversion fee); *Alaska Elec. Pension Fund* v. *Bank of Am. Corp.*, 175 F. Supp. 3d 44, 54 (S.D.N.Y. 2016) (alleging multi-year period when each defendant made ISDAfix submissions reflecting "exact same bid/ask spread" nearly every day). Instead, Plaintiffs point to four isolated communications among different combinations of only four Defendants and cite statistical averages that say nothing at all about the conduct of any particular Defendant.

---

[18]   Indeed, the concept of "off-the-run" bonds generally does not exist for callable bonds, and Plaintiffs do not allege otherwise.

### 2. Plaintiffs Do Not Plead Viable "Plus Factors."

In addition to parallel conduct, a plaintiff must allege additional facts and circumstances—"plus factors"—creating a plausible inference that any alleged parallel conduct "flowed from a preceding agreement." *Citigroup*, 709 F.3d at 137. "Plus factors" that may support a plausible inference of conspiracy include: "(1) a common motive to conspire; (2) evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and (3) evidence of a high level of interfirm communications." *In re Interest Rate Swaps Antitrust Litig.* ("*In re IRS*"), 261 F. Supp. 3d 430, 463 (S.D.N.Y. 2017). Even if the Court were to consider the CAC's conclusory allegations of "plus factors," which it need not do given the CAC's failure to allege any parallel conduct,[19] the "plus factors" that Plaintiffs recite are insufficient to raise a plausible inference of a massive, market-wide conspiracy.

**Common Motive to Conspire.** The CAC asserts that "GSEs monitored Defendants' performance in the secondary market and awarded underwriting privileges based in part on success in the secondary market," which Plaintiffs argue "gave Defendants a motive to conspire." (CAC ¶ 172.) To plead a common motive to conspire, however, a plaintiff must do more than allege that each defendant had an interest in maximizing its profits, which is always the case. *See, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.8 (9th Cir. 2015) ("common motive for increased profits always exists"); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) ("[I]f a motive to achieve higher prices were sufficient, every company in every industry could be accused of conspiracy because they all would have such a motive."), *aff'd*, 741 F.3d 1022 (9th Cir. 2014). Instead, a plaintiff must allege that the defendants

---

[19] *See In re IRS*, 261 F. Supp. 3d at 471 ("Given the few well-pled allegations of parallel relevant activity among Dealers . . . , there is, arguably, no charter to inquire into the existence of the three 'plus factors' identified by the Second Circuit.").

had a strong interest in *conspiring* to engage in conduct that they were unlikely to undertake absent a conspiracy. *See Twombly*, 550 U.S. at 566 ("no reason to infer that the companies had agreed among themselves to do what was only natural"). The CAC makes no effort to allege that here.

**Parallel Acts Against Self-Interest.** Plaintiffs fail to allege any parallel acts at all by Defendants, much less parallel acts that were against each Defendant's economic self-interest.

**Interfirm Communications.** Plaintiffs assert that "because Defendants could communicate freely with one another during the underwriting and syndication of GSE Bonds, they were able to use those [same] lines of communication to enter into illegal agreements about pricing." (CAC ¶ 162.) Plaintiffs also allege that "traders and sales personnel . . . had well-established relationships" and "overlapping employment" at different dealers (*id*. ¶ 166) and "gathered for social and industry events" (*id*. ¶ 168). These allegations amount, at most, to an opportunity to conspire, which alone cannot support an inference of conspiracy. *Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993) ("The mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred."); *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *33 (S.D.N.Y. Aug. 29, 2014) ("plaintiffs' allegations . . . amount only to a potential[] opportunity to communicate, which is nothing more than a bare assertion incapable of supporting a plus-factor on its own"), *aff'd*, 833 F.3d 151 (2d Cir. 2016). Likewise, allegations about participation in industry events and attendance at conferences (CAC ¶¶ 169-70) are insufficient to plead a "plus factor." *Twombly*, 550 U.S. at 567 n.12 (rejecting inference of conspiracy based on participation in trade association); *In re Elevator Antitrust Litig.*, 2006 WL 1470994, at *11 (S.D.N.Y. May 30, 2006) (allegation that "company executives attend trade, industry, or social functions together is clearly insufficient to state a claim"), *aff'd*, 502 F.3d 47 (2d Cir. 2007).

**Market Concentration and Barriers to Entry.**  The CAC alleges that "[t]here is a high level of industry concentration in," and "high barriers to entry into," what Plaintiffs call "the GSE Bond market."  (CAC ¶¶ 176-77.)  But the CAC fails to explain how a putative market in which 16 of the largest dealers collectively account for only 77% of the underwritings and have "market shares" ranging from 0.13% (SG) to 14.07% (Barclays) is "highly concentrated."  (*Id.* ¶ 134 & Table 1.)  Such widely dispersed "market shares" do not resemble a highly concentrated market with attendant risk of price fixing.  *See* VII PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1431a, at 214 (2d ed. 2003) ("[E]mpirical studies considering many industries have suggested that noncompetitive pricing is likely to appear when the *four leading firms account for some 50 to 80 percent of the market*.") (emphasis added).[20]  Plaintiffs also make no effort to reconcile their allegation of "high barriers to entry" (CAC ¶ 177) with the fact that 65 dealers in total are authorized to underwrite GSE bonds.

**The *Bloomberg* Article.**  Plaintiffs also point to the June 2018 *Bloomberg* article reporting on the DOJ's inquiry into potentially manipulative trading in Fannie Mae and Freddie Mac bonds.  (*Id.* ¶¶ 155-57.)  Under settled law, "the mere fact that regulatory entities have investigated, and may still be investigating, the possibility of misconduct" does not constitute a "plus factor."  *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.* ("*Gold*"), 213 F. Supp. 3d 631, 662 (S.D.N.Y. 2016).[21]  The *Bloomberg* article is also so general that it provides no support for

---

[20] The Herfindahl-Hirschman Index ("HHI") implied by Plaintiffs' Table 1 (CAC ¶ 134) is as low as 570.9, far below the 1500 upper threshold set by the DOJ and the Federal Trade Commission for markets those agencies consider to be "unconcentrated" and competitive.  *See* U.S. Dep't of Justice and Fed. Trade Comm'n, Horizontal Merger Guidelines at 19 (Aug. 19, 2010), *available at* https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf.

[21] *See also In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 560 (S.D.N.Y. 2016) (holding that "ongoing government investigations into possible manipulation of" a particular

Plaintiffs' allegations.  *Cf. In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 723-24 (S.D.N.Y. 2017) (finding allegations of DOJ investigation relevant where alleged co-conspirator had been charged with and pled guilty to price-fixing).

**Other Cases and Investigations in Unrelated Markets.**  Plaintiffs cannot salvage their claim of an overarching conspiracy by referring to prior cases and investigations involving other financial products and some (but not all) Defendants.  (CAC ¶¶ 227-34.)  Many Defendants had nothing to do with those cases or investigations, and "evidence of [certain] Defendants' wrongdoing with respect to LIBOR and FX and the existence of regulatory investigations into the precious metals markets do not substantiate Plaintiffs' antitrust claim[]" with respect to GSE bonds.  *Gold*, 213 F. Supp. 3d at 661.  Those allegations are the kind of "if it happened there, it could have happened here" allegations that the Second Circuit has rejected.  *In re Elevator*, 502 F.3d at 52.

C.    **Plaintiffs' Resort to Group Pleading Underscores the Implausibility of the Alleged Overarching Conspiracy.**

Plaintiffs bear the burden of alleging facts sufficient to support a plausible inference that each of the Defendants "*in their individual capacities*, consciously committed themselves to a common scheme designed to achieve an unlawful objective."  *In re IRS*, 261 F. Supp. 3d at 478 (quoting *AD/SAT, a Div. of Skylight, Inc.* v. *Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999)) (emphasis added).  Plaintiffs thus must allege "specifics with respect to the acts of [each] particular defendant."  *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491-92 (D. Conn. 2008).  "Mere generalizations as to any particular defendant—or even defendants as a

_____

instrument is not a plus factor, especially where "none of the regulatory investigations cited by Plaintiffs has advanced to the point of charging any of the Defendants"); *LaFlamme* v. *Société Air France*, 702 F. Supp. 2d 136, 154 (E.D.N.Y. 2010) (allegation of investigation "'carries no weight in pleading an antitrust conspiracy claim'").

group—are insufficient." *In re Zinc*, 155 F. Supp. 3d at 384.   Accordingly, a complaint that describes a conspiracy in "general terms without any specification of any particular activities by any particular defendant" is "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever." *In re Elevator*, 502 F.3d at 50-51; *see also Hinds Cty., Miss.* v. *Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) (plaintiffs must allege a "factual connection between each Defendant and the alleged conspiracy").

The CAC does not satisfy these basic pleading requirements.   Instead, it relies on generalized allegations directed at "Defendants" as an undifferentiated whole.  Plaintiffs' improper resort to group pleading underscores the implausibility of the alleged overarching conspiracy, and is an independent basis for dismissal. *See In re IRS*, 261 F. Supp. 3d at 470-71 (dismissing portion of antitrust claim where allegations "[took] the form of conclusory group pleadings").

### 1. Plaintiffs' Group Pleading Is Fatal to Their Claims Against All Defendants.

The CAC fails to plead a single non-conclusory allegation that any Defendant participated in a market-wide conspiracy, much less that each Defendant did.   Rather, Plaintiffs rely on generalized commentary about the marketplace (CAC ¶¶ 158-78), statistics that fail to isolate the conduct of any individual Defendant (*id.* ¶¶ 179-221), and four chats among different combinations of only four out of 15 Defendants discussing specific bonds (*id.* ¶¶ 144-54).   For certain Defendants, Plaintiffs plead no individualized facts whatsoever.[22]   These Defendants were not participants in the four identified chats, and the CAC alleges only that they are approved GSE bond dealers that underwrite GSE bonds and trade them in the secondary market.  (*Id.* ¶¶ 27-106,

---

[22]  Those Defendants are Barclays, Cantor, Citi, Credit Suisse, First Tennessee ("FTN"), HSBC, JPMorgan, Nomura, SG, TD, and UBS.   Although Cantor was a co-underwriter of the bond discussed in one chat (CAC ¶ 152), it was not a participant in the relevant chat, and there is no suggestion that Cantor agreed to anything.

