**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE GSE BONDS ANTITRUST
LITIGATION

No. 1:19-cv-01704 (JSR)

**PLAINTIFFS' MEMORANDUM OF LAW IN**
**SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**

**[REDACTED]**

# TABLE OF CONTENTS

**Page(s)**

FACTS ............................................................................................................................. 3

I.  EVIDENCE COMMON TO THE CLASS WILL SHOW THAT DEFENDANTS COLLUSIVELY INFLATED THE PRICE OF ALL GSE BONDS DURING THE CLASS PERIOD ............................................................................................................. 3

II. EVIDENCE COMMON TO THE CLASS WILL SHOW THAT DEFENDANTS' INFLATION OF GSE BOND PRICES IMPACTED AND CAUSED DAMAGES TO PLAINTIFFS AND THE CLASS ...................................................................... 10

ARGUMENT .................................................................................................................. 12

I.  STANDARD ........................................................................................................... 12

II. THE CLASS SATISFIES ALL ELEMENTS OF RULE 23(a) ...................................... 13

    A.  Joinder Is Impracticable ..................................................................... 13

    B.  Plaintiffs' Case Raises Common Questions ...................................... 13

    C.  Plaintiffs' Claims Are Typical ............................................................ 14

    D.  Plaintiffs Are Adequate Class Representatives and Will Fairly Represent the Interests of the Class ....................................................................... 15

        1.  Plaintiffs' Interests Are Aligned with Those of the Class ........................ 16

        2.  Lowey Dannenberg, P.C. and Scott+Scott Attorneys at Law LLP Are Qualified to Represent the Class and Should Be Appointed Class Counsel Under Rule 23(g) ....................................................................... 16

III. THE CLASS SATISFIES RULE 23(b)(3) .................................................................. 17

    A.  Common Questions of Collusion, Impact, and Damages Predominate ............... 17

        1.  Violations of Antitrust Law ................................................................. 18

        2.  Classwide Impact ............................................................................. 19

        3.  Damages ......................................................................................... 21

    B.  Class Treatment Is the Superior Method to Resolve the Disputes ...................... 23

IV. THE COURT CAN ASCERTAIN CLASS MEMBERS OBJECTIVELY ...................... 24

CONCLUSION ............................................................................................................... 25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)..........................................................................................22

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
   568 U.S. 455 (2013)..........................................................................................12

*Ballinger v. Advance Magazine Publishers, Inc.*,
   No. 13 Civ. 4036, 2014 WL 7495092 (S.D.N.Y. Dec. 29, 2014).........................12

*Behrend v. Comcast Corp.*,
   655 F.3d 182 (3d. Cir. 2011), *rev'd on other grounds*,
   133 S. Ct. 1426 (2013)......................................................................................21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................................18

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*,
   290 F.R.D. 409 (S.D.N.Y. 2010) .....................................................................3, 14

*Brown v. Kelly*,
   609 F.3d 467 (2d Cir. 2010)..............................................................................17

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) ............................................................................21

*Chhab v. Darden Rests., Inc.*,
   No. 11 Civ. 8345, 2016 WL 3004511 (S.D.N.Y. May 20, 2016).........................23

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)........................................................................................19, 21

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007)........................................................................14, 15, 17

*Dial Corp. v. News Corp.*,
   314 F.R.D. 108 (S.D.N.Y. 2015) ....................................................................18, 22

*Ebin v. Kangadis Food Inc.*,
   297 F.RD. 561 (S.D.N.Y. 2014) .......................................................................24

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*,
   317 F.R.D. 374 (S.D.N.Y. 2016) .......................................................................21

*Gonqueh v. Leros Point To Point, Inc.*,
   No. 14-CV-5883, 2015 WL 9256932 (S.D.N.Y. Sept. 2, 2015)...............................................23

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   No. 06-MD-1775, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014)...............................12, 17, 21

*In re Amaranth Nat. Gas Commodities Litig.*,
   269 F.R.D. 366 (S.D.N.Y. 2010) ...........................................................................................14

*In re Currency Conversion Fee Antitrust Litig.*,
   264 F.R.D. 100 (S.D.N.Y. 2010) ....................................................................................14, 23

*In re Elec. Books Antitrust Litig.*,
   No. 11 MD 2293, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014)........................14, 17, 22, 23

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009).....................................................................................................15

*In re High-Tech Employee Antitrust Litig.*,
   985 F. Supp. 2d (N.D. Cal. 2013) ..........................................................................................20

*In re IMAX Secs. Litig.*,
   283 F.R.D. 178 (S.D.N.Y. 2012) ...........................................................................................17

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018)..............................................................13, 14, 17, 19

*In re Mun. Derivatives Antitrust Litig.*,
   252 F.R.D. 184 (S.D.N.Y. 2008) ...........................................................................................16

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) .....................................................................................13, 18

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015)......................................................................................................19

*In re Petrobras Sec. Litig.*,
   862 F.3d 250 (2d Cir. 2017)...................................................................................17, 23, 24

*In re Platinum & Palladium Commodities Litig.*,
   10-cv-3617, 2014 WL 3500655 (S.D.N.Y. July 15, 2014)....................................................14

*In re Playmobil Antitrust Litig.*,
   35 F. Supp. 2d 231 (E.D.N.Y. 1998) ...............................................................................15, 17

*In re Sumitomo Copper Litig.*,
   194 F.R.D. 430 (S.D.N.Y. 2000) ...........................................................................................14

*In re Vitamins Antitrust Litig.*,
   209 F.R.D. 251 (D.D.C. 2002)...............................................................................................18

*Johnson v. Az. Hosp. and Healthcare Ass'n*,
   No. CV-07-1292, 2009 WL 5031334 (D. Az. July 14, 2009) .................................................20

*Moreno v. Deutsche Bank Americas Holding Corp.*,
   15-Civ-9936, 2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017) ...................................................13

