**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE GSE BONDS ANTITRUST
LITIGATION

Case No. 1:19-cv-01704 (JSR)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**FINAL APPROVAL OF CLASS ACTION SETTLEMENTS WITH**
**BARCLAYS CAPITAL INC. AND GROUP DEFENDANTS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

PROCEDURAL HISTORY AND SETTLEMENT TERMS ............................................... 2

ARGUMENT ...................................................................................................................... 4

I.      THE SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE ..................... 4

      A.     Judicial Policy Favors Settlement ........................................................... 4

      B.     Courts Approve Class Action Settlements When They Are Fair, Reasonable, and Adequate ................................................................................................ 4

      C.     The Proposed Settlements Are Procedurally Fair .................................... 5

            1.     Rule 23(e)(2)(A) – Plaintiffs Have Adequately Represented the Class ..... 5

            2.     Rule 23(e)(2)(A) – Co-Lead Counsel Have Adequately Represented the Class ............................................................................................... 5

            3.     Rule 23(e)(2)(B) – the Proposed Settlements Were Negotiated at Arm's Length ......................................................................................... 6

                a.     Negotiations Between Plaintiffs and Barclays Were Complex and at All Times Highly Adversarial ............................................... 7

                b.     Negotiations Between Plaintiffs and Group Defendants Were Complex and at All Times Highly Adversarial ............................... 7

      D.     The Proposed Settlements Are Substantively Fair ................................... 9

            1.     Rule 23(e)(C)(i) – the Relief Provided to the Class Is Superior to Continued Litigation ......................................................................... 9

                a.     The Class Faced Significant Risks in Establishing Liability ........ 10

                b.     The Class Faced Significant Risks in Certifying a Class and Maintaining It on Appeal ............................................................. 11

                c.     Even if the Class Proved Liability, It Risked Not Being Able to Prove Damages or Maintain Them on Appeal ......................... 12

                d.     The Recovery Is Reasonable in Light of the Best Possible Recovery and the Attendant Risks of Litigation ......................... 13

                e.     Other Factors Reflecting the Reasonableness of the Settlements .................................................................................. 15

                f.     While Defendants May Be Able to Sustain a Larger Judgment, that Factor Alone Does Not Undercut the Reasonableness of the Settlement ................................................................................. 18

            2.     Rule 23(e)(2)(C)(ii) – the Claims Process Is Fair and Rational ............... 19

             3.     Rule 23(2)(C)(iii) – the Proposed Award of Attorneys' Fees Supports Final Approval ..................................................................... 20

4.      Rule 23(e)(C)(iv) – the Supplemental Agreements Do Not Weigh
        Against Final Approval.............................................................................. 21

5.      Rule 23(e)(2)(D) – the Proposed Settlements Treat Class Members
        Equitably to Each Other............................................................................. 22

II.    THE NOTICE PROGRAM ADEQUATELY APPRISED CLASS MEMBERS OF
       THEIR RIGHTS ............................................................................................... 22

III.   THE REACTION OF THE CLASS FAVORS APPROVAL .......................................... 24

IV.    THE PROPOSED SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED ...... 25

CONCLUSION.......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*City of Detroit v. Grinnell Corp*.,
  495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by Goldberger v.*
  *Integrated Resources, Inc*., 209 F.3d 43 (2d Cir. 2000) ................................................4, 13, 14

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)......................................................................................................5

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006)....................................................................................................5

*Dial Corp. v. News Corp*.,
  317 F.R.D. 426 (S.D.N.Y. 2016) ..........................................................................................19

*Gelboim v. Bank of America Corp*.,
  823 F.3d 759 (2d Cir. 2016)..................................................................................................10

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
  909 F. Supp. 2d 259 (S.D.N.Y. 2012)...................................................................................19

*In re Charles Schwab Corp. Sec. Litig.*,
  No. C 08-01510 WHA, 2011 WL 1499107 (N.D. Cal. Apr. 19, 2011)..................................22

*In re Currency Conversion Fee Antitrust Litig.*,
  No. 01 MDL 1409, 2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006) ..........................................14

*In re Drexel Burnham Lambert Grp., Inc.*,
  995 F.2d 1138 (2d Cir. 1993).................................................................................................22

*In re EVCI Career Colleges Holding Corp. Secs. Litig*.,
  No. 05-CV-10240, 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ..........................................19

*In re Facebook, Inc., IPO Sec. & Derivative Litig*.,
  343 F. Supp. 3d 394 (S.D.N.Y. 2018)..............................................................................19, 24

*In re Global Crossing Secs. and ERISA Litig*.,
  225 F.R.D. 436 (S.D.N.Y. 2004) .............................................................................................9

*In re High-Tech Employee Antitrust Litig*.,
  No. 11-CV-02509, 2015 WL 5159441 (N.D. Cal. Sept. 2, 2015) ..........................................22

*In re Initial Pub. Offering Sec. Litig*.,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009).....................................................................................20

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   327 F.R.D. 483 (S.D.N.Y. 2018) ...............................................................................12, 13, 18

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ......................................................................................12, 21

*In re Nasdaq Mkt.-Makers Antitrust Litig.*,
   No. 94 Civ. 3996 RWS, 2000 WL 37992 (S.D.N.Y. Jan. 18, 2000) .....................................20

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).....................................7

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
   330 F.R.D. 11 (E.D.N.Y. 2019) .......................................................................................13, 14

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
   827 F.3d 223 (2d Cir. 2016).................................................................................................5, 24

*In re Petrobras Sec. Litig.*,
   317 F. Supp. 3d 858 (S.D.N.Y. 2018), *appeal dismissed*, No. 18-2120, 2018
   WL 7108171 (2d Cir. Sept. 13, 2018), and *aff'd*, 784 F. App'x 10 (2d Cir.
   2019) .....................................................................................................................................20

*In re Se. Milk Antitrust Litig.*,
   No. 2:08-MD-1000, 2014 WL 12546969 (E.D. Tenn. Jan. 30, 2014)...................................22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. MDL 3:07-md-1827, 2011 WL 7575004 (N.D. Cal. Dec. 27, 2011) ..............................21

*In re Vitamins Antitrust Litig.*,
   No. 99-197, 2000 WL 1737867 (D.D.C. Mar. 31 2000) ......................................................20

*In re WorldCom, Inc. Sec. Litig.*,
   No. 02 Civ. 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004)...............................22

*Martin v. Caterpillar, Inc.*,
   No. 07-CV-1009, 2010 WL 3210448 (C.D. Ill. Aug. 12, 2010).............................................18

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   No. 08-CV-42, 2015 WL 6964973 (E.D.N.Y. Nov. 10, 2015)...............................................22

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ................................................................................................14

*Shapiro v. JPMorgan Chase & Co.*,
   No. 11-cv-8331 (CM)(MHD), 2014 WL 1224666 (S.D.N.Y. March 24, 2014) .....................9

*U.S. Football League v. Nat'l Football League*,
   644 F. Supp. 1040 (S.D.N.Y. 1986).......................................................................................12

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)................................................................................................... *passim*

