**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE GSE BONDS ANTITRUST
LITIGATION

Case No. 1:19-cv-01704 (JSR)

**MEMORANDUM OF LAW**
**IN SUPPORT OF CO-LEAD COUNSEL'S AMENDED MOTION FOR AN AWARD OF**
**ATTORNEYS' FEES AND PAYMENT OF LITIGATION EXPENSES**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

I.      THE ATTORNEYS' FEE REQUEST IS FAIR AND REASONABLE ..................... 2

   A.  The Goldberger Factors Support Awarding Co-Lead Counsel's 20% Fee Request ..... 4

       1.      Co-Lead Counsel invested substantial time and resources to prosecuting this
               Action ................................................................................................................ 4

               a.      Initial Investigation and Pre-Filing Work ............................................. 5

               b.      Amended Complaints and Motions to Dismiss ..................................... 5

               c.      Deutsche Bank, FTN, and Goldman Sachs Settlement Negotiations
                       and Cooperation ................................................................................... 6

               d.      Discovery ............................................................................................. 7

               e.      Plan of Distribution and Class Certification ......................................... 9

               f.      Barclays and Group Defendants Settlement Negotiations ................... 10

       2.      The magnitude and complexity of the case justify the fee request ................. 11

       3.      The fee request is warranted based on the level of risks in this Action .......... 12

       4.      Co-Lead Counsel provided high-quality representation ................................. 14

       5.      The 20% fee request is reasonable in relationship to the Settlements ............ 15

       6.      Public policy supports approval of the fee request. ....................................... 16

   B.  The Reasonableness of the Fee Request Is Supported by the Lodestar Cross-Check  17

   C.  Co-Lead Counsel's Fee Request Is Below the Attorneys' Fees Percentages Negotiated
       with Plaintiffs Prior to Filing the Initial Complaint ............................................. 20

II.     THE REQUEST FOR REIMBURSEMENT OF LITIGATION EXPENSES IS
        REASONABLE AND SHOULD BE GRANTED ................................................... 21

CONCLUSION ................................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alaska Electrical Pension Fund v. Bank of America Corp.*,
  No. 14-cv-7126 (JMF), 2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018) ..................................... 3

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
  No. 07-cv-2207(JGK), 2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010) ...................................... 12

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ........................................................................................................ 2

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
  954 F. Supp. 2d 276 (S.D.N.Y. 2013) .......................................................................... 16

*City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132,
  2014 WL 1883494 (S.D.N.Y. May 9, 2014) ............................................................... 13

*Dial Corp. v. News Corp.*,
  317 F.R.D. 426 (S.D.N.Y. 2016) ................................................................................. 15

*Fresno Cty. Employees' Ret. Ass'n v. Isaacson/Weaver Family Tr.*,
  925 F.3d 63 (2d Cir. 2019) ............................................................................................ 3

*Goldberger v. Integrated Resources, Inc.*,
  209 F.3d 43 (2d Cir. 2000) ...................................................................... 4, 12, 17, 18, 20

*Guevoura Fund Ltd. v. Sillerman*,
  No. 1:15-cv-07192(CM), 2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ..................... 21

*In re Arakis Energy Corp. Sec. Litig.*,
  No. 95-cv-3431(ARR), 2001 WL 1590512 (E.D.N.Y. Oct. 31, 2001) ......................... 21

*In re Citigroup Inc. Bond Litig.*,
  988 F. Supp. 2d 371 (S.D.N.Y. 2013) .......................................................................... 11

*In re Colgate-Palmolive Co. ERISA Litig.*,
  36 F. Supp. 3d 344 (S.D.N.Y. 2014) ....................................................... 3, 15, 17, 18

*In re Credit Default Swaps Antitrust Litig.*,
  No. 13-md-2476, 2016 WL 2731524 (S.D.N.Y. April 26, 2016) ........................ 2, 17, 19, 20

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  No. 13 Civ. 7789 (LGS), 2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018) ..................... 11, 19

*In re Merrill Lynch Tyco Research Sec. Litig.*,
  249 F.R.D. 124 (S.D.N.Y. 2008) .................................................................................. 14

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998).................................................................................... 11, 13

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   986 F. Supp. 2d 207 (E.D.N.Y. 2013) ..................................................................................... 3

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   991 F. Supp. 2d 437 (E.D.N.Y. 2014).............................................................................. 12, 15

*In re Visa Check/Mastermoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D.N.Y. 2003) ..................................................................................... 3

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
   No. MDL 2672 CRB (JSC), 2017 WL 2178787 (N.D. Cal. May 17, 2017) ........................... 20

*In re WorldCom Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) ................................................................................... 20

*LeBlanc-Sternberg v. Fletcher*,
   143 F.3d 748 (2d Cir. 1998) .................................................................................................. 18

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ......................................................................... 2, 15, 19

*Meredith Corp. v. SESAC, LLC*,
   87 F. Supp. 3d 650 (S.D.N.Y. 2015) ................................................................... 11, 14, 15, 21

*Pillsbury Co. v. Conboy*,
   459 U.S. 248 (1983) .............................................................................................................. 16

*United States Football League v. National Football League*,
   644 F. Supp. 1040 (S.D.N.Y. 1986) ...................................................................................... 13

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ................................................................................................ 3, 19

*Yang v. Focus Media Holding Ltd.*,
   No. 11-cv-9051 (CM)(GWG), 2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014).......................... 22

**Other Authorities**

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
   7 J. EMPIRICAL LEGAL STUD. 811 (2010) .............................................................................. 16

MANUAL FOR COMPLEX LITIGATION (Fourth) §14.121 (2004) ..................................................... 3

Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*,
   92 N.Y.U. LAW J. 937 (2017)............................................................................................... 16

Pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, Scott+Scott Attorneys at Law LLP ("Scott+Scott") and Lowey Dannenberg, P.C. ("Lowey" and, collectively with Scott+Scott, "Co-Lead Counsel") respectfully submit this amended motion for an award of 20% ($77.3 million) in attorneys' fees from the $386,500,000 common fund established by the settlements with Deutsche Bank, FTN, Goldman Sachs, Barclays, and the Group Defendants[1] (collectively, the "Settlements") and payment of $1,718,773.04 (0.45% of the common fund) in Litigation Expenses,[2] plus interest on the award, reflecting Plaintiffs' Counsel's time and expenses litigating this Action from inception (June 1, 2018) through March 31, 2020.[3]

## INTRODUCTION

After a year of hard-fought litigation, and almost two years after Plaintiffs' Counsel began their initial investigation into the claims eventually brought by Plaintiffs in the Action, before the Court are five Settlements that will, if approved, completely resolve this Action. Co-Lead Counsel's request for 20% of the settlement fund as attorneys' fees is reasonable in light of the quality and quantity of the work they performed on behalf of the Settlement Class.

