**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| IN RE GSE BONDS ANTITRUST LITIGATION |

Case No. 1:19-cv-01704 (JSR)

**FINAL REPORT AND ACCOUNTING CONCERNING**
**COMPLIANCE REPRESENTATIVE TO PENNSYLVANIA TREASURY**

Pursuant to the Court's Order Approving Payment to Paredes Strategies LLC as Compliance Representative to Pennsylvania Treasury (ECF No. 431), this is the Final Report and Accounting of the Compliance Representative, which covers the period from December 2021 to June 2023. Plaintiff and class representative, the Treasurer of the Commonwealth of Pennsylvania ("Pennsylvania Treasury"), selected Paredes Strategies, LLC ("Paredes Strategies") to assist Pennsylvania Treasury in conferring with the Active Settling Defendants concerning their maintenance of an antitrust compliance program and adoption of antitrust compliance best practices in the Government Sponsored Enterprise ("GSE") bond market. Pennsylvania Treasury negotiated, and the Court approved, a flat fee payment of $550,000 to Paredes Strategies for work to be conducted over a 29-month period. This flat fee includes any payments to Hunton Andrews Kurth LLP ("Hunton"), with which Paredes Strategies collaborates to perform various functions for this engagement.

The culmination of this engagement is the submission to this Court of a final comprehensive report detailing compliance best practices necessary to prevent and detect anticompetitive conduct in the GSE bond market. Like most all other states, local and municipal governments, and public agencies nationwide, Pennsylvania Treasury routinely invests public dollars in the GSE bond market. Consequently, it remains an important objective of the class representative to describe and advocate for the implementation of compliance safeguards designed

to prevent the conduct that gave rise to this litigation and to ensure the GSE bond market is free from artificial pricing, collusive behavior, and manipulation.

To this end, Paredes Strategies and Hunton spent approximately 450 hours[1] in this final phase which included reviewing materials; preparing for and conducting meet-and-confers with the Active Settling Defendants; performing follow-up discussions with market participant banks; reviewing over 100 policies, procedures, codes of conduct, training materials, communications sent to employees, and other documents from the Banks to assess the Active Settling Defendants' antitrust compliance programs; and drafting reports, as directed and overseen by the Pennsylvania Treasurer. The Final Report, a copy of which is attached as Exhibit 1, accounts for these activities.

The Final Report expands and details key attributes of effective antitrust compliance practices that are ideally incorporated into each company's enterprise risk management programs. In particular, the Final Report details specific features of an effective antitrust complaint program to include:

- an integration into the entity's overall compliance and risk management infrastructure;

- development of thoughtful oversight policies and procedures, effective and continual training, robust communications controls and surveillance, compliance monitoring;

- routine testing and auditing of compliance controls and mandates;

- establishment of direct and clear oversight as part of organizational structure;

- inclusion of dynamic evolution of the compliance program to address emerging practices and new risks; and

- development and implementation of a culture of compliance and code of conduct.

---

[1] Paredes Strategies and Hunton spent more than 1,300 hours in total on the first and final phases.

<u>Summary of Account</u>. The final phase of the work has been completed for which Paredes Strategies and Hunton have or will receive a total of $550,00.00. The balance of the Court-authorized payment, $183,333.34, will be disbursed pursuant to the engagement agreement.

DATE:  July 11, 2023                                  Respectfully submitted,

***<u>s/ Christopher Craig</u>***
CHRISTOPHER CRAIG
Chief Counsel
**PENNSYLVANIA TREASURY**
**DEPARTMENT**
**OFFICE OF THE CHIEF COUNSEL**
129 Finance Building
Harrisburg, PA 17120
ccraig@patreasury.gov
*Attorney for Plaintiff  Stacy M. Garrity the*
*Treasurer of the Commonwealth of Pennsylvania*

VINCENT BRIGANTI
CHRISTIAN LEVIS
MARGARET MACLEAN
ROLAND R. ST. LOUIS, III
*Interim Co-Lead Counsel for the Class and*
*Attorneys for Plaintiff Stacy M. Garrity as the*
*Treasurer of the Commonwealth of Pennsylvania*
*and the head of the Pennsylvania Office of the State*
*Treasurer*

CHRISTOPHER M. BURKE (CB-3648)
DAVID R. SCOTT (DS-8053)
AMANDA F. LAWRENCE (AL-8804)
KRISTEN ANDERSON (KA-1965)
DONALD A. BROGGI (DB-9661)
THOMAS BOARDMAN (TB-0530)
*Interim Co-Lead Counsel for the Class and*
*Attorneys for Plaintiff City of Birmingham*
*Retirement and Relief System*

# HUNTON
## ANDREWS KURTH



Stacy Garrity, State Treasurer



# Final Report of the Representative of the Treasurer of the Commonwealth of Pennsylvania

June 2023

Paredes Strategies LLC  |  Hunton Andrews Kurth LLP

**Overseen by Pennsylvania Treasury Department's Office of Chief Counsel**

**I.  Executive Summary** ................................................................. **4**

**II.  Introduction** .......................................................................... **7**

**III.  Overview of GSE Bond Market** .................................................. **9**

    GSE OPERATIONS .................................................................... 9

    DEFENDANTS' OPERATIONS ....................................................... 9

    FEATURES OF THE GSE BOND MARKET AND POTENTIAL
    FOR ANTICOMPETITIVE CONDUCT .............................................. 10

    THE PENNSYLVANIA TREASURY'S INTEREST ................................ 11

**IV.  In re GSE Bonds Antitrust Litigation** ..................................... **13**

    THE LAWSUIT ....................................................................... 13

    COMPLIANCE AND REMEDIATION MEASURES ............................. 13

**V.  The Value of Effective Antitrust Compliance Programs** ........... **15**

    RISK MANAGEMENT AND COMPLIANCE GUIDANCE ....................... 15

    THE ROLE OF GOVERNMENTAL BODIES ..................................... 16

**VI.  Effective Antitrust Compliance and Best
Practice Considerations** ............................................................ **18**

**VII.  Conclusion** ....................................................................... **26**

**Appendix A – Final Observations** ............................................... **27**

**Exhibit 1 – Appendix A to the Initial Report** ............................... **33**

# I. Executive Summary

The Review Team[1] provides this Final Report of the Representative of the Treasurer of the Commonwealth of Pennsylvania (the "Final Report"), including the Review Team's assessment of antitrust compliance best practices and related efforts to prevent and detect anticompetitive conduct, after having fulfilled its obligations under the various settlement agreements reached in *In re GSE Bonds Antitrust Litigation*,[2] as described in the Initial Report,[3] relating to the meet-and-confers with defendant banks (each a "Bank" and, collectively, the "Banks"). The plaintiffs (a public pension fund, a benefit retirement plan, a health plan, and the Pennsylvania Treasury) brought suit on behalf of a class of investors) alleged that they "were overcharged each time they purchased GSE Bonds from Defendants and underpaid each time they sold GSE Bonds to Defendants"[4] as a result of the Banks' alleged anticompetitive conduct in the GSE bond market. The Pennsylvania Treasury has a vital interest in the integrity of the GSE bond market because it, like many other government entities and similar public sector institutions, is a significant holder of GSE bonds. The plaintiffs ultimately reached settlement agreements with the Banks, all of which required the Banks to meet-and-confer with the Pennsylvania Treasury and its representative regarding antitrust compliance. The Pennsylvania Treasury Office of Legal Counsel actively participated in and oversaw the entirety of the meet-and-confer process under the settlements, reflecting the Commonwealth's focus on promoting effective antitrust compliance in the GSE bond market.

Because of the nature of the GSE bond market and the opportunity for horizontal competitors to work together in syndicates, it is important to consider the potential for anticompetitive conduct in this market. Banks that were previously working jointly as part of a syndicate may act as both counterparties and competitors once GSE bonds trade after their primary issuance. The GSE bond market can thus create an atypical challenge for antitrust compliance which must be accounted for through a sound compliance program that is tested for effectiveness and continuously improved in light of changing risks and enhanced compliance tools and techniques that develop.

The following briefly introduces key best practice considerations that the Review Team engaged with the Banks on throughout the meet-and-confer process, including as applied to the particular features and attributes of each Bank's antitrust compliance program, mindful that there is no one-size-fits-all approach to compliance that is optimal in every situation:

- **Compliance Infrastructure:** Compliance should be promoted when a firm's antitrust compliance program is effectively integrated into the firm's overall compliance infrastructure and when antitrust is identified as a specific risk to focus on because this helps ensure that antitrust receives appropriate prioritization and attention as a risk to remediate.

- **Policies and Procedures:** Policies and procedures are central to creating the processes, practices, oversight, and discipline that facilitate compliance, particularly given that anticompetitive conduct, when and if it occurs, generally depends on how people act and communicate. Among other things, policies and procedures should be "brought to life" with realistic scenarios that provide constructive guidance that motivates individuals' understanding of how to (and how not to) behave in certain situations they may confront and processes and practices they are to follow.

- **Training:** Effective training helps individuals steer clear of violative conduct—whether of legal and regulatory requirements or firm policies and procedures—by informing them of what is and what is not appropriate behavior. As with policies and procedures, a training best practice is to leverage concrete "dos" and "don'ts" that reflect real-world scenarios people may find themselves in and to make training salient, such as with role-playing or other types of interaction.

---

1  The Pennsylvania Treasury (as defined later in this Final Report) engaged Paredes Strategies LLC as its representative, along with antitrust and securities lawyers at the law firm Hunton Andrews Kurth LLP ("Hunton"), to engage with the defendant banks in the meet-and-confer process provided for as part of the settlement agreements in what this Final Report refers to as the GSE Bonds Litigation. Mr. Paredes and the attorneys from Hunton will be referred to throughout this report as the "Review Team."

2  No. 1:19-cv-01704 (S.D.N.Y.) (the "GSE Bonds Litigation").

3  The Review Team submitted its "Initial Report of the Representative of the Treasurer of the Commonwealth of Pennsylvania" (the "Initial Report") to the Pennsylvania Treasury in December 2021. In addition, the Initial Report was filed with the Court on December 28, 2021. *See* GSE Bonds Litigation, ECF No. 457-1.

4  *See* Third Am. Compl. ¶ 262, GSE Bonds Litigation, ECF No. 254.

- **Communications and Surveillance:** Robust communications policies, procedures, controls, and surveillance are significant to an effective antitrust compliance program that prevents and identifies inappropriate efforts to coordinate. Beyond clearly delineating between approved and non-approved methods of communicating, firms should leverage surveillance tools that deploy increasingly sophisticated technology to detect and, in turn, deter wrongdoing.

- **Monitoring, Testing, and Audit/Assurance:** Monitoring, testing, and audit/assurance is key to ensuring that an antitrust compliance program is effective "in practice" and not only "on paper." These are means by which a firm ensures that its compliance program is designed effectively over time to address risks, including antitrust risks, and that policies and procedures are being followed and that surveillance and other controls are operating as intended to prevent and detect wrongdoing.

- **Organizational Structure:** While no single organizational structure is optimal in all instances, it is essential that all three lines of defense are actively involved in shaping, enforcing, and evaluating the antitrust compliance program. Also, there should be committees, working groups, and other similar governance bodies, all the way up to the board of directors, with a governance and oversight role. This helps broaden the breadth of perspectives that is brought to bear and can assist in promoting discipline and a culture of integrity. Risk management and internal controls should be integrated throughout the organizational structure, including an identifiable person or group that "owns" antitrust compliance, such as the Chief Compliance Officer. Such an individual or group should have the authority necessary to address anticompetitive behavior and confer with the board of directors to safeguard against misconduct and promote adherence to compliance best practices.

- **Risk Assessment and Lessons Learned:** Risks and regulatory expectations are not forever static, but can change; and, accordingly, best practice compliance programs should be dynamic so that opportunities to implement emerging best practices can be taken advantage of. Firms should undertake a structured analysis of material regulatory, litigation, technology, and marketplace developments to ascertain the impacts

on a firm's risk profile and the robustness of its control environment if risks have changed.

- **Culture:** Culture can drive conduct at an institution by setting the tone for what is encouraged, expected, and required, as well as what is not tolerated, thereby filling the inevitable gaps in policies, procedures, controls, training, and governance. Codes of Conduct and Codes of Ethics are a centerpiece in documenting what constitutes good behavior. Those Codes should not only exist on paper, however, but should tangibly guide behavior and need to be reinforced by management.

- **Technological Advances/Emerging Risks and Capabilities:** As technology changes, new antitrust risks can emerge. For example, algorithms and artificial intelligence are being used in unprecedented ways in corporate decision making, and people communicate using mobile devices and via chats/texts more than ever. This can create new ways to coordinate. That said, new ways of mitigating and managing risks also are offered as new technology can afford new tools and techniques for crafting and assessing preventative and detective controls. Compliance programs need to be attuned to the impacts of technology on risk and need to take advantage of technology to bolster controls.

- **Data:** A compliance program should evaluate opportunities for how to effectively integrate data and related analytics to help identify potential anticompetitive conduct that warrants further investigation. Firms can ascertain risks using data that show patterns, trends, and aberrations that a person might otherwise overlook, particularly when different data sets are combined in search of correlations and other associations that should be looked into.

- **Sustainability and Continuous Improvement:** An antitrust compliance program's approach to monitoring, testing, and audit/assurance should evaluate not only whether the elements of the program are operating as intended (e.g., implemented effectively and being followed), but also whether they continue to be designed effectively over time. Even if achieving what it was designed to achieve, elements of a compliance program still may need to be redesigned to account for new businesses, a reorganization, new technology, new regulation, or new marketplace dynamics if the company's compliance program is to remain fit for purpose.