134, 245, 249, 251, 253-54, 261.)  The mere fact that they underwrite and trade bonds does not support an inference that these Defendants—or any other Defendant—participated in a monolithic conspiracy to fix the prices of hundreds of thousands of transactions in tens of thousands of bonds over a seven-year period.  *See Gold*, 213 F. Supp. 3d at 678 (participation in market "does not constitute circumstantial evidence of misconduct; such allegations could apply to any number of large banks, none of which is (or could be) named as defendants on that basis"). The absence of non-conclusory allegations as to these Defendants requires dismissal.  *See Citigroup*, 709 F.3d at 135-36 (allegation of "conspiracy" or "agreement" is a "legal conclusion, not a factual allegation").

Plaintiffs' lack of individualized allegations is particularly pronounced with respect to their assertion that Defendants "artificially widened" bid-ask spreads in the secondary market. (CAC ¶ 211.)  Plaintiffs make no allegation about *any* individual Defendant's quoted bid-ask spreads.  While the CAC relies on several statistics about spreads (*id*. ¶¶ 214, 216, 220), not a single one isolates the conduct of any Defendant or identifies any allegedly tainted transactions with any Plaintiff.  Rather, Plaintiffs rely on averages and/or aggregate pricing quotes across differing sets of market participants.  For the single statistic that purports to isolate quotes by seven Defendants (Figure 6), Plaintiffs again report only aggregate results.  This aggregation of data— group pleading in another guise—says nothing about any individual Defendant's quoted bid-ask spreads, much less its completed transactions.

## 2.     Plaintiffs' Claims Against Some Defendants Are Even More Deficient for Additional Reasons.

### a.     For a group of Defendants, Plaintiffs do not allege direct evidence, statistical evidence, or specific transactions.

Even if Plaintiffs had alleged a plausible antitrust conspiracy here (they have not), their allegations fail to connect many Defendants to the purported conspiracy, for one or more of three additional reasons, discussed further below:  (i) Plaintiffs allege no chats or any other "direct

evidence" of conspiracy concerning these Defendants, (ii) Plaintiffs' statistical allegations do not apply to them, and (iii) Plaintiffs fail to plead that they entered into specific transactions with them.

For five Defendants in this group—FTN, HSBC, Nomura, TD, and UBS—the CAC is utterly devoid of any such allegations.[23]  Absent any connection between these Defendants and the CAC's core allegations, Plaintiffs are left only with generic assertions about their presence in the marketplace for GSE bonds.  (*See*, *e.g.*, CAC ¶¶ 60-73, 79-92, 134.)  It is well settled, however, that mere industry participation is insufficient to plead an antitrust conspiracy.  For that very reason, several courts have singled out specific defendants, including HSBC and UBS, and dismissed them from conspiracy cases that went forward against other defendants.  *See*, *e.g.*, *In re IRS*, 261 F. Supp. 3d at 483 (holding that allegations directed at HSBC were "too sparse to sustain" plaintiffs' claims); *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *51 (S.D.N.Y. Mar. 28, 2017) (dismissing claims against UBS because complaint did "not plausibly support an inference that UBS was part of the alleged conspiracy"); *Gold*, 213 F. Supp. 3d at 678 ("The fact that UBS is a market maker . . . does not constitute circumstantial evidence of misconduct; such allegations could apply to any number of large banks, none of which is (or could be) named as defendants on that basis.").  The same analysis applies here.

**No "Direct Evidence" Allegations.**  Although the CAC identifies four "chats" among co-underwriters that Plaintiffs characterize as "direct evidence" of a price-fixing conspiracy, none of those chats included Barclays, Cantor, Citi, Credit Suisse, FTN, HSBC, JPMorgan, Nomura, SG,

---

[23] For a sixth Defendant—Citi—the CAC is likewise defective for these three reasons, except that a single transaction not plausibly connected to the alleged conspiracy is identified.  (CAC ¶ 261.) And a seventh Defendant—Cantor—is mentioned in one chat but did not itself participate in it. (*Id.* ¶ 152.)

TD, or UBS.  (CAC ¶¶ 144-54.)  Instead, the only material allegations directed at those Defendants appear at Paragraphs 4 and 146.[24]  There, Plaintiffs merely include these Defendants on a laundry list of all Defendants in their wholly conclusory allegations that (i) Defendants are "directly implicated in *conspiratorial* multi-bank chats regarding pricing in the secondary market for GSE Bonds," and (ii) the "cooperating" dealer "directly implicated [them] in this *misconduct.*"  (*Id.* ¶¶ 4, 146 (emphasis added).)  Plaintiffs' assertions that these Defendants participated in unidentified "conspiratorial" communications and unspecified "misconduct" are merely "legal conclusion[s]" that carry no weight in pleading an antitrust conspiracy.  *See Citigroup*, 709 F.3d at 135-36 (allegation of "conspiracy" or "agreement" is a "legal conclusion"); *Starr* v. *Sony BMG Music Entm't*, 592 F.3d 314, 319 n.2 (2d Cir. 2010) ("The allegation that defendants agreed to this price floor is obviously conclusory, and is not accepted as true.").  Moreover, once the conclusory terms "conspiratorial" and "misconduct" are stripped away, all that remains of these allegations is an assertion that these Defendants communicated about GSE bonds with other dealers.  (CAC ¶¶ 4, 146.)  Those allegations have no probative value because, as Plaintiffs acknowledge, GSE bonds are underwritten by syndicates, and "traders involved in GSE Bond syndicates . . . *were allowed to participate in multi-bank chat rooms to discuss pricing*" of the bonds they underwrote.  (*Id.* ¶ 11 (emphasis added); *see also id.* ¶¶ 128, 160.)

**No Statistical Allegations.**  Plaintiffs likewise fail to plead any individualized facts establishing that the CAC's purported statistical analyses—all of which are fatally flawed—even pertain to eight Defendants (Cantor, Citi, FTN, HSBC, Merrill Lynch, Nomura, TD, and UBS). Because all of Plaintiffs' statistics are presented in the aggregate, none are specific to these eight Defendants (or any other individual Defendant).  *See infra* Argument I.D.  Besides these

---

[24]  SG is not listed in Paragraph 4.

fundamental deficiencies in Plaintiffs' analyses, Plaintiffs concede that the bid-ask-quote data analyzed in the CAC do *not* even include quotes from these eight Defendants.  (CAC ¶ 217 n.13.)[25]

Furthermore, Plaintiffs previously advised the Court in their lead-counsel application that their statistical analyses did not identify any anomalous transactions by Cantor, HSBC, Nomura, SG, or TD.  (ECF No. 95 at 6-7.)[26]  That is doubtless why HSBC, Nomura and TD were not named in most of the complaints filed in this matter, and why Cantor and SG were not identified in ***any*** of the previous complaints.  All five Defendants appear to have been added to the CAC only as an afterthought.

**No Allegations of Transactions with Plaintiffs.**  Plaintiffs also fail to plead that certain Defendants engaged in any specific transactions with them.  Because Plaintiffs have not come close to alleging that all syndicates fixed the prices of all GSE bonds sold over a seven-year period, they bear the burden of pleading that each Defendant participated in unlawful price-fixing with respect to the particular bonds Plaintiffs purchased.  *See infra* Argument III.  Yet the CAC does not specify any transaction that a Plaintiff entered into with Cantor, FTN, Goldman Sachs, HSBC, Nomura, SG, TD, or UBS, much less a transaction allegedly affected by purported price-fixing.  (*See* CAC ¶¶ 238-61.)  Additionally, Plaintiffs identify only a single ***sale*** to each of Citi and Credit Suisse—one ***2.5 years***, and the other almost ***2 years***, after the relevant bond was issued (*id*. ¶¶ 253,

---

[25]  The CAC alleges that SG quotes were included in the aggregate dataset it purportedly used.  (CAC ¶ 217 n.13.)  With an alleged market share of only 0.13%, however, SG's contribution to any dataset would be immaterial.  (*Id*. ¶ 134 & Table 1.)

[26]  Plaintiffs previously reported that their initial complaint "correctly identified the Defendants, in part, because Plaintiffs were able to confirm their identity using 'unmasked' FFB pricing data rather than the readily available anonymous trading data."  (ECF No. 95 at 7.)

261)—that are not plausibly connected to the alleged conspiracy to increase prices **shortly after** bonds entered the secondary market (*id*. ¶¶ 144-54).

> **b.   FTN illustrates the defects in Plaintiffs' group pleading.**

Not only is the claim against FTN defective for the reasons identified above, but **neither** of the two datasets used by Plaintiffs—FINRA's TRACE data and MarketAxess's bid-ask-quote data—include transactions reported or quoted by FTN's GSE trading desk.[27] Plaintiffs' conclusory group-pleading allegations do not remotely connect FTN to the alleged conspiracy, nor do they tie any other Defendant to the purported conspiracy.

> **D.   Plaintiffs' Statistics Are Fatally Flawed and Unreliable.**

Plaintiffs rely heavily on statistics, summarized in a series of charts, that they assert show "supracompetitive prices for GSE Bonds" between January 1, 2009 and January 1, 2016.  (CAC ¶¶ 6, 179-221.)  Plaintiffs argue that these statistics "are consistent with a price-fixing conspiracy." (*Id*. ¶ 179.)   As the Supreme Court held in *Twombly*, however, allegations that are "merely consistent with" a conspiracy are insufficient to state a claim.  550 U.S. at 557.  That is reason enough to disregard them.