*New York v. Julius Nasso Concrete Corp.*,
   202 F.3d 82 (2d Cir. 2000)........................................................................................................21

*Pichardo v. Carmine's Broadway Feast Inc.*,
   15-CV-03312, 2016 WL 4379421 (S.D.N.Y. June 13, 2016) ................................................12

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)................................................................................................21, 22

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)......................................................................................................13

*SA/NV v. Deutsche Bank Nat'l Trust Co.*,
   No. 14-cv-4394, 2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017) ...............................................24

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
   659 F.3d 234 (2d Cir. 2011)................................................................................................12, 13

*State of N.Y. v. Hendrickson Bros., Inc.*,
   840 F.2d 1065 (2d Cir. 1988)....................................................................................................22

*Sykes v. Mel Harris and Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015)...................................................................................................18, 21

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ....................................................................................................16, 19, 20

*U.S. Football League v. Nat'l Football League*,
   842 F.2d 1335 (2nd Cir. 1988)..................................................................................................21

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017), *cert. denied,* 138 S. Ct. 1702 (2018) ...........................................12

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)...................................................................................................................13

**Statutes, Rules, and Regulations**

Federal Rules of Civil Procedure
    Rule 23(a)............................................................................................ *passim*
    Rule 23(a)(1)...........................................................................................13
    Rule 23(a)(2)...........................................................................................13
    Rule 23(a)(3)...........................................................................................14
    Rule 23(a)(4)...........................................................................................15
    Rule 23(b)...............................................................................11, 12, 23
    Rule 23(b)(3)....................................................................................... *passim*
    Rule 23(g) ..........................................................................................3, 16

**Other Authorities**

4 H. Newberg & A. Conte, NEWBERG ON CLASS ACTIONS §18.28 (3d ed. 1992) ........................18

Plaintiffs seek recovery on a classwide basis for an anticompetitive scheme by the Defendant dealers to fix the prices of Government Sponsored Entity bonds ("GSE Bonds") in the secondary market during the Class Period.  Defendants are 16 of the largest financial institutions in the world who together control the majority of the GSE Bond market.  Despite the reach of the conspiracy, the mechanics of it were simple:  Defendants communicated with one another through chat rooms and via telephone to systematically inflate the prices to be charged to customers for GSE Bonds in the secondary market.  As a result of their conduct, Defendants profited at the expense of investors, such as Plaintiffs and the Class.

To provide relief for those injured by Defendants' scheme, Plaintiffs respectfully request the Court certify the following "Class:"

> All persons or entities who purchased unsecured GSE Bonds issued by Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Federal Farm Credit Banks, and Federal Home Loan Banks in the secondary market during the period of January 1, 2009 through January 1, 2016 (the "Class Period") from a Defendant where such transaction took place in the United States or its territories.[1]

As demonstrated below, the Class satisfies Federal Rule of Civil Procedure 23(a).  First, the Class is ascertainable and numerous such that joinder is impracticable.  The Class consists of tens of thousands of investors who traded directly with Defendants and for which there exists records of those trades.  Second, there are multiple questions of law and fact common to the Class, including primarily whether Defendants' scheme restrained trade in violation of Section 1 of the Sherman Act and injured the Class.  Third, named Plaintiffs' claims are typical of the Class as they are investors who bought bonds from Defendant dealers in the secondary market – just like other

---

[1]     Excluded from the Class are Defendants and any parent, subsidiary, affiliate, employee, agent or co-conspirator of any Defendant.  Also excluded is the Judge presiding over this action, his or her law clerks, their spouses, and immediate relations.  The Class definition also excludes transactions in which a party purchased a GSE Bond directly from a GSE.

Class members.  Finally, named Plaintiffs are adequate representatives of the Class and Class Counsel is well-qualified.  Plaintiffs have actively participated and guided their counsel, who are highly experienced antitrust class action litigators.  The Class satisfies the four requirements of Rule 23(a).

The Class also satisfies the requirements of Rule 23(b)(3) – common issues predominate and a class action is a superior vehicle to provide relief.  Common evidence will prove each element of the Class's Sherman Act claims, ensuring common issues predominate.  Common evidence of the agreement to restrain trade will include, among other things, Defendants' documents, including chat room transcripts establishing that Defendants implemented an effective price floor for GSE Bonds in the secondary market.  Expert econometric analyses of market-wide GSE Bond trading will demonstrate Defendants' conduct caused higher trading costs, leading to classwide injury and damages.  The evidence viewed as a whole – as required by Supreme Court and Second Circuit precedent – demonstrates an overarching agreement to fix GSE Bond prices in the secondary market.

The expert opinion of Dr. Hal Singer shows that common impact can be demonstrated on a classwide basis.  Dr. Singer, a renowned, well-published expert and academic in antitrust economics, opines that: (1) standard econometric methods and data can provide classwide proof that Defendants' conduct had anticompetitive effects, *viz*, stabilized and increased prices in the GSE Bond secondary market; (2) standard econometric methods provide classwide proof of common impact; and (3) standard econometric methods can provide classwide proof of aggregate damages to Class members flowing from Defendants' anticompetitive conduct.  Further, Dr. Singer demonstrates that each of the three Class representatives has suffered antitrust injury as a result of Defendants' conduct.  Finally, Plaintiffs also satisfy Rule 23(b)(3)'s superiority

requirement as a single, consolidated action is far superior to a raft of costly individual lawsuits, because the evidence of Defendants' conduct is common to the Class.

Accordingly, Plaintiffs respectfully request that the Court certify the Class pursuant to Rules 23(a) and 23(b)(3) and appoint Plaintiffs as Class Representatives and Scott+Scott Attorneys at Law LLP and Lowey Dannenberg, P.C. as Class Counsel pursuant to Rule 23(g).