**Statutes, Rules, and Regulations**

15 U.S.C.
   §15(a) ......................................................................................................................................14

Federal Rules of Civil Procedure
   Rule 23 ...............................................................................................................................4, 24
   Rule 23(2)(C)(iii) ...................................................................................................................20
   Rule 23(a)...............................................................................................................................25
   Rule 23(b)(3)..........................................................................................................................25
   Rule 23(e).....................................................................................................................4, 6, 21
   Rule 23(e)(2).............................................................................................................................1
   Rule 23(e)(2)(A) ..................................................................................................................4, 5
   Rule 23(e)(2)(B)....................................................................................................................4, 6
   Rule 23(e)(2)(C).......................................................................................................................4
   Rule 23(e)(2)(C)(i)...................................................................................................................9
   Rule 23(e)(2)(C)(ii)................................................................................................................19
   Rule 23(e)(2)(C)(iv)...............................................................................................................21
   Rule 23(e)(2)(D) ................................................................................................................4, 22
   Rule 23(e)(3)...........................................................................................................................21
   Rule 23(e)(C)(i).......................................................................................................................9
   Rule 23(e)(C)(iv)....................................................................................................................21

**Other Authorities**

Manual for Complex Litigation, Fourth (2004)
   §21.631....................................................................................................................................21

**INTRODUCTION**

Plaintiffs present the Court with two settlements, each of which the Court preliminarily approved in Orders dated February 3, 2020 and February 6, 2020, respectively.  If finally approved, these settlements would resolve all claims against all Defendants in this Action.[1]  The $87 million settlement with Barclays Capital Inc. ("Barclays") and $250 million Group Defendants settlement (together, the "Settlements") with BNP Paribas Securities Corp., Cantor Fitzgerald & Co., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, HSBC Securities (USA) Inc., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co. LLC, Nomura Securities International, Inc., SG Americas Securities, LLC, TD Securities (USA) LLC, and UBS Securities LLC ("Group Defendants"), along with the Deutsche Bank, FTN, and Goldman Sachs settlements, bring the total recovery for the Settlement Class to $386.5 million.

In granting preliminary approval of both Settlements, the Court found, under the new, more exacting standards of amended Rule 23(e)(2), that it would likely be able to grant final approval to the Settlements following the fairness period.  While the period is ongoing, the initial reaction of the Class to the Settlements favors approval.  To date, no objections to the Settlements have been filed, and there are only three requests for exclusion.  For the reasons explained below, the Settlements represent an excellent recovery for the Settlement Class in light of the significant risks of continued litigation and should be approved.

---

[1]     Unless otherwise defined herein, all capitalized terms have the same meaning as set out in the Stipulation and Agreement of Settlement with Barclays Capital Inc. ("Barclays Stipulation" or "Barclays Stip.") and Stipulation and Agreement of Settlement with BNP Paribas Securities Corp., Cantor Fitzgerald & Co., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, HSBC Securities (USA) Inc., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co. LLC, Nomura Securities International, Inc., SG Americas Securities, LLC, TD Securities (USA) LLC, and UBS Securities LLC ("Group Defs. Stipulation" or "Group Defs. Stip.").  ECF Nos. 343-1; 343-2.

1

## PROCEDURAL HISTORY AND SETTLEMENT TERMS

On May 23, 2019, Plaintiffs filed the First Amended Complaint, which included allegations based on cooperation materials provided by Deutsche Bank pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"). Joint Decl., ¶21. On July 12, 2019, Plaintiffs filed the Second Amended Complaint in order to name Deutsche Bank as a defendant. Joint Decl., ¶24. On September 3, 2019, the Court granted in part, and denied in part, Defendants' motion to dismiss the Second Amended Complaint. ECF No. 253 ("*GSE Bonds I*"). The motion was denied as to Goldman Sachs, Deutsche Bank, BNP Paribas, Morgan Stanley, and Merrill Lynch. *GSE Bonds I* at 11-12. The Court granted the motion as to Barclays, Citigroup, Credit Suisse, FTN, UBS, JPMorgan, HSBC, Nomura, TD Securities, Cantor Fitzgerald, and SG Americas. *Id.* at 17. On September 10, 2019, Plaintiffs filed the Third Amended Complaint to allege more specific evidence as to the dismissed defendants. ECF No. 254. On October 15, 2019, the Court denied the dismissed defendants' motion to dismiss the Third Amended Complaint. ECF No. 288 at 4 ("*GSE Bonds II*").

On October 29, 2019, the Court preliminarily approved settlements with Deutsche Bank and FTN. ECF No. 296; *see also* ECF No. 298 ("*GSE Bonds III*"). On December 12, 2019, the Court preliminarily approved the settlement with Goldman Sachs. ECF No. 339 ("*GSE Bonds IV*"). Notice of the Deutsche Bank, FTN, and Goldman Sachs settlements was provided to the Settlement Class between November 2019 and January 2020. ECF No. 350, ¶¶10 n.2, 11, 19.

As to Barclays and the Group Defendants, documentary discovery proceeded briskly and intensively per the Court's schedule. Defendants collectively produced approximately 9.1 million pages of documents, and Plaintiffs produced approximately 300,000 pages of documents. Joint Decl., ¶¶28, 50. The parties also exchanged large sets of transaction data. Joint Decl., ¶¶34, 51. As of December 6, 2019 (the date Plaintiffs entered into the final settlement in principle with

Group Defendants), Plaintiffs had taken one deposition, and the parties had scheduled 48 depositions (including the deposition of Plaintiffs' class certification expert) and were negotiating dates for 26 additional depositions to be taken before the close of fact discovery on December 23, 2019.  Joint Decl., ¶26.

On November 19, 2019, Plaintiffs filed their class certification motion.  ECF No. 321.  On December 6, 2019, the Court stayed the Action until December 16, 2019, pending submission of Plaintiffs' motions for preliminary approval of the Barclays and Group Defendants Settlements. On December 17, 2019, the Court extended the stay pending the Court's decision on preliminary approval of the settlements.  Joint Decl., ¶40.

On January 30, 2020, the Court heard oral argument on Plaintiffs' motion for preliminary approval of the Barclays and Group Defendants Settlements.  Joint Decl., ¶¶101, 112.  On February 3, 2020, the Court preliminarily approved the settlement with Group Defendants.  ECF No. 364 ("*GSE Bonds V*"); *see also* ECF No. 298.  The Court had further questions regarding the opt out reduction provision of the Supplemental Agreement with Barclays, which Co-Lead Counsel and Barclays' Counsel addressed at an additional preliminary approval hearing on February 5, 2020.  Joint Decl., ¶102.  In response to the Court's questions, the parties proposed, and the Court approved, revisions to the Notice that disclosed the general terms of the opt out reduction provision.  *Id*.  Subject to the Notice revisions, on February 6, 2020, the Court preliminarily approved the settlement with Barclays.  ECF No. 366; *see also* ECF No. 367 ("*GSE Bonds VI*").  Notice of the Barclays and Group Defendants Settlements was provided to the Settlement Class in February and March 2020.  Straub Decl., ¶¶5, 8-14, 15-19.