---

[1] "Group Defendants" means BNP Paribas Securities Corp., Cantor Fitzgerald & Co., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, HSBC Securities (USA) Inc., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co. LLC, Nomura Securities International, Inc., SG Americas Securities, LLC, TD Securities (USA) LLC, and UBS Securities LLC.

[2] Unless otherwise defined herein, all capitalized terms have the same meaning as set out in the Stipulations and Agreements of Settlement with Deutsche Bank Securities Inc. (ECF No. 257-1) ("DB Stipulation"); FTN (ECF No. 267-1) ("FTN Stipulation"); and Goldman Sachs (ECF No. 318-1) ("GS Stipulation"), Barclays (ECF No. 343-1) and the Group Defendants (ECF No. 343-2). The foregoing stipulations are collectively referred to as the "Stipulations." Unless otherwise noted, citations are omitted, and emphasis is added.

[3] "Plaintiffs' Counsel" means Co-Lead Counsel, Berman Tabacco ("Berman") and Korein Tillery LLC ("Korein"). Berman and Korein contributed work on behalf of the Settlement Class prior to Co-Lead Counsel's appointment, and Berman continued its representation of class representative Electrical Workers Pension Fund Local 103, I.B.E.W. and Local 103, I.B.E.W. Health Benefit Plan (collectively, "I.B.E.W.") throughout the Action.

Co-Lead Counsel worked efficiently and effectively to meet the discovery and trial schedule set by the Court and achieved what ordinarily takes several years in an antitrust case—using only its own lawyers.  Co-Lead Counsel brought the case from the initial complaint, past amended complaints and two motions to dismiss, through document discovery, all the way to the class certification motion, while simultaneously negotiating settlements and obtaining cooperation along the way. There simply was no time for extraneous or duplicative work. Further, Co-Lead Counsel worked at the direction of highly involved and motivated institutional investor clients which drove the litigation every step of the way.  In consultation with our clients, Co-Lead Counsel are requesting a lower percentage of the recovery than that negotiated at arms' length at the inception of the case.

## **ARGUMENT**

## I.     **THE ATTORNEYS' FEE REQUEST IS FAIR AND REASONABLE**

The $386.5 million recovered by the Settlements is a common fund that will provide relief to the Settlement Class.  When "a class plaintiff successfully recovers a common fund for the benefit of a class, the costs of litigation should be spread among the fund's beneficiaries." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002).  Under this principle, "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476, 2016 WL 2731524, at *16 (S.D.N.Y. April 26, 2016) ("*CDS Litig.*").  Accordingly, the recovery warrants an award of reasonable attorneys' fees.

Courts "may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method," although "[t]he trend in this Circuit is toward the percentage method." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir.

2

2005). The percentage method is preferred because it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Id.*; *accord Fresno Cty. Employees' Ret. Ass'n v. Isaacson/Weaver Family Tr.*, 925 F.3d 63, 71 (2d Cir. 2019) ("[O]nce the parties have agreed to settle, the percentage-of-the-fund methodology serves as important motivation for counsel to maximize the class's recovery, and, a fortiori, counsel's fee"); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 348 (S.D.N.Y. 2014) (stating that the percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of the litigation"); MANUAL FOR COMPLEX LITIGATION (Fourth) §14.121 (2004) ("Indeed, one purpose of the percentage method is to encourage early settlements by not penalizing efficient counsel, thus ensuring that competent counsel continue to be willing to undertake risky, complex, and novel litigation.").

This is particularly true here, where Co-Lead Counsel prosecuted the case under an accelerated timeline and achieved litigation milestones that have taken years in similarly complex actions. *See, e.g., Alaska Electrical Pension Fund v. Bank of America Corp.*, No. 14-cv-7126 (JMF), 2018 WL 6250657, at *3, (S.D.N.Y. Nov. 29, 2018) ("*ISDAFix*") (large antitrust financial services litigation that reached class certification stage four years after filing of complaint); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) (same); *Dahl v. Bain Capital Partners, LLC*, No. 07-cv-12388, ECF No. 1095 (D. Mass. Feb 2, 2015) (same after almost 7 years of litigation); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 215 (E.D.N.Y. 2013) (same after 6 years of litigation), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016). That Co-Lead Counsel was able to

get so much done in less than a year is a testament to their effort, skill and experience, as well as the Court's pre-trial management.

Under either the percentage of the fund or lodestar approach, Co-Lead Counsel respectfully submit that their request of 20% of the settlement fund is reasonable. It rewards Co-Lead Counsel for their investment of time, expertise, and capital, which produced a successful outcome for the Settlement Class in litigation that was complex, fast paced, and high risk.

### A. The Goldberger Factors Support Awarding Co-Lead Counsel's 20% Fee Request

Courts evaluating whether a fee is "reasonable" must consider: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 50 (2d Cir. 2000). Each *Goldberger* factor weighs in favor of the reasonableness of Co-Lead Counsel's fee request in this Action.