As an overarching observation, in the Review Team's opinion, the goals of the meet-and-confer process were achieved. The meet-and-confers were intended to help promote effective compliance and the careful consideration and adoption of antitrust compliance best practices in the GSE bond market. Through the meet-and-confer process, the Review Team and the Pennsylvania Treasury gained insight into ongoing enhancements and changes that the Banks have continued to make to their antitrust compliance programs (and other potential compliance program updates that remained under evaluation), in addition to changes that the Banks had earlier put into place in connection with the GSE Bonds Litigation and related settlements. The Banks and their counsel cooperated in terms of the materials that the Banks provided to the Review Team for review and analysis, the tone and tenor of the Banks' engagement with the Review Team, and the substantive nature of the discussions in each of the meet-and-confers. The Review Team was encouraged by the enhancements and continuous improvements that Banks explained they had made or were considering adding to their compliance programs and by the seriousness with which those the Review Team interacted appeared to take antitrust compliance. The meet-and-confer construct, while not an audit, afforded ample opportunity for the Review Team to engage with the Banks regarding perspectives on effective antitrust compliance, including rigorous discussion of, and reflection on, antitrust compliance best practices.

Moving forward, the Review Team encourages the Banks to continue to consider and evaluate the contents of this Final Report and the productive substantive discussions and engagement that the Banks and the Review Team had across the meet-and-confers in helping to ensure that their antitrust compliance programs are effective in both their design and operation over time and that opportunities to further integrate and implement best practices, which themselves can change over time, are not overlooked.



## II. Introduction

This is the Final Report of the consultants serving as the "representative" of the Treasurer of the Commonwealth of Pennsylvania ("Pennsylvania Treasury") for purposes of the settlement agreements reached in *In re GSE Bonds Antitrust Litigation*, No. 1:19-cv-01704 (S.D.N.Y.) ("GSE Bonds Litigation"). This Final Report builds upon the information included in the representative's Initial Report, filed on December 28, 2021, ECF No. 457-1. The Initial Report is incorporated by reference into this Final Report.

The underlying GSE Bonds Litigation sprang from allegations that several banks,[5] which collectively accounted for a substantial majority of the underwriting of government-sponsored enterprise ("GSE") bonds over the relevant period,[6] violated federal antitrust law by allegedly agreeing to fix GSE bond prices in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The plaintiffs—a public pension fund, a benefit retirement plan, a health plan, and the Pennsylvania Treasury, suing on behalf of a class of investors—sought damages and injunctive relief, centering on allegations that the plaintiffs paid too much when they bought GSE bonds and received too little when they sold them.

Ultimately, between August and December 2019, the defendant banks (each a "Bank" and, collectively, the "Banks") reached settlement agreements with the plaintiffs that were subject to the direction and oversight of the Pennsylvania Treasury. Under the settlements, each Bank that continued to maintain a GSE bond desk engaging in GSE bond transactions was required to meet-and-confer on a regular basis with the Pennsylvania Treasury and its representative regarding such Bank's antitrust compliance program and antitrust compliance best practices.[7] More specifically, each Bank was required to meet-and-confer

with the plaintiffs and a representative of the Pennsylvania Treasury, who was from the Office of Legal Counsel, on a semi-annual basis for a 24-month period, with one of the Bank's meet-and-confer obligations being annual.[8]

As did the Initial Report, this Final Report provides an overview of the GSE bond market and its significance, the GSE Bonds Litigation, and the settlement agreements reached in this matter. This Final Report also highlights the practical need to protect the marketplace from anticompetitive behavior that can result in distorted prices and that can erode confidence in markets. Put simply, buyers are harmed if they pay more as a result of anticompetitive behavior, and sellers are harmed if they sell for less as a result of anticompetitive behavior. In the context of the GSE bond market, it is particularly consequential if, for example, states and municipalities that hold GSE bonds earn lower financial returns than they otherwise would have to fund key initiatives and priorities that people depend on. This observation underscores the contribution of the meet-and-confer process under the GSE Bonds Litigation settlements to promote sound antitrust compliance in the GSE bond market. To this end, this Final Report explains key attributes of effective antitrust compliance and best practices for well-designed and operationally-effective compliance programs that stand to benefit consumers and investors by promoting competition and market integrity.

Effective antitrust compliance programs promote competition by preventing anticompetitive conduct and fostering a culture of, and a commitment to, compliance beyond particular policies, procedures, controls, training, and testing. It is essential in the GSE bond space, as well as others, that these programs are effective in both design

---

5   Defendant banks include Barclays Capital Inc.; BNP Paribas Securities Corp.; Citigroup Global Markets Inc.; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; First Tennessee Bank, N.A.; FTN Financial Securities Corp.; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Inc.; UBS Securities LLC; Morgan Stanley & Co. LLC; HSBC Securities (USA) Inc.; Nomura Securities International, Inc.; TD Securities (USA) LLC; Cantor Fitzgerald & Co.; and SG Americas Securities, LLC. This Final Report will use these entities' common names. A courtesy copy of this Final Report was provided to each defendant bank that remains actively engaged in the GSE bond market.

6   As noted in the Initial Report, these Banks accounted for 77.2% of GSE bond underwriting from the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, the Federal Home Loan Bank, and the Federal Farm Credit Bank between January 2009 and January 2016. *See* Second Am. Compl. ¶ 134, Table 1, *In re GSE Bonds Antitrust Litig.*, No. 1:19-cv-01704 (S.D.N.Y. July 12, 2019), ECF No. 244; *see also* Initial Report at 1.

7   The compliance provisions applied only to settling defendants that intended to remain active in the GSE bond market. *See, e.g.*, Group Stipulation and Agreement of Settlement ¶ 18, (Dec. 16, 2019), ECF No. 343-2. HSBC, BNP Paribas, Credit Suisse, and SG Americas no longer maintain a GSE bond desk and, therefore, are not subject to the compliance provisions pursuant to the settlement. HSBC had such a desk when the Review Team conducted the first round of meet-and-confers, and thus HSBC did participate in one meet-and-confer, but HSBC shut down its GSE bond desk before the second round of meet-and-confers.

8   *See* settlement agreements with Deutsche Bank ¶ 21, (Sept. 11, 2019), ECF No. 257-1; First Horizon ¶ 19, (Sept. 24, 2019), ECF No. 267-1; Goldman Sachs ¶ 19, (Nov. 14, 2019), ECF No. 318-1; Barclays ¶ 19, (Dec. 16, 2019), ECF No. 343-1; and Group Settling Defendants ¶ 19, (Dec. 16, 2019), ECF No. 343-2. As described in the Initial Report, the settlements varied slightly, but captured substantially the same core substantive elements insofar as the meet-and-confer process is concerned. *See* Initial Report at 18. For Barclays, the meet-and-confer obligation was annual. *See* Barclays Settlement ¶ 19, (Dec. 16, 2019), ECF No. 343-1.



and operation, are periodically reviewed to ensure that they are being adhered to, are incorporated into the overall risk management structure, and include elements intended to promote sustainability and continuous improvement over time as techniques, tools, risks, opportunities, and regulatory developments unfold. A sound compliance program is not static, but should be dynamic in that it is adaptable, as warranted, to changing facts and circumstances. Against this backdrop, the Initial Report describes the role of the Review Team in assisting the Pennsylvania Treasury's assessments of the Banks' antitrust compliance programs as part of the settlements.

As noted above, this Final Report incorporates by reference the Initial Report, and covers the Review Team's work through the completion of four rounds of meet-and-confers and the preparation of this Final Report. This Final Report has been prepared for and provided to the Pennsylvania Treasury per the objectives of the compliance provisions in the settlement agreements with the Banks, and the best practice conclusions herein are likewise prepared for and provided to the Pennsylvania Treasury per the settlements' objectives. This Final Report, Appendix A, Exhibit 1, and their contents should not be used, relied upon, or communicated for any other purpose, and are not intended to convey any opinion as to any Bank's compliance with any relevant statutes, rules, regulations, or orders.

## III. Overview of GSE Bond Market

### GSE OPERATIONS

A government-sponsored enterprise ("GSE") is a quasi-governmental entity established to enhance the flow of credit to specific sectors of the American economy. The trading in the bonds of four GSEs were specifically referred to in the plaintiffs' Third Amended Complaint ("Complaint"): Federal Home Loan Mortgage Corporation ("Freddie Mac"); the Federal National Mortgage Association ("Fannie Mae"); the Federal Home Loan Bank ("FHLB"); and the Federal Farm Credit Bank ("FFCB") (collectively, the "Agencies").[9] Freddie Mac and Fannie Mae are central to the US housing market by providing investors of agency mortgage-backed securities ("Agency MBS") with guarantees of principal and interest payments for those securities. GSEs guarantee Agency MBS backed by conventional mortgage loans that are subject to guidelines set by the GSEs and the Federal Housing Finance Agency. Further detail and discussion of these Agencies and their importance to the US housing market can be found in the Initial Report.[10]

### DEFENDANTS' OPERATIONS

Defendants in the GSE Bonds Litigation were banks and horizontal competitors that traded bonds issued by GSEs. Unlike the Agency MBS, for which Fannie Mae and Freddie Mac provide guarantees, the GSE bonds are used directly to finance the GSEs' operations and issued several times a month. Although GSE bonds are not backed by the US government, they are generally considered a low credit risk. The Complaint alleged that, due to GSE bonds' "perceived safety and high credit quality," they have been "a key component" of Commonwealth investments by the Pennsylvania Treasury.[11]

The Complaint summarized how the GSE bond market works. First, Fannie Mae, Freddie Mac, and other GSEs issue GSE bonds to a preapproved group of "Approved GSE Bond Dealers," including the Banks during the settlement period, that underwrite GSE bonds.[12] Next, Approved GSE Bond Dealers trade GSE bonds with investors.[13]

The Complaint alleged that GSEs will select the Approved GSE Bond Dealers by, among other ways, holding an "auction" wherein Approved GSE Bond Dealers bid for the right to take the new bond to market.[14] During this auction, Approved GSE Bond Dealers often work together in groups called "syndicates" to submit proposals reflecting their plan for underwriting and bringing a new bond to market.[15] The winning Approved GSE Bond Dealers that are part of the syndicate are awarded an allocation of newly-issued GSE bonds, and those dealers then "work together in the 'primary market' to try and place the new GSE Bonds with a bulk buyer."[16] During this "syndication" phase, the Complaint described that "[e]xceptions are made to banks' usual policies prohibiting participation in multi-bank chat rooms to allow the traders working on a syndicate to easily communicate in real time."[17] The syndication phase ends when the Approved GSE Bond Dealers declare the new issuance "free to trade" ("FTT") and at that point secondary market trading begins.[18] The same traders that cooperate in the primary market "are supposed to compete against one another to sell the newly issued GSE Bonds to investors" in the secondary market.[19] This quick transformation for banks, from cooperating as part of a syndicate as they help bring an offering to market, to subsequently becoming competitors once the offering is complete, presents a unique practical challenge from an antitrust perspective—namely, to ensure that allowed coordination (during the syndicate phase) does not persist in impermissible ways once the GSE bonds go FTT.

---

9   Third Am. Compl. ¶ 1.

10  *See* Initial Report at 3–6.

11  *See* Third Am. Compl. ¶¶ 19–20.

12  *Id.* ¶ 125.

13  *Id.*

14  *Id.* ¶ 126.

15  *Id.* ¶ 128.

16  *Id.* ¶¶ 128–29.

17  *Id.* ¶ 129.

18  *Id.* ¶ 130.

19  *Id.*

The Complaint alleged that the Banks controlled over three-fourths of the GSE bond market during the relevant time period, which, according to the Complaint, "gave Defendants substantial control over the GSE Bond supply available to investors in the secondary market" and gave them the "ability to fix the prices that investors paid for GSE Bonds, and the motive and opportunity to fix GSE Bond prices to generate enormous GSE Bond trading profits."[20]

## FEATURES OF THE GSE BOND MARKET AND POTENTIAL FOR ANTICOMPETITIVE CONDUCT

Antitrust law recognizes that competition in markets increases consumer welfare, reduces inefficiencies, and promotes market integrity, all of which helps spur confidence that the marketplace is fair. Because of the nature of the GSE bond market and the opportunity for horizontal competitors to work together in syndicates, it is important to consider the potential for anticompetitive conduct in the GSE bond market. For example, as mentioned above, the GSE bond market includes two distinct phases. In the first phase, GSE bond dealer banks may permissibly work together as a syndicate to place the GSE bonds with a bulk buyer in the primary market. In the second phase, the bonds are free to trade, and banks at that point are competing to transact in GSE bonds in the secondary market. This structure presents an unusual sequence of events. Banks that were previously working jointly as part of a syndicate may act as both counterparties and competitors once bonds are free to trade. Indeed, the "traders who participated in the GSE Bond auctions and primary market syndication are the same ones responsible for selling those GSE Bonds to investors in the secondary market after they are marked FTT."[21] Accordingly, it is important to recognize the possibility that anticompetitive coordination could occur after the syndicate phase concludes; and the quick change from "syndicate to FTT" once the primary GSE bond issuance is complete can create an atypical challenge for antitrust compliance that training and communications-related controls should account for.

By way of example, the Complaint alleged anticompetitive conduct involved agreements on price after the syndicate phase ended:

**January 18, 2012:**

Trader #1: FTT at 99.90?

Trader #2: how about $35mm of the 2.25 and $50mm of the 2.75?

Trader #2: That way, we each take $50mm 2.25y and $143mm 2.75y?

Trader #1: ok

—

Trader #3: where are we going out on these bonds? 99.90? just want to make sure everyone's cool w/that

Trader #1: Yes, 99.90

Trader #2: 99.90 on everything

Trader #3: Thx[22]

**February 17, 2012:**

Trader #1: how are you guys doing? We have 100mm left

Trader #2: 150mm left

Trader #3: I'd say free it up given the cheapening trend of FHLB

Trader #3: $140mm left

Trader #2: I just don't want to create a race to the bottom between the 3 of us, doesnt help anyone

—

Trader #1: go out ftt 99.985?