Moreover, Plaintiffs' abrupt reversals from their initial complaint expose the contrived and

---

[27]  Plaintiffs' data may include transactions reported by another Defendant for which FTN was a *customer*, but the data do not include transactions reported by FTN's GSE trading business.  FTN's GSE trading business is part of First Tennessee Bank National Association, and that entity does not report TRACE data because it is not a FINRA-regulated broker-dealer.  *See* FINRA, *Firms We Regulate*, https://www.finra.org/about/firms-we-regulate (listing FINRA-regulated broker-dealers); FINRA, *Frequently Asked Questions (FAQ) about the Trade Reporting and Compliance Engine (TRACE)*, http://www.finra.org/industry/trace/trace-faq ("The TRACE reporting obligations apply only to FINRA member firms.").  Although Defendant FTN Financial Securities Corp. ("FTNFSC") is a FINRA-regulated broker-dealer, FTNFSC is not the entity that houses FTN's GSE bond trading business and its activity in GSE bonds is *de minimis*.  *See* FTN Financial, *Fixed Income Sales & Trading*, https://www.ftnfinancial.com/investment-services/fixed-income-sales-and-trading.

results-driven nature of their statistical allegations.  For example, relying on virtually identical data, Plaintiffs previously alleged that the conspiracy ended two years earlier, in April 2014. (Compl. ¶¶ 10, 136.)  By contrast, the *Alaska* plaintiff, relying on much of the same publicly available data (ECF No. 101 at 7), alleged that its analysis showed that prices were competitive before January 2012 and that the conspiracy lasted until June 2018.  (*Alaska* Compl. ¶¶ 15, 90, 92, 107.)  Plaintiffs also previously asserted that they had investigated "bid-ask spreads" for FFCB and FHLB bonds, and found it "unlikely they were part of Defendants' conspiracy" because those bonds traded "with narrower bid-ask spreads, consistent with a normally functioning market." (ECF No. 131 at 2-3.)  But the CAC now reverses course and asserts that Defendants conspired to "artificially wide[n] bid-ask spreads" of FFCB and FHLB bonds.  (CAC ¶¶ 211-21.)

Plaintiffs make no attempt to harmonize the current version of their statistical allegations with the different allegations they made earlier.  Given these contradictions, the Court should not treat Plaintiffs' economic analysis as well-pleaded facts entitled to the presumption of truth.  *See Palm Beach Strategic Income, LP* v. *Salzman*, 457 F. App'x 40, 42-43 (2d Cir. 2012) (affirming dismissal of amended complaint that "directly contradicted" prior complaints); *see also In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.* ("*Silver*"), 2013 WL 1100770, at *4-5 (S.D.N.Y. Mar. 18, 2013) (dismissing complaint due to insufficiency and unreliability of plaintiffs' statistical and economic analyses), *aff'd*, 560 F. App'x 84 (2d Cir. 2014).

Besides those contradictions, Plaintiffs' statistics are fundamentally flawed and unreliable on their own terms.  *First*, Plaintiffs have collapsed millions of transactions into a single meaningless "average" that reveals nothing about pricing patterns over time.  *Second*, none of Plaintiffs' statistics provide any information specific to any Defendant, and several charts do not distinguish between transactions involving Defendants and those involving non-defendants, a

critical omission because Defendants are just 15 out of 65 authorized GSE underwriters.  *Third*, Plaintiffs' underlying data and assumptions are opaque, cherry-picked, and presented in a misleading manner.[28]  *Fourth*, Plaintiffs' statistics fail to control for various factors, which render the CAC's conclusions inherently unreliable.  And, *fifth*, aside from the common flaws that infect all of Plaintiffs' statistics, the CAC's individual charts suffer from additional facial defects.

### 1. Plaintiffs' Use of Averages Renders Their Analysis Unreliable.

In each of Plaintiffs' charts, a single "average" price or bid-ask spread, standing in for millions of transactions during the class period, is compared to another single "average" price or bid-ask spread for transactions after the class period.  These comparisons of two sets of averages are presented as evidence of pricing patterns that, according to Plaintiffs, can be explained only by a price-fixing conspiracy.  (*See* CAC ¶¶ 179-221 & Figs. 2-6.)  But Plaintiffs' exclusive reliance on overbroad averages obscures all variations in the data—and the underlying reasons for any differences, which may have nothing to do with Defendants—all of which undercuts the notion that the charts are suggestive of any misconduct at all, let alone a sprawling, multi-year conspiracy.

Rather than showing how prices changed over time by, for example, showing average prices on a monthly, quarterly, or even annual basis (*cf. Alaska* Compl. ¶ 91), Plaintiffs elected to reduce six years of pricing data before January 1, 2016 into a single, uninformative figure. Plaintiffs' oversimplified presentation of average data during and after the alleged conspiracy is inherently susceptible to manipulation and thus unreliable.  A single average price of $100 for a six-year period could, for example, reflect five consecutive years with an average price of $20

---

[28]  The data underlying Plaintiffs' statistics are both inconsistent and incomplete.  Plaintiffs' data begin 14 months into the class period because TRACE reporting did not become mandatory until March 1, 2010.  (CAC ¶ 185 n.6.)  For Figures 2 through 5, Plaintiffs' post-class period runs through the end of 2017.  (*Id.* ¶¶ 185-86, 192, 198, 216.)  By contrast, Figure 6 indicates that its post-class period runs through the end of 2018.

followed by a single year with an average price of $500 *or* six consecutive years with an average price of $100 each.

A comparison of the charts in Plaintiffs' original complaint (for a class period ending April 27, 2014) with the charts in the CAC (for a class period ending January 1, 2016) demonstrates why averages are useless as evidence of a conspiracy.  The CAC's alleged "conspiracy period" now includes 20 months that previously were included in the post-conspiracy "control period."  But in Figure 2, the average price in the control period increased from 0.4 basis points ("bps") in the original complaint to 1.2 bps in the CAC.  (*Compare* Compl. ¶ 143 (Fig. 2), *with* CAC ¶¶ 185-86 (Fig. 2).)  If Plaintiffs' two analyses were reliable and consistent, as a matter of mathematics, for the average price in the control period to increase in the CAC, the average price for the 20 months that were shifted into the alleged conspiracy period in the CAC must be ***lower*** than the average price for the months that remained in the control period.[29]  But that is inconsistent with Plaintiffs' assertion that those 20 months were part of the alleged conspiracy.  As another example, Plaintiffs' calculation of the average spread for riskless principal transactions during the class period increased from 13.4 bps in the original complaint to 36.1 bps in the CAC.  (*Compare* Compl. ¶ 179 (Fig. 6), *with* CAC ¶ 216 (Fig. 5).)  But that makes no sense.  How could the average bid-ask spread nearly triple simply by adding a 20-month period that the original complaint alleged had ***lower*** bid-ask spreads than the rest of the conspiracy period?  (*See* Compl. ¶¶ 175-79 & Fig. 6.)  These anomalies show that Plaintiffs' analysis based on averages is completely unreliable.

---

[29]  Similarly, in Figure 4, the expanded class period results in an ***increase*** in the average price for the post-conspiracy control period compared to Treasury yields.  (*Compare* Compl. ¶¶ 158-60 (Fig. 5), *with* CAC ¶ 197 (Fig. 4).)  In Figure 5, the expansion results in an ***increase*** in the average bid-ask spread for the post-conspiracy control period from 11.9 to 16.7 bps.  (*Compare* Compl. ¶ 179 (Fig. 6), *with* CAC ¶ 216 (Fig. 5).)

The CAC's use of averages further obscures (i) the impact of changing macro-economic conditions during the seven-year class period and the two-year control period to which it is compared, (ii) all distinctions among prices charged for the bonds of each of the four issuers, (iii) all differences in bond characteristics, including whether bonds were callable or non-callable, as well as variations in tenor and/or notional amount, (iv) the distinction between primary-market and secondary-market transactions, and (v) differences in the volume of GSE bonds issued during the relevant period.[30]

### 2. Plaintiffs' Data Fail to Distinguish Among Defendants or Between Defendants and Non-Defendant Dealers.

Plaintiffs' statistics treat Defendants as a group without attempting to isolate the conduct of any individual Defendant. The CAC's "[a]ggregate data tell[] the Court little about the actual position of any particular Defendant," and they do not show that "any given Defendant" engaged in any misconduct "consistently or even occasionally." *Gold*, 213 F. Supp. 3d at 648; *see also Silver*, 2013 WL 1100770, at \*4 (dismissing complaint where statistics "reflect generalized fluctuations" and "[p]laintiffs do not include allegations that are sufficiently factual—and not conclusory—to connect or link these fluctuations to actions undertaken by [the defendant]"). This deficiency is especially problematic because Defendants made up just 15 out of 65 approved GSE dealers and often participated in syndicates with non-defendant dealers. (CAC ¶ 133.) Defendants' shares of underwritings also varied widely, with no Defendant having a dominant position in what is an unconcentrated "market" by any measure. (*Id*. ¶ 134 & Table 1.)

---

[30] For example, Fannie Mae and Freddie Mac issued almost $800 billion in debt in 1Q 2009, but only $100 billion in 1Q 2014. *See* Fannie Mae, *Debt Reports*, http://www.fanniemae.com/ portal/funding-the-market/debt/reports/index.html; *see also* Fannie Mae, *Debt Reports*, http://www.freddiemac.com/debt/securities-data/#detailFunding. Time periods with greater issuances will be over-represented in Plaintiffs' averages, while time periods with lesser issuances will be under-represented.

Two of the charts (Figures 2 and 5) do not even attempt to isolate Defendants as a group, but instead look at *all* approved GSE bond dealers.  While the other charts purport to distinguish between Defendants and non-defendants, they are both over- and under-inclusive.  Figures 3 and 4 are over-inclusive because they focus on bonds underwritten by Defendants without accounting for the fact that Defendants often participated in syndicates with non-defendants.  Figure 6 is under-inclusive because Plaintiffs included price quotes from only seven out of 15 Defendants. (*Id.* ¶ 217 n.13.)[31]  Even as to those seven, Plaintiffs do not isolate individual Defendants, nor do they claim to have accounted for *all* or even *most* quotes during the relevant period.  Instead, they admit that "[g]enerally, the identity of the dealer supplying a GSE Bond quote is removed from the data."  (*Id.* ¶ 217 n.12.)

### 3. Plaintiffs' Underlying Data and Assumptions Are Opaque and Unreliable.

Plaintiffs fail to provide basic information about the data and assumptions underlying their analysis, and the limited information they do disclose only casts doubt on their statistics. Conclusory statistics are not entitled to any presumption of truth.  *7 W. 57th St. Realty Co.* v. *Citigroup, Inc.*, 2015 WL 1514539, at *12 (S.D.N.Y. Mar. 31, 2015) (opaque and unreliable data that merely "flag[] the possibility of a conspiracy" are "not sufficient to meet the plausibility test under *Iqbal*"), *aff'd*, 2019 WL 1914278 (2d Cir. Apr. 30, 2019).

---

[31]  Plaintiffs could not identify in the data any quotes attributable to Cantor, Citi, FTN, HSBC, Merrill Lynch, Nomura, TD, and UBS.  (CAC ¶ 217 n.12 ("Generally, the identity of the dealer supplying a GSE Bond quote is removed from the data"); ¶ 217 n.13 ("Quotes could be attributed to [only] seven Defendants . . . .").)