## **FACTS**

I. **EVIDENCE COMMON TO THE CLASS WILL SHOW THAT DEFENDANTS COLLUSIVELY INFLATED THE PRICE OF ALL GSE BONDS DURING THE CLASS PERIOD**

Defendants were some of the largest GSE Bond dealers during the Class Period[2] and members of an exclusive group of approved GSE Bond dealers[3] authorized to underwrite new GSE Bonds.[4] The underwriting business is relatively simple: Defendants purchase new GSE Bonds from the GSEs at a discount and they profit by selling those bonds to customers for more than what they paid.[5]

---

[2]   All Ex. ___ references are to the exhibits attached to the Declaration of Margaret MacLean in Support of Plaintiffs' Motion for Class Certification filed herewith. *See, e.g,* Ex. 1 ███████ ████████████████████████████████████████████████; *see also* Third Consolidated Class Action Complaint ("TAC" or "¶") 135 (collective market share of more than 77% percent).

[3]   Ex. 2 ████████████████████████████████████ Ex. 3 ████████ Ex. 4 ████████████████████████████████████████ Ex. 5 ████████████████████████████████

[4]   Ex. 6 ████████████████████████████████████ Ex. 7 ████████████ Ex. 8 ████████████████████████

[5]   Ex. 9 ████████████████████████████████████ Ex. 10 ████████

Defendants acquire new GSE Bonds during the underwriting process in one of three ways: (1) through an auction in which approved GSE Bond dealers submit competitive bids (either individually or as a group) to buy new GSE Bonds;[6] (2) by "mandate" where the GSE pre-selects one or more approved GSE Bond dealers to serve as lead underwriters for a specific GSE Bond;[7] or (3) by requesting more of a certain GSE Bond directly from the issuing GSE.[8]

Bonds acquired through each of these underwriting channels are then sold to customers in a two-step process.  First, the bonds enter "syndication" where the approved GSE Bond dealers involved in underwriting a GSE Bond directly market that bond to (primarily) regional banks in the primary market.[9]  Approved GSE Bond dealers are permitted to communicate with each other regarding prices during the syndication phase of an offering to facilitate placing that bond with



customers.[10]   After some period of time, anywhere from immediately to usually less than two weeks,[11] the approved GSE Bond dealers involved in the syndicate will declare any remaining amount of the bond "free to trade" (or "FTT") in the secondary market.[12]

At no time, either before or after the syndicate breaks, are approved GSE Bond dealers permitted to discuss or coordinate prices in the secondary market.[13]  Instead, they are supposed to compete with each other on price to win business from investors.[14]  Defendants, however, perceived competition on price in the secondary market as a significant risk.  Allowing competition for the bond about to go FTT would spark a "race to the bottom" in which traders sought to offer lower prices than their co-underwriters in order to sell more bonds while driving profits for the group down.[15]  Common evidence shows that Defendants avoided such a race to the bottom by



agreeing not to compete with each other and instead, to fix prices for bonds in the secondary market.

Common evidence primarily in the form of chat room transcripts produced by Defendants will further demonstrate the nature, scope, and operation of their conspiracy. Defendants' participation in these chats was commonplace and persistent during the entirety of the Class Period. The chats are remarkable both in their uniformity and in their brazenness.

The chats demonstrate an agreement not to compete – to play nice with competitors. For example, one trader wrote to his coconspirators, ███████████████████████████ ██████████████████████████████████████████████[16] Other traders expressed the same common motive not to compete with each other in similar multi-dealer chat rooms. A Morgan Stanley trader wrote, ████████████████████████████ ████████████████████████████████████████████████████████████████ ████[17]

The chats demonstrate that Defendants' trading desks had a standard operating procedure to unlawfully agree with their competitors on prices for GSE Bonds in the secondary market. No matter the banks or bonds involved, the process was the same: using chat rooms, the traders agreed on price. The traders often used simple, shorthand language: "99.925?," "works for me," "cool," "fine," "ok." The traders communicated in "antitrust haikus": short, expressive chats that

---

[16] Ex. 41 ███████████████

[17] Ex. 42 ████████████████████

perfectly framed the agreement to refrain from competing. The dealer conspiracy flowed consistently from 2009 all the way through 2015, to wit:[18]

**July 15, 2009** [redacted]

[redacted] [19] [redacted]

**July 27, 2015** [redacted] [20]**:**

[redacted]

[18] *See also, e.g.*, Ex. 43 [redacted] (September 3, 2010 chat between [redacted] Ex. 44 [redacted] (August 24, 2010 chat between [redacted]; Ex. 45 [redacted] (October 21, 2011 chat between [redacted]; Ex.46 [redacted] (January 25, 2011 chat between [redacted] Ex. 47 [redacted] (August 15, 2012 chat between [redacted]; Ex. 48 [redacted] (August 1, 2012 chat between [redacted] Ex. 49 [redacted] (March 20, 2012 chat between [redacted]; Ex. 50 [redacted] (June 6, 2012 chat between [redacted]; Ex. 51 [redacted] (March 5, 2013 chat among [redacted]; Ex. 52 [redacted] Ex. 53 [redacted] (March 10, 2014 chat between [redacted]; Ex. 54 [redacted] (March 24, 2014 chat between [redacted] Ex. 55 [redacted] July 22, 2015 chat between [redacted]

[19] [redacted]

[20] Ex. 56 [redacted] Ex. 57 [redacted]



The practice was so standardized that Defendants even agreed on the FTT price of a GSE Bond when **_bidding_** for that bond – before any syndicate was ever formed.  For example, in the chat below, traders from Defendants determine what they will bid for a bond in a GSE Bond auction based on where they agree to fix the FTT price of that bond in the secondary market:



***

Demonstrating the culture of collusion pervading Defendants' trading desks throughout the entire process of taking GSE Bonds to market, ██████████████████████

████████████████████████████████████ ████████████████████

████████████████████████████████████████ [23]