ARGUMENT

## I.     THE SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE

### A.     Judicial Policy Favors Settlement

'"The compromise of complex litigation is encouraged by the courts and favored by public policy."'  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005).[2]  The Second Circuit therefore acknowledges "the 'strong judicial policy in favor of settlements, particularly in the class action context."'  *Id.*

### B.     Courts Approve Class Action Settlements When They Are Fair, Reasonable, and Adequate

Under the Federal Rules of Civil Procedure, class settlements must be "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e).  Because the circuits implemented this standard through various formulations, the 2018 amendments to Rule 23 articulated a four-pronged test that was intended to harmonize the circuits' varying articulations of the standard.  Fed. R. Civ. P. 23(e), Adv. Comm. Notes to 2018 Amendments ("2018 Advisory Note").  The first two of these prongs (Rule 23(e)(2)(A)-(B)) address the "procedural fairness" of the settlement, while the last two (Rule 23(e)(2)(C)-(D)) address the "substantive fairness."  2018 Advisory Note.

Courts in the Second Circuit have traditionally considered the nine factors listed in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), known as the *Grinnell* factors, to assist in weighing final approval and determining whether a settlement is substantively "fair, reasonable, and adequate."[3]  There is a significant overlap between the Rule 23(e) factors and the *Grinnell* factors, which complement each other.  *GSE Bonds III* at 3.

---

[2]     Unless otherwise noted, citations are omitted and emphasis is added.

[3]     The *Grinnell* factors are:  (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of

4

**C.      The Proposed Settlements Are Procedurally Fair**

      **1.      Rule 23(e)(2)(A) – Plaintiffs Have Adequately Represented the Class**

The class representatives' adequacy is judged by whether their "interests are aligned with other class members' interests because they suffered the same injuries" as the other class members. *GSE Bonds III* at 4.  Adequacy must be assessed independently of the fairness of the settlement itself, and instead must look to whether the proposed settlement class is "sufficiently cohesive to warrant adjudication."  *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 827 F.3d 223, 232 (2d Cir. 2016).  Plaintiffs here have the same interests as Settlement Class Members, since all have suffered the same alleged injury:  "monetary losses resulting from GSE bond transactions with settling defendants." *GSE Bonds III* at 4.  The Settlement Class is therefore sufficiently cohesive, and Plaintiffs are adequate representatives, as they have "an 'interest in vigorously pursuing the claims of the class.'" *Id.* (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)).

      **2.      Rule 23(e)(2)(A) – Co-Lead Counsel Have Adequately Represented the Class**

In appointing Co-Lead Counsel as interim class counsel, the Court has already made initial determinations of counsel's adequacy.  *See* 2018 Advisory Note (interim appointment entails an evaluation of counsel's adequacy to represent the class).  At final approval, however, the focus is on the actual performance of counsel, as judged by the litigation required to reach settlement, counsel's conduct of settlement negotiations, and the results obtained.  *See* 2018 Advisory Note; *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (directing courts to analyze the

---

discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

negotiating process and discovery undertaken by class counsel).  This Rule 23(e) factor also overlaps with the third *Grinnell* factor that evaluates the stage of the proceedings and the amount of discovery completed.

The stipulations of settlement were signed on December 16, 2019 (Barclays) and December 15, 2019 (Group Defendants).  They follow Co-Lead Counsel's extensive pre-filing investigation, which was triggered by a June 1, 2018 *Bloomberg* report that DOJ was investigating banks operating in the GSE Bond market, as well as analysis of cooperation materials from Deutsche Bank, FTN, and Goldman Sachs.  Joint Decl., ¶¶10-15, 66-68, 77-79, 88-89.  While negotiating these Settlements, Co-Lead Counsel were simultaneously prosecuting Plaintiffs' claims, including briefing a motion for class certification and reviewing documents from Defendants in anticipation of upcoming depositions.  Joint Decl., ¶¶41-42, 56-57.  As the Court previously found at preliminary approval, on the basis of Co-Lead Counsel's investigation and prosecution of the Action, "[h]ere, plaintiffs' counsel is sufficiently well informed."  *GSE Bonds III* at 11.

Co-Lead Counsel negotiated the Settlements as vigorously as they litigated them.  Former U.S. District Judge Layn R. Phillips, who mediated the settlement with Group Defendants, stated that "the Settlement reflects counsels' informed assessments of the best interests of their respective clients."  *See* Phillips Decl., ECF No. 343-3, ¶21.  As set forth in detail in §I.D.1.d., *infra*, the results obtained by the Settlements also demonstrate that Co-Lead Counsel adequately represented the Class.

### 3. Rule 23(e)(2)(B) – the Proposed Settlements Were Negotiated at Arm's Length

The 2018 revisions to Rule 23(e) are consistent with the long-standing Second Circuit rule that "a strong initial presumption of fairness attaches to [a] proposed settlement," when the "integrity of the arm's length negotiation process is preserved . . . ."  *See* Fed. R. Civ. P.

23(e)(2)(B); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  Regarding the conduct of the negotiations, the drafters of the 2018 amendments state that "the involvement of a neutral or court-affiliated mediator or facilitator . . . may bear on whether [negotiations] were conducted in a manner that would protect and further the class interests."  2018 Advisory Note.

<strong>a. Negotiations Between Plaintiffs and Barclays Were Complex and at All Times Highly Adversarial</strong>

On November 7, 2019, Plaintiffs and Barclays engaged in arm's-length negotiations during an in-person meeting attended by Co-Lead Counsel, separate counsel for Pennsylvania Treasury, and both outside and in-house counsel from Barclays.  Joint Decl., ¶95.  Counsel for both parties presented their respective clients' positions on liability, class certification, and potential damages recoverable in the Action.  The parties' views of the case were irreconcilable and the negotiations stalled.  Co-Lead Counsel and Barclays' Counsel, however, continued to discuss a potential resolution of the Action over the next two weeks through many telephonic discussions.  On November 21, 2019, the parties' representatives met again in person and reached a tentative understanding on the material monetary and non-monetary terms of a settlement, but a definitive agreement in principle was not reached until the parties executed a binding term sheet on December 1, 2019.  Joint Decl., ¶96.  The parties executed a Stipulation and Agreement of Settlement on December 16, 2019.  Joint Decl., ¶97.