#### 1. Co-Lead Counsel invested substantial time and resources to prosecuting this Action

Co-Lead Counsel devoted over 27,500 hours prosecuting this Action, assigning more than 70 attorneys (some virtually full time) to this matter since Co-Lead Counsel's leadership appointment. Joint Decl. ¶118; Declaration of Daryl Scott ("Scott Decl.") ¶6, Ex. A; Declaration of Vincent Briganti ("Briganti Decl.") ¶6, Ex. A.[4] In addition, Berman and Korein worked almost 2,700 hours on the matter. Joint Decl. ¶118; Declaration of Todd A. Seaver ("Seaver Decl.") ¶7, Ex. A.; Declaration of George A. Zelcs ("Zelcs Decl.") ¶4, Ex. A. Below is a summary of the work performed and the resources devoted to prosecuting the Action.

---

[4] Time spent preparing this motion is not included in hours reported.

### a. Initial Investigation and Pre-Filing Work

Plaintiffs' Counsel developed a class action complaint that the Court described as reflecting "substantial investigative work and invest[ment of] significant resources."  ECF No. 159 at 3.  Using three datasets that contained over 5.9 million transactions and more than 100 million quotes, Plaintiffs' economic experts detected patterns of potentially collusive conduct in the GSE Bond market. Joint Decl. ¶11. After developing substantial information from these experts and data sources, interviewing market participants and industry experts, reviewing publicly available information, and analyzing tens of thousands of client transactions, Plaintiffs' Counsel filed the first complaint in this Action on February 22, 2019 and a companion complaint on March 19, 2019.  *Id.* ¶¶12-16.  Plaintiffs' complaint was the first to identify and allege Defendants' involvement in an alleged price fixing conspiracy involving GSE Bonds.  *Id.* ¶14.

### b. Amended Complaints and Motions to Dismiss

Following their appointment as interim class counsel, Co-Lead Counsel filed three amended class action complaints.  *Id.* ¶¶21, 24, 27.  The complaints incorporated cooperation material provided by the leniency applicant, Deutsche Bank, pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA").  *Id.* ¶¶19, 21, 27. Based on Deutsche Bank's cooperation, the First Amended Complaint (and Second Amended Complaint[5]) alleged "rare smoking gun" evidence, consisting of quotations from four chat room transcripts that "unmistakably show traders . . . agreeing to fix prices at a specific level before bringing the bonds to the secondary market."  ECF No. 253 at 11-12 ("*GSE Bonds I*"); Joint Decl. ¶ 21.  The First Amended Complaint also expanded Plaintiffs' claims by naming six additional Defendants, extending the Class Period by two years, and including GSE Bonds issued by two additional

---

[5] The Second Amended Complaint was identical to its predecessor but named Deutsche Bank as a Defendant.  Joint Decl. ¶24.

government-sponsored enterprises, Federal Farm Credit Banks and Federal Home Loan Banks. Joint Decl. ¶21.

The Third Amended Complaint was largely identical to the Second Amended Complaint but, based on further Deutsche Bank cooperation, added 19 chat room conversations that were substantially similar in kind to the chat room conversations previously alleged, and "[t]aken most favorably to plaintiffs, . . . show[ed] traders working on behalf of the remaining defendants apparently agreeing to fix FTT prices for newly issued GSE bonds."  ECF No. 288 at 4 ("*GSE Bonds II*"); Joint Decl. ¶27.

On the basis of Plaintiffs' Counsel's initial investigation, data analysis, and incorporation of the Deutsche Bank cooperation materials, the Court denied two motions to dismiss.  *Id.* ¶¶26, 30.

### c. Deutsche Bank, FTN, and Goldman Sachs Settlement Negotiations and Cooperation

Settlement negotiations with Deutsche Bank, FTN, and Goldman Sachs proceeded in parallel with the motions to dismiss.  *See* Joint Decl. ¶¶60-94.  Before each mediation, the parties exchanged detailed mediation statements addressing liability, class certification, and damages. *Id.* ¶¶61, 73, 85.

Mediation with Deutsche Bank occurred on July 1 and 2, 2019 before the Honorable Jan M. Adler (ret.).  *Id.* ¶61.  In addition to exchanging mediation statements, at the mediation, the parties presented and cross examined their respective experts.  *Id.* ¶62.  The mediation was initially unsuccessful. However, discussions between Plaintiffs, Deutsche Bank and the mediator continued, ultimately resulting in an agreement in principle to settle the Action for $15,000,000 on July 9, 2019.  *Id.* ¶62.  Following further extensive negotiations on the form of the stipulation

of settlement, Plaintiffs and Deutsche Bank executed the Deutsche Bank Stipulation on August 21, 2019.  Joint Decl. ¶64.

FTN contacted Co-Lead Counsel in June 2019 to discuss resolving the Action. Mediation with FTN occurred on July 8, 2019, before Jed D. Melnick, Esq.  *Id.* ¶73.  The parties were unable to reach an agreement on any terms.  The parties continued their discussions through the mediator and, on September 3, 2019, agreed in principle to settle the Action for $14,500,000. *Id.* ¶74.  Plaintiffs and FTN executed the FTN Stipulation on September 16, 2019.  *Id.* ¶75.

Goldman Sachs contacted Co-Lead Counsel on or about September 7, 2019 to discuss a possible settlement of the Action.  *Id.* ¶84.  On October 2, 2019, Mr. Melnick conducted a mediation between the parties.  *Id.* ¶85.  After a full day of mediation, with the parties at an impasse, Plaintiffs and Goldman Sachs accepted a "mediator's proposal," and reached an agreement in principle to settle the Action for $20,000,000.  *Id.* ¶86.  Plaintiffs and Goldman Sachs executed the Goldman Sachs Stipulation on November 14, 2019.  *Id.* ¶87.

In addition to the monetary terms, the cooperation negotiated by Co-Lead Counsel was central to these Settlements.  The cooperation terms required Deutsche Bank, FTN, and Goldman Sachs to provide information and documents to assist Plaintiffs in the continuing prosecution of the Action against the (then) remaining Defendants.  *Id.* ¶¶ 66-68, 77-79, 88-90.