Trader #3: Good by me

Trader #2: sure ftt at 99.985[23]

**April 19, 2012:**

Trader #1: mind if we just free them to 99.925 and wake some people up

Trader #2: sure

Trader #3: I'm ok with that[24]

---

20  *Id.* ¶ 136.
21  *Id.* ¶ 130.
22  *Id.* ¶ 159.
23  *Id.* ¶ 149.
24  *Id.* ¶ 165.

**July 17, 2012:**

Trader #1: we were 99.875 yesterday right?

Trader #2: correct.

Trader #1: cool.

Trader #2: you guys all cool w/ that?

——

Trader #1: yes sir.

Trader #3: our live mark right now is 99.66.

Trader #2: I know we're FTT, and anyone can hit any bid, but given that it's day #2 w/ these bonds, figure maybe we at least try and stay on the same page…[25]

In light of this, the Pennsylvania Treasury sought to inform and enhance the Banks' antitrust compliance programs and practices through the meet-and-confer process as part of the settlement agreements in order to mitigate the risk of future anticompetitive conduct by promoting sound practices and encouraging best practices that prevent and detect potentially violative activities. Through the meet-and-confers, the Pennsylvania Treasury, along with the Review Team, discussed with the Banks key attributes of effective antitrust compliance and best practices for well-designed and operationally-effective compliance programs, as described in more detail in Parts V and VI of this Final Report.

## THE PENNSYLVANIA TREASURY'S INTEREST

The Pennsylvania Treasury has a vital interest in the operation and integrity of the GSE bond market. The Commonwealth of Pennsylvania, like many states, local governments, school districts, regional agencies, and similar public-sector institutions, is a significant holder of GSE bonds, in part because of legal limitations on permitted investments. The investment authority of most Pennsylvania public institutions, like municipal governments, school districts, and local agencies, is statutorily restricted to permit only low-risk financial products. These restrictions often explicitly identify GSE bonds as among a constrained set of permissible investments.[26] Pennsylvania is not unique in this regard; similar statutory restrictions that list GSE bonds as permissible investments limit other states and localities.[27]

Given investment limitations, the GSE bond market is, on a relative basis, even more consequential to the Commonwealth because the Commonwealth has fewer alternatives to investing in GSE bonds. Holding GSE bonds offers additional practical benefits in low interest rate environments because of the additional yield that can help support a jurisdiction's funding needs. Accordingly, as the entity that oversees all Commonwealth funds, allegations of market manipulation in GSE bonds are of tremendous concern to the Pennsylvania Treasury. Anticompetitive conduct would affect the returns the Commonwealth earns on a sizable portion of its investment holdings, financial returns that support important activities and commitments of the Commonwealth. The Complaint put it this way:

---

25  *Id.* ¶ 151.

26  *See, e.g.*, 53 P.S. § 5410.1 (restricting investment authority of public corporations and municipal authorities to limited list of approved financial products, including "obligations…of any…United States government-sponsored enterprise…"); 55 P.S. § 697.9 (restricting investment authority of the Philadelphia Regional Port Authority to limited list of approved financial products, including Freddie Mac and Fannie Mae); 64 Pa.C.S.A. § 6012 (restricting investment authority of the Pennsylvania Convention Center Authority to include "obligations of" Freddie Mac and Fannie Mae); 24 P.S. § 4-440.1 (restricting investment authority of public school districts to include "short-term obligations of the United States Government or its agencies or instrumentalities"); 16 P.S. § 2399.13 (restricting investment authority of Third Class County convention centers to include obligation issued by Freddie Mac and Fannie Mae); 53 Pa.C.S.A. § 5510.1 (restricting the investment authority of municipal parking authorities to include FFCB, FHLB, and Fannie Mae); 74 Pa.C.S.A. § 1761 (restricting the investment authority of municipal transportation authorities to include FFCB, FHLB, and Fannie Mae); 55 P.S. § 698.29 (restricting the investment authority of the Port of Pittsburgh to include FHLB and Fannie Mae); and 7 P.S. § 6020-162 (applicable to pre-2013 transactions and proceedings; restricting the investment authority of state savings associations to include Fannie Mae and FHLB).

27  *See, e.g.*, Ala. Code § 45-37A-51.137(c) (Birmingham Retirement and Relief System); Alaska Stat. § 06.45.060(a) (credit unions); Ariz. Rev. Stat. § 35-323(A) (public funds); Ark. Code § 19-1-504 (public funds); Cal. Gov. Code § 16430 (surplus state funds); Colo. Rev. Stat. § 24-75-601.1(1)(b)(I) (public funds); Conn. Gen. Stat. § 7-400(1)(A) (municipal funds); Del. Code tit. 5, § 910 (bank or trust company); D.C. Code § 47-351.03(c) (District funds); Fla. Stat. § 17.57(2) (state funds); Ga. Code § 50-17-63(b) (general fund); Haw. Rev. Stat. § 36-21(a)(2),(4)-(6) (state funds); Idaho Code § 50-1013(h) (municipal corporations); 30 Ill. Comp. Stat. Ann. § 5-13-9-2(a)(2)(A)-(C) (public funds); Iowa Code § 261A.19 (Higher Education Loan Authority); Kan. Stat. Ann. § 75-4209 (state funds); Ky. Rev. Stat. § 42.500 (excess funds in State Treasury); La. Rev. Stat. § 33:2955 (state political subdivisions); Me. Rev. Stat. tit. 5, § 135 (state funds); Md. Code Ann., State Fin. & Proc. § 6-222 (state funds); Mass. Ann. Laws ch. 29, § 49 (sinking fund); Mich. Comp. Laws § 38.1137 (retirement funds); Minn. Stat. Ann. § 11A.24 (pension funds); Miss. Code § 27-105-33(d)(iii) (state funds); Mo. Rev. Stat. § 369.219(2) (savings and loan associations); Mont. Code § 7-6-202(1)(c) (local government public money); Neb. Rev. Stat. § 8-320(2) (reserve funds); Nev. Rev. Stat. Ann. § 355.060(2)(b) (State Permanent School Fund); N.H. Rev. Stat. § 402:28(I)(b)(7), (9) (domestic insurance companies); N.M. Stat. § 6-10-10(F)(2) (public money); N.Y. State Fin. Law § 98(3-a) (state funds); N.C. Gen. Stat. § 147-69.1(c)(2) (General Fund, Highway Fund, and Highway Trust Fund); N.D. Cent. Code § 40-36-13(3) (proceeds of refunding bonds); Ohio Rev. Code § 135.14(B)(2) (political subdivision interim moneys); Okla. Stat. tit. 6, § 806(E)(8), (11) (banks); Or. Rev. Stat. § 733.650(8) (insurance); R.I. Gen. Laws § 27-41-12(1)(ii) (health maintenance organizations); S.C. Code § 6-5-10(a)(2) (state political subdivision funds); S.D. Codified Laws § 51A-4-26 (banks); Tenn. Code § 9-4-602 (state funds); Tex. Fin. Code § 184.101(d)(5)–(6) (state trust companies); Utah Code § 51-7-11(3)(b)(ii), (c)(ii), (h)(i)(C)-(D) (public funds); Va. Code § 6.2-1186(A)(5), (9) (assets of state savings institutions); Vt. Stat. tit. 8, § 3461c(1)(B) (insurance); Wash. Rev. Code § 43.84.080 (excess state funds); W. Va. Code § 12-6C-9(e) (state funds); Wis. Stat. § 220.0405(7)(k) (universal banks); and Wyo. Stat. § 9-4-831 (public funds).



19. The Treasurer's powers and responsibilities are both inherent to the office and statutorily derived. Among these duties, the State Treasurer is the sole and exclusive statutory custodian of virtually all state agency funds ("Commonwealth Funds"), with a fiduciary obligation to safeguard and protect all Commonwealth assets within his custodial care. To this end, all Commonwealth agencies are obligated to deposit Commonwealth moneys as directed by the Treasurer. Commonwealth Funds total more than $100 billion and include the Public School Employees' Retirement System, the State Employees' Retirement System, the Pennsylvania Municipal Retirement System, the State Workers' Insurance Fund, and the Workers' Compensation Security Fund. These funds serve as safety nets for thousands of Pennsylvania teachers, police officers, state agency employees, and others.

20. Due to their perceived safety and high credit quality, GSE Bonds have been a key component of Commonwealth Fund investments for many years. Commonwealth Funds transacted in more than $63 billion in GSE Bonds during the Class Period.

21. In addition to his custodial role, the Treasurer has independent investment management authority over approximately $19.5 billion in Commonwealth Funds, including Long-term Investment Pool 198, Short-term Investment Pool 99, and the Tuition Account Program, among others. Accordingly, the Treasurer has standing to pursue the claims at issue here on behalf of all Commonwealth Funds. He serves as a party here in his official capacity.[28]

As class representative, the Pennsylvania Treasury oversaw the crafting of the settlement agreements reached with the Banks in the GSE Bonds Litigation and actively participated throughout the entirety of the meet-and-confer process. Under the settlements, each Bank that continued to maintain a GSE bond desk engaging in GSE bond transactions was required to meet-and-confer with the Pennsylvania Treasury and its representative regarding such Bank's antitrust compliance program and antitrust compliance best practices periodically for a 24-month period. This meet-and-confer obligation under the settlements reflects the Pennsylvania Treasury's emphasis on efforts to prevent and detect anticompetitive behavior that adversely affect the holders of GSE bonds, like the Pennsylvania Treasury and other states, municipalities, and instrumentalities.

---

28 Third Am. Compl. ¶¶ 19–21.

# IV.  In re GSE Bonds Antitrust Litigation

## THE LAWSUIT

The plaintiffs sued in the Southern District of New York on February 22, 2019, alleging that the dealer banks agreed to fix GSE bond prices in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The plaintiffs comprised a public pension fund, a benefit retirement plan, a health plan, and the Pennsylvania Treasury, suing on behalf of a class of investors. Alleging that they "were overcharged each time they purchased GSE Bonds from Defendants and underpaid each time they sold GSE Bonds to Defendants,"[29] the plaintiffs sought both damages and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Further detail of the underlying litigation can be found in the Initial Report.[30] Between August and December 2019, the Banks reached settlement agreements with the plaintiffs:[31] Deutsche Bank ($15 million);[32] First Tennessee Bank and FTN Financial Securities ($14.5 million);[33] Goldman Sachs ($20 million);[34] Barclays ($87 million);[35] and the remaining Banks ("Group Settling Defendants") ($250 million).[36]

As part of their settlement agreements, the Banks agreed to meet-and-confer with plaintiffs and a representative of the Pennsylvania Treasury on a periodic basis to discuss their ongoing antitrust compliance policies, procedures, and controls applicable to the GSE bond market, and to cooperate with plaintiffs to evaluate antitrust compliance best practices in the GSE bond market.[37]

The Court approved all five settlements in an Order dated June 16, 2020.[38] In total, the Banks paid more than $386 million via settlement agreements and attorneys' fees, as well as their commitment of time and effort in response to the litigation.[39]

## COMPLIANCE AND REMEDIATION MEASURES

As the Initial Report underscored, compliance is imperative to the proper functioning of the market and the integrity of the financial industry. The US Department of Justice ("DOJ") Antitrust Division explains that:

> Antitrust compliance programs promote vigorous competition in a free market economy by creating a culture of good corporate citizenship within a company that seeks to prevent antitrust violations. Although an antitrust compliance program may not prevent every violation, an effective compliance program should be able to detect and address potential antitrust violations. Moreover, effective antitrust compliance programs not only prevent, detect, and address antitrust violations, they also further remedial efforts and help foster corporate and individual accountability by facilitating a corporation's prompt self-reporting and timely and thorough cooperation in…investigations.[40]

The settlement agreements entered into in the GSE Bonds Litigation evince this sentiment. In addition to the financial portion of the settlements, as explained above, each Bank agreed to comport with important compliance measures intended to ensure that it has an effective antitrust

---

29  *Id.* ¶ 262.

30  *See* Initial Report at 11–16.

31  *See id.* at 13–16 for further detail on the settlements.

32  Deutsche Bank Settlement at 1, 21, 54, (Sept. 11, 2019), ECF No. 257-1. Under the Settlement Agreement, Deutsche Bank's meet-and-confer commitment was for a period of 24 months. Deutsche Bank did not participate in a third or fourth meet-and-confer, as the Review Team was informed that Deutsche Bank claimed to have completed its meet-and-confer obligation under its settlement agreement as of August 21, 2021.

33  First Horizon Settlement ¶¶19, 52, (Sept. 24, 2019), ECF No. 267-1. In February 2022, TD Bank Group announced its acquisition of First Horizon ("FHN"). *See* First Horizon Corp., Regulation FD Disclosure (Form 8-K) (Feb. 28, 2022). Due to TD's proposed acquisition of FHN, the Review Team did not conduct further meet-and-confers with FHN. It was reported in May 2023 that TD and FHN had agreed to terminate the transaction. *See* Vipal Monga & Adriano Marchese, [Toronto-Dominion Bank, First Horizon Call Off Merger](#), Wall St. J. (May 4, 2023).

34  Goldman Sachs Settlement ¶19, (Nov. 14, 2019), ECF No. 318-1.

35  Barclays Settlement ¶¶ 19, 52, (Dec. 16, 2019), ECF No. 343-1.

36  Group Settlement ¶55, (Dec. 16, 2019), ECF No. 343-2. The Group Settling Defendants included: BNP Paribas Securities Corp.; Cantor Fitzgerald & Co.; Citigroup Global Markets Inc.; Credit Suisse Securities (USA) LLC; HSBC Securities (USA) Inc.; J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Inc.; Morgan Stanley & Co. LLC; Nomura Securities International, Inc.; SG Americas Securities, LLC; TD Securities (USA) LLC; and UBS Securities LLC.