### a.      Plaintiffs do not adequately identify their underlying data.

Although Plaintiffs previously said they have "proprietary" data that identify Defendants (ECF No. 95 at 8), the CAC does not disclose the source of those data, much less explain why they are complete or reliable.  The only sources the CAC identifies—TRACE and MarketAxess—do not identify underwriters or counterparties.[32]  The Court need not credit statistical allegations based on undisclosed data.  Such allegations are akin to pleading bald conclusions rather than well-pled facts.  *See*, *e.g.*, *Silver*, 2013 WL 1100770, at *4 ("statistical analyses" that are not "sufficiently factual" are akin to "mere conclusory statements" entitled to no weight).

### b.      Plaintiffs fail to account for underwriter concessions.

In Figures 2, 3, and 4, Plaintiffs calculate "price inflation" as the difference between the price paid to the GSE issuer and the price charged to investors for the bonds on offer days.  (CAC ¶¶ 183, 189, 192, 198.)  But this comparison fails to account for the underwriter concession, the fee paid to the underwriter by the issuer for underwriting the bonds.  (*See id.* ¶¶ 128-32.)  The underwriter concession is the difference between the price paid to the GSE and the price at which bonds are sold to investors in the primary market.  It is set by negotiations between the GSEs and their underwriters and is publicly disclosed.  (ECF No. 101 at 23.)  By failing to account in their comparisons for the underwriter concession—which has nothing to do with their claim—Plaintiffs artificially increased the alleged price inflation by an amount that would vary on a bond-by-bond basis, rendering their statistics meaningless.  The *Alaska* plaintiff criticized Plaintiffs for this fundamental flaw in their analysis (*id.* at 4-5, 23), yet Plaintiffs did nothing to correct it.

---

[32] *See*, *e.g.*, FINRA, *TRACE: The Source for Real-Time Bond Market Transaction Data* at 3, http://www.finra.org/sites/default/files/TRACE_Overview.pdf ("TRACE Overview").

### c. Plaintiffs' data do not reliably identify customer sales or post-FTT sales by Defendants.

The CAC asserts that "Defendants conspired to fix the price at which GSE Bonds [went] FTT in the secondary market." (CAC ¶ 145.) But its statistics appear to be based on TRACE data reported by broker-dealers that are members of FINRA. For at least three reasons, TRACE data could not have allowed Plaintiffs to identify Defendants' post-FTT sales to customers and thus cannot support the CAC's assertion.

*First*, TRACE data are anonymous.[33] As a result, Plaintiffs could not have used such data to identify sales by Defendants.

*Second*, FINRA's rulebook states that a counterparty identified as a "customer" in TRACE data "includes a broker-dealer that is not a FINRA member." FINRA Rule 6710(e). Accordingly, transactions that TRACE data identify as "customer" sales include sales to broker-dealers that are not members of FINRA and are not limited to sales to end customers.

*Third*, TRACE data cannot reliably distinguish pre-FTT sales from post-FTT sales. TRACE provides two designations for each sale about timing: (i) P1, which is used for sales by an underwriter on the first day of trading at a listed or fixed-offering price or at a discount from the listed or fixed-offering price, and (ii) S1, which is used for any primary-market or secondary-market transaction after the first day of trading.[34] As a result, both pre-FTT and post-FTT sales on the first day of trading could be labeled as P1, and both pre-FTT and post-FTT sales after the first day of trading could be labeled as S1. Because transactions designated as either P1 or S1

---

[33] *See* TRACE Overview at 3.
[34] *See* FINRA, *Reporting of Corporate and Agencies Debt Frequently Asked Questions (FAQ)*, Section 4.17, *available at* https://www.finra.org/industry/faq-reporting-corporate-and-agencies-debt-frequently-asked-questions-faq.

include both pre-FTT and post-FTT sales, Plaintiffs cannot reliably isolate post-FTT sales using TRACE data.

This creates significant problems for Plaintiffs.  For instance, Plaintiffs assert that Figures 2 and 3 show that Defendants "charge[d] higher prices to investors for newly issued GSE Bonds during the Class Period."  (CAC ¶ 189; *see also id.* ¶ 192.)  Because Plaintiffs cannot isolate post-FTT sales to investors using TRACE data, they instead analyze the prices charged by Defendants *on the first day of trading*.  (*See id.* ¶¶ 182-93.)  But Plaintiffs themselves recognize that trades on the first day of an underwriting likely include both primary- and secondary-market sales.  (*Id.* ¶¶ 127-29.)

### d.    Plaintiffs' data do not focus on callable GSE bonds.

Plaintiffs do not offer *any* analysis focused on transactions in callable GSE bonds, and the CAC does not contain a single chart that provides statistics limited to callable bonds.  Indeed, much of Plaintiffs' analysis is limited to benchmark or reference notes, which are distinct from callable bonds.  (*Id.* ¶¶ 185, 206.)  Plaintiffs' statistical allegations thus are not relevant to their "direct evidence" of conspiracy, which relates exclusively to callable bonds.

### 4.    Plaintiffs Fail to Control for Various Factors.

Plaintiffs' statistics fail to control for various macro-economic and other factors that could have affected prices, which renders their analysis meaningless.  *See Love* v. *Johanns*, 439 F.3d 723, 731 (D.C. Cir. 2006) (failure to control for relevant variables makes it "impossible—as a statistical matter—to draw meaningful conclusions").  Because Plaintiffs fail to address "obvious alternative explanation[s]" for their statistical differences between the alleged conspiracy period and the alleged post-conspiracy period, *Twombly*, 550 U.S. at 567, their statistics do not create a plausible inference of conspiracy.  *LLM Bar Exam, LLC* v. *Barbri, Inc.*, 271 F. Supp. 3d 547, 578

(S.D.N.Y. 2017) ("An inference of conspiracy will not arise when . . . there are obvious alternative explanations."), *aff'd*, 922 F. 3d 136 (2d Cir. 2019).

**Macro-Economic Factors.**   In Figures 2, 3, 5, and 6, Plaintiffs compare the alleged conspiracy period to the post-conspiracy control period.  Yet they fail to control for critical changes in the marketplace during the alleged conspiracy period, some of which include:

- *2008-2011 financial and housing crises.*  The financial and housing crises made it more risky for dealers to hold GSE bonds (*see* CAC ¶ 142) and widened spreads between Treasuries and GSE bonds.  All told, the housing crisis inflicted hundreds of billions of dollars in losses on Fannie Mae and Freddie Mac, which did not return to profitability until 2012.[35]  FHLB experienced similar financial pressure.[36]

- *2011 and 2013 proposals to close Fannie Mae and Freddie Mac.*  After these crises, several proposals were made to close Fannie Mae and Freddie Mac and sell their assets.[37]  These proposals increased uncertainty in the marketplace.

- *2011 downgrading of Fannie Mae and Freddie Mac.*  When Standard & Poor's downgraded U.S. sovereign debt on August 8, 2011, it also downgraded the debt of Fannie Mae and Freddie Mac due to "their direct reliance on the U.S. government."[38]  Standard & Poor's also downgraded the debt of FFCB and FHLB.  *Id.*

- *2013 "taper tantrum."*  In 2013, the Federal Reserve said it would scale down its bond

---

[35]  W. Scott Frame et al., *The Rescue of Fannie Mae and Freddie Mac*, 29 J. ECON. PERSP. at 25, 46 (2015); *see also* Josh Boak, *Downgrade could be KO for housing*, Politico (July 19, 2011) https://www.politico.com/story/2011/07/downgrade-could-be-ko-for-housing-059380.

[36]  *See* Stefan Gissler & Borghan Narajabad, *The Increased Role of the Federal Home Loan Bank System in Funding Markets, Part 3: Implications for Financial Stability*, Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/econres/notes/feds-notes/the-increased-role-of-the-federal-home-loan-bank-system-in-funding-markets-part-3-20171018.htm.

[37]  *See* Dep't of the Treasury, *Reforming America's Housing Finance Market* 1-2 (2011), https://www.treasury.gov/initiatives/documents/reforming%20america's%20housing%20finance%20market.pdf; Danielle Douglas, *Senators introduce bipartisan bill to replace Fannie, Freddie with new agency*, Wash. Post (June 25, 2013), https://www.washingtonpost.com/business/economy/senators-introduce-bipartisan-bill-to-replace-fannie-freddie-with-new-agency/2013/06/25/c5437850-dd9e-11e2-b197-f248b21f94c4_story.html?noredirect=on&utm_term=.5e7b5a6b84ce.

[38]  Press Release, Market News International, *S&P Text: Fannie, Freddie Downgrade to 'AA+'; Outlooks Negative* (Aug 8, 2011).

purchases, leading to a rapid increase in interest rates and selloff of GSE bonds.  Dealers reduced their balance sheets significantly, decreasing liquidity and increasing volatility.[39]

All of these factors increased risk and would lead to larger price differences between the primary and secondary market, as well as wider bid-ask spreads, during the alleged conspiracy period. (CAC ¶ 142.)  In contrast, Plaintiffs' control period of January 2016 through December 2017 was a period of relative economic calm.[40]

**Bond Maturity and Callability.**  Plaintiffs do nothing to control for changes over time in the characteristics of GSE bonds such as maturity and callability.  During the alleged conspiracy period, GSE bonds generally had longer maturities, and a higher percentage were callable.[41] Although both factors should result in a larger "underwriting concession," Plaintiffs fail to account for either.[42]

---

[39]  Tobias Adrian et al., *Dealer Balance Sheet Capacity and Market Liquidity during the 2013 Selloff in Fixed-Income Markets*, Federal Reserve Bank of New York (Oct. 16, 2013), https://libertystreeteconomics.newyorkfed.org/2013/10/dealer-balance-sheet-capacity-and-market-liquidity-during-the-2013-selloff-in-fixed-income-markets.html.

[40]  *See*, *e.g.*, Fed. Open Market Comm., *Minutes of the Federal Open Market Committee*, Figure 1,  https://www.federalreserve.gov/monetarypolicy/files/fomcminutes20171213.pdf;  Bd.  of Governors of the Federal Reserve System, *Policy Tools: Open Market Operations*, https://www.federalreserve.gov/monetarypolicy/openmarket.htm.