Defendants also implemented their conspiracy over the telephone.  For example, ████

████████████████████████████████████████████████████

████ [24]  On October 8, 2013, ████████████████████████████████

████████████████████████████ [25]  Likewise, ████████████████████

---

[21]    Ex. 58 ████████████████████████████████

██████████

[22]    Ex. 59 ████████████████████████████████

████████████

[23]    Ex. 60 ██████████████

[24]    Ex. 61 ████████████████

[25]    Ex. 62 ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ [26]

Further reinforcing the market-wide sweep of the conspiracy is evidence of traders discussing price-fixing in large multibank chat rooms not dedicated to any one particular syndicate. In one example, the chat room stayed open for two days, and included nine traders from Credit Suisse, UBS, Wells Fargo, and Jefferies.  Towards the end of the chat, one trader suggested an FTT price for a bond, to which another replied, ████████████████████████████████

████████████████████████████████████ [27]

Defendants' conspiracy spanned callable and non-callable (*e.g.*, bullet) bonds.  In many instances, the same traders traded both callable and non-callable bonds.[28]  Defendants used the same mechanisms to fix the prices of "bullet" bonds in the secondary market.  For example,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ [29] An hour later, ████████████████████████████████

████████████████████████████████████████████████████████

---

[26]     Ex. 63 ████████████████████

[27]     Ex. 64 ████████████████████████

[28]     None of the organizational charts for the GSE bond trading desks at Merrill Lynch, Morgan Stanley, Nomura, Societe Generale, TD Securities, UBS, BNP Paribas, Cantor Fitzgerald, or Citigroup distinguish between callable and non-callable bond traders.  *See* Ex. 65 ████████████████; Ex. 66 ████████████████  Ex. 67 ████████████  Ex. 68 ████████████  Ex. 69 ████████  Ex. 70 ████████  Ex. 71 ████████████████  Ex.   72 ████████████  *See also* Ex.   73 ████████████████████████████████████████████████████████

[29]     Ex. 74 ████████████████████████

███████████████████████████████████████████████████████████████[30]

This chat also shows that like many cartels, Defendants here monitored and enforced the

participants' adherence to the agreement.[31]

Common evidence will also demonstrate that Defendants followed through on their

agreement to fix GSE Bond prices in the secondary market.  After agreeing to fix the prices of

GSE Bonds, they carried out their agreement by offering the bonds to the market at or above the

agreed-upon price floor.  In the ordinary course, Defendants published email "blasts" to their buy-

side customers advertising the bond for sale at the prices the cartel had set.  Defendants' production

encompasses thousands of such "blasts."   To take just a single representative example, ██

████████████████████████████████████████████████████

██████[32]  ██████████████████████████████████

██████████████████[33]

## II.   EVIDENCE COMMON TO THE CLASS WILL SHOW THAT DEFENDANTS' INFLATION OF GSE BOND PRICES IMPACTED AND CAUSED DAMAGES TO PLAINTIFFS AND THE CLASS

Defendants' conspiracy caused all or virtually all Class members to pay artificially inflated

prices for GSE Bonds in the secondary market.  As Plaintiffs' expert Dr. Singer opines, both the



questions of impact and damages can be answered on a classwide basis using common formulae. As explained in his report, Defendants' agreement to fix the prices of GSE Bonds in the secondary market allowed members of the conspiracy to profit due to reduced competition. The resulting harm suffered by all or virtually all Class members was reflected in higher trading costs when transacting in GSE Bonds in the secondary market. Importantly, Dr. Singer also notes that callable bonds and bullets bonds are similar instruments and thus "economic substitutes." Under "elementary economic principles," an increase in the price of one instrument causes an increase in the price of a substitute instrument (such as callable and bullet GSE Bonds). Therefore, as Dr. Singer notes, pervasive anticompetitive conduct would have resulted in "general market wide inflation of GSE Bonds prices." Singer Report at ¶¶17, 45.[34]

Dr. Singer modeled GSE Bond trading and ran a set of regressions on Defendants' trade data comparing benchmark prices in a clean period to the prices paid for individual Class member trades during the Class Period, yielding estimates of price inflation attributable to the conspiracy. The regressions are also used to estimate "but-for" prices that would have prevailed absent Defendants' collusion. By comparing these "but-for" prices to actual prices from Defendants' data, Dr. Singer's model can calculate the injury that each Class member suffered on each of their transactions during the Class Period. After performing preliminary calculations based on the still-developing database of trades from the Class Period, Dr. Singer determined that all or virtually all Class members for whom data are currently available were injured by Defendants' conspiracy to fix the prices of GSE Bonds in the secondary market.

---

[34]     Ex. 80, Class Certification Expert Report of Hal J. Singer, Ph.D.

## ARGUMENT

### I.   STANDARD

To certify a class, the plaintiff must establish by a preponderance of the evidence that each of the four elements of Rule 23(a) and one of the bases for certification under Rule 23(b) are satisfied. *Waggoner v. Barclays PLC,* 875 F.3d 79, 93 (2d Cir. 2017), *cert. denied,* 138 S. Ct. 1702 (2018). Rule 23(a) provides that a class may be certified if the plaintiff demonstrates numerosity, commonality, typicality and adequacy of class plaintiffs. Fed. R. Civ. P. 23(a). In addition, Rule 23(b) permits a case to go forward as a class action if: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members;" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

While the Court may consider merits questions to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied," Rule 23 does not grant courts a license "to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds,* 568 U.S. 455, 466 (2013). *See also Shahriar v. Smith & Wollensky Rest. Grp., Inc.,* 659 F.3d 234, 251 (2d Cir. 2011) (it is not otherwise permissible for courts to invade the province of the jury by resolving merits issues about which there is a dispute). "'In determining the propriety of a class action, the question is not whether the plaintiff . . . will prevail on the merits, but rather whether the requirements of Rule 23 are met." *In re Air Cargo Shipping Servs. Antitrust Litig.,* No. 06-MD-1775, 2014 WL 7882100, at *29 (E.D.N.Y. Oct. 15, 2014).[35]

---

[35]   Unless otherwise noted, citations are omitted and emphasis is added.