<strong>b. Negotiations Between Plaintiffs and Group Defendants Were Complex and at All Times Highly Adversarial</strong>

Negotiations with Group Defendants occurred, as noted, under the auspices of former U.S. District Judge Phillips and his fellow mediator, Greg Lindstrom, Esq.  Joint Decl., ¶103.  On December 2, 2019, Plaintiffs and Group Defendants engaged in a full-day mediation.  *Id.*  The participants included counsel representing each of the 12 Group Defendants, representatives from

the Co-Lead Counsel firms, and separate counsel for I.B.E.W. and Pennsylvania Treasury.  *Id.*  Prior to the mediation, on November 26, 2019, the parties exchanged and submitted to Judge Phillips and Mr. Lindstrom detailed mediation statements that addressed liability, class certification, damages, and, in the case of Plaintiffs, non-monetary terms with respect to compliance.  Joint Decl., ¶105.  On November 30, 2019, Judge Phillips then sent each side a list of detailed and probing questions that they were each to be prepared to address at the mediation.  *Id.*  The December 2 mediation session was contentious, adversarial, and ended with a wide chasm between the parties in their respective negotiating positions on both monetary and non-monetary terms.  Phillips Decl., ECF No. 343-3, ¶19.  On December 4, 2019, Judge Phillips, on his own initiative, delivered a mediator's proposal encompassing both monetary and non-monetary terms with a response date of December 6, 2019.  Joint Decl., ¶107.  Judge Phillips and Mr. Lindstrom were in virtually constant communication with the parties between December 4 and December 6, participating in more than a dozen telephonic discussions with the parties.  Phillips Decl., ECF No. 343-3, ¶19.  On December 6, the parties reached an agreement in principle to settle and informed the Court.  Joint Decl., ¶108.  On December 15, 2019, Plaintiffs and Group Defendants signed the Group Defendants Stipulation.  Joint Decl., ¶109.

Judge Phillips confirms that the mediation was hard-fought, complex, and highly adversarial as to both the monetary and non-monetary terms of the Settlement.  Phillips Decl., ECF No. 343-3, ¶21 ("I want to emphasize how incredibly difficult it was to bring this combination of disparate views and interests to consensus in the time frame with which we were working."); *see also GSE Bonds III* at 5 (stating that "a mediator's involvement in settlement negotiations can help demonstrate their fairness").

These factors weigh in favor of final approval because both of the Settlements were the product of arm's-length negotiations between experienced counsel.

**D.      The Proposed Settlements Are Substantively Fair**

At final approval, the Court's role is not to "'decide the merits of the case or resolve unsettled legal questions,'" or "'foresee with absolute certainty the outcome of the case,'" *Shapiro v. JPMorgan Chase & Co.*, No. 11-cv-8331 (CM)(MHD), 2014 WL 1224666, at *10 (S.D.N.Y. March 24, 2014), but rather to "assess the risks of litigation against the certainty of recovery under the proposed settlement."  *In re Global Crossing Secs. and ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004).

### 1.      Rule 23(e)(C)(i) – the Relief Provided to the Class Is Superior to Continued Litigation

Rule 23(e)(C)(i) codifies many of the Second Circuit's *Grinnell* factors, which guide the assessment of the fairness of proposed settlements.  Seven of the pre-amendment factors are captured by Rule 23(e)(2)(C)(i):  the complexity, expense, and likely duration of the litigation (factor 1); the risks of establishing liability (factor 4); establishing damages (factor 5); and maintaining the class action through trial (factor 6); the ability of the defendants to withstand a greater judgment (factor 7); and the range of reasonableness of the settlement fund in light of the best possible recovery (factor 8) and in light of all the attendant risks of litigation (factor 9).

The Court's role in evaluating this factor is not to handicap the plaintiffs' chance of success or to resolve open factual or legal questions, but rather to "balance the benefits afforded the Class, . . . against the continuing risks of litigation." *GSE Bonds III* at 7.  The arguments that Defendants would have raised had the litigation proceeded could have completely defeated, or significantly narrowed, the scope of the Class's claims.  Former U.S. District Judge Phillips, the mediator who helped to achieve the complete resolution of this case with a settlement with the last group of remaining Defendants, characterized class certification and merits defenses as raising considerable risks to Plaintiffs' case.  *See* Phillips Decl., ECF No. 343-3, ¶¶10, 13, 17.  As further set out below,

Judge Phillips' discussion of that settlement's primary drivers provides a window into what arguments Defendants would have raised in opposition to class certification, at summary judgment, and at trial.

### a. The Class Faced Significant Risks in Establishing Liability

As the Court has noted, "[D]efendants contend that they can present a strong case against plaintiffs after discovery," and "there is no guarantee that plaintiffs will be able to prove liability." *GSE Bonds III* at 8. While Plaintiffs had prevailed at the pleadings stage, Plaintiffs faced significant risks in establishing liability. At the pleadings stage, for example, "'the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibly of independent action, as would be required at later litigation stages such as a defense motion for summary judgment, or a trial.'" *GSE Bonds I* at 11 (quoting *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 781 (2d Cir. 2016)). Defendants argued that the documentary discovery record (which was substantially completed just before the mediation) showed an absence of direct evidence supporting Plaintiffs' theories of collusion related to bid/ask spreads and off-the-run bonds. Phillips Decl., ECF No. 343-3, ¶14. Defendants indicated they would argue that the alleged free-to-trade ("FTT") conduct related to fewer than 1,000 bonds, among over 45,000 issued during the Class Period. *Id.*[4] Although Plaintiffs would argue that the evidence would be sufficient to prove an overarching conspiracy even if the evidence of the conduct was limited to 1,000 bonds, the vast majority of Defendants' damages exposure would have been eliminated if this Court or a jury had concluded that the conspiracy was limited to 1,000 bonds, *i.e.*, as only 2%

---

[4]     Defendants also contended that on a developed factual record, however, they would convince the Court or a jury that the alleged conduct related to communications in taking bonds free-to-trade (the "FTT conduct") was part of, or ancillary to, permissible syndication activity, which they maintained was lawful. *See* Phillips Decl., ECF No. 343-3, ¶14; *see also GSE Bonds I* at 13-14.

of the bonds would remain in the case.  *Id.*, ¶15.  Other liability scope issues also raised the risk of significantly reducing Defendants' exposure.  Defendants argued that Plaintiffs could not prove liability with respect to at least 75% of all GSE Bonds issued because they were underwritten by a single underwriter or by a group of underwriters that included no Defendants.  *Id.*

In order for the Class to be successful, Plaintiffs must be able to succeed on each of the challenges that Defendants would raise, while Defendants would have had to succeed only once to significantly reduce their exposure.  The risks of establishing liability underscore the reasonableness of the Settlements.

### b.   The Class Faced Significant Risks in Certifying a Class and Maintaining It on Appeal

Plaintiffs' impact theory on class certification is based on their contention that an increase in the price of bonds that went FTT caused a general market-wide inflation of all GSE Bonds traded in the secondary market.  Phillips Decl., ECF No. 343-3, ¶15.  Plaintiffs' expert opined that he can measure impact and damages through common formulae to compute the overcharge on each class member's transactions.  *Id.*  Plaintiffs believe that their econometric model is well supported by economic principles and recent case law in the District.  *Id.*  Plaintiffs, however, would have had to overcome Defendants' attacks on their econometric model to certify a damages class.  *Id.*, ¶16.