### d.  Discovery

On May 31, 2019, the DOJ moved to partially stay discovery, which Plaintiffs opposed, and, after an *in camera* presentation by the DOJ, the Court granted the stay.  Joint Decl. ¶22. While this prevented Co-Lead Counsel from gaining access to Defendants' DOJ productions at the onset of discovery, Co-Lead Counsel quickly turned to other avenues.

Plaintiffs served their first sets of discovery requests, containing 38 document requests and 12 interrogatories.  *Id.* ¶32.  Co-Lead Counsel negotiated the scope of search terms,

custodians, transaction data, and document productions, holding more than 70 telephonic meet-and-confers with Defendants. *Id.* ¶¶32-38. This all occurred in just a few months, given the September 23, 2019 deadline for completion of data productions and October 24, 2019 deadline for substantial completion of document productions. *Id.*

Defendants produced 1.9 million documents totaling more than 9.1 million pages and over 7 million lines of data. *Id.* ¶¶34, 38. Co-Lead Counsel assigned approximately 40 of their own attorneys to review and analyze Defendants' document productions. *Id.* ¶42. Using technology assisted review ("TAR") and a seed set of chats identified by Deutsche Bank, FTN and Goldman Sachs pursuant to cooperation settlement terms, Co-Lead Counsel identified documents more likely to be relevant to the Action. Co-Lead Counsel then performed a full review of this narrowed tranche of approximately 250,000 documents (approximately 2,000,000 pages) before the Action was stayed in December 2019 in light of the Settlements. *Id.* ¶39, 41.

Co-Lead Counsel also responded to Defendants' discovery requests to Plaintiffs, collecting over 330,000 documents from Plaintiffs. *Id.* ¶¶47-50. The application of agreed-upon search terms resulted in a set of over 36,000 documents, which Co-Lead Counsel reviewed for responsiveness and privilege. *Id.* ¶¶48-50. Plaintiffs produced over 15,000 documents totaling over 300,000 pages to Defendants. *Id.* ¶¶48-50.

Co-Lead Counsel were preparing to take or defend 75 depositions by the close of fact discovery on December 23, 2019. *Id.* ¶¶43-46. Co-Lead Counsel worked to prepare several current and former employees of Plaintiffs and corporate representatives for the three Plaintiffs for depositions noticed by Defendants. *Id.* When the Court stayed the Action in December 2019 in light of the Settlements, Co-Lead Counsel had taken one deposition, and the parties had

scheduled 48 depositions to be taken in December 2019 and were negotiating the dates for 26

other depositions of Plaintiffs' and Defendants' witnesses in December 2019.  *Id.*

### e.  Plan of Distribution and Class Certification

Co-Lead Counsel worked with consulting experts from the bond industry, Wall Street,

and academia to refine the Plan of Distribution and the class damages model and to help interpret

data and documents obtained from the Defendants in order to streamline the discovery process

and prepare for depositions.   Joint Decl. ¶¶8, 57-58, 63.

In July 2019, Co-Lead Counsel began working with Plaintiffs' experts to develop the

Plan of Distribution.  Joint Decl. ¶63.  Once Co-Lead Counsel selected the Claims Administrator

following a multi-party RFP process, Co-Lead Counsel also conferred with the Claims

Administrator on the Plan of Distribution.  *Id.*  Co-Lead Counsel were also working in parallel

with Plaintiffs' experts to model impact and damages on a class-wide basis.  *Id.* ¶33-35.

On November 19, 2019, Co-Lead Counsel filed their class certification motion, which

was the culmination of their analysis of chat room and transaction data up to that point along

with extensive expert work on class-wide impact and damages.  Joint Decl. ¶¶56-57. The

memorandum of law and selection of exhibits required significant research, drafting, and

analysis of documents, data, and legal precedent.  Along with the memorandum, Plaintiffs

submitted the Class Certification Expert Report of Hal J. Singer, Ph.D.  ECF No. 330-86; Joint

Decl. ¶57.  Dr. Singer opined that standard econometric methods could provide class wide proof

that the challenged conduct caused anticompetitive effects, common impact, and aggregate

damages. *Id.*  Dr. Singer's regression model showed that prices paid by class members to

Defendants during the class period were significantly inflated relative to prices paid during the

benchmark period (*i.e.*, after the end of the class period), controlling for other quantifiable and

economically justified factors that could have affected GSE Bond prices. *Id.*; *see generally* ECF No. 330-86 at ¶4 (summary of findings).

On December 9 and 17, 2019, the Court stayed the deadline for Defendants' class certification opposition (due December 19, 2019) pending submission and a decision on preliminary approval of settlements with Barclays and Group Defendants. Joint Decl. ¶59.

### f.   Barclays and Group Defendants Settlement Negotiations

Settlement negotiations with Barclays and Group Defendants proceeded in parallel with discovery and the class certification filing. Joint Decl. ¶¶95-112.

On November 7, 2019, counsel for Plaintiffs and Barclays met in-person to discuss a possible resolution of the Action. *Id.* ¶95. The respective counsel shared their views on liability, class certification and damages. *Id.* The meeting did not result in a resolution, but discussions between Plaintiffs and Barclays continued by telephone over the next two weeks. *Id.* On November 21, 2019, Plaintiffs and Barclays' representatives met again in person and reached a tentative understanding on monetary terms ($87,000,000) and certain non-monetary terms. *Id.* ¶¶5, 96. Plaintiffs and Barclays executed a binding term sheet on December 1, 2019 and executed the Barclays Stipulation on December 16, 2019. *Id.* ¶¶96-97.