37  *See, e.g., id.* ¶ 19.

38  Order, (June 16, 2020), ECF No. 430.

39  In addition, the Banks are under investigation by the US Department of Justice. *See* David McLaughlin & Tom Schoenberg, [US Opens Criminal Probe Into Trading in Fannie, Freddie Bonds](#), Bloomberg (June 1, 2018).

40  US Dept. of Justice, Antitrust Division, [Evaluation of Corporate Compliance Programs in Criminal Antitrust Investigations](#), at 1 (July 2019), (hereinafter, "Guidelines").



compliance program in place.[41] Each Bank agreed to maintain an antitrust compliance program that is "reasonably designed to detect and prevent anticompetitive conduct" in the GSE bond market as long as the Bank operates in that market.[42] "Reasonably designed" is determined, at least in part, with reference to key antitrust compliance principles described in each settlement, as explained below in Part V. It is axiomatic that a program prioritize preventing antitrust violations before they occur and detecting them if they do occur. While no program can provide an absolute guarantee against non-compliance, a "critical factor[] in evaluating any program [is] whether the program is adequately designed for maximum effectiveness in preventing and detecting wrongdoing by employees."[43]

As mentioned above, as part of the Banks' settlement agreements, each of the Banks was required to "meet-and-confer" with the plaintiffs and a representative of the Pennsylvania Treasury on a semi-annual basis for a 24-month period to evaluate such Bank's antitrust compliance program with the goal of reducing the potential for anticompetitive conduct like that alleged in the Complaint; for Barclays, the meet-and-confer obligation was annual.[44]

---

41  *See* settlement agreements with Deutsche Bank ¶ 19, (Sept. 11, 2019), ECF No. 257-1; First Horizon ¶ 18, (Sept. 24, 2019), ECF No. 267-1; Goldman Sachs ¶18, (Nov. 14, 2019), ECF No. 318-1; Barclays ¶ 18, (Dec. 16, 2019), ECF No. 343-1; and Group Settling Defendants ¶ 17, (Dec. 16, 2019), ECF No. 343-2.

42  *See* settlement agreements with Deutsche Bank ¶¶ 19–20; First Horizon ¶¶ 18–19; Goldman Sachs ¶¶ 18–19; Barclays ¶¶ 18–19; and Group Settling Defendants ¶¶ 17–19.

43  *See* Guidelines at 3.

44  *See* settlement agreements with Deutsche Bank ¶ 21; First Horizon ¶ 19; Goldman Sachs ¶ 19; Barclays ¶ 19; and Group Settling Defendants ¶ 19.

# V. The Value of Effective Antitrust Compliance Programs

## RISK MANAGEMENT AND COMPLIANCE GUIDANCE

Enterprise risk management focuses on a broad range of risks that could impact a business. These risks are sometimes categorized as, among other categories, conduct risk, operational risk, and financial risk. Compliance shortcomings can manifest in all of these and additional respects. A compliance problem, such as an antitrust violation, may be rooted in misconduct (e.g., price collusion) that, in turn, leads to financial sanctions and impacts how the business is structured and run, as well as harms its reputation. This is why the DOJ and regulators stress that compliance is the responsibility of all three lines of defense, including the business (i.e., the first line), and why effective compliance programs leverage all three lines in allocating risk-related roles and responsibilities. And given the potential magnitude of the consequences when there is a violation—antitrust or otherwise—compliance should receive C-suite and board-level attention and prioritization. Finally, from a broader policy perspective for the GSE bond market, compliance is imperative to the proper functioning of the market and the integrity of the financial industry.

The Initial Report describes various views that reflect this sentiment and provide guidance regarding the components of effective antitrust compliance programs, including antitrust compliance principles articulated in the Banks' settlement agreements ("Settlement Principles"), the "Compliance Program for Financial Institutions in the GSE Bond Market" attached as Exhibit C to the settlement agreement for the Group Settling Defendants ("Exhibit C Program"), and the DOJ Antitrust Division's "Evaluation of Corporate Compliance Programs in Criminal Antitrust Investigations" published in 2019 ("DOJ Antitrust Guidelines").[45] These documents are complementary, addressing common themes and features that set the stage for effective antitrust compliance with an eye on best practices. As indicated in the Initial Report and in this Final Report, the Review Team's approach to the meet-and-confers was informed by the Settlement Principles, the Exhibit C

Program, and the DOJ Antitrust Guidelines—mindful that there is no one-size-fits-all approach that is optimal for every organization in every instance, and that it is prudent to allow organizations flexibility to tailor a compliance program that best fits that organization's business, structure, risks, governance, and the like.

**Settlement Principles:** Each Bank agreed that as long as it operated a GSE desk, it would maintain an effective antitrust compliance program that is "reasonably designed to detect and prevent anticompetitive conduct" in the GSE bond market.[46] "Reasonably designed" is determined, at least in part, with reference to key antitrust compliance principles described in each settlement as "important criteria for an effective multi-factor approach to preventing and detecting anticompetitive conduct."[47] The Settlement Principles encompass:

- Rigorous training so employees and management understand their antitrust compliance obligations;
- A culture of compliance that is supported from the top down;
- Strong oversight of compliance measures, including through periodic reviews, monitoring, testing, and auditing;
- Dedicated resources, such as responsible attorneys and compliance professionals, who support the antitrust compliance program; and
- Periodic gap assessments to promote continuous improvement.[48]

This collection of attributes of sound compliance recognizes that individuals need to be aware of the "dos" and "don'ts" to avoid antitrust violations, and that it is also necessary to ensure that a firm's compliance infrastructure—from the engagement of its legal and compliance functions, to how the firm tests to ensure that controls are being adhered to, to reviewing and updating elements of the antitrust compliance program to address new risks—are applied so that the compliance program operates effectively in practice and is not only well-designed on paper.

---

45  *See* Initial Report at 18–24.

46  *See* settlement agreements with Deutsche Bank ¶¶ 19–20; First Horizon ¶¶ 18–19; Goldman Sachs ¶¶ 18–19; Barclays ¶¶ 18–19; and Group Settling Defendants ¶¶ 17–19.

47  *See* settlement agreements with Deutsche Bank ¶ 19; First Horizon ¶ 18; Goldman Sachs ¶ 18; Barclays ¶ 18; and Group Settling Defendants ¶ 17. The Barclays settlement states "multi-factor, risk-based approach." Barclays ¶ 18.

48  *See* Initial Report at 19–21; *see also* Group Stipulation and Agreement of Settlement ¶ 17, (Dec. 16, 2019), ECF No. 343-2.

**Exhibit C Program:** The Exhibit C Program attached to the settlement agreement for the Group Settling Defendants sets forth "commonly accepted industry practices and United States Department of Justice guidance that define the high-level components and sub-components that should be included in an effective compliance program."[49] The Exhibit C Program largely amplifies the antitrust compliance Settlement Principles mentioned above and is organized around the following core elements:

- Effective governance;
- A culture of compliance;
- Mechanisms of accountability;
- Clear escalation and whistleblowing channels;
- The role of the Chief Compliance Officer;
- Putting in place internal controls that provide for adequate risk assessment and monitoring/assurance;
- Change management processes that promote sustainability and continuous improvement;
- Effective training on compliance obligations; and
- Independent testing.

These particular elements build off the general "Three Lines of Defense" framework that the Exhibit C Program recognizes as "generally accepted."[50] The Exhibit C Program emphasizes that its guidelines should be "tailored to the specific size, products and services, geographic distribution and business model of a particular financial institution."[51]

**DOJ Antitrust Guidelines:** The DOJ Antitrust Guidelines discuss the DOJ Antitrust Division's approach to evaluating a corporate antitrust compliance program, underscoring the following components of sound compliance:

(1) the design and comprehensiveness of the program; (2) the culture of compliance within the company; (3) responsibility for, and resources dedicated to, antitrust compliance; (4) antitrust risk assessment techniques; (5) compliance training and communication to employees;

(6) monitoring and auditing techniques, including continued review, evaluation, and revision of the antitrust compliance program; (7) reporting mechanisms; (8) compliance incentives and discipline; and (9) remediation methods.[52]

As with the Settlement Principles and the Exhibit C Program, the DOJ Antitrust Guidelines are rooted in recognizing the importance of both preventative and detective controls, along with a commitment to compliance that manifests itself in a company's efforts to self-assess the effectiveness of its own compliance and to take steps to continuously improve.

## THE ROLE OF GOVERNMENTAL BODIES

The DOJ's Antitrust Division focuses on enforcing the antitrust laws, including those statutes that were part of the GSE Bonds Litigation. The US Securities and Exchange Commission ("SEC") has responsibility for shaping, administering, and enforcing federal securities regulation; and while that does not include responsibility for or jurisdiction over antitrust, the SEC does consider, in fulfilling its obligations as a capital markets regulator, impacts on competition and efficiency in our financial markets.

Over the past several years, the DOJ Antitrust Division has enhanced its focus on compliance programs to prevent anticompetitive behavior "before it starts."[53] The DOJ has emphasized the importance of compliance programs, not only as a means to prevent criminal antitrust violations by companies and their employees, but also as a way to provide companies with greater opportunities for leniency on criminal fines and penalties.[54] By way of illustration, the Antitrust Division highlighted the compliance efforts of one corporate defendant describing it as a "comprehensive and innovative compliance policy" that was implemented in the wake of its antitrust violation.[55] The policy required training of senior management and all sales personnel, including one-on-one training for those with jobs that are at a high risk of antitrust crimes. Training effectiveness was

---

49 Group Stipulation and Agreement of Settlement, Ex. C at 2.

50 *Id.* at 3.

51 *Id.* at 2. Although the individual settling defendants' agreements do not contain the Exhibit C Program as such, the "gap" or "risk" assessment principle in each contemplates that the relevant settling Bank will periodically assess its antitrust compliance program and ensure it is "consistent with industry best practice." *See* settlement agreements with Deutsche Bank ¶ 19, (Sept. 11, 2019), ECF No. 257-1; First Horizon ¶ 18, (Sept. 24, 2019), ECF No. 267-1; Goldman Sachs ¶ 18, (Nov. 14, 2019), ECF No. 318-1; and Barclays ¶ 18, (Dec. 16, 2019), ECF No. 343-1.

52 Guidelines at 3–4.

53 Brent Snyder, Deputy Assistant Attorney General, Compliance is a Culture, Not Just a Policy, DOJ Antitrust Division (Sept. 9, 2014).

54 *Id.*

55 *United States v. KYB Corp.*, 1:15-cr-00098 (S.D. Ohio Oct. 5, 2015), ECF No. 21.

tested both before and after training. The policy featured strong oversight by requiring prior approval and reporting of all competitor contact. Reports were reviewed by in-house counsel. The program also featured an anonymous hotline. These efforts, according to the DOJ, reflected senior management's prerogative to "set the tone at the top and made compliance with antitrust laws a true corporate priority."[56]

In June 2020, the DOJ and the SEC released a "Memorandum of Understanding" ("MOU") between them describing their commitment to "cooperation with respect to promoting competitive conditions in the securities industry."[57] The DOJ and the SEC agreed to confer at least bi-annually to discuss and review "law enforcement and regulatory matters related to competitive conditions in securities markets" in order to share information, increase their understanding of the issues, and improve their effectiveness in carrying out each of their respective responsibilities.[58]

As referenced above, the DOJ Antitrust Guidelines describe several key elements of an effective antitrust compliance program, mindful that no one-size-fits-all. The DOJ Antitrust Guidelines also discuss the Antitrust Division's evaluation of a corporate antitrust compliance program when considering whether to bring criminal charges against a corporation, including core questions the Antitrust Division asks to frame its evaluation and elements of an effective compliance program. The Guidelines explain that the "Justice Manual asks prosecutors to consider three 'fundamental' questions in their evaluation:

1. Is the corporation's compliance program well designed?

2. Is the program being applied earnestly and in good faith?

3. Does the corporation's compliance program work?"[59]

In addition, the DOJ Antitrust Guidelines include in-depth questions prosecutors may consider as they evaluate a compliance program. Such questions include, "What is the format of the antitrust compliance program? Is it in writing?" and "In what specific ways are antitrust compliance policies and procedures reinforced through the company's internal controls?"[60] Examples of other questions are, "How has the company communicated its antitrust policies and procedures to all employees?" and "What methods does the company use to evaluate the effectiveness of its antitrust compliance program?"[61]



---

56  *Id.*

57  DOJ Antitrust Division & SEC, Mem. of Understanding (June 22, 2020).

58  *Id.* at 1.

59  *See* Guidelines at 2, citing Justice Manual § 9-28.800.

60  *Id.* at 4.

61  *Id.* at 8, 10.

# VI. Effective Antitrust Compliance and Best Practice Considerations

In the Review Team's opinion, the goal of the meet-and-confer process to promote antitrust compliance was achieved. The Banks and their counsel cooperated in terms of the materials that the Banks provided to the Review Team for review and analysis,[62] the tone and tenor of the Banks' engagement with the Review Team, and the substantive nature of the discussions in each of the meet-and-confers.[63] The Review Team was encouraged by the enhancements and continuous improvements that the Banks explained they had made or were considering adding to their compliance programs and by the seriousness with which those the Review Team interacted appeared to take antitrust compliance. The meet-and-confer construct, while not an audit, afforded ample opportunity for the Review Team to engage with the Banks regarding perspectives on effective antitrust compliance, including rigorous discussion of, and reflection on, antitrust compliance best practices.