[41]  For example, Freddie Mac long-term bonds dropped from about $47 billion (24% of $196 billion in total issuances) in the third quarter of 2010 to about $11 billion (9% of $127 billion of total issuances) in the fourth quarter of 2016, while short-term bonds increased from about $125 billion (63% of total issuances) in the third quarter of 2010 to about $105 billion (82% of total issuances) in in the fourth quarter of 2016.  *See* Freddie Mac, *Securities Data*, http://www.freddiemac.com/debt/securities-data/#detailFunding.

[42]  *Compare* CUSIP 3137EACX5 (non-callable Freddie Mac bond with two-year maturity, and concession of 6.25 bps), *with* CUSIP 3134G3CC2 (callable Freddie Mac bond with two-year maturity, and concession of 12.50 bps); *compare* CUSIP 3137EADK2 (non-callable Freddie Mac bond with seven-year maturity, and a concession of 12.50 bps), *with* CUSIP 3137EADB2 (non-callable Freddie Mac bond with ten-year maturity, and concession of 15.00 bps).  Pricing term sheets for Freddie Mac bonds are available at http://www.freddiemac.com/debt/legal/.

**Differences Between Defendants and Non-Defendants.**  In Figure 4, Plaintiffs purport to compare pricing by Defendants and non-defendants.  But they fail to account for key differences between them, including that (i) Defendants are mostly large banks, while non-defendants include a wide range of other types of dealers with different risk profiles, and (ii) Defendants underwrote larger, more complex bond issuances, which required them to assume more risk.[43]  In times of financial stress, such as the first part of the alleged conspiracy period, these differences between Defendants and non-defendants would become even more acute, as only larger financial institutions could take the risk of underwriting bonds with significant price volatility.

Figure 4 itself indicates that there are differences—entirely unrelated to any alleged conspiracy—between the pricing of Defendants and non-defendants.  Figure 4 purports to show that the "price inflation" for newly issued GSE bonds above Treasury yields was 2.5 times greater for Defendants than for non-defendants during the alleged conspiracy period and 2.7 times greater during the control period.[44]  The fact that this difference increased during the control period is inconsistent with Plaintiffs' claim of a conspiracy.

### 5. Plaintiffs' Individual Charts Suffer from Additional Facial Flaws.

In addition to the common defects infecting all of Plaintiffs' statistics, the CAC's individual charts suffer from additional facial flaws.  For example:

---

[43]  For example, the average size of issuances underwritten by Defendants and DBSI was $441 million in 2009 and $135 million in 2018 versus $39 million in 2009 and $29 million in 2018 for issuances underwritten only by non-defendants.  *See* Freddie Mac, *Debt Issues*, http://www. freddiemac.com/debt/data/cgi-bin/lookup.cgi?cusip2=&dtFrom=01%2F01%2F2009&dtTo =12%2F31%2F2009&issuetype=; *see also* Freddie Mac, *Debt Issues*, http://www.freddiemac.com /debt/data/cgi-bin/lookup.cgi?cusip2=&dtFrom=01%2F01%2F2018&dtTo=12%2F31%2F 2018&issuetype=.

[44]  During the alleged conspiracy period, Plaintiffs claim that the price inflation was 100 bps for Defendants and 40 bps for non-defendants—a ratio of 2.5.  (CAC ¶ 197, Fig. 4.)  During the control period, Plaintiffs allege that the price inflation was 43 bps for Defendants and 16 bps for non-defendants—a ratio of 2.7.  (*Id.*)

- Figures 2 and 3 purport to measure the difference between the price paid to issuers and the price charged to investors. Figure 2 measures this difference for *all* dealers and found a difference of 10.6 bps during the conspiracy period. (CAC ¶¶ 186-89.) Figure 3 measures this difference *only* for Defendants and found a difference of only 2.58 bps. (*Id*. ¶¶ 190-93.) That implies that Defendants were charging *lower* prices than non-defendant dealers.

- In Figure 4, Plaintiffs compare (i) the difference between the price paid to issuers and the price charged to investors, and (ii) "the yield offered by U.S. Treasury securities with a comparable maturity." (*Id*. ¶ 198.) Prices and yields are different metrics: prices are a percentage of the par value of a bond (*e.g.*, 99.5 out of 100), while yield is the percentage return earned on an investment. Figure 4's comparison thus makes no sense.

- In the figures included in Paragraphs 208 and 209, Plaintiffs measure "yield spreads over treasury bonds" (*id*. ¶ 207) for 55 GSE bonds for both sales to other dealers and sales to customers. But these figures suggest that these yield spreads are *negative*—meaning that investors accepted *less* interest for GSE bonds than for Treasury bonds. (*Id*. ¶¶ 208-09 & n.11.) That defies logic: Treasuries are less risky than GSE bonds, and investors thus demand a premium for GSE bonds. (*Id*. ¶¶ 114, 136.)

- In the figure included in Paragraph 210, Plaintiffs claim that "narrower bid-ask spreads were used by dealers to encourage customer purchases of GSE bonds at inflated prices." (*Id*. ¶ 210.) Plaintiffs also state that "bid-ask spreads for formerly on-the-run bonds declined almost two basis points." (*Id*.) But narrower bid-ask spreads would have led to lower transaction prices and *benefited* customers. In addition, Plaintiffs' allegation that bid-ask spreads "declined" is completely inconsistent with their other allegations that Defendants somehow *inflated* the price of bonds about to go off-the-run. (*Id*. ¶¶ 204, 206.)

- In Figure 5, Plaintiffs analyze bid-ask spreads for "riskless principal transactions" where "a dealer purchases a GSE Bond after it has already agreed to sell the GSE Bond to a customer or vice-versa." (*Id*. ¶ 215.) Plaintiffs nowhere explain why this limited set of transactions is relevant to GSE bonds overall.

- In Figure 6, Plaintiffs look at quotes for GSE bonds, not actual transaction prices, and select 36 million GSE bonds quotes for the seven-year conspiracy period and 47 million quotes for the three-year control period. (*Id*. ¶ 217.) Plaintiffs do not explain how they selected the quotes; why they used fewer quotes from the longer conspiracy period than the shorter control period; or how quotes relate to actual transaction prices.

## II.   Plaintiffs Fail to State a Rule-of-Reason Claim Based on Alleged Agreements Among Co-Underwriters During the Syndication Phase of Offerings.

Beyond their conclusory allegations of a market-wide, overarching conspiracy, Plaintiffs contend, based on three chats (*id*. ¶¶ 148-49, 152), that three Defendants while in syndicate improperly discussed whether to declare the bonds they underwrote FTT and at what discount to

par initially to offer the bonds in the secondary market.  (The fourth chat (*id.* ¶ 150) on its face did not result in any agreement.)   Under settled precedent, the rule of reason applies to alleged agreements among co-underwriters working together in a syndicate about the price of the bonds they underwrote.  Thus, to the extent the Court chooses to decide the issue on this motion, any allegation of agreements among co-underwriters on the initial discount to par should be assessed under the rule of reason.  The CAC does not even attempt to plead a rule-of-reason claim.

### A.     The Rule of Reason Applies to Agreements Among Co-Underwriters Operating as a Syndicate About the Price of the Bonds They Underwrote.

"*Per se* liability is limited to 'agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'"  *In re IRS*, 261 F. Supp. 3d at 467 (quoting *Nat'l Soc'y of Prof'l Eng'rs* v. *United States*, 435 U.S. 679, 692 (1978)).  As a result, "most antitrust claims are evaluated under the rule of reason."  *LLM Bar Exam*, 271 F. Supp. 3d at 578-79.  The *per se* rule applies only when "considerable experience" teaches that the category of restraint at issue has "manifestly anticompetitive effects" and "lack[s] any redeeming virtue."  *Leegin Creative Leather Prod., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 886 (2007); *see also Continental T.V., Inc.* v. *GTE Sylvania Inc.*, 433 U.S. 36, 58-59 (1977) ("[D]eparture from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing."); *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 2019 WL 1747780, at *5 (N.D. Cal. Mar. 8, 2019) ("[B]ecause 'a certain degree of cooperation' is necessary to market athletics competition, the Court applies the Rule of Reason.").

Where competitor collaboration, including on pricing, allows a new product to be brought to market with greater efficiency, the *per se* rule does not apply.  *See*, *e.g.*, *Broad. Music, Inc.* v. *CBS* ("*BMI*"), 441 U.S. 1, 9, 24 (1979) (applying rule of reason in evaluating blanket copyright

-42-

licenses).[45]  For example, the "pricing decisions of a legitimate joint venture do not fall within the narrow category of activity that is *per se* unlawful."  *Texaco* v. *Dagher*, 547 U.S. 1, 8 (2006).  Nor does the *per se* rule apply to horizontal-pricing restraints in complex business relationships with which courts do not have experience, and where anticompetitive effects are not apparent.  In *BMI*, the Supreme Court held that the *per se* rule did not apply to an agreement between copyright owners and their licensing agencies to provide blanket copyright licenses.  441 U.S. at 24.  The Court criticized the Second Circuit's "literal approach" of labeling the conduct *per se* illegal because the "competitors have literally 'fixed' a 'price.'"  *Id.* at 9.  It emphasized that courts classify conduct as a *per se* violation "only after considerable experience with certain business relationships."  *Id.*

Consistent with these principles, in the seminal case of *United States* v. *Morgan*, 118 F. Supp. 621 (S.D.N.Y. 1953), the court applied the rule of reason to antitrust allegations directed at an underwriting syndicate, declining to apply *per se* treatment to the syndicate members' alleged pricing and stabilization activities.  *Id.* at 687-89.  The court found that pricing agreements within an underwriting syndicate differ fundamentally from pricing agreements among competitors in the purchase and sale of commodities and manufactured products, and agreed with defendants that the underwriting syndicate "is a reasonable business combination having the purpose and effect of efficiently promoting, rather than restraining, trade."  *Id.* at 690.