Courts within the Second Circuit repeatedly emphasize that "'Rule 23 should be given liberal rather than restrictive construction'" and that the "'general preference is for granting rather than denying class certification.'"  *Pichardo v. Carmine's Broadway Feast Inc.,* 15-CV-03312, 2016 WL 4379421, at * 4 (S.D.N.Y. June 13, 2016).  Accordingly, "[d]oubts concerning the propriety of class certification should be resolved in favor of class certification."  *Ballinger v. Advance Magazine Publishers, Inc.,* No. 13 Civ. 4036, 2014 WL 7495092, at *3 (S.D.N.Y. Dec. 29, 2014).

## II.   THE CLASS SATISFIES ALL ELEMENTS OF RULE 23(a)

### A.   Joinder Is Impracticable

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable."   "[B]ut this requirement 'does not mandate that joinder of all parties be impossible.'"  *In re LIBOR-Based Fin. Instruments Antitrust Litig.,* 299 F. Supp. 3d 430, 460, (S.D.N.Y. 2018).  Courts presume numerosity for classes of 40 or more members.  *See, e.g.*, *Shahriar,* 659 F.3d at 252.  Plaintiffs need not furnish "evidence of exact class size or identity of class members to satisfy the numerosity requirement."  *Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir. 1993).  Through Defendants' own data, Plaintiffs have so far identified thousands of Class members.[36]  This clearly satisfies the numerosity requirement.

### B.   Plaintiffs' Case Raises Common Questions

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Common questions arise "'[w]here the same conduct or practice, by the same defendant gives rise to the same kind of claims from all class members.'"  *Moreno v. Deutsche*

---

[36]   Dr. Singer notes that, prior to corrections being performed for naming complications, there were over 3,000 Class members for the three Defendants for which the data was complete.  Once data is received from all 16 Defendants, that number will likely be much higher.  *See* Singer Report, n.93.

*Bank Americas Holding Corp.,* 15-Civ-9936, 2017 WL 3868803, at *4 (S.D.N.Y. Sept. 5, 2017). When assessing commonality, even "'a single [common] question' will do." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 359 (2011).

Commonality is regularly found in antitrust cases because questions of the "existence, scope, and efficacy" of an antitrust conspiracy are "important common questions." *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 509 (S.D.N.Y. 1996). *See also Cordes & Co. Fin. Servs.*, *Inc. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 105 (2d Cir. 2007) ("allegations of the existence of . . . conspiracy are susceptible to common proof"); *LIBOR,* 299 F. Supp. 3d at 590 ("the question of whether a conspiracy to suppress LIBOR existed is a common one"); *In re Platinum & Palladium Commodities Litig.,* 10-cv-3617, 2014 WL 3500655, at *9 (S.D.N.Y. July 15, 2014). The commonality requirement "is not demanding," *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg,* 290 F.R.D. 409, 418 (S.D.N.Y. 2010) and poses "a 'low hurdle.'" *In re Sumitomo Copper Litig.,* 194 F.R.D. 430, 481 (S.D.N.Y. 2000).

This case includes a host of substantial common questions that are capable of generating common answers, including: (i) whether Defendants conspired to fix the prices for GSE Bonds in the secondary market; (ii) whether Defendants' conduct violated Section 1 of the Sherman Act; and (iii) what are the appropriate measures of classwide harm for Plaintiffs' claims? These common questions amply meet Rule 23(a)'s commonality requirement.

### C.    Plaintiffs' Claims Are Typical

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement is "not demanding" and is satisfied where "'each [class] member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293, 2014 WL 1282293, at *12 (S.D.N.Y. Mar. 28,

2014).   This standard is readily satisfied in price-fixing conspiracies which aim to prove "a conspiracy, its effectuation, and damages therefrom – precisely what the absent class members must prove to recover."   *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 111 (S.D.N.Y. 2010) (collecting cases); *see also In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 376 (S.D.N.Y. 2010) (stating that "the typicality requirement may be satisfied where 'injuries derive from a unitary course of conduct by a single system'").

Here, Plaintiffs' claims are typical of the Class's claims because Plaintiffs allege that a price-fixing conspiracy by the same Defendants gave rise to higher market-wide trading costs for GSE Bonds, thus harming all Class members.   Any differences that may exist as to the amount of damages suffered by each Class member as a result of Defendants' conduct does not preclude a finding of typicality.   *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 242 (E.D.N.Y. 1998).

### D.   Plaintiffs Are Adequate Class Representatives and Will Fairly Represent the Interests of the Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).   The adequacy determination focuses on whether: "'1) plaintiff's interests are antagonistic to the interest of other members of the class; and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'"   *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).   While the focus of the adequacy inquiry is to uncover "conflicts of interest between named parties and the class they seek to represent," only a "'fundamental'" conflict – *i.e.*, one that goes to the heart of the litigation – will defeat a motion for certification.   *Id.*

1.      **Plaintiffs' Interests Are Aligned with Those of the Class**

Plaintiffs' interests are aligned with other Class members' interests because they suffered the same injuries – monetary losses resulting from GSE Bond transactions at artificial prices with a Defendant involved in the conspiracy.  Indeed, Dr. Singer specifically notes that all three named Plaintiffs were injured by Defendants' conspiracy.  *See* Singer Report at ¶53.  Moreover, Plaintiffs have demonstrated to date that they share the same interests as the Class by vigorously pursuing Class members' claims.  Plaintiffs have dedicated substantial efforts to prosecuting this case, including:  (1) assisting in discovery, including the collection and production of documents; (2) reviewing and editing filings; (3) actively participating in settlements; (4) participating in strategic discussions and decisions; and (5) preparing for their upcoming depositions by Defendants. Plaintiffs will continue to commit their time and resources to prosecute the action vigorously against the remaining Defendants through trial and appeal.