As this Court noted at preliminary approval, the risk of failing to certify a class or failing to maintain it through trial supports final approval where, as here, "'it is likely that defendants would oppose class certification' if the case were to be litigated."  *GSE Bonds III* at 8.  In opposition to certification, Defendants would have argued that Plaintiffs could not prove the required link between the FTT conduct at issue and class-wide injury and that the need for individualized class member inquiries would overwhelm any common issues.  Phillips Decl., ECF

No. 343-3, ¶16.  Defendants would have advanced the argument that Plaintiffs could not show that initial FTT offering prices on a small fraction of the total number of GSE Bonds outstanding affected the prices of all other GSE Bonds over a seven-year period, particularly given that the market for high-quality debt is extremely competitive and there are a large number of substitutes for the GSE Bonds at issue.  *Id.*

Even if Plaintiffs prevailed on their class certification motion, "[i]nterlocutory appeals may arise after the Court's class certification decision, generating lengthy delays."  *GSE Bonds III* at 7. Plaintiffs further faced the risk of maintaining the class through trial.  *GSE Bonds III* at 8; *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 494 (S.D.N.Y. 2018) ("*LIBOR*") (even if a class is certified, "'subsequent developments in the case [that] call into question [the plaintiffs'] allegations' . . . could warrant modification or decertification").

### c.   Even if the Class Proved Liability, It Risked Not Being Able to Prove Damages or Maintain Them on Appeal

"As the Second Circuit has noted, 'the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal.'"  *GSE Bonds III* at 8 (quoting *Wal-Mart*, 396 F.3d at 118); *see also U.S. Football League v. Nat'l Football League*, 644 F. Supp. 1040, 1041-42 (S.D.N.Y. 1986) (jury awarded antitrust plaintiff nominal damages of only $1 after ten-week trial). Complex cases often involve "battles of the experts" on proof of damages, which makes it "'difficult to predict with any certainty which testimony would be credited.'"  *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998).

This case is no exception.  At trial, both sides would have offered expert testimony on damages in addition to liability.  There is a substantial risk that a jury might accept one or more of Defendants' damages arguments and award far less than the funds secured by the Settlements, or

nothing at all.  Defendants have asserted, with the benefit of expert analysis of their own, that there are no damages, and that, at most, treble damages would not exceed $150 million.  Phillips Decl., ECF No. 343-3, ¶16.  Even if Plaintiffs "'prevail[ed] at trial, post-trial motions and the potential for appeal could prevent the class members from obtaining any recovery for several years, if at all.'"  *GSE Bonds III* at 7.

"'[B]alanc[ing] the benefits afforded the Class, including ***immediacy*** and ***certainty*** of recovery, against the continuing risks of litigation,'" these factors weigh in favor of approval of the Settlements.  *GSE Bonds III* at 7 (quoting *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 37 (E.D.N.Y. 2019)).

### d.    The Recovery Is Reasonable in Light of the Best Possible Recovery and the Attendant Risks of Litigation

Courts often consider together the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation.  *GSE Bonds III* at 14; *Payment Card*, 330 F.R.D. at 47-48.  In considering these factors, "'the settlement amount's ratio to the maximum potential recovery need not be the sole, or even the dominant, consideration when assessing the settlement's fairness.'"  *LIBOR*, 327 F.R.D. at 495 (approving settlements where the plaintiffs did not even provide a damages estimate).  This is because, as the Court has recognized, "some risks would be attendant upon continuing to litigate."  *GSE Bonds III* at 15.  Accordingly, the analysis of these factors takes into account "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  *Wal-Mart*, 396 F.3d at 119.  As the Second Circuit has explained, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."  *Grinnell*, 495 F.2d at 455 n.3.

13

Plaintiffs developed a damages model that estimated a range of trial damages potentially recoverable in the Action of between $857 million and $1.68 billion, assuming Plaintiffs prevailed on all contested issues.  If Plaintiffs were to succeed at trial, this figure would be subject to automatic trebling pursuant to 15 U.S.C. §15(a).  *GSE Bonds III* at 18.  Accordingly, Plaintiffs' treble damages estimate is $2.571 billion to $5.04 billion.

There are, of course, many steps remaining to any potential verdict.  Plaintiffs therefore emphasize that these are estimated figures, and Group Defendants' estimate of trebled trial damages is no more than $150 million.  Phillips Decl., ECF No. 343-3, ¶16.  Actual recovery at trial, if any, would be subject to the risks outlined in this Memorandum as well as many others.  Plaintiffs would have had to prevail on a number of difficult issues that raised substantial litigation risks, as discussed in §I.D.1.a., *supra*.

Following the approach set forth in this Court's preliminary approval orders:  Applying Barclays' alleged market share of 14.07% (Third Amended Complaint, ECF No. 254, ¶135 (Table 1)) to Plaintiffs' trial damages estimate, the $87 million Settlement Amount represents 37% to 72% of Barclays' share of single trial damages ($120,579,900 to $236,376,000) and 12% to 23% of the potential trebled recovery ($361,739,700 to $709,128,000).  The estimated recovery from Barclays compares favorably to recoveries in other antitrust cases.[5]

---

[5]     *See, e.g.*, *GSE Bonds III* at 15 (holding that 13% to 17% recovery along with other factors under the Deutsche Bank settlement "appears reasonable"); *GSE Bonds IV* at 9 (preliminarily approving Goldman Sachs settlement, which recovered 10.9% to 21.3% of treble damages); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (approving settlement where "[e]ven considering the trebling effect, the settlement amount represents approximately ten percent of the class's estimate of its own trebled damages"); *In re Currency Conversion Fee Antitrust Litig.*, No. 01 MDL 1409, 2006 WL 3247396, at *6 (S.D.N.Y. Nov. 8, 2006) (preliminarily approving settlements "representing roughly 10-15% of the credit transaction fees collected by Defendants"); *Payment Card*, 330 F.R.D. at 49 (stating that the Second Circuit did not take issue with original settlement recovery of "2.5% of the largest possible estimate of actual damage to merchants," which was based on single damages); *Grinnell Corp.*, 495 F.2d at 455 n.2 (stating that

Similarly, following the approach set forth in the Court's November 7, 2019 and December 16, 2019 Opinion and Orders:  Applying Group Defendants' alleged collective market share of 47.89%, the $250 million Settlement Amount represents 31% to 61% of Group Defendants' share of single trial damages ($410,417,300 to $804,552,000) and 10% to 20% of the potential trebled recovery ($1,231,251,900 to $2,413,656,000).  The estimated recovery from Group Defendants compares favorably to recoveries in other antitrust cases.[6]

Plaintiffs respectfully submit that the relief provided to the Settlement Class is within the range of reasonableness.

### e.    Other Factors Reflecting the Reasonableness of the Settlements

Further, Plaintiffs respectfully submit that the Settlements provide additional benefits to the Settlement Class beyond monetary relief.  Settlement Class Members, including those members that are limited to dealing in high-credit government securities due to statutory or other constraints, need to have confidence that the GSE Bond market is free from collusion. Accordingly, the compliance measures agreed to by Barclays and Group Defendants were a key concern of Plaintiffs.  Plaintiffs believe that these compliance measures ensure that any monetary relief will not be simply a cost of doing business, but lead to real reform in the GSE Bond market and long-term relief for the GSE Bond market participants.  Plaintiffs believe these measures are necessary to prevent and detect future anticompetitive conduct in the GSE Bond market and are indispensable to market integrity.  The Court previously found similar compliance remediation measures provided value that weighed in favor of preliminary approval.  *GSE Bonds III* at 16.