Group Defendants contacted Co-Lead Counsel in late 2019 to discuss resolving the Action. On December 2, 2019, the parties participated in a full day in-person mediation before former U.S. District Judge Layn R. Phillips and his fellow mediator, Gregory P. Lindstrom, Esq. *Id.* ¶103. Prior to the mediation, the parties exchanged mediation briefs, and had several discussions with Judge Phillips and Mr. Lindstrom. *Id.* ¶¶104-105. At the conclusion of the mediation on December 2, the parties were unable to reach an agreement. *Id.* ¶106. On December 4, 2019, on his own initiative, Judge Phillips presented Plaintiffs and Group Defendants with a mediator's proposal. *Id.* ¶107. On December 6, 2019, the parties agreed in

principle to settle the Action for $250,000,000 and executed the Group Defendants Stipulation on December 15, 2019.  *Id.* ¶¶5, 107-109.

The first *Goldberger* factor, the investment of time and resources to prosecuting this Action, supports Co-Lead Counsel's fee request.

### 2.   The magnitude and complexity of the case justify the fee request

"Class actions have a well-deserved reputation as being most complex," *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) ("*NASDAQ III*"), with antitrust cases standing out as some of the most "complex, protracted, and bitterly fought." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 669 (S.D.N.Y. 2015).  In cases that require more expertise, a larger percentage of the fund should be awarded to the lawyers who can competently bring and prosecute the case.  *See In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 379 (S.D.N.Y. 2013) ("The upshot is that the magnitude and complexity of the litigation also weigh in favor of a significant award.").

Plaintiffs' claims of collusion in the GSE Bond market, occurring over more than seven years, involving thousands of bond issuances and implicating 16 Defendants, are the very definition of a complex and risky case.  *See id.* at 379 (finding the broad scope of time and bonds involved contributed to the complexity of the case).

Co-Lead Counsel did not have access to the DOJ's investigation and, instead, developed the facts through their own investigation and cooperation from Deutsche Bank.  Co-Lead Counsel examined the GSE Bond market, bought data and hired experts to analyze GSE Bond Transactions, and obtained cooperation regarding the alleged anticompetitive conduct.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2018 WL 5839691, at *4 (S.D.N.Y. Nov. 8, 2018), *aff'd sub nom. Kornell v. Haverhill Ret. Sys.*, No. 18-3673-CV, 2019 WL 5681336 (2d Cir. Nov. 1, 2019) (recognizing that counsel could not rely on "regulatory

findings or law enforcement actions to prove class-wide impact or damages for purposes of class certification"). Co-Lead Counsel provided robust and multi-faceted statistical analysis to support Plaintiffs' claims. Despite Defendants' attacks (*see, e.g.,* Defs. Mem. in support of Joint Mot. to Dismiss (June 13, 2019), ECF No. 221 at 29-41), this economic analysis was ultimately credited as corroborating Plaintiffs' claims. *See GSE Bonds II*. Co-Lead Counsel's efforts to develop economic analysis to further support Plaintiffs' claims exemplify the level of complexity involved in this case. *See Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07-cv-2207(JGK), 2010 WL 3119374, at *6 (S.D.N.Y. Aug. 6, 2010) (describing the work undertaken by class counsel in a "complicated and difficult class action" that involved "significant discovery, complicated statistical analysis, and a complex mediation process").

The second *Goldberger* factor, the magnitude and complexity of the Action, supports Co-Lead Counsel's fee request.

### 3. The fee request is warranted based on the level of risks in this Action

The third *Goldberger* factor, the risk of the litigation, is perhaps "the most important *Goldberger* factor." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014) ("*Payment Card*"); *see also Goldberger,* 209 F.3d at 54 ("We have historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement."). For purposes of this analysis, the risk is "measured as of when the case is filed." *Goldberger*, 209 F.3d at 55.

As discussed in detail in the Memoranda of Law in Support of Final Approval of the Settlements, and summarized here, Plaintiffs faced significant *ex ante* litigation risks in proving liability, class-wide impact, and damages.

At all times during the litigation, Plaintiffs faced uncertainty in their ability to establish liability on the alleged overarching conspiracy that encompassed a large portion of secondary

12

trading in the GSE Bond market.  While Plaintiffs ultimately succeeded in defeating Defendants'

motions to dismiss arguments, proving the elements of an antitrust claim remained a significant

challenge.  At class certification, Plaintiffs would have to prove, in part through expert

testimony, that Defendants' conspiratorial conduct caused class-wide impact to nearly all class

members and that individual class members' damages could be computed on a common,

formulaic basis.  While Co-Lead Counsel believe that there is sufficient evidence to support a

finding of class-wide impact and damages, Defendants have vast combined resources and are

represented by top counsel from many of the nation's most prominent law firms.  They would

have coordinated a substantial attack on Plaintiffs' experts.

Plaintiffs also had the burden to prove actual damages.  A successful *Daubert* challenge

or effective cross-examination at trial could have resulted in a significantly reduced verdict even

if liability had been proved.  Even where the DOJ has secured a guilty plea, civil juries have

found no damages. *See, e.g.*, Special Verdict on Indirect Purchases, *In re TFT-LCD (Flat Panel)*

*Antitrust Litig*., No. 3:07-md-01827 SI (N.D. Cal. Sept. 3, 2013), ECF No. 8562. "Indeed, the

history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial

on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."

*NASDAQ III*, 187 F.R.D. at 476; *see United States Football League v. National Football League,*

644 F. Supp. 1040, 1042 (S.D.N.Y.1986) (jury awarded $1.00 in damages despite plaintiffs'

verdict on antitrust claim) (cited in *NASDAQ III*), *aff'd,* 842 F.2d 1335, 1377 (2d Cir. 1988).

Finally, the Action was prosecuted on a contingent basis, with Co-Lead Counsel bearing

all of the financial risk.  *See City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132, 2014 WL

1883494, at *14 (S.D.N.Y. May 9, 2014) ("The Second Circuit has recognized that the risk

associated with a case undertaken on a contingent basis is an important factor in determining an

appropriate fee award.").  Litigating against some of the world's largest financial institutions, which have significant resources, fine attorneys, and the ability to continue this case for years at the trial and appellate levels, presented a substantial risk that Co-Lead Counsel were and remain prepared to shoulder.  *See Meredith Corp.*, 87 F. Supp. 3d at 670 (noting "substantial risk" where counsel bore the "risk of defeat").