When a firm suffers an antitrust compliance problem, it can pose serious financial, operational, and reputational risks. Consequently, a commitment to building and maintaining an effective antitrust compliance program that prevents anticompetitive conduct and detects it if it occurs is essential for a business. It is also vital as a matter of public policy because society benefits from competitive markets—hence the core justification for the antitrust laws. With this in mind, the following describes the Review Team's conclusions relating to key best practice considerations on which the Review Team engaged with the Banks throughout the meet-and-confer process, including as applied to the particular features and attributes of each Bank's antitrust compliance program.[64] In the Review Team's view, these best practices incorporate and build on the DOJ Antitrust Guidelines, as well as the Exhibit C Program and the Settlement Principles.

## Compliance Infrastructure

Compliance should be promoted when a firm's antitrust compliance program is effectively integrated into the firm's overall compliance infrastructure (e.g., first, second, and third lines of defense philosophy; risk assessments; training frameworks; policy and procedure updates; periodic reviews and testing of control design and operating effectiveness; governance and oversight; internal audit; etc.) and when antitrust is identified as a specific risk on which to focus. This helps ensure that antitrust risk receives appropriate prioritization and attention, as well as being embedded into more general risk categories (e.g., conduct risk and operational risk). Among other things, integration like this helps buttress accountability, sustainability, and continuous improvement. For example, a periodic risk assessment might discern that employees are communicating using different devices and over different channels than in the past and that, as a result, communications policies and procedures, as well as training and surveillance tools, should be updated to respond to the way communication may have changed over time. As an overarching matter, compliance programs—indeed, risk management more generally—should increasingly use data and technology as a means of assessing risks, both real-time and periodically, preventing and detecting wrongdoing, and mitigating a wide range of other risks to the enterprise. Data and artificial intelligence, for example, may spot patterns, correlations, changes, and anomalies—whether in individual behavior, pricing, quantity, market share, etc.—indicative of a rising risk or violation that a human could not easily identify.

## Policies and Procedures

Policies and procedures are central to creating the processes, practices, oversight, and discipline that facilitate

---

62 Deutsche Bank only engaged in the first two rounds of meet-and-confers. *See supra* note 32.

63 *See* Appendix A for a summary of the meet-and-confer process, including the Review Team's engagement with the Banks regarding the features that make for a sound antitrust compliance program.

64 The conclusions herein are aggregated, generalized, and organized around strategic antitrust compliance principles, processes, and practices that the Review Team assembled based on various guidance, including the Banks' settlement agreements, the DOJ Antitrust Guidelines, and Exhibit C of the Group Settlement Agreement, as well as the collective experience of the Review Team. The manner in which a particular best practice consideration applies to a particular Bank could differ as Banks may address elements and aspects of compliance and related control objectives differently. As is explained in the Final Report, the Review Team and each Bank engaged in detailed discussions regarding best practices and the specifics of each Bank's antitrust compliance program throughout the meet-and-confers.

The best practices discussion contained in this Final Report is intended to assist in evaluating antitrust compliance in the GSE bond market and should be read in conjunction with the Preliminary Observations in Appendix A of the Initial Report, attached as Exhibit 1 to this Final Report. The Review Team's Final Observations and best practice considerations in this Final Report highlight select best practices and indications of an effective antitrust compliance program, but do not and are not intended to communicate required components for a compliance program to be reasonably designed to detect and prevent anticompetitive conduct or reflect any determinations relating to the appropriate application of specific antitrust best practices in each-and-every situation.

There is more than one way to structure and implement an effective antitrust compliance program, including one that accounts for best practices, and it is appropriate and recommended for a Bank to tailor its compliance program to its particular facts and circumstances. As a result, one can expect that the design and implementation of an antitrust compliance program will vary from Bank-to-Bank. The absence of a particular component does not necessarily suggest that a compliance program is inadequate or ineffective.

compliance, particularly given that anticompetitive conduct, when and if it occurs, generally depends on how people act and communicate. It is axiomatic that policies and procedures should have the appropriate coverage and content, in that they should, among other things, address a wide range of behaviors, anticipate how violations might occur, engage the first line of defense (i.e., the business), be understandable by the intended audiences, and be reviewed from time-to-time to ensure they are and remain effective in both their design and operation. They also should instruct individuals to ask questions of compliance, legal, or supervisors if they are unsure about anything so as to avoid even the appearance of engaging in anticompetitive conduct. Part-and-parcel of these and other attributes of sound policies and procedures, it is best when policies and procedures are "brought to life" by FAQs, hypotheticals, illustrative "dos and don'ts," or other tools and techniques in an effort to heighten their salience, understandability, and beneficial practical effect. It is important for individuals, based on their day-to-day roles and responsibilities, to appreciate how a policy or procedure applies to them and for individuals to be alert to the kinds of situations—some of which may be subtle and unexpected—that, if not handled correctly, could create legal and compliance challenges, or at least the appearance of such. For example, syndications like those used to bring GSE bonds to market can present antitrust risks that should be addressed by policies and procedures, bolstered by training, to provide guidance to traders so they understand that coordination with competitors must end once the syndicate terminates and the bonds go free to trade.

## Training

Effective training helps individuals steer clear of violative conduct—whether of legal and regulatory requirements or firm policies and procedures—by informing them of what is and what is not appropriate behavior. This is so whether the behavior is engaged in directly by people, or involves the use of technology. Indeed, the development and deployment of technology applications, like algorithms and artificial intelligence, have received increasing attention by antitrust authorities. In addition to covering the right topics (such as when an issuance begins trading following a GSE bond offering) and being administered with the appropriate frequency (which often is annual) and to the appropriate people at the company (including trading desks at financial institutions), there are other indicia of effective

training. A nuance that training should underscore is that more casual or social settings, such as dinners, industry events, and trade association gatherings, do not in any way alleviate a person's obligation to comply with the antitrust laws. Additionally, similar to the best practice for policies and procedures, training should be "brought to life" with scenarios, vignettes, case studies, and the like to help those being trained understand how best to behave in certain situations they may encounter and to heighten overall awareness and alertness. As with policies and procedures, in the GSE bond market, this may include training and guidance on how the antitrust rules may allow certain communication and cooperation as part of a syndication, while prohibiting analogous coordination with these same parties (and others) once the syndicate ends. This is more effective than training that only summarizes and describes applicable requirements. Even more impactful could be finding efficient ways of conducting interactive role-playing and, at some point, leveraging technology (e.g., metaverse and virtual/augmented reality) to recreate circumstances individuals may encounter to see how they would respond, such as the kinds of conversations that a trader may face after a GSE bond goes free to trade as compared to when the syndicate is permitted during the underwriting stage of a bond offering. Incorporating behavioral law and economics (and other learnings from psychology) into training is a more-recent training enhancement that firms should consider because it can raise awareness of how decisions might be made under different circumstances with potential compliance and ethical implications so that individuals can be alert.

In addition to a company's general antitrust training, more tailored training can provide further benefits if administered based on different roles and responsibilities, such as training supervisors regarding their antitrust-related supervisory obligations so that they can better ensure their teams comply, and training those who perform communications reviews regarding what might indicate anticompetitive behavior to support their focus on antitrust as well as financial fraud and manipulation.

When joining a company, the training a person receives should include antitrust training as a supplement to more general conduct-related training. In addition to training as part of employee onboarding, an organization should administer its antitrust training regularly enough so that individuals are kept aware of the need to avoid potential

anticompetitive behavior. If compliance issues arise or compliance testing suggests a lack of adherence, companies should consider special training reminders as part of lessons learned and to reinforce good conduct. Individuals who may actually engage with competitors as part of their job, such as GSE bond traders, may benefit from more frequent training to keep antitrust issues and concerns front-of-mind.

However the training is ultimately designed, there should be meaningful coverage of antitrust as part of a firm's training so that antitrust receives the appropriate emphasis as a priority area. It is useful if the antitrust training expressly ties back to a firm's Code of Conduct or Code of Ethics and enterprise risk management framework to underscore the firm's broader goal of ethical business and to stress the business case for steering clear of anticompetitive conduct and minimizing reputational risk. Antitrust training is likewise more effective if it makes clear that individuals are required to "raise their hand" to ask questions when they may not understand something, to report untoward conduct they observe (e.g., using the firm's whistleblower hotline), and that it might be necessary to exit certain discussions or transactions in light of antitrust considerations.

### Communications and Surveillance

To start with, firms need to determine what are (and what are not) approved methods of communicating and enforce those requirements. As to communications that do occur, robust communications policies, procedures, controls, and surveillance are significant to an effective antitrust compliance program that prevents and, if they occur, identifies inappropriate efforts to coordinate. More practically, this should translate into, among other things, surveillance tools and techniques that are designed to detect and deter anticompetitive conduct, in addition to violations outside antitrust like financial fraud and manipulation; those reviewing communications being appropriately trained and being supported with guidance on what to look for that could signal an antitrust violation; the surveillance and communications review process itself being periodically reviewed to ensure it is effective (i.e., detecting the potential misconduct it is intended to detect), with an assessment of false positives and false negatives; the consideration of risk-based reviews of certain communications to address higher-risk activities and emerging regulatory emphasis in addition to the firm's standard surveillance; the review, escalation,

and remediation workflow being well-established, documented, understood, and periodically assessed for effectiveness; and aggregate metrics/trends from communications surveillance and reviews being tracked and reported, such as to appropriate members of management and governance bodies. Furthermore, technology, such as natural language processing, allows for increasingly advanced ways of identifying indicia of misconduct in addition to lexicons.

Recent regulatory developments have underscored the need to ensure that a firm's communications-related compliance elements are sound.[65] More specifically, these regulatory developments, including the associated enforcement actions, substantiate the value of periodically reviewing the design and operating effectiveness of communications



---

65  *See generally* [SEC Charges 16 Wall Street Firms with Widespread Recordkeeping Failures](#) (Sept. 27, 2022).

controls to ensure that all the ways people communicate that need to be subject to a firm's controls are being captured, something remote working has accentuated; otherwise, key communications—such as telephone conversations and text messages—could fall outside the firm's controls, making it more difficult to prevent and detect misconduct, including antitrust violations. With respect to the GSE bond market specifically, this would be expected to include well-designed controls (and training) regarding the use and monitoring of chat rooms that syndicate members use to ensure they do not become a venue in which anticompetitive behavior occurs, along with emphasizing that only permitted devices and electronic communications channels can be used for work-related communications. In sum, communications surveillance plays a significant part in preventing and detecting anticompetitive behavior rooted in individuals' efforts to inappropriately coordinate on price or other types of collusion that the antitrust laws prohibit.

## Monitoring, Testing, and Audit/Assurance

Monitoring, testing, and audit/assurance is key to ensuring that an antitrust compliance program is effective "in practice" and not only "on paper." These are all techniques a firm deploys to assess whether personnel are complying with policies and procedures; whether supervisors are meeting their supervisory and related oversight functions to ensure their teams are in compliance; and whether controls, such as surveillance tools, are designed to identify (and are in fact identifying) the potential misconduct they are expected to identify. Both the first line of defense and the second line of defense should be actively involved in monitoring and testing to ensure that the antitrust compliance program remains designed effectively and is operating effectively. As the first line of defense, the business is closest to the day-to-day of the market, business activities, risks, and how individuals are conducting themselves, and so is uniquely positioned to express a view on the soundness of a firm's approach to promoting compliance. Compliance is an essential second line function that, because of its subject-matter expertise concerning regulatory matters and separateness from the business, offers another vital perspective in ensuring that the compliance program is reviewed for its effectiveness. Audit/assurance may be performed by a firm's in-house internal audit function and/or by an outside third party—in either case, to achieve a more independent evaluation of a compliance program's soundness. Audit/assurance as to a particular element of compliance may be more episodic,

giving priority to areas that are deemed higher-risk, such as because there have been business changes, due to findings from regulatory examinations and supervision, or in response to pronouncements from regulators and other government officials; whereas monitoring and testing occurs on a regular basis and typically has a close nexus to a firm's periodic risk assessment to ensure that controls remain fit for purpose as the risk environment evolves. When a firm's monitoring, testing, or audit/assurance processes identify a compliance shortcoming or a meaningful opportunity for continuous improvement, it is key that the firm take the appropriate next steps to remedy any issues and enhance its compliance program in light of the findings. The three lines of defense, working together, support a firm's overall risk management capabilities and function.

Relating back to the above "Compliance Infrastructure" discussion, a firm's general approach to monitoring, testing, and audit/assurance, along with its approach to periodic risk assessments, should apply to its antitrust compliance program and, of course, should be tailored to account for potential anticompetitive behavior. An example of what would be expected is at least an annual review of policies and procedures, including a firm's antitrust and communications policies and procedures, to ensure they and the practices they contemplate are up-to-date and effective in addressing the risk of anticompetitive behavior over time. From a more technical perspective, a firm should periodically assess the design of its communications surveillance, including to verify that all means and modes of communication are captured and that lexicons, natural language processing, and other surveillance techniques are appropriately capturing communications suggestive of potential anticompetitive behavior.

A distinctive aspect of this is the role of supervisors in setting the right example, and, to the extent allocated the responsibility for doing so, helping to ensure that personnel are adhering to policies and procedures. Supervisors often are assisted by individuals serving in a first-line risk/controls function, who can make a very significant contribution to underscoring the need for the business itself to emphasize compliance. Accordingly, effective monitoring, testing, and audit/assurance includes evaluation by the second and/or third lines, on a regular basis, of whether supervisors are performing their supervisory responsibilities appropriately.