Justice Stevens' concurring opinion in *Credit Suisse Securities (USA) LLC* v. *Billing*, 551 U.S. 264 (2007), cited *Morgan* with approval.  Justice Stevens explained that "agreements among

---

[45]  *See also NCAA* v. *Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 103-04 (1984) (rule of reason applies to NCAA rules setting minimum prices member schools can charge for television broadcast rights); *Polk Bros., Inc.* v. *Forest City Enters.*, 776 F.2d 185, 190 (7th Cir. 1985) (rule of reason applies to agreement between stores jointly funding shopping center not to sell competing products ancillary to collaborative construction project).

underwriters on how best to market IPOs, including agreements on price and other terms of sale to initial investors, should be treated as procompetitive joint ventures for purposes of antitrust analysis." *Id.* at 285-86. *Billing* itself illustrates that joint underwriting activities are treated differently for purposes of the antitrust laws. Plaintiffs in *Billing* sued ten banks that participated in syndicates to underwrite IPOs, alleging that defendants agreed to inflate share prices in IPOs and post-IPOs by, among other things, requiring IPO purchasers to buy additional shares in the secondary market. 551 U.S. at 269-70. The Court rejected plaintiffs' antitrust claims on the ground that the securities laws implicitly preclude application of the antitrust laws to defendants' joint-underwriting activities. *Id.* at 279-84. In so holding, the Court emphasized that "underwriters' efforts jointly to promote and to sell newly issued securities . . . is central to the proper functioning of well-regulated capital markets." *Id.* at 276.

Here, Plaintiffs challenge syndicate activity aimed at bringing a new product—a GSE bond—to the market. Any alleged agreement among co-underwriters about how best to sell newly issued bonds should be evaluated under the rule of reason. This includes any agreements among syndicate members about when to declare the bonds FTT and reduce the price to a discount below par. After winning an auction to underwrite an offering, co-underwriters usually offer the bonds in the primary market at par (*i.e.*, 100) to non-dealer investors, but they also have the right to decide, either immediately or after offering the bond at par for some period of time, to declare the bonds FTT and then sell them at a discount to par (*e.g.*, 99.985). GSEs leave it to the collective discretion of the syndicate to decide when to declare callable bonds FTT and at what discount to par.

In one of the cited chats, the underwriters, after winning the auction, immediately discussed declaring the bonds FTT and offering them at a discounted price of 99.90 or 99.925 rather than at

par.  (CAC ¶ 149.)  Given that the syndicate had already lawfully agreed to sell the bonds at par, it cannot be *per se* unlawful for the syndicate to agree immediately to sell them instead at a discount to par.  That is procompetitive (and quintessential joint-underwriting) activity that should not be condemned under the *per se* rule.  Plaintiffs themselves acknowledge that dealers are free to communicate with each other during the syndication phase about the price of the bonds they underwrote.  (*Id.* ¶¶ 11, 128, 160.)

Moreover, customers would not benefit if underwriters had an incentive to remain in syndicate indefinitely and charge customers the offering price of par, rather than agreeing to go FTT and offer the bonds at a ***discount*** to par.  The rule of reason exists, in part, to avoid such arbitrary distinctions and anomalous outcomes.  *See Continental T.V.*, 433 U.S. at 58-59 (departure from rule-of-reason standard must be based on demonstrable economic effect rather than on formalistic line drawing); *SCFC ILC, Inc.* v. *Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994) (*per se* standard applies only to practices that "are entirely void of redeeming competitive rationales").

There is an additional reason why the rule of reason should apply here:  in performing the syndication function, an underwriting syndicate sits in the middle of a two-sided market, matching GSEs and investors.  *See Ohio* v. *Am. Express Co.*, 138 S. Ct. 2274, 2284-87 (2018).  As frequent issuers, GSEs have an interest in selling their bonds at the highest possible price and thus paying the lowest possible rate of interest.  The CAC thus acknowledges that GSEs are concerned with the pricing of their bonds in the secondary market.  (CAC ¶ 172.)  Imposing *per se* liability on underwriters for any agreements in furtherance of their collective effort to market newly issued GSE bonds could chill competition among underwriters to procure the bonds, thus reducing the prices that GSEs obtain for their bonds and subjecting GSEs to higher rates of interest.  This two-

sided market dynamic requires the Court to weigh the effect of the challenged conduct on investors against its effects on GSEs, and thus precludes application of the *per se* rule.  *See Am. Express*, 138 S. Ct. at 2287 (in two-sided market, "competition cannot be accurately assessed by looking at only one side . . . in isolation").

Unsurprisingly, ***no*** court ever has held that coordinated activity among co-underwriters regarding an underwriting syndicate's offering, including the price of that offering, is inherently anticompetitive and thus subject to *per se* condemnation.  There is no reason for this Court to be the first.  Indeed, the Court need not even reach this issue now because Plaintiffs try, but fail, to allege a broader, overarching conspiracy that finds no support in the syndicate communications quoted in the CAC.

### B.     Plaintiffs Do Not Even to Try to Plead a Rule-of-Reason Claim.

"[U]nder a rule-of-reason analysis, the plaintiff 'bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within'" a properly defined relevant market.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010).  As a threshold matter, a plaintiff must plead a plausible "relevant market, including both a product market and a geographic market."  *Integrated Sys. & Power, Inc.* v. *Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298 (S.D.N.Y. 2010).  "[O]nce the relevant market is defined," a plaintiff must plead that the market was "susceptible to the exercise of market power through tacit coordination."  *Todd* v. *Exxon Corp.*, 275 F.3d 191, 207-08 (2d Cir. 2001).  A plaintiff then must allege facts demonstrating that "the challenged action adversely affected competition in the relevant market."  *MacDermid Printing Sols. LLC* v. *Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016).  "If the plaintiff carries this burden, the court . . . decide[s] whether the anticompetitive effects of the practice are justified by any countervailing pro-competitive benefits."  *In re Ins. Brokerage*, 618 F.3d at 316.

The CAC does not even attempt to satisfy the elements of a rule-of-reason claim. Plaintiffs instead simply assert that "Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade." (CAC ¶ 277.) Such boilerplate language is insufficient to plead a claim under the rule of reason. For starters, Plaintiffs fail to define a relevant antitrust market allegedly restrained by Defendants' conduct. The CAC's general references to the "GSE Bond market" are insufficient to satisfy Plaintiffs' pleading burden. *See Chapman* v. *N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (complaint must "define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand").[46] Plaintiffs' failure to define the relevant market makes it impossible to evaluate Defendants' alleged market power and the competitive effects of the challenged conduct in that market. *See Todd*, 275 F.3d at 200, 207-08. Plaintiffs' failure to plead a violation of Section 1 under the rule of reason requires the dismissal of any claim based on in-syndicate agreements among co-underwriters about the bonds they underwrote.

## III. Plaintiffs Lack Antitrust Injury Because They Fail to Allege Any Injury-In-Fact.

Given the CAC's failure to plead a plausible overarching conspiracy, Plaintiffs must plead both a conspiracy and antitrust injury on a bond-by-bond basis. Antitrust injury "is a threshold, pleading-stage inquiry." *Gatt Commc'ns, Inc.* v. *PMC Assocs., LLC*, 711 F.3d 68, 75 (2d Cir. 2013). "To demonstrate antitrust injury, a plaintiff must show (1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." *In re SSA Bonds Antitrust Litig.*, 2018 WL 4118979, at *6 (S.D.N.Y. Aug. 28, 2018). "Unlike government agencies, private plaintiffs do not have the right to bring suit against any person they

---

[46]    *See also Concord Assocs., L.P.* v. *Entm't Props. Tr.*, 817 F.3d 46, 53-55 (2d Cir. 2016) (dismissing of Section 1 claims for failure plausibly to define product market); *Bookhouse of Stuyvesant Plaza, Inc.* v. *Amazon.com, Inc.*, 985 F. Supp. 2d 612, 621 (S.D.N.Y. 2013) (same).

reasonably suspect has committed a certain sort of wrong . . . . Plaintiffs can only recover in a civil action if they can establish that *they themselves* have been harmed by defendants' activities." *Id.*

Plaintiffs fail to plead any injury-in-fact because they do not allege that Defendants fixed the price of the bonds they purchased or sold.   Plaintiffs thus do not allege that "they themselves have been harmed" by any alleged price fixing, and their antitrust claim should be dismissed. *Harry* v. *Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir. 2018); *see also In re SSA Bonds*, 2018 WL 4118979, at \*8 ("[B]ecause Plaintiffs have not plausibly alleged that they themselves were injured by the alleged conspiracy, their antitrust claim must be dismissed.").

### A. Plaintiffs Do Not Adequately Allege That Defendants Fixed the Price of Bonds They Purchased or Sold.

Although Plaintiffs generally assert that "Defendants fixed the prices of GSE Bonds during the Class Period" (CAC ¶ 236), the CAC does not adequately allege that Defendants fixed the price of any bond *Plaintiffs* purchased.  Despite Plaintiffs' claim of "smoking gun direct evidence" of price fixing (*id.* ¶ 3), the CAC points to only four chats among four Defendants and DBSI purportedly discussing pricing of *four* specific callable bonds.  (*Id.* ¶¶ 147-53.)  The CAC does not allege, however, that any Plaintiff purchased those bonds on the dates of the chats or even shortly afterwards.  (*See id.* ¶¶ 238, 242-45, 248-51, 257.)  Three Plaintiffs—Birmingham, IBEW Pension Plan, and IBEW 103—fail to identify any specific bonds they purchased or sold.  They also do not allege that they purchased or sold any of the bonds that were affected by the conspiracy according to the "cooperating" dealer.  Although Commonwealth Funds makes a vague and conclusory allegation that it traded GSE bonds that the alleged cooperator "identified as being impacted by the conspiracy" (*id.* ¶ 21), the CAC identifies only six such transactions, involving only four callable bonds and only two Defendants (*id.* ¶ 238).  Only one of those callable bonds is discussed in any of the four cited chats, and Commonwealth Funds' transaction occurred **over two**

-48-

*months after* that chat.  (*Id.* ¶¶ 148, 238.)[47]  Plaintiffs do not allege that the underwriters' supposed agreement to go FTT at a particular discount to par continued to affect secondary-market prices more than two months later.[48]

*In re SSA Bonds* is directly on point.  In that case, plaintiffs "quote[d] from transcripts of over 150 chats and phone calls" produced by two cooperating dealers.  2018 WL 4118979, at *2.  Like Plaintiffs here, the plaintiffs alleged that the conspiracy involved "*every* transaction entered into by . . . Defendants during the Class Period, not just those associated with the chats summarized in the CAC."  *Id.* at *3.  According to plaintiffs, the "chats were 'mere examples' of acts in furtherance of a continuous conspiracy that infected 'each and every' transaction."  *Id.* at *6.  The court rejected those arguments, holding that plaintiffs did not suffer antitrust injury because they "d[id] not allege that any of the[] chats referred to transactions to which they were a party."  *Id.*  The court thus concluded that plaintiffs "have not plausibly alleged that they themselves were injured by the alleged conspiracy."  *Id.* at *8.  In so ruling, the court declined plaintiffs' invitation "to infer, based on approximately 150 chats . . . , that Plaintiffs' individually negotiated transactions with the Dealer Defendants during that period must have likewise been tainted and injured them."  *Id.*  This Court should decline Plaintiffs' similar invitation here based on four chats.