2.      **Lowey Dannenberg, P.C. and Scott+Scott Attorneys at Law LLP Are Qualified to Represent the Class and Should Be Appointed Class Counsel Under Rule 23(g)**

Plaintiffs also request that the Court appoint Lowey Dannenberg, P.C. and Scott+Scott Attorneys at Law LLP as Class Counsel.  The Court appointed the two firms as interim co-lead Class counsel in May 2019.  *See* ECF No. 159.  The same considerations that guided the Court's selection of interim co-lead Class counsel apply.  *See In re Mun. Derivatives Antitrust Litig.,* 252 F.R.D. 184, 186 (S.D.N.Y. 2008).  The Court has already found that both Lowey Dannenberg and Scott+Scott possess the qualifications, experience, and ability to prosecute this case.  *See* ECF No. 159.  They have zealously represented Plaintiffs and the putative Class and are prepared to litigate this case through trial against the remaining Defendants.

## III.     THE CLASS SATISFIES RULE 23(b)(3)

Plaintiffs seek to certify the Class pursuant to Rule 23(b)(3) as questions of law or fact predominate and a class action is the superior method for adjudication of the claims.

### A.     Common Questions of Collusion, Impact, and Damages Predominate

The predominance inquiry "'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).  A plaintiff does not have "'to prove that each element of her claim is susceptible to class wide proof,'" but rather, a plaintiff need only show "'that common questions ***predominate*** over any questions affecting only individual [class] members.'"  *In re Petrobras Sec. Litig.*, 862 F.3d 250, 268 (2d Cir. 2017) (quoting *Amgen*, 568 U.S. 455) (emphasis in original).  *See also LIBOR*, 299 F. Supp. 3d at 462 ("As its name suggests, '[t]he predominance requirement calls only for predominance, not exclusivity, of common questions.'"); *Air Cargo*, 2014 WL 7882100, at *35 ("If the most substantial issues in controversy will be resolved by reliance primarily upon common proof, class certification will generally achieve the economies of litigation that Rule 23(b)(3) envisions.").  Put another way, a proposed class with common questions of law and fact will satisfy the predominance requirement "unless it is clear that individual issues will overwhelm the common questions." *Playmobil*, 35 F. Supp. 2d at 245.

Predominance is "'a test readily met in certain cases alleging . . . violations of the antitrust laws.'"  *Cordes*, 502 F.3d at 105 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)); *Elec. Books*, 2014 WL 1282293, at *13 ("'where plaintiffs were allegedly aggrieved by a single policy of the defendant[], and there is a strong commonality of the violation and the harm, this is precisely the type of situation for which the class action device is suited'") (quoting *Brown v. Kelly*, 609 F.3d 467, 484 (2d Cir. 2010)).

Here, Plaintiffs' proof of all three elements of the Class's antitrust claims – a violation of antitrust law, impact, and damages – will predominantly (indeed, overwhelmingly) raise questions of law or fact common to the Class.

### 1. Violations of Antitrust Law

The existence and scope of Defendants' conspiracy to fix the prices for GSE Bonds in the secondary market will be established by common evidence. "As the Supreme Court has observed, the requirement of predominance is 'readily met in certain cases alleging . . . violations of the antitrust laws.'" *In re IMAX Secs. Litig.*, 283 F.R.D. 178, 187 (S.D.N.Y. 2012) (quoting *Amchem*, 521 U.S. at 625); *NASDAQ*, 169 F.R.D. at 518 ("Courts repeatedly have held that the existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant individual issues are present.").

Here, Plaintiffs will use common evidence to prove that the illegal conduct stemmed from "an agreement, tacit or express" rather than individualized decision-making. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). That evidence will focus on the actions of Defendants and will not vary among Class members. *See, e.g. Dial Corp. v. News Corp.,* 314 F.R.D. 108, 114 (S.D.N.Y. 2015) ("[I]ssues relevant to proving a violation of the antitrust laws . . . can be proven through class-wide, common evidence because they focus on [defendants'] conduct, not on the actions of putative class members."); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002). For example, chat room communications showing a "conscious commitment to a common scheme" are common to all Class members. Critically, none of this proof will vary by Class member. Plaintiffs will demonstrate a single conspiracy existed which had the effect of diminishing competition in and stabilizing the prices of GSE Bonds in the secondary market thereby causing Class members injury. *See* 4 H. Newberg & A. Conte, NEWBERG ON CLASS ACTIONS §18.28 at 18-98 (3d ed. 1992) ("As a rule, the allegation of a price-fixing conspiracy is

sufficient to establish predominance of common questions."). The evidence of a horizontal price-fixing conspiracy, a *per se* violation of the Sherman Act, is common to all Class members and predominates over any individual issues.[37]

### 2.    Classwide Impact

At the class certification stage, Plaintiffs need only establish that impact is "'capable of proof at trial through evidence that [is] common to the class rather than individual to its members.'" *See Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013). Impact, or "fact of injury," is demonstrated by establishing that common evidence exists to show that all, or almost all, class members suffered damage on at least one transaction. *See LIBOR*, 299 F. Supp. 3d at 594-95 (finding "the question of whether each class member has experienced injury as a result of the alleged 16-bank conspiracy is a common one"); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 25 (1st Cir. 2015) (without deciding whether a class can include "more than a de minimis number of uninjured parties," certifying class because "it has not been shown that the class here includes more than a de minimis number of uninjured parties"); *see also Tyson Foods*, 136 S. Ct. at 1044-45 (affirming certification despite presence of 212 uninjured members, representing 6.33% of class).