---

"there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery").

[6]      *See* cases cited in note 5, *supra*.

Plaintiffs discussed separately with Barclays and Group Defendants the elements of an effective antitrust compliance program that encompasses trading in GSE Bonds, and the settlements reflect principles designed to detect and prevent anticompetitive conduct, including: (i) rigorous compliance training; (ii) a culture of compliance; (iii) strong oversight; (iv) dedication of corporate resources; and (v) robust gap assessment.  Barclays Stip., ¶18; Group Defs. Stip., ¶17. These factors are consistent with the Antitrust Division's public guidance document that outlines what its prosecutors look for when evaluating antitrust compliance programs.[7]

Barclays and each Group Defendant that maintains a GSE Bonds trading desk ("Active Settling Defendant")[8] represents that they currently maintain antitrust compliance programs generally incorporating these principles, and agree to maintain a substantially similar compliance program adhering to these principles so long as they are engaged in GSE Bond transactions. Barclays Stip., ¶19; Group Defs. Stip., ¶18.  In addition, for 24 months following the final approval of the Settlements, unless they are no longer engaged in GSE Bond transactions, Barclays and Active Settling Defendants agree to, as applicable:  (i) confirm to Plaintiffs and a representative of Pennsylvania Treasury that such Active Settling Defendant continues to maintain an antitrust compliance program designed to detect and prevent anticompetitive conduct in the GSE Bond Market; and (ii) confer with Plaintiffs to consider and evaluate antitrust compliance best practices in the GSE Bond market.  Barclays Stip., ¶19; Group Defs. Stip., ¶19.

In addition, the Group Defendants Settlement provides that Pennsylvania Treasury shall, following a competitive bidding process, select and engage a well-qualified representative or

---

[7]     U.S. Dep't Justice Antitrust Div., *Evaluation of Corporate Compliance Programs in Criminal Antitrust Investigations* at 3-4 (July 2019), https://www.justice.gov/atr/page/file/1182001/download (last visited April 9, 2020).

[8]     BNP Paribas Securities Corp., SG Americas Securities, LLC, and Credit Suisse Securities (USA) LLC are "Non-Active Settling Defendants" under Group Defendants Settlement.

representatives, based on a list of at least eight representatives provided by the Active Settling Defendants within 30 days of preliminary approval of the Settlement and approved by the Mediator to ensure adequacy of qualifications and independence of control, to assist as its "representative" in connection with the activities described above.  Group Defs. Stip., ¶19(a) and (b).

Pennsylvania Treasury, in consultation with Co-Lead Counsel and Judge Phillips (Ret.), oversaw a competitive bidding process from a list of eight representatives provided by Active Settling Defendants.  Group Defs. Stip., ¶20.  Under the supervision of Judge Phillips, Co-Lead Counsel immediately reached out to each of the eight individuals identified by the Active Settling Defendants, providing background on the matter and the proposed engagement and enclosing a questionnaire focused on expertise and conflicts.  Three of the eight indicated interest and sent responses to the questionnaire.  A representative of Judge Phillips' office, two representatives of Pennsylvania Treasury, and Co-Lead Counsel conducted multiple calls with each one to obtain follow-up information, all of which was shared with the mediator.  Each candidate then submitted a proposed scope of work and corresponding budget.  A scoring committee consisting of a representative of Judge Phillips' office, two representatives of Pennsylvania Treasury, Lowey Dannenberg, and Scott+Scott interviewed the candidates.  Each scoring committee member filled out a scoring sheet for each candidate, which assigned points for factors including experience, lack of conflicts, price, and quality of submissions.

Ultimately, following review of all the scoring sheets and discussion with the scoring committee members, Pennsylvania Treasury selected Paredes Strategies LLC ("Paredes Strategies"), subject to the Court's approval of the costs involved.  *See* Joint Decl., Ex. 1 (Paredes Strategies' response to Plaintiffs' initial questionnaire and biographies of team members who would be assigned to the project).  Judge Phillips confirmed that Paredes Strategies has the appropriate expertise and independence to undertake the task set forth in the Settlement

Agreement.  Based on the bidding process, Pennsylvania Treasury estimates that the costs of engaging Paredes Strategies for two years will total $550,000, and respectfully requests that the Court approve this proposed budget.  *See* Group Defs. Stip., ¶20.  Courts have previously sanctioned the appointment and payment of independent parties in similar circumstances.  *See, e.g.*, *Martin v. Caterpillar, Inc*., No. 1:07-cv-1009, ECF No. 152-1 (C.D. Ill. Nov. 5, 2009) (class action settlement agreement in ERISA action provided that the parties would cause an independent monitor to be paid from the qualified settlement fund to ensure defendant would not use retail mutual funds as core investment options for a period of 24 months); *Martin v. Caterpillar, Inc*., No. 07-CV-1009, 2010 WL 3210448, at *3 (C.D. Ill. Aug. 12, 2010) (granting final approval of settlement).

> **f.  While Defendants May Be Able to Sustain a Larger Judgment, that Factor Alone Does Not Undercut the Reasonableness of the Settlement**

There is little reason to doubt that Barclays and Group Defendants could withstand a greater judgment than the amount paid in settlement, but "'fairness does not require that the [defendant] empty its coffers before this Court will approve a settlement.'"  *LIBOR*, 327 F.R.D. at 494.  The Court previously found that this factor, standing alone, does not warrant declining to approve a settlement.  *GSE Bonds III* at 14 (noting that "[s]ome courts have held . . . that 'in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement'"); *see also LIBOR*, 327 F.R.D. at 495 (stating that "this factor is intended to 'strongly favor settlement' when 'there is a risk that an insolvent defendant could not withstand a greater judgment' but that 'the ability of defendants to pay more, on its own, does not render the settlement unfair'").

### 2.      Rule 23(e)(2)(C)(ii) – the Claims Process Is Fair and Rational

Co-Lead Counsel developed the Plan of Distribution in consultation with Plaintiffs' experts and the Claims Administrator.  Joint Decl., ¶63.  *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 414 (S.D.N.Y. 2018) ("Plaintiffs' Plan of Allocation was prepared by experienced counsel along with a damages expert – both indicia of reasonableness."); *In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 909 F. Supp. 2d 259, 270 (S.D.N.Y. 2012) (finally approving plan of allocation developed by lead counsel with assistance from their damages expert).

"Rule 23(e)(2)(C)(ii) requires courts to examine 'the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims.'"  *GSE Bonds III* at 9 (quoting Fed. R. Civ. P. 23(e)(2)(C)(ii)).  Further, a "'claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding.'"  *Id.* (quoting 2018 Advisory Note).  A plan of distribution "'must be fair and adequate,'" but "it 'need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.'"  *GSE Bonds III* at 9.  For these reasons, a plan of distribution "'need not be perfect'" in order to be approved.  *Id.* at 9-10 (quoting *In re EVCI Career Colleges Holding Corp. Secs. Litig.*, No. 05-CV-10240, 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007) (collecting cases)).