The third *Goldberger* factor, the level of risk, supports Co-Lead Counsel's fee request.

### 4.  Co-Lead Counsel provided high-quality representation

The Settlement Class includes numerous institutional investors with the sophistication and resources to object to the Settlements.  While the objection period is ongoing for the Barclays and Group Defendants Settlements, the objection period concluded for the Deutsche Bank, FTN and Goldman Sachs Settlements on February 14, 2020. There have been no objections to any of the Settlements from the Settlement Class, a class that includes many sophisticated and experienced institutional investors. The lack of objections to date are one indication of the quality of the work performed by Co-Lead Counsel on behalf of the Settlement Class.

The quality of representation may also be measured by evaluating "the recovery obtained and the backgrounds of the lawyers involved in the lawsuit."  *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008).  These Settlements have created a combined Settlement Fund of $386.5 million to benefit the Settlement Class and recover a significant portion of the estimated damages in light of the substantial litigation risks faced by Plaintiffs. Based on Co-Lead Counsel's research, the recovery is in the top 20 of class action recoveries in antitrust cases.  *See* Joint Decl., Ex 1.  In addition, the Settlements provide the benefit of GSE Bond market-specific antitrust compliance measures designed to prevent and detect future anticompetitive conduct in the GSE Bond market.  *See Meredith Corp.*, 87 F. Supp. 3d at 670

14

(approving fee award where settlement included conduct restrictions that would provide long-term structural relief for class members).

A final consideration for assessing the quality of the representation is "[t]he quality of opposing counsel" in the case. *Maley*, 186 F. Supp. 2d. at 373. Defendants are represented by large, well-regarded law firms with impressive track records. *Meredith Corp.*, 87 F. Supp. 3d at 670 (noting that counsel's achievement in "obtaining valuable recompense . . . for its clients is particularly noteworthy given the caliber and vigor of its adversaries").

The fourth *Goldberger* factor, the quality of representation, supports Co-Lead Counsel's fee request.

### 5. The 20% fee request is reasonable in relationship to the Settlements

Courts evaluate the requested fee in relation to the settlement by looking to "comparable cases" for "guideposts." *See Payment Card*, 991 F. Supp. 2d at 443-44. In megafund settlements of more than $100 million, fee awards will frequently "follow a sliding-scale" as the settlement size increases, and consequently, fee percentages generally "bear an inverse relationship to the amount of the settlement." *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 435 (S.D.N.Y. 2016). While fee awards must be reasonable, "[a]ttorneys should not fear that, at any point, by securing a larger award for the class, they will receive a smaller award." *In re Colgate-Palmolive*, 36 F. Supp. 3d at 349.

The 20% fee award sought here is lower than awards deemed fair and reasonable in other similarly sized megafund antitrust settlements in this District and elsewhere. *See* Joint Decl., Ex. 2 (finding the average fee awarded in megafund antitrust cases greater than $100 million but less than $500 million is 26.89% and the average fee awarded in megafund antitrust cases between $300 million and $500 million is 23.26%).

Studies collecting empirical evidence of attorneys' fee awards also support the requested fee award.  This Court has previously consulted such studies to evaluate the reasonableness of a requested fee award.  *See City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.,* 954 F. Supp. 2d 276, 281 (S.D.N.Y. 2013) (citing 2010 study by Theodore Eisenberg & Geoffrey P. Miller).  Professors Eisenberg and Miller analyzed antitrust settlements nationwide between 2009 and 2013 and found that plaintiffs' counsel had achieved a mean settlement recovery of $501 million and a median recovery of $37.3 million. Over the same time period, the mean antitrust fee award in those case was 27% of the recoveries, and 30% was the median fee award. *See* Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. LAW J. 937, 952 tbl. 4 (2017) ("Eisenberg & Miller III") (analysis of fee and class recoveries by category).[6]  In other research, based on a sample size of eight cases between 2006 to 2007, Fitzpatrick found that the average fee award for settlements between $250 million and $500 million was 17.8%, with a median award of 19.5% and a standard deviation of 7.9%.  Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811, 839, tbl. 11 (2010).

The fifth *Goldberger* factor, the fee request in relation to the settlement fund, weighs in favor of Co-Lead Counsel's fee request.

### 6.  Public policy supports approval of the fee request.

Public policy encourages enforcement of the antitrust laws through private civil suits to deter infringing conduct in the future.  *See Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This Court has emphasized the importance of the private action as a means of furthering the

---

[6] Eisenberg and Miller's research provides empirical support that fee percentages will decrease for larger megafund settlements.  Eisenberg & Miller III,  92 N.Y.U. LAW J. at 969 ("Higher recoveries are associated with lower percentage fees and higher lodestar multipliers.").

policy goals of certain federal regulatory statutes, including the federal antitrust laws."). Awarding a reasonable percentage of the common fund "provid[es] lawyers with sufficient incentive to bring common fund cases that serve the public interest." *Goldberger*, 209 F.3d at 51. If attorneys' fees are routinely set too low, particularly in instances where counsel effectively and efficiently litigate a matter, they will be deterred from bringing meritorious cases in the future. *See In re Colgate-Palmolive*, 36 F. Supp. 3d at 352 (S.D.N.Y. 2014). Here, Co-Lead Counsel's work advanced the interest of the antitrust laws and protected investors who might otherwise be without recourse. *See CDS Litig.*, 2016 WL 2731524, at *18 ("Our antitrust laws address issues that go to the heart of our economy. Our economic health, and indeed our stability as a nation, depend upon adherence to the rule of law and our citizenry's trust in the fairness and transparency of our marketplace."). These investors include many public institutions that guarantee the wellbeing of hardworking civil servants and private union pensions funds protecting the pensions of industrious union members. All three lead Plaintiffs here fall into one of these two categories. No referral fees were paid or received here; these Plaintiffs brought this Action to benefit their constituents and others similarly situated. As detailed in the declarations accompanying Plaintiffs' requests for an incentive award, Plaintiffs maintained an exceptionally high degree of involvement in and control over this litigation. *See* Declaration of James D. Love, Declaration of Michael P. Donovan, and Declaration of Christopher B. Craig, filed herewith.