## Organizational Structure

No single organizational structure is optimal in all instances. That said, it is best when all lines of defense—first, second, and third—are actively part of the antitrust compliance program because each brings a different, but complementary, vantage point. Risk management and internal controls should be integrated throughout the organizational structure. A first-line role and responsibility for the business in evaluating risks and developing and implementing controls can be uniquely constructive given the first line's closeness to day-to-day business operations and its ability not only to identify risks to the enterprise, but also to offer keen insight into the design features of controls that would be effective. Compliance requires more than the commitment of a firm's legal, compliance, and risk functions. Appropriate governance and oversight also are important. This can take the form of committees, working groups, and other similar governance bodies, all the way up to the board of directors, which are encouraged as a best practice to have an appropriate board committee that includes compliance, and enterprise risk more generally, within its scope to facilitate board-level engagement on these key items. This helps broaden the breadth of perspectives that is brought to bear, and such governance bodies can assist in promoting discipline and a culture of integrity; and they offer a path of escalation when issues need attention and resolution. Against this organizational backdrop, it can prove to be particularly consequential if there is an identifiable person or group that "owns" antitrust as a subject area so that a breadth and depth of antitrust-specific expertise and experience can be brought to bear in keeping the compliance program effective; and if an organization's structure does not practically lend itself to "ownership" as such, it is even more useful for there to be subject matter experts whose expertise and experience can motivate effective compliance and assist in evaluating best practices over time. Such an individual or group should have the authority necessary to address anticompetitive behavior and confer with the board of directors to safeguard against misconduct and promote adherence to compliance best practices.

In any organizational structure intended to address risk, the compliance function, led by the Chief Compliance Officer ("CCO"), will be instrumental. As part of their mandate to assist in the management of risk, CCOs, of course, should understand the risks associated with non-compliance, including legal, regulatory, litigation, and reputational risks. It is also important to appreciate how non-compliance can disadvantage a business more than in a legal or regulatory sense, by making it more difficult to meet strategic goals and adversely impacting financial results beyond having to pay fines and sanctions.[66] An effective compliance program is needed to prevent anticompetitive conduct and exposure to significant litigation costs, government investigations, damage to the corporate brand, distractions from running the business, constraints on operations, and the like.[67] The CCO should be empowered to address anticompetitive behavior and communicate and confer with the board of directors to safeguard against such behavior and promote adherence to compliance best practices.



---

66 As discussed above, the Banks involved in the GSE Bonds Litigation in the aggregate paid more than $386 million via settlement agreements and attorneys' fees.

67 As discussed in both the Initial Report and this Final Report, designing, implementing, and maintaining an effective compliance program involves periodic monitoring, testing, and audit/assurance. The CCO, along with the first line of defense (the business), and the third line of defense (internal audit) colleagues, plays a key role in ensuring that the compliance program is reviewed periodically, such as annually or more frequently when warranted, including audit/assurance of a firm's antitrust compliance program and related internal controls.

**Risk Assessment and Lessons Learned**

As part of ensuring that an antitrust compliance program remains effective in its design and operation over time, it is beneficial to learn from your own experiences, as well as those of others. Some of those lessons may be what has worked well (e.g., the development of analytics that identified a burgeoning risk); whereas other lessons may prompt additions to a risk assessment process and may warrant a review and, as appropriate, revision of controls, as occurred in response to the GSE Bonds Litigation. The GSE Bonds Litigation indicated particular antitrust difficulties that can arise when a syndicate premised on coordination ends and collaborators turn into competitors, and thus the need to consider that when fashioning communications-related controls and surveillance in chat rooms.

Risks and regulatory expectations are not forever static, but can change; and, accordingly, best practice compliance programs should be dynamic so that effective compliance is sustainable and opportunities to implement emerging best practices can be taken advantage of. To that end, lessons are often learned and risk profiles are often updated more informally as part of daily "business as usual" learnings and insights as marketplace and regulatory/litigation developments unfold. However, a more formalized and structured lessons learned process is a best practice that helps ensure important items are not overlooked and, when identified, are socialized in the firm and effectively feed into the antitrust compliance program and a firm's overall compliance infrastructure. One option is for the business, legal, compliance, and other stakeholders to conduct in-depth analyses of material regulatory, litigation, technology, and marketplace developments to ascertain the implications for understanding the firm's own risk profile and, to the extent that a risk exists at the firm to a greater degree than anticipated, to assess the robustness of the firm's control environment to address it.

Furthermore, messages communicated based on the lessons that are learned can further reinforce a company's culture of compliance. While it is helpful, without question, for the legal and compliance functions to communicate such messages, messaging from senior management that emphasizes the importance of compliance for the long-term success of the business can be distinctively impactful.

**Culture**

Although culture can be difficult to define with precision, culture remains consequential to driving conduct at an institution by setting the tone for what is encouraged, expected, and required, as well as what is not tolerated, thereby filling the inevitable gaps in policies, procedures, controls, training, and governance, which are inherently subject to some limitations and parameters. Codes of Conduct and Codes of Ethics are a key starting point for sending the right message; that said, such Codes should not only exist on paper, but should tangibly guide behavior. Insofar as antitrust is concerned, it is especially useful when such Codes expressly provide that anticompetitive conduct is not acceptable and that the company has an obligation to promote market integrity, with effective policies, procedures, training, controls, and governance to support that commitment.

Beyond Codes of Conduct and Codes of Ethics, ongoing messaging stressing the importance of compliance is impactful too. It can be very supportive in creating the proper tone when senior management and the business, in addition to the legal and compliance functions, engage in compliance messaging, which could take many express and implicit forms, such as general reminders and examples of good conduct, messages in response to litigation or enforcement actions that underscore how people should comport themselves and the negative impacts that can result when individuals engage in misconduct, and amplifications of existing policies and procedures to ensure they remain top of mind.

Holding people appropriately accountable, including by incorporating compliance and ethics as a routine part of performance and compensation evaluations, when they engage in wrongdoing also reflects a culture of compliance, and can incentivize individuals to steer clear of misconduct. Likewise, it is important to hold supervisors responsible for effectively performing their compliance-related supervision, which is a key part of the three-lines-of-defense approach to compliance and risk management. Firms also demonstrate a positive compliance culture when they ensure that individuals understand their responsibility to speak-up—whether via an anonymous whistleblower hotline, to their supervisor, to the legal or compliance functions, or otherwise—when they see inappropriate behavior. It is critical to bolster this with a strong anti-retaliation framework.

To evaluate how a company is measuring up to its culture standards, companies should increasingly assess how they can leverage data to develop more quantitative indicators of culture as informed by observed conduct throughout the organization. Such data can be informative for all three lines of defense, as well as for the C-suite and board of directors to assist in managing risk to the enterprise.

### Technological Advances/Emerging Risks and Capabilities

Technology is continuously advancing. As that occurs, new risks—antitrust and otherwise—can emerge. For example, antitrust authorities have been considering the potential antitrust implications of algorithms and artificial intelligence that are increasingly used by companies to inform decisions. New ways of mitigating and managing risks also can emerge because new technology can afford new tools and techniques for crafting and assessing preventative and detective controls. One area is communications surveillance; today people communicate differently than not long ago (mobile devices and chats/texts being examples), people work more virtually than previously, and more sophisticated technological means of identifying misconduct have been developed. A firm's approach to communications should account for these developments to ensure that a firm's communications-related controls cover the communications that should be covered and are monitored effectively for potentially anticompetitive behavior, leveraging new capabilities for doing so, as appropriate. A particularly cutting-edge aspect of this concerns how technology and data science can be used to identify potential violations as artificial intelligence/machine learning is increasingly deployed in business and as part of compliance and risk management efforts.

### Data

Building on the immediately preceding best practice relating to technology, data and related analytics can be instructive in revealing certain conduct that otherwise might not be as readily discernible. A compliance program should evaluate opportunities for how to effectively integrate data to help identify potential anticompetitive conduct, such as by working to determine how reasonably to detect anomalistic behavior based on trading data (e.g., outlier pricing, volume, or transaction patterns) that warrant further investigation. Data that presents a more holistic picture of employee

conduct and any attendant risks can also facilitate first-line supervision of employees generally. Integrating different types of data, rather than looking at each data set (let alone each data point) individually, can be particularly instructive when done appropriately because it offers a more complete view, although one has to be mindful that false positives and "noise" in the data can be too distracting and divert time and effort away from more productive priorities. Data is key to shaping a business's strategy and operations; analytics have become increasingly used to bolster compliance and overall enterprise risk management.

### Sustainability and Continuous Improvement

An antitrust compliance program's approach to monitoring, testing, and audit/assurance should evaluate not only whether the elements of the program are operating as intended (e.g., implemented effectively and being followed), but also whether they continue to be designed effectively over time. A compliance program can be operating as intended but nonetheless some aspect of redesign still may be warranted, say, to account for new businesses, a reorganization, new technology, new regulation, or new marketplace dynamics. For example, an antitrust violation would be expected to lead a firm to reassess the design of key elements of its antitrust program, such as its antitrust policies and procedures, training, and surveillance, to ascertain how they could be improved to better prevent and detect anticompetitive conduct going forward. Relatedly, it likely would prompt the firm to take a fresh look at its risk environment to ensure that the firm did not fail to appreciate material risks warranting further mitigation.

One specific way, among others, of promoting sustainability and continuous improvement is for a firm to periodically benchmark its antitrust compliance program against the DOJ Antitrust Guidelines to determine how the program compares in light of changes in the market, shifting regulatory expectations, evolving products, and the like.[68]

In general, periodic assessments of risk and control effectiveness should, as appropriate, focus specifically on antitrust risk and controls, along with rules and regulations, guidelines, examination and inspection findings, enforcement actions and prosecutions, and policy pronouncements issued by relevant state and federal governmental bodies. Private litigation and case law

---

68 See Guidelines, *supra* note 40.

developments also should be inputs to these periodic risk and control reviews.

As the meet-and-confers progressed to their conclusion, the Review Team gained further insight into ongoing enhancements and changes that Banks continued to make to their antitrust compliance programs throughout the duration of the meet-and-confer process (and other potential compliance program updates that remained under evaluation), in addition to changes that Banks had earlier put into place in correlation with the GSE Bonds Litigation and related settlements. The following aggregated and generalized observations recount antitrust compliance developments and approaches at Banks, whether implemented, ongoing, or under consideration. They supplement the Preliminary Observations in Appendix A of the Initial Report.[69] The manner in which a particular observation applies to a particular Bank could vary as Banks may address elements and aspects of compliance and related control objectives differently. Although they are not meant to express elements of an antitrust compliance program that must exist for effective antitrust compliance, the following, coupled with the Preliminary Observations, are consonant with efforts to implement and maintain a sound antitrust compliance program relevant to the GSE bond market that improves over time.

- Further updating and developing antitrust policies and procedures and communications policies and procedures to provide additional guidance, including in the form of more detail, scenarios, FAQs, and the like, and otherwise ensuring that relevant policies and procedures are appropriately robust in terms of their scope and coverage and are "user friendly."

- Revising Codes of Conduct and Codes of Ethics to highlight and underscore certain topics or themes or otherwise refresh them.

- Enriching antitrust training, such as by developing certain role-based training, updating the frequency with which such training is administered, adding and bolstering training topics or modules to further focus on specific risks, taking innovative and engaging approaches to "bring training to life," and incorporating improvements relating to knowledge checks.

- Enhancing communications-related training, including when it comes to permitted and non-permitted devices and means of communicating.

- Taking steps toward integrating behavioral law and economics (and other learnings from psychology) into trainings.

- Assessing effective options for antitrust training at the C-suite and board-of-directors levels.

- Integrating additional elements of electronic communications into the reviews that are conducted on a risk-basis.

- Enhancing electronic communications surveillance by adapting technological advances.

- Formalizing certain governance body remits to include antitrust.

- Bolstering human resources for additional focus on antitrust compliance.

- Exploring how best to leverage emerging technology to prevent and detect potential anticompetitive conduct.

- Considering how new uses of technology may create new risks that need to be managed effectively, thus potentially requiring revisions to elements of the antitrust compliance program.

- Assessing market trends that could introduce new risks that warrant antitrust compliance adaptations to address.

- Exploring how best to further integrate the use of data and related analytics into antitrust compliance.

The degree to which and ways in which the above best practice considerations and other features consistent with a sound antitrust compliance program apply to each Bank varies, as is to be expected since there is no one-size-fits-all application of elements of effective antitrust compliance and best practices. Moving forward, the Review Team encourages the Banks to continue to consider and evaluate the contents of this Final Report and the productive substantive discussions and engagement that the Banks and the Review Team had across the meet-and-confers in helping to ensure that their antitrust compliance programs are effective in both their design and operation over time and that opportunities to further integrate and implement best practices, which themselves can change over time, are not overlooked.

---

[69] In the Review Team's view, the Preliminary Observations identified in Appendix A of the Initial Report continue to hold as of the date of this Final Report, as the Review Team did not learn anything additional as the meet-and-confer process continued that the Review Team believes calls the Preliminary Observations into question. Appendix A of the Initial Report is attached as Exhibit 1 to this Final Report.



## VII. Conclusion

Protecting and promoting competition takes dedicated individuals and programs that effectively prevent and detect anticompetitive conduct. After conducting dozens of meetings and spending over 1,000 hours preparing for and participating in the meet-and-confer process and discussing antitrust compliance with the Banks, the Review Team optimistically emerges from this two-year process encouraged that the personnel with whom it engaged take antitrust compliance seriously. Each Bank engaged in meaningful discussions, cooperatively listening to the Review Team's tailored feedback and explaining how its program operated and, as relevant, how its program has evolved, even during the course of the meet-and-confer process itself, which underscores the value of the meet-and-confers. The meetings also provided a structure for in-depth reflection on the Settlement Principles, the Exhibit C Program, and the DOJ Antitrust Guidelines, each of which was woven into the entirety of the meet-and-confers. The 24-month commitment not only gave the Review Team, with the Pennsylvania Treasury's valuable engagement and contributions, a chance to share concrete ideas with each Bank and discuss best practices, but also opened the door to continued guidance, as the Review Team offered to be available to each Bank, as appropriate, should it be interested in further dialogue on antitrust compliance. In short, the Review Team believes that the meet-and-confer process was consequential in promoting the goal of antitrust compliance in the GSE bond market and encourages the Banks to consult this Final Report and reflect on the meet-and-confer discussions they had with the Review Team and the Pennsylvania Treasury as the Banks seek to sustain sound antitrust compliance programs going forward and continuously improve.