Accordingly, even if the CAC adequately pleads an antitrust violation based on the four chats, Plaintiffs did not suffer antitrust injury because they do not allege direct injury as a result of any agreement on the initial discounted price discussed in the chats.  *See, e.g., Arista Records LLC*

---

[47]  One of the bonds that Commonwealth Funds allegedly purchased—CUSIP 313378BR1 (CAC ¶ 238)—is the same bond discussed in the "February 17, 2012" chat (*id.* ¶ 148).  But Commonwealth Funds' only alleged purchase of that bond occurred on April 23, 2012, more than *two months* after the discussion in the cited chat.  (*Id.* ¶ 238.)

[48]  As explained above, the same trade data on which Plaintiffs rely show that, after this bond went FTT, the very next sale was at a price ***below*** the price discussed in the chat.  *See supra* at Argument I.A.1; *see also* Ex. 8.

v. *Lime Grp. LLC*, 532 F. Supp. 2d 556, 569 (S.D.N.Y. 2007) (plaintiff failed to plead "injury-in-fact as a result of [the alleged] price-fixing scheme" because plaintiff never alleged that it attempted to purchase allegedly price-fixed license); *Harry*, 889 F.3d at 116 (dismissing antitrust claim where plaintiffs "d[id] not even present evidence that they traded at 'artificial prices'" and thus alleged "no actual injury").

### B.   Plaintiffs' Statistics Are Insufficient to Show That Any Plaintiff Suffered Injury-in-Fact.

Besides the four chats discussed in the CAC, Plaintiffs argue that prices of GSE bonds were inflated throughout the class period based on statistical analysis of average prices determined by market-wide data.  Such a generalized analysis, however, is no substitute for plausible factual allegations that Defendants fixed the price of a bond Plaintiffs purchased or sold.  *See*, *e.g.*, *Precision Assocs., Inc.* v. *Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *8-11 (E.D.N.Y. Jan. 4, 2011) (dismissing antitrust claim where plaintiffs failed to allege they personally "paid the fixed charges" and rejecting argument that antitrust injury could be pled by alleging that "surcharges [on certain routes] led to the inflation of prices for freight forwarding services in the U.S. market overall").  In addition, many of Plaintiffs' statistics do not even pertain to the types of GSE bonds that Plaintiffs allegedly purchased.[49]  As such, they are insufficient to plead that any Plaintiff suffered injury-in-fact.

**Plaintiffs' Analysis of Offer-Day Prices.**  The CAC includes a series of charts purporting to show that the prices Defendants charged investors for newly issued GSE bonds on offer days were higher before January 1, 2016 than after.  (CAC ¶¶ 182-99.)  Even if taken at face value, this

---

[49]  Plaintiffs nowhere explain how they are entitled to damages for trades with Defendants where the bond at issue was syndicated solely by dealers not alleged to be co-conspirators.  Yet their implausibly broad class definition would include those trades.

analysis—which does not concern any specific Defendant or any specific bond, much less any specific transaction—does not show that Plaintiffs were injured by Defendants' conduct.

For example, much of Plaintiffs' analysis is limited to offer-day prices of benchmarks or reference notes. (*See id.* ¶¶ 185-89.) No Plaintiff alleges, however, that it purchased a benchmark bond or reference note at any point during the class period,[50] let alone on the offer day. Plaintiffs' analysis of the prices of "All Newly Issued GSE Bonds" on "offer days" (*id.* ¶¶ 191-99) fares no better because the CAC does not allege that any Plaintiff purchased any GSE bond on the offer day. Although the CAC asserts that "the price inflation for newly issued GSE Bonds persisted for a minimum of one week after offer days" (*id.* ¶ 190), Plaintiffs allege **no** factual support for that bald assertion. The CAC's failure to link its analysis of offer-day prices to Plaintiffs' trading defeats any claim of injury-in-fact on that basis. *See Harry*, 889 F.3d at 116.

**Plaintiffs' Analysis of Bonds Going "Off-the-Run."** The CAC also includes charts that purportedly suggest that Defendants "inflated prices" of reference notes that were "about to go off-the-run" in the "two days immediately leading up to a new issuance." (CAC ¶¶ 204-08.) All of Plaintiffs' assertions of supposed price anomalies are limited to the "two days immediately leading up to a new issuance" (*id.* ¶ 204) or the three days immediately before, on, or after "the new auction of a replacement on-the-run bond" (*id.* ¶¶ 207-10). The CAC does not allege that any Plaintiff purchased a single GSE bond in the "two days immediately leading up to a new issuance" or in the three days before, on, or, after a new auction. (*Id.* ¶¶ 204, 238-61.)[51]

---

[50] Plaintiffs previously admitted that "Fannie Mae Benchmark Notes and Freddie Mac Reference Notes" comprise only "33.9%" of reported transactions. (Compl. ¶ 142.)

[51] Commonwealth Funds and Birmingham fail to identify **any** specific purchases of GSE bonds in the days leading up to or after a new issuance. (CAC ¶¶ 238-45, 255-61.) They instead offer only conclusory assertions. (*Id.* ¶¶ 241, 256.) IBEW 103 alleges a single purchase of an on-the-run GSE bond on October 29, 2010, which was **six days** before the bond went off-the-run on November 4, 2010. (*Id.* ¶ 251.)

**Plaintiffs' Analysis of "Average" Bid-Ask Spreads.**  The CAC further asserts that "bid-ask spreads were wider during the Class Period as compared to the post-Class Period." (*Id.* ¶ 211.) The only allegations offered in support of that assertion are comparisons of "average" bid-ask spread "quotes" before and after January 2016.  (*Id.* ¶¶ 214, 216, 220.)  These "averages" are insufficient to plead that Defendants artificially widened the bid-ask spreads on every GSE bond over a seven-year period.  *See, e.g.*, *Sheet Metal Workers Local 441 Health & Welfare Plan* v. *GlaxoSmithKline, PLC*, 2010 WL 3855552, at *30 (E.D. Pa. Sept. 30, 2010) ("[A]veraging by definition glides over what may be important differences.").  Plaintiffs also admit that their analysis of bid-ask spreads is based on bid-ask spreads *quoted* by dealers (CAC ¶¶ 211, 215, 217-20), not on prices actually *paid* by investors.  As Plaintiffs themselves recognize, quotes are simply "non-binding indications of where a dealer might trade a certain GSE bond in the future," not actual transaction prices.  (ECF No. 131 at 6.)  The CAC thus alleges only a *possibility* that Plaintiffs' transactions *might* have been affected by a widening of bid-ask spreads, which is not enough to plead antitrust injury.  *See In re SSA Bonds*, 2018 WL 4118979, at *7; *Harry*, 244 F. Supp. 3d at 416.

## IV. Plaintiffs' Claim Based on Pre-February 22, 2015 Conduct Is Time-Barred.

Plaintiffs' antitrust claim based on conduct occurring before February 22, 2015 is barred by the Clayton Act's four-year statute of limitations.  *See* 15 U.S.C. § 15b.  This four-year limitations period begins to run "as soon as there is injury to competition," *Johnson* v. *Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir. 1996), and where, as here, a plaintiff alleges a continuing antitrust conspiracy, only the conduct within the limitations period is actionable.  *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000).

Plaintiffs allege that Defendants conspired to fix prices of GSE bonds between January 1, 2009 and January 1, 2016.  (CAC ¶ 1.)  Because Plaintiffs did not bring suit until February 22,

2019, their antitrust claim only can challenge conduct that occurred after February 22, 2015.[52]  The statute of limitations thus reduces Plaintiffs' proposed class period to a little over ten months and bars any claim based on the four chats alleged in the CAC.

In an effort to avoid this time bar, Plaintiffs assert that the statute of limitations was equitably tolled because Defendants fraudulently concealed their alleged conspiracy.  (CAC ¶ 271.)  To plead fraudulent concealment, an antitrust plaintiff must allege "(1) that the defendant concealed the existence of the antitrust violation; (2) that plaintiff remained in ignorance of the violation until sometime within the four-year antitrust statute of limitations; and (3) that his continuing ignorance was not the result of lack of diligence."  *Hinds Cty.* v. *Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009).   Allegations of fraudulent concealment must be sufficiently particularized to satisfy Rule 9(b).  *Id.*  The CAC's fraud allegations fall well short of satisfying that heightened pleading standard.

**No Affirmative Acts of Concealment.**   To plead affirmative acts of concealment, a plaintiff must allege "that defendants took affirmative steps to conceal the alleged [violation] or the resulting injury from plaintiffs."  *Sejin Precision Indus. Co.* v. *Citibank, N.A.*, 235 F. Supp. 3d 542, 552 (S.D.N.Y. 2016).   As alleged acts of concealment, the CAC relies on generic statements from certain Defendants' 2010 annual reports about the strength of their compliance programs.

---

[52]  Plaintiffs' original complaint, filed on February 22, 2019, did not name as defendants Morgan Stanley, TD, Nomura, Cantor, SG, or HSBC.  Morgan Stanley, TD, Nomura, and HSBC were first named in the *Alaska* complaint filed on February 26, 2019; SG and Cantor were first named in the CAC filed on May 23, 2019.  Plaintiffs thus cannot assert an antitrust claim against those Defendants based on conduct occurring before February 26, 2015 and May 23, 2015, respectively. *See, e.g.*, *Madison 92nd St. Assocs., LLC* v. *Courtyard Mgmt. Corp.*, 624 F. App'x 23, 28 (2d Cir. 2015) (claims against new parties in amended complaint do not relate back under Rule 15 absent prior omission by "mistake"); *In re Vitamin C Antitrust Litig.*, 995 F. Supp. 2d 125, 131 (E.D.N.Y. 2014) (lack of knowledge of party's alleged involvement is not a "mistake" under Rule 15).