As demonstrated through the accompanying expert report of Dr. Singer, Plaintiffs will present common proof that due to Defendants' conspiracy, Class members transacted with Defendants at prices less favorable than what would have prevailed in the absence of the conspiracy and that the conspiracy caused widespread anticompetitive effects affecting all or almost all Class members. Using data produced by Defendants supplemented by publicly available data (which is common to all members of the Class and requires no individualized inquiries), Dr.

---

[37]    Individualized damages issues should not defeat certification under Rule 23(b)(3) if common issues as to liability predominate. *See, e.g. Sykes v. Mel Harris and Assocs. LLC,* 780 F.3d 70, 87 (2d Cir. 2015) ("'[c]ommon questions may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues'").

Singer compares prices customers actually paid for GSE Bonds during the Class Period to a "but-for price" they would have paid absent collusion.

To arrive at the "but-for price," Dr. Singer uses a regression model, a technique widely accepted by economists and statisticians which compares benchmark prices in a clean or competitive period to prices during the conspiracy. The "dependent variable" for the regression model is the natural logarithm of price paid by a given Class member for a purchase of a given GSE Bond from a Defendant at a given point in time. Singer Report at ¶46. Dr. Singer also controlled for numerous explanatory variables (drawn from academic literature and his professional research) as well as economic fundamentals and interest rate volatility. *Id.* Finally, the regression model includes a "conduct variable" to measure the effect of the conspiratorial conduct after taking all other explanatory variables into account. *Id.* at ¶47. This ensured an apples-to-apples comparison, such that the difference between the actual price and the but-for effective price is the measure of injury on a particular trade. Dr. Singer found that the prices of GSE Bonds sold to Class members during the Class Period were higher than in the "clean period," holding all other explanatory variables constant. *Id.* at ¶49. The results were highly statistically significant. *Id.*

Indeed, Dr. Singer is able to show classwide impact under two independent methodologies: The first (discussed above) uses the regression model and takes what was paid versus what would have been paid absent collusion. *Id.* at ¶53. The second is a two-pronged classwide approach accepted in cases such as *In re High-Tech Employee Antitrust Litig.,* 985 F. Supp. 2d (N.D. Cal. 2013) and *Johnson v. Az. Hosp. and Healthcare Ass'n,* No. CV-07-1292, 2009 WL 5031334 (D. Az. July 14, 2009) that shows: (1) there is classwide evidence capable of showing collusion generally inflated the prices paid by Class members (*i.e.*, the results of the regression model); and

(2) because GSE Bonds follow a formulaic pricing structure, it "implies that conduct that artificially inflates the prices paid on Class Purchases generally will be transmitted to all or nearly all Class Members." Singer Report at ¶58.  Through both of these, Dr. Singer is able to show that the "vast majority of Class Members paid higher prices on Class Purchases than they would have in the but-for-world." *Id.* at ¶53.  This finding is consistent with the presence of collusive conduct.

### 3.   Damages

At the class certification stage, "'[a]ll that is required . . . is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 393 (S.D.N.Y. 2016). It is well-established that where liability can be proved classwide, individualized proof of damages does not defeat predominance.  *See, e.g.*, *Sykes,* 780 F.3d at 88 ("*Comcast* did not rewrite the standards governing individualized damage considerations . . . .  [a]ll that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'").  *See also Roach v. T.L. Cannon Corp.,* 778 F.3d 401, 402, 405 (2d Cir. 2015) (individual damages determinations do not defeat predominance).  "It would drive a stake through the heart of the class action device . . . to require that every member of the class have identical damages." *Butler v. Sears, Roebuck & Co.,* 727 F.3d 796, 801 (7th Cir. 2013).  In the Second Circuit, the "burden of proving antitrust damages is not as rigorous as in other types of cases." *New York v. Julius Nasso Concrete Corp.,* 202 F.3d 82, 88 (2d Cir. 2000).[38]

---

[38]    *See also Behrend v. Comcast Corp.,* 655 F.3d 182, 203 (3d. Cir. 2011), *rev'd on other grounds,* 133 S. Ct. 1426 (2013)("Given the inherent difficulty of identifying a 'but-for-world,' we do not require that damages be measured with certainty, but rather that they be demonstrated as a matter of just and reasonable inference…"); *U.S. Football League v. Nat'l Football League,* 842 F.2d 1335, 1378 (2nd Cir. 1988)("[O]nce proof of injury causation has been established, courts

Dr. Singer's report describes how he is able to multiply the percent increase (determined from his regression model) in the price of GSE Bonds by Defendants' aggregate sales volumes to Class members (derived from publicly available sources) to calculate classwide damages.  Singer Report at ¶59.  In a price-fixing conspiracy, damages are measured as "'the difference between the prices actually paid and the prices that would have been paid absent the conspiracy.'"  *Elec. Books*, 2014 WL 1282293, at *16 (quoting *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988)).  Establishing such damages by formula is commonly accepted.  *See, e.g.*, *Roach*, 778 F.3d at 407.  It is also standard economic practice in antitrust cases to utilize, as Dr. Singer does, a "but-for world" comparison evaluating prices during the conspiracy compared to a benchmark non-collusive period.  *Elec. Books*, 2014 WL 1282293, at *25 (collecting cases and noting the "'before and after' method, . . . is a well-accepted method of measuring antitrust damages'").

As described above, Dr. Singer's model for calculating trade-specific damages relies on common formulae.  The key model inputs for the Class damages analysis are Defendants' data produced in this litigation, which includes trades executed with Class members, supplemented by publicly available data.  These data fields identify the specific market conditions and characteristics of each trade, and thus allow Dr. Singer to incorporate those individual characteristics into his analysis without resorting to individual evidence.  This is a cogent model that measures Class members' damages through the use of a methodology common to the Class.  Nothing more is required.  *See Dial Corp.*, 314 F.R.D. at 119.