As the Court stated at preliminary approval, "[t]he Plan of Distribution represents a reasonable method of ensuring 'the equitable and timely distribution of a settlement fund without burdening the process in a way that will unduly waste the fund.'"  *GSE Bonds III* at 10-11; *see also GSE Bonds IV* at 6.  If the Court grants final approval, the Claims Administrator will calculate payments based on each individual claimant's transaction claim amount divided by the total of all transaction claim amounts.  *Pro rata* distributions such as this one are regularly approved by courts as reasonable and equitable.  *See, e.g.*, *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 429, 439

(S.D.N.Y. 2016); *In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1737867, at *6 (D.D.C. Mar. 31 2000) ("Settlement distributions such as this one, that apportion funds according to the relative amount of damages suffered by class members have repeatedly been deemed fair and reasonable.").[9]

### 3.    Rule 23(2)(C)(iii) – the Proposed Award of Attorneys' Fees Supports Final Approval

The Court concluded that Co-Lead Counsel's request for attorneys' fees did "not weigh against preliminary approval." *GSE Bonds III* at 11-13; *GSE Bonds IV* at 6-7.  Co-Lead Counsel now seek a fee of 20% (representing a lodestar multiplier of 4.09) and expense reimbursement of $1,718,773.04, the basis for which is set out in the accompanying Fee and Expense Application. For purposes of final approval, however, the requested fee is firmly within the range of fees granted from comparable class settlement funds and therefore weighs in favor of this court granting final approval.  *See* Fee and Expense Application, §I.A.5.

The timing of the attorney-fee payment also supports final approval.  Consistent with this Court's prior practice, the Settlements ask the Court to authorize payment to Co-Lead Counsel of 50% of the attorneys' fees awarded upon entry of an order approving attorneys' fees, with payment of the balance of the award to be paid to Co-Lead Counsel when distribution of the proceeds of the Net Settlement Fund to claimants has been very substantially completed.  *See, e.g.*, *In re*

---

[9]    In consultation with Co-Lead Counsel, the Claims Administrator will implement a minimum payment of between $10 to $25 so that all valid claims would receive at least the minimum.  *In re Nasdaq Mkt.-Makers Antitrust Litig.*, No. 94 Civ. 3996 RWS, 2000 WL 37992, at *2 (S.D.N.Y. Jan. 18, 2000) (approving $25 minimum payment as a reasonable means of compensating class members with relatively small claims and noting that the "$25 floor will not cause reallocation of more than 1% to 2% of the Settlement Fund"); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 497-98 (S.D.N.Y. 2009) (approving $10 minimum payment "no matter how small [the] Recognized Claim" as reasonable to "enable class members with relatively small claims to participate meaningfully").

*Petrobras Sec. Litig.*, 317 F. Supp. 3d 858, 877 (S.D.N.Y. 2018), *appeal dismissed*, No. 18-2120, 2018 WL 7108171 (2d Cir. Sept. 13, 2018), and *aff'd*, 784 F. App'x 10 (2d Cir. 2019).[10]

### 4.   Rule 23(e)(C)(iv) – the Supplemental Agreements Do Not Weigh Against Final Approval

"Rule 23(e)(2)(C)(iv) requires courts to consider 'any agreement required to be identified by Rule 23(e)(3),' that is, 'any agreement made in connection with the proposal.'" *GSE Bonds III* at 13 (quoting Fed. R. Civ. P. 23(e)(2)(C)(iv) and 23(e)(3)).   Pursuant to Rule 23(e)(3), at preliminary approval, Plaintiffs disclosed a Supplemental Agreement with Group Defendants, which provides Group Defendants with a qualified right to withdraw or terminate the settlement upon the occurrence of certain conditions.   This qualified right arises if potential Settlement Class Members who meet certain criteria exclude themselves from the Settlement Class.   In adopting its reasoning from the prior settlements, the Court found it had "no bearing on the preliminary approval analysis." *GSE Bonds III* at 13; *GSE Bonds IV* at 7.

Plaintiffs and Barclays also entered into a Supplemental Agreement, which provides Barclays with a qualified right to terminate the settlement upon the occurrence of certain conditions, as well as a potential opt out reduction payment if opt outs reach specified threshold percentages.[11]   This opt out reduction provision was described to Class Members in the Notice approved by the Court.   Straub Decl., Ex. A, §9.   To date, this opt out reduction provision has not

---

[10]   *See also NASDAQ*, 187 F.R.D. at 479–80 (stating that "[n]umerous courts have directed that the entire fee award be disbursed immediately upon entry of the award, or within a few days thereafter" and citing cases); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. MDL 3:07-md-1827, 2011 WL 7575004, at *1 (N.D. Cal. Dec. 27, 2011) (same and citing cases).

[11]   Both agreements were submitted to the Court under seal at the parties' request, as "[k]nowledge of the specific number of opt outs that will vitiate a settlement might encourage third parties to solicit class members to opt out." Manual for Complex Litigation, Fourth (2004) §21.631; *see also* Fed. R. Civ. P. 23(e), 2003 Advisory Committee Note, Subdiv. (e).

been triggered.  Joint Decl., ¶102.  If the provision is triggered, Co-Lead Counsel will notify the Court in their May 22, 2020 reply brief.

At preliminary approval, the Court was "satisfied that the agreement does not weigh against preliminary approval."  *GSE Bonds VI* at 1. Further, opt out reductions are not uncommon provisions in class action settlements and have been approved in this District and elsewhere.[12] Therefore, the Supplemental Agreements do not weigh against final approval.

### 5. Rule 23(e)(2)(D) – the Proposed Settlements Treat Class Members Equitably to Each Other

As detailed in §I.D.2., *supra*, the Plan of Distribution allocates funds among class members on a *pro rata* basis, which courts have uniformly approved as equitable.  The proposed Settlements therefore meet the requirements of Rule 23(e)(2)(D).

## II. THE NOTICE PROGRAM ADEQUATELY APPRISED CLASS MEMBERS OF THEIR RIGHTS

Due process requires that class members receive "the best notice practical under the circumstances."  *In re Drexel Burnham Lambert Grp., Inc.*, 995 F.2d 1138, 1144 (2d Cir. 1993). "Best notice practical" does not impose any "rigid rules" on class notice, but instead imposes a "reasonableness" standard that is met when the notice campaign "'fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to

---

[12]     *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 2591402, at *6 (S.D.N.Y. Nov. 12, 2004) (settlement with opt out reduction provision with 1.5% threshold and no cap on amount, resulting in $75 million reduction); *In re Se. Milk Antitrust Litig.*, No. 2:08-MD-1000, 2014 WL 12546969, at *1 (E.D. Tenn. Jan. 30, 2014) (settlement with opt out reduction provision with no threshold and no cap on amount, resulting in $5.48 million reduction); *In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2011 WL 1499107, at *1 (N.D. Cal. Apr. 19, 2011) (settlement with opt out reduction provision with no threshold and no cap on amount, resulting in $936,000 reduction); *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509, 2015 WL 5159441, at *3 (N.D. Cal. Sept. 2, 2015) (opt out reduction trigger not met); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42, 2015 WL 6964973, at *3 (E.D.N.Y. Nov. 10, 2015) (same).

them in connection with the proceedings.'" *Wal-Mart*, 396 F.3d at 114.  Accordingly, courts in this circuit have held that notice plans are adequate when they combine first-class mail, reasonably calculated to reach nearly all class members, with extensive publication notice.  *See, e.g.*, *id*. at 104.  The contents of a notice are adequate when they explain the general terms of the settlement and the proposed attorneys' fees, along with the date, time, and place of the fairness hearing, in a way that may be '"understood by the average class member."'  *Id*. at 114.  At preliminary approval, the Court approved and ordered a direct mail and media notice plan to notify Class Members of the proposed Settlements.  The Claims Administrator carried out the notice plan as ordered.  Straub Decl., ¶¶5, 8-14, 15-25.