The sixth *Goldberger* factor, public policy considerations, favors Co-Lead Counsel's fee request.

### B.  The Reasonableness of the Fee Request Is Supported by the Lodestar Cross-Check

When using the percentage method, courts may also require "documentation of hours as a 'cross check' on the reasonableness of the requested percentage," *Goldberger*, 209 F.3d at 50,

"to ensure that an otherwise reasonable percentage fee would not lead to a windfall." *In re Colgate-Palmolive*, 36 F. Supp. 3d at 353. When used as a cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50.

Lodestar is calculated by "multipl[ying] the reasonable hours billed by a reasonable hourly rate." *In re Colgate-Palmolive*, 36 F. Supp. 3d at 347. Courts use "prevailing market rates" and current rates to calculate the lodestar figure to account for the delay in payment. *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (citing *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 283-84 (1989)).

Plaintiffs' Counsel have spent 30,281.14 hours litigating the Action, producing a total lodestar amount of $18,880,537.75. The hourly billing rates for attorneys working on this case ranged from $350 to $1,150. Scott Decl., Ex. A; Briganti Decl., Ex. A; Seaver Decl., Ex. A; Zelcs Decl., Ex. A.[7] Billing rates in the same range have been previously approved as reflective of market rates in New York for work of comparable size and complexity. *See, e.g.*, *CDS Litig*, 2016 WL 2731524, at *17 (granting fee award using partner rates of $834 to $1,125 and

---

[7] Plaintiffs' Counsel have submitted declarations that reflect the firms' respective lodestar calculations based on current billing rates for contingent (and if applicable non-contingent) matters. *See* Scott Decl. ¶6; Briganti Decl. ¶6; Seaver Decl. ¶9.; Zelcs Decl. ¶4. Co-Lead Counsel has audited the hours worked to confirm that they reflect time and effort properly and reasonably attributable to this Action. Scott Decl. ¶4; Briganti Decl. ¶4; see *LeBlanc-Sternberg*, 143 F.3d at 764 ("The court should include the number of hours claimed by plaintiffs' attorneys that are supported by time records, that are not excessive or duplicative, and that do not reflect work done only in connection with unrelated claims on which plaintiffs did not succeed."). As stated in their respective declarations, Berman and Korein were closely involved with investigating the facts, working with experts developing the case theories and the first-filed complaint prior to the lead counsel appointment. Berman has continued to serve as the counsel for class representative I.B.E.W., representing the client at mediations and assisting with its discovery obligations. *See* Seaver Decl. ¶¶40-56. No firm employed any contract or temporary attorneys to perform work in this action. Scott Decl. Ex. A; Briganti Decl. Ex. A; Seaver Decl. Ex. A; Zelcs Decl. Ex. A.

associate rates of $411 to $714, *see* ECF No. 482); *In re Foreign Exchange*, 2018 WL 5839691 (granting fee award using partner rates up to $1,375 and associate rates of $350 to $700, *see* ECF No. 939).

Once the lodestar figure is determined, courts typically enhance it by a positive multiplier "to reflect consideration of a number of factors, including the contingent nature of success and the quality of the attorney's work." *Maley*, 186 F. Supp. 2d at 370. A fee award of 20% of the settlement fund represents a multiplier of 4.09. A crosscheck multiplier of 4.09 is reasonable compared with other antitrust class actions in this District and elsewhere. *See* Joint Decl., Ex. 2; *see also Wal-Mart*, 396 F.3d at 123 (upholding multiplier of 3.5 as reasonable and observing that "multipliers of between 3 and 4.5 have become common").

Moreover, the speedy resolution (and the attendant lower lodestar value) of this case did not result because the claims here were qualitatively easier. Rather, these outcomes reflect the skill of Co-Lead Counsel. As discussed above, Co-Lead Counsel, together with Berman and Korein, developed this complex case from scratch. *See* Part I.A.2 *supra*. After the Court set a schedule that gave Co-Lead Counsel just over a year to develop the case and bring claims to trial, Co-Lead Counsel devoted commensurate resources and staffing to handle each and every litigation event in the compressed pre-trial schedule. *See* Part I.A.1 *supra*. The increased personnel and resources Co-Lead Counsel devoted to the fray increased the risk the firms faced and, in a less aggressive pretrial framework, would have been deployed elsewhere. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 2178787, at *2 (N.D. Cal. May 17, 2017) ("Class Counsel had to turn down opportunities to work on other cases to devote the appropriate amount of time, resources,

and energy necessary to handle this complex case. This factor supports an award of the requested fees.").

### C. Co-Lead Counsel's Fee Request Is Below the Attorneys' Fees Percentages Negotiated with Plaintiffs Prior to Filing the Initial Complaint

Co-Lead Counsel's retention agreements with Plaintiffs provide additional indicia of the reasonableness of Co-Lead Counsel's fee request.  Courts give great weight to negotiated fee agreements because they typically reflect actual market rates.  *Goldberger*, 209 F.3d at 52 (stating that "market rates, where available, are the ideal proxy" for an attorney's compensation). Additionally, there is "a well-recognized rebuttable 'presumption of correctness' given to the terms of an *ex ante* fee agreement between class counsel and lead plaintiff" applied in cases where the fee was negotiated by a "sophisticated benefits fund with fiduciary obligations to its members and where that fund has a sizeable stake in the litigation." *CDS Litig.*, 2016 WL 2731524, at *16; *see Sullivan v. Barclays*, No. 13-cv-02811, ECF No. 504 at 27:7-18 (S.D.N.Y. June 11, 2019) (Castel, J.) (awarding attorneys' fees according to negotiated retainer schedule where public institutional investor actively monitored and participated in the action); *In re WorldCom Sec. Litig.*, 388 F. Supp. 2d 319, 356 (S.D.N.Y. 2005) (courts should give  "great weight" to negotiated fee agreements).