The Review Team will engage in any follow-up with the Pennsylvania Treasury, as appropriate, in connection with this Final Report, and otherwise considers the Review Team to have fulfilled its responsibilities under the settlement agreements.

# Appendix A – Final Observations

## I.  SUMMARY OF THE MEET-AND-CONFER PROCESS

Pursuant to settlements reached in the underlying GSE Bonds Litigation, the Banks that continued to maintain a GSE bond desk engaging in GSE bond transactions were required to meet-and-confer on a regular basis with the Pennsylvania Treasury and its representative regarding such Bank's antitrust compliance program and antitrust compliance best practices.[70] More specifically, each Bank was required to meet-and-confer on a semi-annual basis for a 24-month period, with one Bank having an annual meet-and-confer obligation.[71]

The following highlights select key actions the Review Team, as the representative of the Pennsylvania Treasury in connection with the meet-and-confer process, took since its July 2020 engagement:

| ACTION | DATE |
|---|---|
| Paredes Strategies LLC and Hunton Andrews Kurth LLP Engaged | July 2020 |
| Review Team Sends Initial Correspondence to 13 Banks | July – August 2020 |
| Review Team Holds Initial Calls with 13 Banks | September 2020 |
| Review Team Reviews Extensive Materials Provided by Banks in Advance of Meet-and-Confers | November – December 2020 |
| Review Team Conducts First Meet-and-Confers with 12 Banks[72] | November – December 2020 |
| Follow-up with Banks and Ongoing Review of Materials by Review Team | January – April 2021 |
| Review Team Conducts Second Meet-and-Confers with 12 Banks[73] | May – June 2021 |
| Ongoing Review of Materials by Review Team and Preparation of Initial Report and Preliminary Observations | June – November 2021 |
| Delivery of Initial Report and Preliminary Observations by Review Team | December 2021 |
| Review Team Prepares for and Conducts Third Meet-and-Confers with 10 Banks[74] | November – December 2021 |
| Follow-up with Banks and Ongoing Review of Materials by Review Team | January – February 2022 |
| Ongoing Review of Materials and Preparation for Fourth Meet-and-Confers by Review Team | March – April 2022 |
| Review Team Conducts Fourth Meet-and-Confers with 10 Banks[75] | May – June 2022 |
| Review of Fourth Meet-and-Confers and Preparation of Final Report | June 2022 – June 2023 |
| Delivery of Final Report by Review Team | June 2023 |

[70] The compliance provisions applied only to settling defendants that intended to remain active in the GSE bond market. *See, e.g.,* Group Settlement Agreement ¶ 18, (Dec. 16, 2019), ECF No. 343-2. HSBC, BNP Paribas, Credit Suisse, and SG Americas no longer maintain a GSE bond desk and, therefore, are not subject to the compliance provisions pursuant to the settlement. HSBC had such a desk when the Review Team conducted the first round of meet-and-confers, and thus HSBC did participate in one meet-and-confer, but HSBC shut down its GSE bond desk before the second round of meet-and-confers.

[71] *See* settlement agreements with Deutsche Bank ¶ 21, (Sept. 11, 2019), ECF No. 257-1; First Horizon ¶ 19., (Sept. 24, 2019), ECF No. 267-1; Goldman Sachs ¶ 19., (Nov. 14, 2019), ECF No. 318-1; Barclays ¶ 19, (Dec. 16, 2019), ECF No. 343-1; and Group Settling Defendants ¶ 19, (Dec. 16, 2019), ECF No. 343-2. As described in the Initial Report, the settlements varied slightly but captured substantially the same core substantive elements insofar as the meet-and-confer process is concerned. *See* Initial Report at 18.

   For Barclays, the meet-and-confer obligation was annual. *See* Barclays Settlement Agreement ¶ 19, (Dec. 16, 2019), ECF No. 343-1.

[72] Barclays did not take part in this round of meet-and-confers because its meet-and-confer obligation was annual. *Id.*

[73] This included an initial meet-and-confer with Barclays. HSBC did not take part in this round of meet-and-confers because it had stopped operating a GSE bond desk.

[74] Barclays did not take part in this round of meet-and-confers because its meet-and-confer obligation was annual. Deutsche Bank did not participate in a third or fourth meet-and-confer, as Deutsche Bank claimed to have completed its meet-and-confer obligation under its settlement agreement as of August 21, 2021.

[75] This included a second meet-and-confer with Barclays. In February 2022, TD Bank Group announced its acquisition of FHN. *See* First Horizon Corp., Regulation FD Disclosure (Form 8-K) (Feb. 28, 2022). Due to TD's proposed acquisition of FHN, the Review Team did not conduct further meet-and-confers with FHN. It was reported in May 2023 that TD and FHN had agreed to terminate the transaction. *See* Vipal Monga & Adriano Marchese, Toronto-Dominion Bank, First Horizon Call Off Merger, Wall St. J. (May 4, 2023).

The Review Team estimates that it spent approximately 1,300 hours in total reviewing materials, preparing for and conducting meet-and-confers, assessing the Banks' antitrust compliance programs, preparing the Initial Report and the Preliminary Observations, and preparing the Final Report. This time includes over 40 meet-and-confer sessions conducted between fall 2020 and spring 2022, each lasting roughly 1.5 to 2 hours, numerous follow-up discussions with several Banks, and time spent reviewing over 200 policies, procedures, Codes of Conduct, training materials, communications sent to employees, and other documents from the Banks. As of June 2022, the Review Team completed all meet-and-confers provided for in the Banks' settlement agreements.

## II.  THE REVIEW TEAM'S PLANNED OBJECTIVES

As indicated in the Initial Report and in the Final Report, the Review Team's approach to the meet-and-confers was informed by the Settlement Principles, the Exhibit C Program, and the DOJ Antitrust Guidelines—mindful that there is no one-size-fits-all approach that is optimal for every organization in every instance, and that it is prudent to allow organizations flexibility to tailor a compliance program that best fits the organization's business, structure, risks, governance, and the like. As such, the Review Team proceeded with the initial meet-and-confers with two "phases" in mind: first, the Review Team would assess the design effectiveness of each Bank's current antitrust compliance program, including its policies and procedures, internal controls, training, and culture; and

second, the Review Team planned to delve further into design effectiveness while considering how each Bank had implemented its compliance program. From the outset, the Review Team expected each phase to involve both discussions with the Banks and their counsel and the review and analysis of documents related to each Bank's compliance program, with the meet-and-confer process offering an opportunity for considerable and serious engagement around effective antitrust compliance and best practices, rather than constituting an audit of each Bank's compliance program. As described in the Initial Report, the Review Team studied discovery materials in the underlying litigation, in addition to numerous other documents, and interacted regularly throughout summer and fall of 2020 to refine a framework of priorities, themes, topics, and questions to prepare for and facilitate the meet-and-confers.

## III.  THE FIRST AND SECOND ROUNDS OF MEET-AND-CONFERS

In December 2020, the Review Team and the Pennsylvania Treasury conducted the first meet-and-confers with counsel and representatives of 12 of the 13 Banks that remained active in the GSE bond market.[76] Each Bank used the time to present on its compliance program, guided by a list of questions and topics that the Review Team sent in advance of the meet-and-confers to help focus the meet-and-confers on the most relevant items to facilitate productive discussions particularized to the components and characteristics of each Bank's compliance program. The Banks also generally took advantage of the opportunity to



---

76  As noted throughout, Barclays' settlement agreement provided for annual meet-and-confers. The Review Team agreed that the initial meet-and-confer with Barclays would be more informative and productive if it followed those of the other Banks. In addition, the Review Team held an initial meet-and-confer with HSBC in December 2020. Because HSBC informed the Pennsylvania Treasury in May 2021 that it no longer operates a GSE bond desk, the Review Team did not have additional meet-and-confers with HSBC.

submit various compliance materials to the Review Team before the meet-and-confers so that the Review Team had the opportunity to formulate an approach that would address not only sound antitrust compliance principles and best practices, but that also could be tailored to the specific policies, procedures, training, surveillance, and other features of each Bank, tracking the Settlement Principles, the Exhibit C Program, and the DOJ Antitrust Guidelines. As described in the Initial Report,[77] the first round of meet-and-confers featured interactive, robust discussion and covered a variety of topics, affording ample opportunity for the Review Team to confer with the Banks regarding perspectives on antitrust compliance best practices. The Banks were cooperative, helpful, and engaged, and the Review Team followed up with the Banks during January and February 2021 with regard to any outstanding materials and questions at that time.

In total, the Review Team held 12 first-round meet-and-confers, had six follow-up calls with Banks, and reviewed approximately 100 documents. The Review Team also held regular internal calls and discussions with the Pennsylvania Treasury throughout this time. By the end of the first round of meet-and-confers, the Review Team had spent hundreds of hours on review and assessment activities.

The second round of meet-and-confers took place in May and June 2021.[78] While the first round of meet-and-confers featured presentations by the Banks regarding their antitrust compliance programs, the second round of meet-and-confers focused on specific, tailored topics that the Review Team identified for each Bank in order to delve further into the particular elements comprising each Bank's compliance program. The Review Team sent each Bank several questions and document requests in response to what was learned during the first meet-and-confer for that Bank, intending to allow for focused, efficient, and productive discussions that could shed additional light on the effectiveness of each Bank's compliance program giving due consideration to best practices and, relatedly, continuous improvement. Once again, key personnel from the Banks attended the meet-and-confers, and the Banks were cooperative during the second meet-and-confers (or, in the case of Barclays, its first annual meet-and-confer), presenting information, addressing questions, and discussing important compliance features

and practices with the Review Team. In total, the Review Team held 12 meet-and-confers during the second round and reviewed any updated materials the Banks provided.

## IV.  THE INITIAL REPORT

After the first two rounds of meet-and-confers concluded, the Review Team analyzed what it had learned and prepared and submitted an Initial Report providing an overview of the GSE bond market and its significance, the GSE Bonds Litigation, and the various settlement agreements reached in this matter. The Initial Report also highlights important elements of effective antitrust compliance and discusses the role of the Review Team in assisting the Pennsylvania Treasury's assessment of the Banks' antitrust compliance programs as part of the settlements. After describing the first two rounds of meet-and-confers, the Initial Report provides Preliminary Observations, attached as Appendix A to the Initial Report (and as Exhibit 1 to the Final Report), which reflect the general structure and attributes of antitrust compliance programs across the Banks and categorized according to rigorous training, culture of compliance, strong oversight, dedicated resources, and gap or risk assessment. The Initial Report was submitted to the Pennsylvania Treasury on December 23, 2021, and filed as part of the Treasury's First Accounting Concerning Paredes Strategies LLC on December 28, 2021.



---

77  *See* Initial Report at 27–29.

78  The Review Team held its first annual meet-and-confer with Barclays in May 2021.

## V.  THE THIRD AND FOURTH ROUNDS OF MEET-AND-CONFERS

In fall 2021 and spring 2022, respectively, the Review Team and the Banks turned to the third and fourth rounds of meet-and-confers. Once again, the Banks that participated in these rounds and their counsel were cooperative and engaged throughout the year. And with the benefit of information and experience from a year of substantive discussions, both internally and with the Banks, along with the analysis of scores of documents and other relevant materials, the Review Team took the opportunity to refine its objectives and approach for the final two meet-and-confers, grounded in the Review Team's initial plan and what the Review Team had learned to-date as a result of the meet-and-confers.

### The Review Team's Ongoing Objectives

The Review Team approached the third and fourth rounds of meet-and-confers with granular, Bank-specific thoughts and feedback coupled with an in-depth discussion of more thematic "strategic" (to use the Review Team's phrase for ease of reference) best practice considerations to advance effective compliance generally and within the context of antitrust specifically.[79] The more detailed input the Review Team offered that was tailored specifically to each Bank's compliance program helped bring sound antitrust compliance principles, practices, and structures to life, including with practical steps to achieve strategic goals. The Review Team thought it would be of considerable benefit to provide tactical feedback to each Bank, having analyzed each Bank's compliance program, rather than speaking only in broader generalities; therefore, the Review Team developed particularized commentary that is actionable, as may be appropriate.

In advance of the meet-and-confers, the Review Team corresponded regularly throughout summer and fall of 2021 to discuss each Bank's antitrust compliance program and the hallmarks of effective antitrust compliance. The Review Team analyzed updated documents that the Banks provided, revisited materials the Banks had previously provided, identified and evaluated learnings from the first two rounds of meet-and-confers, and assessed the Banks' responses to questions that the Review Team submitted to them. Through its analysis and preparation, the Review Team developed

a framework of themes, topics, input, and questions. In particular, the Review Team assembled a non-exhaustive list of considerations organized around the following topics to help guide the discussions during the third meet-and-confers, each of which is described in more detail in the Final Report:

- Compliance Infrastructure
- Policies and Procedures
- Training
- Communications and Surveillance
- Monitoring, Testing, and Audit/Assurance
- Organizational Structure
- Risk Assessment and Lessons Learned
- Culture
- Technological Advances/Emerging Risks and Capabilities
- Data
- Sustainability and Continuous Improvement

Overall, these categories capture more granular topics and ideas that follow from the Settlement Principles, the Exhibit C Program, and the DOJ Antitrust Guidelines, along with the Review Team's own experience. They emphasize that a compliance program needs to be effective "in practice" and not only "on paper"; that it needs to be sustainable and continuously improved so it remains effective over time as new risks, markets, products, and business structures and practices take shape; that it needs to be adhered to; and that culture matters. Of course, there is no one-size-fits-all solution, but considerations related to the above topics are generally good ideas and principles to incorporate into any antitrust compliance program and are consonant with best practices.