(CAC ¶ 271(a)-(m).)  Plaintiffs cannot meet their pleading burden under Rule 9(b) simply by quoting general statements in securities filings.  Plaintiffs do not allege—much less with the required particularity—that any of these statements were false, let alone fraudulent.[53] Furthermore, Plaintiffs fail to make any allegation of acts of concealment as to three Defendants— Cantor, HSBC, and SG.[54]

**Not a "Self-Concealing" Conspiracy.**  To allege a "self-concealing" conspiracy, a plaintiff must plead facts establishing that the alleged conspiracy "is, by its nature, unknowable." *SEC* v. *Jones*, 476 F. Supp. 2d 374, 382 (S.D.N.Y. 2007).  Plaintiffs' own allegations belie any claim that the supposed conspiracy was unknowable:  the CAC argues that a conspiracy can plausibly be inferred from publicly available information about GSE bond prices.  Plaintiffs further contend that price increases in "the most recently issued GSE Bonds" in the days before new issuances cannot be explained by "market factors and are, in fact, the opposite of what is expected." (*Id*. ¶ 8.)  Plaintiffs cannot have it both ways.  They cannot rely on widely available data as evidence of a plausible conspiracy, while simultaneously contending that the same data did not at least put them on inquiry notice years ago.  "[A]ll that is necessary to cause the tolling period to

---

[53]  Indeed, the Second Circuit reaffirmed as recently as this year that "general statements about reputation, integrity, and compliance with ethical norms are . . . too general to cause a reasonable investor to rely upon them."  *Singh* v. *Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019); *see also ECA & Local 134 IBEW Joint Pension Tr. of Chi.* v. *JPMorgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (general public statements about bank's risk management processes and integrity "are too general to cause a reasonable investor to rely upon them").

[54]  Plaintiffs identify statements allegedly made by only 12 of the 15 Defendants.  Although they state that their list is "non-exhaustive" (CAC ¶ 271), the absence of any allegations against three Defendants precludes Plaintiffs from asserting fraudulent concealment against them.  *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009) ("In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible.").

cease is for there to be reason to suspect the probability of any manner of wrongdoing." *In re IRS*, 261 F. Supp. 3d at 489; *see also Woori Bank* v. *Merrill Lynch*, 923 F. Supp. 2d 491, 497 (S.D.N.Y. 2013) (plaintiff may not "simultaneously claim[] that the generalized evidence cited as the basis of its complaint" is "sufficiently detailed to state a cognizable claim of relief and that, nevertheless, these facts were somehow insufficiently particular to cause the statute of limitations to run").[55]

**No Due Diligence.**  Plaintiffs fail to allege that they performed any due diligence or that the exercise of diligence would have been futile.  Instead, they simply assert, without any factual support, that Defendants' alleged conspiracy "could not have [been] discovered . . . through the exercise of due diligence until June 2018" when the *Bloomberg* article was published.  (CAC ¶ 273.)  That boilerplate allegation is insufficient to plead that Plaintiffs exercised diligence, particularly when Plaintiffs allege that publicly available data evidence a conspiracy.  *See*, *e.g.*, *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (plaintiffs failed to plead diligence where plaintiffs made "no allegation of any specific inquiries of [the defendant], let alone detail[ed] when such inquiries were made, to whom, regarding what, and with what response").

## CONCLUSION

For the foregoing reasons, the CAC should be dismissed in its entirety with prejudice.

---

[55] Plaintiffs also allege that "Defendants engaged in multiple, similar price-fixing conspiracies" and that findings from other investigations "support the conspiracy alleged" in the CAC.  (CAC ¶¶ 227-28.)  Although Plaintiffs admit that those findings were made public by April 2014 (Compl. ¶ 138), they do not explain why they would not at least put Plaintiffs on inquiry notice by that time.  *See Woori Bank*, 923 F. Supp. 2d at 497.

Dated: June 13, 2019
       New York, New York


/s/ John E. Schmidtlein _____          /s/ Richard D. Owens _____
John E. Schmidtlein                     Richard D. Owens
Jesse T. Smallwood                      Lawrence E. Buterman
Beth A. Stewart                         Lilia B. Vazova
WILLIAMS & CONNOLLY LLP                 LATHAM & WATKINS LLP
650 Fifth Avenue, Suite 1500            885 Third Avenue
New York, New York  10019               New York, New York  10022-4834
Telephone:  (646) 949-2800              Telephone:  (212) 906-1200
Facsimile:  (646) 949-2801              Facsimile:  (212) 751-4864
                                        richard.owens@lw.com
725 Twelfth Street, NW                   lawrence.buterman@lw.com
Washington, D.C.  20005                  lilia.vazova@lw.com
Telephone:  (202) 434-5341
Facsimile:  (202) 434-5029              *Attorneys for Defendant Barclays Capital Inc.*
jschmidtlein@wc.com
jsmallwood@wc.com
bstewart@wc.com


*Attorneys for Defendant Merrill Lynch,*
*Pierce, Fenner & Smith LLC*

/s/ Adam S. Hakki
Adam S. Hakki
Agnès Dunogué
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 848-4000
Facsimile:  (646) 848-4924
adam.hakki@shearman.com
agnes.dunogue@shearman.com

John F. Cove, Jr.
SHEARMAN & STERLING LLP
535 Mission Street, 25th Floor
San Francisco, California  94105-3225
Telephone: (415) 616-1100
Facsimile: (415) 616-1339
john.cove@shearman.com

*Attorneys for Defendant BNP Paribas Securities Corp.*

/s/ Meredith Kotler
Meredith Kotler
Lev L. Dassin
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York  10006
Telephone:  (212) 225-2000
mkotler@cgsh.com
ldassin@cgsh.com

*Attorneys for Defendant Citigroup Global Markets Inc.*

/s/ David Sapir Lesser
David Sapir Lesser
WILMER CUTLER PICKERING HALE
AND DORR LLP
250 Greenwich Street
New York, New York  10007
Telephone:  (212) 230-8800
Facsimile:  (212) 230-8888
david.lesser@wilmerhale.com

Heather Steiner Nyong'o
(*Pro Hac Vice* application forthcoming)
WILMER CUTLER PICKERING HALE
AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (202) 663-6315
Facsimile:  (202) 663-6363
heather.nyong'o@wilmerhale.com

*Attorneys for Defendant Cantor Fitzgerald & Co.*

/s/ David G. Januszewski
David G. Januszewski
Herbert S. Washer
Jonathan D. Thier
Peter J. Linken
Samuel G. Mann
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
Telephone:  (212) 701-3000
djanuszewski@cahill.com
hwasher@cahill.com
jthier@cahill.com
plinken@cahill.com
smann@cahill.com

*Attorneys for Defendant Credit Suisse Securities (USA) LLC*

/s/ Robert D. Wick

Robert D. Wick (*pro hac vice*)
Henry Liu (*pro hac vice*)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, N.W.
Washington D.C.  20001
Telephone:  (202) 662-6000
Facsimile: (202) 662-6291
rwick@cov.com
hliu@cov.com

*Attorneys for Defendants First Tennessee Bank National Association and FTN Financial Securities Corp.*

/s/ Daniel L. Stein

Daniel L. Stein
Jennifer M. Rosa
Gina Del Tatto
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York  10020-1001
Telephone:  (212) 506-2500
Facsimile:  (212) 262-1910
dstein@mayerbrown.com
jrosa@mayerbrown.com
gdeltatto@mayerbrown.com

Andrew S. Marovitz
Britt M. Miller
Robert E. Entwisle
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois  60606
Telephone:  (312) 782-0600
Facsimile:  (312) 701-7711
amarovitz@mayerbrown.com
bmiller@mayerbrown.com
rentwisle@mayerbrown.com

*Attorneys for Defendant HSBC Securities (USA) Inc.*

/s/ Richard C. Pepperman II

Richard C. Pepperman II
Matthew J. Porpora
Jonathan S. Carter
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
peppermanr@sullcrom.com
porporam@sullcrom.com
carterjo@sullcrom.com

*Attorneys for Defendant Goldman Sachs & Co. LLC*

/s/ Boris Bershteyn

Boris Bershteyn
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
boris.bershteyn@skadden.com

Gretchen M. Wolf
Lara A. Flath
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
155 N. Wacker Drive
Chicago, Illinois  60606
Telephone:  (312) 407-0700
Facsimile:  (312) 407-0411
gretchen.wolf@skadden.com
lara.flath@skadden.com

*Attorneys for Defendant J.P. Morgan Securities LLC*

/s/ Brad S. Karp
Brad S. Karp
Richard A. Rosen
Susanna Michele Buergel
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000
Facsimile:  (212) 373-2384
bkarp@paulweiss.com
rrosen@paulweiss.com
sbuergel@paulweiss.com

Jane Baek O'Brien
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
2001 K Street, N.W.
Washington, D.C.  20006
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420
jobrien@paulweiss.com

*Attorneys for Defendant Morgan Stanley &
Co. LLC*

/s/ Matthew S. Hellman
Matthew S. Hellman (*pro hac vice* pending)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, D.C.  20001-4412
Telephone:  (202) 639-6000
Facsimile:  (202) 661-6066
mhellman@jenner.com

Brian J. Fischer
JENNER & BLOCK LLP
919 Third Avenue, 38th Floor
New York, New York  10022-3908
Telephone:  (212) 891-1600
Facsimile:  (212) 891-1699
bfischer@jenner.com

*Attorneys for Defendant Nomura Securities
International, Inc.*

/s/ George S. Canellos
George S. Canellos
Sean M. Murphy
Fiona A. Schaeffer
MILBANK LLP
55 Hudson Yards
New York, New York  10001-2163
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
gcanellos@milbank.com
smurphy@milbank.com
fschaeffer@milbank.com

*Attorneys for Defendant SG Americas
Securities, LLC*

/s/ James H.R. Windels
James H.R. Windels
Brian M. Burnovski
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800
james.windels@davispolk.com
brian.burnovski@davispolk.com

*Attorneys for Defendant TD Securities (USA)
LLC*

/s/ Jefferson E. Bell
Jefferson E. Bell
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166-0193
Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035
jbell@gibsondunn.com

D. Jarrett Arp
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539
jarp@gibsondunn.com

Kyle C. Bisceglie
John G. Moon
Kyle J. Kolb
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 451-2300
Facsimile:  (212) 451-2222
kbisceglie@olshanlaw.com
jmoon@olshanlaw.com
kkolb@olshanlaw.com

*Attorneys for Defendant UBS Securities LLC*