---

have allowed antitrust plaintiffs considerable latitude in proving the amount of damages.");  *Air Cargo*, 2014 WL 7882100, at *60 ("And where exact damages cannot realistically be proven with precision, '[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'").

**B.      Class Treatment Is the Superior Method to Resolve the Disputes**

If common issues predominate over individual issues, then a class action will generally be a superior method for adjudicating the class members' claims.  *See Amchem*, 521 U.S. at 615.  The superiority inquiry examines: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).

A case satisfies the superiority test if "the class device will achieve economies of scale, conserve judicial resources, preserve public confidence in the integrity of the judicial system by avoiding the waste and delay of repetitive proceedings, and prevent inconsistent adjudications of similar claims."  *Chhab v. Darden Rests., Inc.*, No. 11 Civ. 8345, 2016 WL 3004511, at *3 (S.D.N.Y. May 20, 2016) (citing *Gonqueh v. Leros Point To Point, Inc.*, No. 14-CV-5883, 2015 WL 9256932, at *3 (S.D.N.Y. Sept. 2, 2015)).  Superiority is "explicitly comparative in nature: courts must ask whether 'a class action is ***superior to other available methods*** for fairly and efficiently adjudicating the controversy.'"  *Petrobras*, 862 F.3d at 268 (quoting Fed. R. Civ. P. 23(b) (emphasis in original)).

Class litigation is superior in actions where, as here, it would be unduly costly for Class members to pursue litigation on their own.  *See Elec. Books*, 2014 WL 1282293, at *23 (citing *Amchem*, 521 U.S. at 617).  For example, gathering, cleaning, and analyzing the data required to prosecute this litigation on its own has been extremely time-consuming and costly for Plaintiffs.  The costs for Class members to do the same to effectively pursue individual litigation ***through trial*** would likely outweigh any potential individual recovery.  *See In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 117 (S.D.N.Y. 2010) (class litigation was superior where "class

members' claims will be small relative to the high costs of maintaining an antitrust action").  Given the expense of documentary and data discovery, the complexity of the data involved in this action, and the sheer number of Defendants, there is ***no*** realistic alternative to a class action for all but a few Class members here.

## IV.      THE COURT CAN ASCERTAIN CLASS MEMBERS OBJECTIVELY

The members of the proposed Class are also "objectively ascertainable."  *See Petrobras*, 862 F.3d at 269 ("The ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries."). Ascertainability does not require plaintiffs to "identify a comprehensive roster of putative class members at the certification stage."  *Royal Park lnvs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, No. 14-cv-4394, 2017 WL 1331288, at *8 (S.D.N.Y. Apr. 4, 2017).  Rather, plaintiffs must only show that "class members will be, at some point, readily identifiable without resort to individualized hearings."  *Id*.  This standard is "'not demanding' and is 'designed only to prevent the certification of a class whose membership is truly indeterminable.'"  *Ebin v. Kangadis Food Inc.,* 297 F.RD. 561, 567 (S.D.N.Y. 2014).  The Class definition provides definite boundaries for Class membership, including limits relating to: (a) type of financial instruments covered (*i.e.*, GSE Bonds purchased from a Defendant); (b) location of Class member transactions (*i.e.*, in the U.S. or its territories); and (c) timeframe (*i.e.*, between January 1, 2009 and January 1, 2016).  Further, the identities of Class members are identifiable from Defendants' transaction records that detail each entity that transacted in GSE Bonds with Defendants.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion.

DATED:  November 19, 2019

<u>s/Christopher M. Burke</u>
CHRISTOPHER M. BURKE (CB-3648)
WALTER W. NOSS (WN-0529)
**SCOTT+SCOTT ATTORNEYS
AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565
Fax: (619) 233-0508
cburke@scott-scott.com
wnoss@scott-scott.com

DAVID R. SCOTT (DS-8053)
AMANDA F. LAWRENCE (AL-8804)
KRISTEN M. ANDERSON (KA-1965)
DONALD A. BROGGI (DB-9661)
THOMAS K. BOARDMAN (TB-0530)
JUSTIN W. BATTEN
**SCOTT+SCOTT ATTORNEYS AT LAW
LLP**
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Tel: (212) 223-6444
Fax: (212) 223-6334
david.scott@scott-scott.com
alawrence@scott-scott.com
kanderson@scott-scott.com
dbroggi@scott-scott.com
tboardman@scott-scott.com
jbatten@scott-scott.com

*Interim Co-Lead Counsel for the Class*

CHRISTOPHER CRAIG
Chief Counsel
**PENNSYLVANIA TREASURY
DEPARTMENT**
OFFICE OF THE CHIEF COUNSEL
129 Finance Building

Respectfully submitted,

VINCENT BRIGANTI
CHRISTIAN LEVIS
MARGARET MACLEAN
ROLAND R. ST. LOUIS, III
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
mmaclean@lowey.com
rstlouis@lowey.com

*Interim Co-Lead Counsel for the Class*

TODD A. SEAVER
CARL N. HAMMARSKJOLD
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel: (415) 433-3200
Fax: (415) 433-6382
tseaver@bermantabacco.com
chammarskjold@bermantabacco.com

LESLIE R. STERN
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194
lstern@bermantabacco.com

*Attorneys for Plaintiffs Electrical Workers
Pension Fund Local 103, I.B.E.W., and Local
103, I.B.E.W. Health Benefit Plan*

Harrisburg, PA 17120
Tel: (717)787-2465
Fax: (717) 772-0970
ccraig@patreasury.gov

*Attorney for Plaintiff Joseph M. Torsella, in
his official capacity as the Treasurer of the
Commonwealth of Pennsylvania*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Dated:  November 19, 2019                 SCOTT+SCOTT ATTORNEYS AT LAW LLP

                                          *s*/Christopher M. Burke
                                          Christopher M. Burke