Based on feedback received from the prior rounds of notice, the Claims Administrator and Co-Lead Counsel determined that nominee owners, such as brokerage firms and other persons or entities who or which transacted for the beneficial interest of persons or entities other than themselves ("Nominees"), "overnoticed" their customers.   Specifically, a great many of Nominees' customers that transacted in mutual funds, exchange-traded funds, or issuer calls received notice even though they are not Class Members.  ECF No. 363, §I.C.  Customers who did not trade directly with any of the Defendants were also noticed.

Therefore, in this round of Notice, the Claims Administrator implemented several measures to ensure that Notice was not mailed to non-Class Members by Nominees.  *First*, the Claims Administrator required that Nominees certify that their customer searches were limited to eligible CUSIPs to eliminate production of name and address data for customers that may have purchased mutual funds or exchange-traded funds.  *Second*, the Claims Administrator asked that Nominees exclude any transactions resulting from an issuer call, which would not be part of the Settlement Class definition.  *Third*, the Claims Administrator asked that Nominees provide only names of customers who traded directly with a Defendant.  If a Nominee was unable to certify that it used

23

these procedures when conducting its customer searches, then the Claims Administrator did not separately send Notice to that Nominee's general customer list, as such a list was not targeted to identify potential Class Members.[13]   Further, Nominee notice was only a safety net, as 73,356 Notices were mailed to members of the Class that could be individually identified and publication notice was widely disseminated.  *See Facebook,* 343 F. Supp. 3d at 411.

As a result of this refined procedure aimed at better identifying putative Class Members, 116,322 Notices of the Settlements were mailed to potential Settlement Class Members.  Straub Decl., ¶14.  Compared to the prior rounds of notice, this refined Nominee procedure reduced the amount of Notices mailed and decreased confusion, as evidenced by the reduced number of telephone calls that the Claims Administrator and Co-Lead Counsel received from non-Class Members, as well as no communications to the Court regarding this round of Notice (to date).

Thus, the Notice procedures satisfy Rule 23 and due process.

## III.    THE REACTION OF THE CLASS FAVORS APPROVAL

"'It is well settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.  In fact, the lack of objections may well evidence the fairness of the Settlement.'"  *Payment Card*, 2019 WL 6875472, at *16.  Although the fairness period is ongoing, the initial reaction to the Settlements favors final approval.  *Wal-Mart*, 396 F.3d at 118 ("'If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.'").  To date, no objections have been filed, and only three exclusion requests have been received.  Straub Decl., ¶26.  The Claims

---

[13]      Notice was mailed to all opt outs from the first round of settlements and those that previously sent informal email and letter objections to the Court.  Notice was also emailed to all claimants that had submitted claims as of February 28, 2020 (which was the claims submission deadline for the Deutsche Bank, FTN, and Goldman Sachs settlements).  Straub Decl., ¶11.

Administrator will submit an updated report following the April 22, 2020 objection and opt-out deadline, and Plaintiffs will address any objections in their May 22, 2020 reply brief.

## IV.    THE PROPOSED SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED

When preliminarily approving the prior settlements, which the Court incorporated into its preliminary approval orders for these Settlements, the Court concluded that certification of the Settlement Class for settlement purposes was proper because it would likely be able to certify the Class at final approval.  *GSE Bonds III* at 23; *GSE Bonds IV* at 14.  The Court supported its conclusion with specific and detailed findings that each of the Rule 23(a) requirements were met, *GSE Bonds III* at 23-26; *GSE Bonds IV* at 12, and made similarly detailed findings that the requirements for certification of a Rule 23(b)(3) damages class were met.  *GSE Bonds III* at 26-29; *GSE Bonds IV* at 12-14.  In light of the Court's extensive findings, Plaintiffs respectfully request that this Court finally certify the Settlement Class for the reasons stated at preliminary approval.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Final Approval of Class Action Settlements with Barclays Capital Inc. and Group Defendants should be GRANTED.

Dated:  April 13, 2020

 *s/* Christopher M. Burke
CHRISTOPHER M. BURKE (CB-3648)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel:  (619) 233-4565
Fax: (619) 233-0508
cburke@scott-scott.com


DAVID R. SCOTT (DS-8053)
AMANDA F. LAWRENCE (AL-8804)
KRISTEN ANDERSON (KA-1965)

VINCENT BRIGANTI
CHRISTIAN LEVIS
MARGARET MACLEAN
ROLAND R. ST. LOUIS, III
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel:  (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
mmaclean@lowey.com

DONALD A. BROGGI (DB-9661)
THOMAS BOARDMAN (TB-0530)
**SCOTT+SCOTT ATTORNEYS AT
LAW LLP**
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Tel:  (212) 223-6444
Fax: (212) 223-6334
david.scott@scott-scott.com
alawrence@scott-scott.com
kanderson@scott-scott.com
dbroggi@scott-scott.com
tboardman@scott-scott.com

*Interim Co-Lead Counsel for the Class and
Attorneys for Plaintiff City of Birmingham
Retirement and Relief System*

CHRISTOPHER CRAIG
Chief Counsel
**PENNSYLVANIA TREASURY
DEPARTMENT
OFFICE OF THE CHIEF COUNSEL**
129 Finance Building
Harrisburg, PA 17120
ccraig@patreasury.gov

*Attorney for Plaintiff Joseph M. Torsella, in
his official capacity as the Treasurer of the
Commonwealth of Pennsylvania*

rstlouis@lowey.com

*Interim Co-Lead Counsel for the Class and
Attorneys for Plaintiff Joseph M. Torsella is the
Treasurer of the Commonwealth of Pennsylvania
and the head of the Pennsylvania Office of the
State Treasurer*

TODD A. SEAVER
CARL N. HAMMARSKJOLD
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel:  (415) 433-3200
Fax: (415) 433-6382
tseaver@bermantabacco.com
chammarskjold@bermantabacco.com

LESLIE R. STERN
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Tel:  (617) 542-8300
Fax: (617) 542-1194
lstern@bermantabacco.com

*Attorneys for Plaintiffs Electrical Workers
Pension Fund Local 103, I.B.E.W., and Local
103, I.B.E.W. Health Benefit Plan*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 13, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

<u>*s*/ Christopher M. Burke                    </u>
Christopher M. Burke