Pursuant to the retainer previously provided to the Court, Pennsylvania Treasury agreed that Co-Lead Counsel may seek a blended fees rate of 23.25%-27.25% for a gross recovery of just under $400 million.  The fee request of 20% falls below the fees negotiated, an adjustment Co-Lead Counsel made on its own initiative to ensure additional funds are available to Settlement Class Members.

## II.    THE REQUEST FOR REIMBURSEMENT OF LITIGATION EXPENSES IS REASONABLE AND SHOULD BE GRANTED

The attorneys whose work leads to the creation of "a common settlement fund for a class are entitled to reimbursement of [reasonable] expenses that they advance to a class." *Meredith Corp.*, 87 F. Supp. 3d at 671; *see also In re Arakis Energy Corp. Sec. Litig.*, No. 95-cv-3431(ARR), 2001 WL 1590512, at *17 n.12 (E.D.N.Y. Oct. 31, 2001) ("Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course.").  It is not uncommon that in complex antitrust cases such as this one, "substantial expenses [are] necessary," including costs related to initial investigations and research, testifying and consultant experts, discovery expenses, travel, postage and mailing, and copying costs. *Meredith Corp.*, 87 F. Supp. 3d at 671; *see also Guevoura Fund Ltd. v. Sillerman*, No. 1:15-cv-07192(CM), 2019 WL 6889901, at *22 (S.D.N.Y. Dec. 18, 2019).  Such costs are "compensable if they are of the type normally billed by attorneys to paying clients."  *Guevoura Fund*, 2019 WL 6889901, at *22.

As detailed in the individual declarations of Daryl Scott, Vincent Briganti, Todd A. Seaver and George A. Zelcs filed concurrently herewith, through March 31, 2020, Co-Lead Counsel incurred Litigation Expenses relating to this Action totaling $1,718,773.04. Approximately 86.05% or $1,479,037.52 of these costs were spent on expert work.  As the expert work performed in this case helped to both identify and crystallize Plaintiffs' claims and to assess the magnitude of the damages, this work was unquestionably "critically important" to the prosecution of this Action, and of the type of reimbursement that "[c]ourts routinely award." *In re Colgate-Palmolive*, 36 F. Supp. 3d at 353.

As the Court is aware (*see* ECF No. 159 at 4), Co-Lead Counsel used Lowey's own in-house technology to manage the documents produced in this Action.  Through March 31, 2020, the e-discovery costs were $44,330.37 (2.58% of the Litigation Expenses), a substantial savings

21

to the typical monthly costs of discovery hosted by outside vendors.  The remaining charges, comprising approximately 11.37% of Co-Lead Counsel's reimbursement request, consist of travel and meal costs, copying charges (with in-house copies capped at $0.10 per page), online research, filing and service fees, mailing, and telephone charges.[8]  These are all the type of out-of-pocket expenses that are routinely reimbursed from common funds. *Yang v. Focus Media Holding Ltd.*, No. 11-cv-9051 (CM)(GWG), 2014 WL 4401280, at *19 (S.D.N.Y. Sept. 4, 2014) (finding computer research, photocopying, postage, meals, and court filing fees "necessary for Lead counsel to successfully prosecute this case").

## CONCLUSION

For the foregoing reasons, Co-Lead Counsel respectfully request that the Court approve their motion for attorneys' fees and payment of Litigation Expenses in the amounts set forth above.

Dated:  April 13, 2020

CHRISTOPHER M. BURKE
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel:  (619) 233-4565
Fax: (619) 233-0508
cburke@scott-scott.com

DAVID R. SCOTT
AMANDA F. LAWRENCE
KRISTEN ANDERSON
DONALD A. BROGGI
PETER A. BARILE III
THOMAS BOARDMAN

*s/ Vincent Briganti*
VINCENT BRIGANTI
CHRISTIAN LEVIS
MARGARET MACLEAN
ROLAND R. ST. LOUIS, III
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel:  (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
mmaclean@lowey.com
rstlouis@lowey.com

[8] Co-Lead Counsel are not seeking reimbursement for mediator fees charged by Hon. Jan Adler (ret.), Mr. Jed Melnick, or Hon. Layn R. Phillips (ret.) and Gregory P. Lindstrom, Esq. who mediated the settlements with Deutsche Bank, FTN, Goldman Sachs, and Group Defendants.

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Tel:  (212) 223-6444
Fax: (212) 223-6334
david.scott@scott-scott.com
alawrence@scott-scott.com
kanderson@scott-scott.com
dbroggi@scott-scott.com
pbarile@scott-scott.com
tboardman@scott-scott.com

*Interim Co-Lead Counsel for the Class and Attorneys for Plaintiff City of Birmingham Retirement and Relief System*

CHRISTOPHER CRAIG
Chief Counsel
**PENNSYLVANIA TREASURY DEPARTMENT**
**OFFICE OF THE CHIEF COUNSEL**
129 Finance Building
Harrisburg, PA 17120
ccraig@patreasury.gov

*Attorney for Plaintiff Joseph M. Torsella, in his official capacity as the Treasurer of the Commonwealth of Pennsylvania*

*Interim Co-Lead Counsel for the Class and Attorneys for Plaintiff Joseph M. Torsella is the Treasurer of the Commonwealth of Pennsylvania and the head of the Pennsylvania Office of the State Treasurer*

TODD A. SEAVER
CARL N. HAMMARSKJOLD
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel:  (415) 433-3200
Fax: (415) 433-6382
tseaver@bermantabacco.com
chammarskjold@bermantabacco.com

LESLIE R. STERN
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Tel:  (617) 542-8300
Fax: (617) 542-1194
lstern@bermantabacco.com

*Attorneys for Plaintiffs Electrical Workers Pension Fund Local 103, I.B.E.W., and Local 103, I.B.E.W. Health Benefit Plan*