### The Third Round of Meet-and-Confers

The Review Team set a third meet-and-confer date with each Bank that was still participating in the meet-and-confer process for November to early December 2021, and planned to discuss its strategic and tactical perspectives, organized largely around the above topics and the specifics of each Bank's respective compliance program.[80] As described more below, the Review Team prepared to engage in a substantive discussion regarding program design and structure, key elements of antitrust compliance and related best practices,

---

79  These best practices are captured in "Effective Antitrust Compliance and Best Practice Considerations," *supra* Part VI of the Final Report.

80  As noted above, Barclays did not participate in the third round because its meet-and-confer obligation was annual (not semi-annual).

and any further reflections that the Banks wanted to share. The Review Team invited the Banks to provide any updates since the second round of meet-and-confers, including any updated policies, procedures, or trainings, in order to review each Bank's most current materials. As before, the Banks generally took advantage of this opportunity, and sent various compliance materials for the Review Team's consideration before the third meet-and-confers.

Broadly, the Review Team spent the meetings discussing strategic and tactical items.[81] First, the Review Team identified and explained several best practice strategic considerations and principles that generally are characteristic of effective antitrust compliance programs. Second, the Review Team provided to each Bank specific commentary tailored to that Bank's antitrust compliance program, considering both the materials each Bank had submitted and the particular design, structure, and features of such Bank's compliance program as discussed in prior meet-and-confers. The Review Team's goal was to communicate to and discuss with each Bank the importance of key foundational elements of effective compliance and how they may be implemented in practice to achieve best practices over time. In so doing, the Review Team addressed both big-picture themes along with tactical measures, steps, and actions for the near term and for longer-term consideration going forward that were tailored for each Bank to make the meet-and-confers as salient, tangible, and relevant as possible for that Bank. The Review Team also emphasized the compliance objectives of common attributes of sound compliance programs, acknowledging that there can be multiple ways of achieving the objectives. There is not a single set of preventative and detective controls that is optimal in every circumstance.



The Review Team's commentary and engagement with the Banks and their counsel was granular; after the Review Team discussed a host of best practice considerations, the Review Team engaged with each Bank with reference to specific aspects of such Bank's compliance program so that the meet-and-confers could be actionable, as appropriate. The Review Team shared such specific perspectives with each Bank to permit a substantive discussion and to help render the meet-and-confer process more meaningful, bringing to life broader antitrust compliance principles in very concrete terms. In this sense, the Banks received feedback and input on their "living" compliance program.

The Banks and their counsel meaningfully and actively participated in the meet-and-confers and demonstrated receptivity to the Review Team's perspectives on antitrust compliance. Throughout the meet-and-confer process, the Review Team asked each Bank to make available personnel involved in antitrust compliance; and Banks included, in addition to their outside counsel, employees responsible for antitrust compliance. This meant that the Review Team was offering granular feedback and input to relevant personnel at each Bank who, it seems to the Review Team, would be able to consider the Review Team's commentary in a consequential manner and influence change, as may be appropriate. Several of those who participated in the meet-and-confers on behalf of the Banks confirmed that they "heard" the Review Team's thoughts and indicated that they would be taking the Review Team's views into account; they were engaged, signaling that they were already giving thought to certain ideas and would continue digesting the topics discussed. (This was evident during the final round of meet-and-confers as well.) Speaking with Bank personnel also allowed for fulsome and engaging discussions regarding specific elements of each Bank's compliance program, and the Banks generally asked questions and responded in real-time to some of the Review Team's observations, whether more strategic in nature or more tactical. The Review Team was encouraged by the Banks' reception to the considerations discussed and found the conversations to be impactful in meeting the objectives of the meet-and-confer process as a significant part of the settlements.

In total, the Review Team conducted 10 meet-and-confers during the third round and reviewed approximately 40 additional documents. The Review Team also held regular

81  The final meet-and-confer with Barclays covered these items as they pertain to Barclays.

internal calls and discussions with the Pennsylvania Treasury throughout this time. Following the third round, the Review Team identified both general and more Bank-specific additional information that would be helpful to review in advance of the final meet-and-confers. The Review Team followed up via letter in February 2022 requesting both materials and responses to specific questions that arose in order to make the final meet-and-confers as productive as possible for each Bank.

### The Fourth and Final Round of Meet-and-Confers

The Review Team's goal with the final meet-and-confers was four-fold.[82] First, during the fourth round of meet-and-confers, the Review Team wanted to give each Bank a chance to reflect on and react to the strategic and tactical items covered in its third meet-and-confer. The Review Team hoped to hear how the Banks had considered the prior discussions, as well as any steps that had been (or might be) taken in response. Second, as a complement to what the Review Team covered during the third meet-and-confers, the Review Team wanted to reiterate certain best practices and points worthy of additional emphasis (not to the exclusion of others raised during the third meet-and-confers). Third, the Review Team asked each Bank to address particular Bank-specific items and asked each Bank to provide and discuss any updated policies and procedures or other changes to the Bank's antitrust compliance program that were made within the past 12 months or that the Bank was considering implementing in the future. The Review Team hoped that this information would provide it a more fulsome view of how, if at all, each Bank's program had recently evolved and its continuous improvement efforts, which would allow the Review Team to share any additional perspectives and thoughts that might be useful for the Banks. Fourth, the Review Team expected to engage in an open dialogue during the final meet-and-confer regarding antitrust compliance and any additional topics each Bank wished to address with the Review Team.

The final round of meet-and-confers took place in May and June 2022. In total, the Review Team held 10 meet-and-confers in the fourth round and reviewed approximately 50 updated documents the Banks provided. As they had been throughout the entire process, the Banks, as well as their outside lawyers, were engaged and cooperative and made available Bank personnel responsible in some capacity for antitrust compliance. As before, there was valuable discussion with the Banks and their counsel across numerous aspects of antitrust compliance, including on topics that might be characterized as more emerging or cutting-edge. Each Bank participating in the final round was communicative, engaged, and, by all accounts, forthcoming in their willingness to share updated materials that the Review Team had requested. The Banks came prepared with questions and/or responses to specific comments made in the previous meeting, which permitted the Review Team and the Banks to explore strategic and tactical considerations in even greater depth. As relevant, the Banks shared updates to their compliance programs that they were considering and walked the Review Team through various changes that had already been put into effect. Other potential changes or updates were also discussed in the context of policies and procedures, training enhancement, communications surveillance, internal governance structures, accountability and discipline measures, and oversight of compliance effectiveness. Throughout the meet-and-confers, the Banks discussed various improvements that had been put into place—whether as part of or in addition to discussions with the Review Team—and their approach to planned, periodic reviews and opportunities for continuous improvement.

In sum, the Review Team was encouraged by both the breadth and depth of the meet-and-confer discussions and believes that they met the goal of the settlements by providing a framework for robust engagement regarding effective antitrust compliance and related best practices.



---

82 Because Barclays engaged in annual meet-and-confers, its "final" meet-and-confer was its second meeting with the Review Team. The Review Team, accordingly, took a hybrid approach, providing the strategic and tactical feedback that it gave during the other Banks' third meet-and-confers while reserving space for the Review Team's additional goals for the final meet-and-confers.

# Exhibit 1 – Appendix A to the Initial Report

The Pennsylvania Treasury has requested that the Review Team[1] provide a summary of preliminary observations based on having conducted two of the four rounds of meet-and-confers required by the settlement agreements entered into with the defendant banks (each a "Bank" and, collectively, the "Banks"). The preliminary observations in this Appendix A are non-exhaustive, subject to revision, and should not be interpreted as expressing a final view of any sort. These and other, more specific preliminary observations are being shared with each Bank, as appropriate, at the third meet-and-confers in November and December 2021.[2]

The preliminary observations are aggregated and organized around compliance principles and high-level components that contribute to an effective antitrust compliance program,[3] and they reflect the general structure and attributes of antitrust compliance programs across the Banks. The manner in which a particular observation applies to a particular Bank could vary as Banks may address elements and aspects of compliance and related control objectives differently, and the Review Team's understanding and perspective could change as the Review Team's work proceeds.

The preliminary observations are intended to assist in evaluating antitrust compliance in the GSE bond market. The preliminary observations do not and are not intended to communicate required components for a compliance program to be reasonably designed to detect and prevent anticompetitive conduct or reflect any determinations relating to antitrust best practices.

There is more than one way to structure and implement an effective antitrust compliance program, and it is appropriate and recommended for a Bank to tailor its compliance program to its particular facts and circumstances. As a result, one can expect variation from Bank-to-Bank insofar as the design and implementation of antitrust compliance is concerned. The absence of a particular component does not necessarily suggest that a compliance program is inadequate or ineffective.

## RIGOROUS TRAINING

- Banks incorporate antitrust principles into standard compliance training that all employees, including those that work on the GSE bond desk, receive upon joining and periodically over time.

- Banks conduct general antitrust training as well as more business- (or desk-) specific antitrust training.

- Banks have antitrust training that encompasses upper-level management employees.

- Banks track employees' attendance at trainings and discipline employees that do not attend or complete training.

- Banks held trainings in which the GSE Bonds Litigation was discussed.

- Banks revised their antitrust training to factor in the GSE Bonds Litigation.

- Banks have practices in place that allow for ad hoc antitrust training as issues arise, whether internal or external.

- Banks use both in-person and online training.

- Banks review and update their antitrust training materials periodically.

- Banks have communications-related training that covers the means and content of communications.

- Banks issue training-related reminders, alerts, and guidance to employees when there are relevant developments.

## CULTURE OF COMPLIANCE

- Banks have a Chief Compliance Officer that leads the overall compliance function that covers antitrust and the GSE bond desk.

- Banks have members of senior management and other business leaders send messages or directives to employees related to antitrust compliance, in addition to persons from legal and compliance departments sending such notices.

- Banks incorporate antitrust principles into their codes of conduct.

---

1   "Review Team" is defined in the Initial Report.

2   The second of Barclays' annual meet-and-confers will take place in spring/early summer 2022. *See* Barclays Settlement Agreement, ¶ 19.

3   For a description of the principles, see settlement agreements with Deutsche Bank, ¶ 19; Goldman Sachs, ¶ 18; First Horizon, ¶ 18; Barclays, ¶ 18; and Group Settling Defendants, ¶ 17.

- Banks have antitrust-specific policies and procedures prohibiting unlawful conduct.
- Banks have communications-related policies and procedures that govern the means and content of communications.
- Banks have mechanisms to promote discipline and accountability for non-compliance with legal and regulatory requirements as well as internal policies and procedures.
- Banks have anonymous reporting mechanisms for potential whistleblowers and other forms of escalation.
- Banks have non-retaliation policies to encourage personnel to report potential violations.

## STRONG OVERSIGHT

- Banks have compliance personnel that report directly to the CEO, other senior management, or the board of directors.
- Banks have policies, procedures, and practices in place for the periodic review of the effectiveness of components of antitrust compliance.
- Banks undertake regular monitoring and testing of antitrust compliance effectiveness.
- Banks surveil and review GSE bond desk employee communications for potential antitrust concerns, and have mechanisms that provide for escalation where appropriate.
- Banks perform trade surveillance.
- Banks have policies and procedures in place governing employee participation in external organizations and conferences as related to antitrust concerns.
- Banks have policies and procedures in place governing employee participation in multi-firm chat rooms.
- Banks have policies, procedures, and governance practices in place that provide for upper-management and board oversight of antitrust-related risks.
- Banks conduct an annual audit of compliance with GSE agreements as required by GSEs.

## DEDICATED RESOURCES

- Banks deploy a "Three Lines of Defense" framework.
- Banks have an individual or team dedicated specifically to antitrust-related issues and guidance, or Banks rely on individuals or teams within legal and compliance who, although not dedicated specifically to antitrust, have antitrust within their responsibilities.
- Banks take steps to ensure that individuals are aware of and encouraged to contact a supervisor, legal personnel, or compliance personnel if they have any questions or wish to escalate any concerns.
- Banks have compliance personnel who are physically located near the GSE bond desk.
- Banks integrate the legal and compliance functions into their antitrust compliance programs, including guidance, training, monitoring, testing, and risk assessments.
- Banks allocate responsibility to the First Line of Defense to ensure effective compliance, via, for example, supervisory reviews.
- Banks have committees or comparable governance bodies that oversee antitrust risk and compliance, including up to the level of the board of directors.

## GAP OR RISK ASSESSMENT

- Banks conduct periodic risk assessments that include antitrust risk and inform ongoing compliance program design and implementation.
- Banks have an internal auditing function that includes assessing compliance with antitrust laws and the effectiveness of the antitrust compliance program.
- Banks reassessed and enhanced their antitrust compliance programs in response to the GSE Bonds Litigation.
- Banks have processes or practices in place designed to evaluate and account for "lessons-learned," including implications of legal, regulatory, and judicial developments relating to antitrust.
- Banks evaluate opportunities to use new techniques and tools to further promote antitrust compliance.



© 2023 Hunton Andrews Kurth LLP. Attorney advertising materials. Hunton Andrews Kurth, the Hunton Andrews Kurth logo, HuntonAK and the HuntonAK logo are service marks of Hunton Andrews Kurth LLP. These materials have been prepared for informational purposes only and are not legal advice. This information is not intended to create (and receipt of it does not constitute) an attorney-client or similar relationship. Please do not send us confidential information. Past successes cannot be an assurance of future success. Whether you need legal services and which lawyer you select are important decisions that should not be based solely upon these materials. Photographs are for dramatization purposes only and may include models. Likenesses do not necessarily imply current client, partnership or employee status. Hunton Andrews Kurth LLP is a Virginia limited liability partnership. Contact: Samuel A. Danon, Managing Partner, Hunton Andrews Kurth LLP, 2200 Pennsylvania Avenue, NW, Washington, DC, 202.955.1500.

232255-06.23